**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SALLY CHAND, ET AL., | |
| Plaintiffs, | |
| v. | JURY TRIAL DEMANDED |
| MTN IRANCELL TELECOMMUNICATIONS SERVICES COMPANY, MTN GROUP LIMITED, PHUTHUMA NHLEKO, and IRENE CHARNLEY, | |
| Defendants. | Case No.: 22-cv-830 |

**COMPLAINT FOR VIOLATION
OF THE ANTI-TERRORISM ACT**

Ryan R. Sparacino (D.C. Bar No. 493700)
Eli J. Kay-Oliphant (D.C. Bar No. 503235)
Shuman Sohrn (*pro hac vice* pending)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com
shuman.sohrn@sparacinopllc.com

# TABLE OF CONTENTS

Page

A.   THE MTN DEFENDANTS..................................................................... 17

B.   THE INDIVIDUAL DEFENDANTS....................................................... 17

I.   SINCE THE ISLAMIC REVOLUTION IN 1979, THE Islamic Revolutionary
     Guard Corps, INCLUDING THE QODS FORCE, HAS FOMENTED AND
     SUSTAINED ANTI-AMERICAN TERRORISM .......................................... 19

A.   THE ISLAMIC REVOLUTIONARY GUARD CORPS HAS LONG
     SUPPORTED ANTI-AMERICAN TERRORISM AS PART OF IRAN'S
     FOREIGN POLICY................................. **ERROR! BOOKMARK NOT DEFINED.**

     1.   Islamic Revolutionary Guard Corps ......................**Error! Bookmark not defined.**

     2.   Hezbollah ...........................................................**Error! Bookmark not defined.**

     3.   Qods Force ..........................................................**Error! Bookmark not defined.**

II.  After 9/11, The islamic revolutionary guard corps, Including Hezbollah And The
     Qods Force, and its iraqi proxy jaysh al-mahdi, Allied With Al-Qaeda And The
     Taliban, Including its haqqani network, To Wage A Deadly Terrorist Campaign
     Against Americans In Iraq and Afghanistan in order to drive the united states out
     of the middle east ................................................................................ 42

A.   THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS
     FORCE, AND JAYSH AL-MAHDI WAGED A DEADLY TERRORIST
     CAMPAIGN AGAINST AMERICANS IN IRAQ, IRAN, SYRIA, YEMEN,
     AND LEBANON.................................................................................... 47

     1.   Jaysh al-Mahdi ........................................................................ 52

     2.   Asaib Ahl Al-Haq, A Jaysh Al-Mahdi Special Group.......................... 56

     3.   Ka'taib Hezbollah, A Jaysh Al-Mahdi Special Group.......................... 57

B.   THE IRGC'S, INCLUDING ITS HEZBOLLAH DIVISION'S AND QODS
     FORCE'S, AID TO JAYSH AL-MAHDI TO FACILITATE ATTACKS
     AGAINST AMERICANS IN IRAQ AND AFGHANISTAN .................................. 59

III. THE islamic revolutionary guard corps AND ITS TERRORIST PROXIES
     DEPENDED UPON ROBUST ACCESS TO UNITED STATES
     TECHNOLOGY, FINANCIAL MARKETS, AND PERSONS TO CARRY OUT
     ATTACKS AGAINST AMERICANS IN THE MIDDLE EAST .................................. 61

A.   AFTER THE U.S. INVASIONS OF AFGHANISTAN AND IRAQ, THE
     IRGC CONCLUDED THAT IT NEEDED TO REVOLUTIONIZE ITS

ACCESS TO SENSITIVE AMERICAN TECHNOLOGIES THROUGH CORRUPT CORPORATE ALLIES.................................................. 61

B.    THE ISLAMIC REVOLUTIONARY GUARD CORPS SECURED TERRORIST FUNDS, LOGISTICS, AND OPERATIONAL SUPPORT BY MILITARIZING THE IRANIAN TELECOMMUNICATIONS INDUSTRY AND SEIZING CONTROL OF IRAN'S LARGEST TELECOMMUNICATIONS COMPANIES............................................. 70

    1.    MTN Irancell ................................................................................. 71

    2.    Telecommunications Company Of Iran (TCI).................................. 73

C.    THE ISLAMIC REVOLUTIONARY GUARD CORPS RELIED UPON A TRANSNATIONAL NETWORK OF TERRORIST FINANCE, LOGISTICS, OPERATIONS, AND COMMUNICATIONS CELLS TO FUND, ARM, LOGISTICALLY SUSTAIN, AND FACILITATE ATTACKS AGAINST AMERICANS IN IRAQ ............................................................................. 74

    1.    United States ................................................................................. 75

    2.    U.A.E.; Iraq; Iran; Lebanon; Yemen; Syria; Afghanistan; Pakistan.................... 76

    3.    South Africa ................................................................................. 77

    4.    Europe ......................................................................................... 80

    5.    The Americas ............................................................................... 80

    6.    Southeast Asia.............................................................................. 80

IV.    DEFENDANTS TRANSACTED BUSINESS WITH FRONTS, OPERATIVES, AND AGENTS CONTROLLED BY THE Islamic Revolutionary Guard Corps, including hezbollah and the QODS FORCE .................................................. 81

A.    THE ISLAMIC REVOLUTIONARY GUARD CORPS, HEZBOLLAH, AND THE QODS FORCE OPERATE AS AN INTEGRATED TRANSNATIONAL TERRORIST ORGANIZATION WITH A COMMON DOCTRINE, STRATEGY, FINANCIAL STRUCTURE, LOGISTICS STRUCTURE, AND COMMAND-AND-CONTROL ............................................. 81

    1.    The Islamic Revolutionary Guard Corps' Transnational Terrorist Strategy, Doctrine, And Tactics Emphasizes The Deployment Of Joint Cells Of Terrorists Led By Hezbollah, Funded And Resourced By The Qods Force, And Supported By Local Iranian Terrorist Proxies ............................................. 81

    2.    The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division And Qods Force, Follow Common Terrorist Techniques, Tactics, And

Procedures And Use The Same Terrorist Tradecraft To Ensure
Concealment And Cover Around The World ....................................................... 82

    i.    Concealment............................................................................... 84

    ii.   Cover......................................................................................... 87

    iii.  Slush Funds For "Off-Books" Terrorist Finance ...................... 88

    iv.  Corruption As Terrorist Tactic And Tool ................................. 88

    v.   Required Donations (*Khums*) From All IRGC Members............................. 89

B.    THE TERRORIST TRADECRAFT AND DOCTRINE OF THE ISLAMIC
REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH
DIVISION AND QODS FORCE, HAS HISTORICALLY RELIED ON
FRONTS, OPERATIVES, AGENTS, CUT-OUTS, AND ORBITS TO
FUND, ARM, AND OPERATIONALLY SUPPORT IRAN'S ANTI-
AMERICAN TERRORIST PROXY ATTACKS AGAINST AMERICANS ........... 90

C.    THE ISLAMIC REVOLUTIONARY GUARD CORPS', INCLUDING
HEZBOLLAH'S AND THE QODS FORCE'S, TRANSNATIONAL
TERRORIST ENTERPRISE DEPENDED UPON COMPLICIT
MULTINATIONAL CORPORATIONS' WILLINGNESS TO TRANSACT
WITH KNOWN ISLAMIC REVOLUTIONARY GUARD CORPS FRONT
COMPANIES OPERATING IN IRAN'S MOBILE PHONE, LANDLINE,
INTERNET, AND NETWORK COMPUTING SECTORS ..................................... 94

    1.    The Bonyad Mostazafan Was, And Remains, A Front For The Islamic
Revolutionary Guard Corps, Including Hezbollah And The Qods Force............. 94

    2.    Iran Electronics Industries Was, And Remains, A Front For The Islamic
Revolutionary Guard Corps, Including Hezbollah And The Qods Force............. 97

    3.    MTN Irancell Was, And Remains, A Front For The Islamic Revolutionary
Guard Corps, Including Hezbollah And The Qods Force..................................... 98

    4.    The Telecommunications Company Of Iran Was, And Remains, A Front
For The Islamic Revolutionary Guard Corps, Including Hezbollah And
The Qods Force...................................................................................................... 99

    5.    Exit40 Was A Front For Hezbollah ................................................................. 101

V.    DEFENDANTS' TRANSACTIONS WITH FRONTS, OPERATIVES, AND
AGENTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS,
INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED
WEAPONS, FINANCING, LOGISTICAL, AND OPERATIONAL SUPPORT

TO THE IRGC'S SUNNI TERRORIST PROXIES IN IRAQ AND AFGHANISTAN ........................................................................ 102

A.    THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING HEZBOLLAH AND THE QODS FORCE, SOURCED ARMS, RAISED FUNDS, AND OBTAINED LOGISTICAL AND OPERATIONAL SUPPORT THROUGH ILLICIT CORPORATE TRANSACTIONS IN THE TELECOM, COMMUNICATIONS, AND INFORMATION TECHNOLOGY SECTORS ........................................................................ 102

B.    DEFENDANTS MADE ILLICIT DEALS WITH FRONTS, OPERATIVES, AGENTS, AND CUT-OUTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, THAT CAUSED SECURE AMERICAN SMARTPHONES, ENTERPRISE LEVEL SERVERS, NETWORK COMPUTING TECHNOLOGIES, AND WEAPONS TO FLOW THROUGH THE IRGC FRONTS TO REACH HEZBOLLAH, THE QODS FORCE, REGULAR IRGC, AND THEIR SUNNI TERRORIST PROXIES IN IRAQ AND AFGHANISTAN ........................................................................ 105

C.    DEFENDANTS MADE ILLICIT DEALS WITH FRONTS, OPERATIVES, AGENTS, AND CUT-OUTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, THAT CAUSED FUNDS TO FLOW THROUGH THE IRGC FRONTS TO HEZBOLLAH, THE QODS FORCE, AND THEIR SUNNI TERRORIST PROXIES IN IRAQ AND AFGHANISTAN .................................. 108

1.    Procurement Bribery ........................................................................ 108

2.    "Free Goods" ........................................................................ 110

3.    Exit40 ........................................................................ 112

i.    Exit40 Was An Islamic Revolutionary Guard Corps Finance And Logistics Front For Hezbollah And The Qods Force........................................... 112

ii.   Defendants Knowingly Used, Or Concealed The Use Of, Exit40 To Finance Hezbollah And The Qods Force........................................... 113

VI.   defendants provided direct aid to counterparties whom defendants KNEW WERE STRUCTURED TO FINANCE, ARM, AND/OR OPERATIONALLY SUPPORT hezbollah, the qods force, and the Islamic Revolutionary Guard Corps's terrorist proxies in iraq and afghanistan ........................................... 115

A.    MTN GROUP KNOWINGLY SERVED, AND STILL SERVE, AS A JOINT VENTURE PARTNER WITH MTN IRANCELL AND ITS IRANIAN SHAREHOLDERS, THE ISLAMIC REVOLUTIONARY GUARD CORPS,

INCLUDING HEZBOLLAH AND THE QODS FORCE, THROUGH MTN GROUP'S PARTICIPATION IN MTN IRANCELL ............................................... 116

1.   In 2005, MTN Group, Through Phuthuma Nhleko, Promised To Provide "Security" "Cooperation" To Hezbollah, The Qods Force, And Regular IRGC On Behalf Of MTN Group, Himself, And Every MTN Entity Worldwide When He Executed The IRGC's Security Cooperation Agreement On Behalf Of MTN Group and its affiliates .................................... 119

2.   After Executing The Islamic Revolutionary Guard Corps' Security Cooperation Agreement In 2005, MTN Group, Phuthuma Nhleko, and Irene Charnley Routinely Acted On Behalf Of, Or For The Benefit Of, Hezbollah, The Qods Force, And Regular IRGC ................................................ 127

B.   DEFENDANTS KNOWINGLY ASSUMED A FINANCIAL, LOGISTICAL, AND OPERATIONAL ROLE IN THE ISLAMIC REVOLUTIONARY GUARD CORPS', INCLUDING HEZBOLLAH'S AND THE QODS FORCE'S, TERRORIST ENTERPRISE AGAINST AMERICANS WORLDWIDE THAT FUNDED, ARMED, AND LOGISTICALLY SUSTAINED IRGC SUNNI TERRORIST PROXY ATTACKS IN IRAQ AND AFGHANISTAN ........................................................................... 138

1.   Defendants Assumed A Financial Role In The Terrorist Enterprise ................. 143

i.   Defendants Used "Orbits" To Transmit Bribes to Hezbollah, The Qods Force, And The Regular IRGC Through Payoffs To Purportedly Unrelated Third Parties .......................................................................... 143

ii.   Defendants Caused a $300 Million "License Fee" Payment To The Islamic Revolutionary Guard Corps Fronts That Controlled MTN Irancell, Flowing Tens Of Millions Of U.S. Dollars Through Such IRGC Fronts To Hezbollah, The Qods Force, And Their Sunni Terrorist Proxies In Iraq And Afghanistan ........................................................ 144

iii.   Defendants Caused Regular Large Cash Transfers To Flow Through MTN Irancell And Benefit Hezbollah And The Qods Force's Sponsorship Of Sunni Terrorist Proxies In Iraq And Afghanistan .................... 144

2.   Defendants Assumed An Operational Role In The Terrorist Enterprise ........... 146

C.   DEFENDANTS KNOWINGLY ASSUMED A FINANCIAL, LOGISTICAL, AND OPERATIONAL ROLE IN THE TALIBAN'S, INCLUDING THE HAQQANI NETWORK'S, TERRORIST ENTERPRISE IN AFGHANISTAN THAT FUNDED, ARMED, AND LOGISTICALLY SUSTAINED IRGC SUNNI TERRORIST PROXY ATTACKS IN IRAQ AND AFGHANISTAN ........................................................................... 161

1.   Defendants Facilitated Protection Payments To The Taliban............................ 162

2.      Defendants Supported The Taliban, Including Its Haqqani Network, By Deactivating MTN's Cellular Towers At Night ................................................. 169

3.      Defendants' Assistance To The Taliban, Including Its Haqqani Network, Substantially Assisted Islamic Revolutionary Guard Corps' Sunni Terrorist Proxy Attacks Against Americans In Iraq ........................................... 176

D.     DEFENDANTS' ASSISTANCE TO THE ISLAMIC REVOLUTIONARY GUARD CORPS INCLUDING HEZBOLLAH AND THE QODS FORCE, AND THEIR SUNNI TERRORIST PROXIES AL-QAEDA, AL-QAEDA-IN-IRAQ, ANSAR AL-ISLAM, AND THE TALIBAN, INCLUDING ITS HAQQANI NETWORK, COMPORTS WITH MTN'S HISTORICAL BUSINESS PRACTICES IN INTERNATIONAL MARKETS ............................. 178

1.      MTN Aided the Regular Islamic Revolutionary Guard Corps's Terroristic Violence Against Peaceful Iranian Pro-Democracy Demonstrators.................. 178

2.      MTN Aided Terrorists in Nigeria ...................................................................... 179

E.     DEFENDANTS' ASSISTANCE TO THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, HAD A SUBSTANTIAL NEXUS TO THE UNITED STATES.............. 180

1.      Defendants' Conduct Targeted The United States.............................................. 180

2.      Defendants' Conduct Relied On American Contacts ......................................... 184

i.       From 2012 Through 2019, Defendants Regularly Reached Into America To Unlock The U.S. Financial System So That Defendants Could Aid MTN Group's Attempts To Repatriate Hundreds Of Millions Of Dollars Out Of MTN Irancell ........................................................................................... 185

ii.      Defendants Facilitated A $400,000 Bribe That Flowed Through The New York Financial System To A Cut-Out For The Islamic Revolutionary Guard Corps And Into The Budget Of The IRGC ............................................. 188

iii.     Defendants Conspired To Provide, And Did Provide, A Stable, Robust, And Devastating Pipeline Of Illicitly Acquired State-of-the-Art American Technologies To The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force, Including Untraceable American Smartphones......................................................................................................... 189

iv.     Defendants Worked Directly With Hezbollah And Qods Force Operatives To Facilitate Hezbollah's And the Qods Force's Illicit Acquisition Of U.S. Technology To Benefit Their Terrorist Enterprise ............................................. 191

v.     Defendants Facilitated Illicit Efforts By Hezbollah And Qods Force Fronts To Obtain Essential U.S. Services That Was Vital To Hezbollah's, The Qods Forces, And Their Proxies' Terrorist Campaign. ...................................... 191

VII.   DEFENDANTS KNEW THAT THEIR Secret security cooperation AGREEMENT with the irgc, including its hezbollah division and qods force, WAS AN ACT OF international TERRORISM THAT SUBSTANTIALLY ASSISTED terrorist attacks against AMERICANS BY HEZBOLLAH, THE QODS FORCE, AND TERRORIST PROXIES ............................................................. 193

A.    DEFENDANTS KNEW THAT THEIR SECRET SECURITY COOPERATION AGREEMENT WITH THE IRGC WAS AN ACT OF INTERNATIONAL TERRORISM BECAUSE DEFENDANTS KNEW THAT IRAN'S "SECURITY" MISSION COMPRISED INTERNAL AND EXTERNAL ATTACK OPERATIONS AGAINST AMERICANS BY HEZBOLLAH, THE QODS FORCE, AND THEIR PROXIES ............................. 193

B.    DEFENDANTS KNEW THAT THEIR SECRET SECURITY COOPERATION AGREEMENT WITH THE IRGC WAS AN ACT OF INTERNATIONAL TERRORISM BECAUSE DEFENDANTS KNEW THAT THE AMERICAN SMARTPHONES AND OTHER U.S.-ORIGIN COMMUNICATIONS TECHNOLOGIES THAT DEFENDANTS ILLICITLY ACQUIRED FOR, AND TRANSFERRED TO, THE IRGC SUBSTANTIALLY ASSISTED TERRORIST ATTACKS AGAINST AMERICANS ...................................................................................... 207

C.    DEFENDANTS KNEW THAT THEIR SECRET SECURITY COOPERATION AGREEMENT WITH THE IRGC WAS AN ACT OF INTERNATIONAL TERRORISM BECAUSE DEFENDANTS KNEW THAT THE ILLICIT COMMERCIAL TRANSACTIONS THAT DEFENDANTS FACILITATED WITH, ON BEHALF OF, OR FOR THE BENEFIT OF, IRGC FRONTS, OPERATIVES, AGENTS, AND CUT-OUTS SUBSTANTIALLY ASSISTED TERRORIST ATTACKS AGAINST AMERICANS ...................................................................................... 210

D.    DEFENDANTS KNEW THAT THEIR SECRET SECURITY COOPERATION AGREEMENT WITH THE IRGC WAS AN ACT OF INTERNATIONAL TERRORISM BECAUSE DEFENDANTS KNEW THAT THEIR SERVICE AS A KEY GLOBAL FACILITATOR, MANAGEMENT CONSULTANT, FINANCIAL PLANNER, WEAPONS PROCURER, LOGISTICIAN, CELL PHONE AND COMPUTING TECHNOLOGY PROVIDER, RECRUITER, FUNDRAISER, STRATEGIC COMMUNICATIONS PROVIDER, AND DISINFORMATION AGENT FOR THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, WHICH DEFENDANTS KNEW SUBSTANTIALLY ASSISTED ATTACKS AGAINST AMERICANS .................................................................... 215

1.      Defendants Knew That Their Secret Security Cooperation Agreement Revolutionized The IRGC's Command, Control, Communications, And Intelligence Capabilities..................................................................... 221

2.      Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Finance Terrorist Attacks Against Americans..................... 224

        i.    Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Finance Terrorist Attacks Against Americans Through The Illicit Cash Flow That Defendants Caused To Course Through MTN Irancell To The IRGC For Its Terrorist Operations Budgets............................................................................. 224

        ii.   Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Finance Terrorist Attacks Against Americans Through Illicit Off-Books Cash Flow From Fundraising Campaigns, Procurement Bribes, Khums, Financial Management, And Fronts Like Exit40 ............................................................. 229

3.      Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Source Weapons To Commit Terrorist Attacks Against Americans ..................................................................................... 230

        i.    Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Source Improvised Explosive Devises (IEDs)............................................................................................ 230

        i.    Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Source Rockets .................................... 231

4.      Defendants Knew That Their Secret Security Cooperation Agreement Amplified The IRGC's Recruiting, Fundraising, Strategic Communications, And Disinformation Campaigns, Which Defendants Knew Facilitated IRGC Terrorist Operations Against Americans ................... 231

        i.    Defendants Knew That Their Secret Security Cooperation Agreement Aided The IRGC's Recruiting and Fundraising Campaigns............ 232

        ii.   Defendants Knew That Their Secret Security Cooperation Agreement Aided The IRGC's Strategic Communications and Disinformation ................................................................................ 235

VIII.   the funds, arms, technologies, and services that defendants illicitly transferred to hezbollah and the qods force through mtn irancell flowed on, through hezbollah and the qods force, to al-qaeda, al-qaeda-in-iraq, and ansar-al-islam, and caused the attacks in iraq that killed and injured plaintiffs............**Error! Bookmark not defined.**

A.    THE IRGC PROVIDED MATERIAL SUPPORT AND RESOURCES TO AL-QAEDA-AFFILIATED SUNNI TERRORISTS TARGETING AMERICANS IN IRAQ TO UNDERMINE THE U.S. MISSION THERE ..**ERROR! BOOKMARK NOT DEFINED.**

B.    THE IRGC PROVIDED MATERIAL SUPPORT AND RESOURCES TO AL-QAEDA TO FACILITATE AL-QAEDA-RELATED TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ AND AFGHANISTAN.....**ERROR! BOOKMARK NOT DEFINED.**

    1.    The IRGC Established Al-Qaeda's Capabilities Before 9/11, Prevented Its Collapse After 9/11, And Ensured Its Status As An IRGC Sunni Terrorist Proxy In Iraq From 2001 Through Today..............**Error! Bookmark not defined.**

    2.    The IRGC Established Al-Qaeda-In-Iraq As An Iranian Sunni Terrorist Proxy In Iraq .........................................................**Error! Bookmark not defined.**

    3.    The IRGC Established Ansar Al-Islam As An Iranian Sunni Terrorist Proxy In Iraq .........................................................**Error! Bookmark not defined.**

C.    THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED IRGC SUNNI TERRORIST PROXIES WITH WEAPONS, EXPLOSIVES, AND LETHAL SUBSTANCES .....................**ERROR! BOOKMARK NOT DEFINED.**

D.    THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED IRGC IRAQI SUNNI TERRORIST PROXIES WITH LODGING, TRAINING, EXPERT ADVICE OR ASSISTANCE, SAFEHOUSES, PERSONNEL, AND TRANSPORTATION.......................**ERROR! BOOKMARK NOT DEFINED.**

E.    THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED IRGC IRAQI SUNNI TERRORIST PROXIES WITH FINANCIAL SUPPORT ......................... **ERROR! BOOKMARK NOT DEFINED.**

IX.    the funds, arms, technologies, and services that defendants illicitly transferred to hezbollah and the qods force through mtn irancell flowed on to the joint cells and jaysh al-mahdi and caused the attacks in iraq that killed and injured plaintiffs ............. 241

A.    HEZBOLLAH CREATED JAYSH AL-MAHDI AND JAYSH AL-MAHDI SPECIAL GROUPS ASAIB AHL AL-HAQ AND KA'TAIB HEZBOLLAH....... 241

B.    ACTING THROUGH HEZBOLLAH, THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, PROVIDED JAYSH AL-MAHDI WITH THE WEAPONS USED TO ATTACK AMERICANS IN IRAQ............................................................................................................... 248

C.    ACTING THROUGH HEZBOLLAH, THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, PROVIDED JAYSH AL-MAHDI WITH KEY TRAINING AND LOGISTICAL SUPPORT TO ATTACK AMERICANS IN IRAQ ......................................................................... 251

D.    ACTING THROUGH HEZBOLLAH, THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, ROUTED FUNDS TO JAYSH AL-MAHDI TO FINANCE ATTACKS AGAINST AMERICANS IN IRAQ ......................................................................................................... 256

X.    HEZBOLLAH, THE QODS FORCE, AND JAYSH AL-MAHDI KILLED AND INJURED THE PLAINTIFFS WHO WERE ATTACKED IN IRAQ THROUGH TERRORIST ATTACKS THAT DEFENDANTS FUNDED, ARMED, AND LOGISTICALLY SUSTAINED ................................................................. 266

A.    THE AUGUST 17, 2007 ATTACK IN BASRA (THE CHAND FAMILY AND ESTATE) ...................................................................................... 268

B.    THE AUGUST 2, 2005 KIDNAPPING ATTACK IN BASRA (THE VINCENT FAMILY AND ESTATE) ..................................................... 271

C.    THE SEPTEMBER 26, 2005 EFP ATTACK IN BAGHDAD (THE TULSA T. TULIAU FAMILY) ................................................................. 272

D.    THE JANUARY 16, 2006 EFP ATTACK IN BAGHDAD (THE SAMUEL E. PARLIN, JR. FAMILY) .................................................................. 273

E.    THE JANUARY 18, 2006 EFP ATTACK IN BASRA (THE RICHARD HICKMAN FAMILY) ................................................................. 275

F.    THE FEBRUARY 20, 2006 EFP ATTACK IN BAGHDAD (THE DANIEL J. KUHLMEIER FAMILY AND ESTATE) .............................................. 277

G.    THE FEBRUARY 20, 2006 EFP ATTACK IN KARBALA (THE JAY T. COLLADO FAMILY AND ESTATE AND THE JUSTIN WALDECK FAMILY) ........................................................................................ 279

      1.    The Jay T. Collado Family and Estate ............................................. 280

      2.    The Justin Waldeck Family .............................................................. 281

H.    THE MAY 6, 2006 EFP ATTACK IN DIWANIYAH (THE DAVID M. VEVERKA FAMILY) ..................................................................... 281

I.    THE JULY 15, 2006 EFP ATTACK IN BAGHDAD (THE ANDRES J. CONTRERAS FAMILY) ..................................................................... 283

J.     THE JULY 15, 2006 EFP ATTACK IN BAGHDAD (THE ANDRES J.
        CONTRERAS FAMILY) ....................................................................................... 284

K.     THE OCTOBER 22, 2006 EFP ATTACK IN BAGHDAD (THE FAMILIES
        OF DAVID G. TAYLOR, JR., BRIAN G. TAYLOR, KARAR ADEL
        ALABSAWI, JAMES GMACHOWSKI, JUDAS E. RECENDEZ ) ...................... 286

        1.     The David G. Taylor, Jr. Family and Estate ........................................ 287

        2.     The Karar Adel Alabsawi Family ......................................................... 288

        3.     The Judas E. Recendez Family ............................................................. 288

        4.     The Brian G. Taylor Family.................................................................. 289

        5.     The Tyler Norager Family .................................................................... 289

        6.     The James Gmachowski Family ........................................................... 289

L.     THE NOVEMBER 13, 2006 IN BAGHDAD (THE KURTISS LAMB
        FAMILY).............................................................................................................. 290

M.     THE NOVEMBER 16, 2006 CRESCENT SECURITY ATTACK IN BASRA
        (THE FAMILIES OF JONATHON COTÉ, JOSHUA MUNNS, PAUL
        JOHNSON-REUBEN, AND JOHN ROY YOUNG)............................................... 291

        1.     The Coté Family and Estate.................................................................. 294

        2.     The Joshua Munns Family .................................................................... 295

        3.     The Paul Johnson-Reuben Family ........................................................ 295

        4.     The John Roy Young Family ................................................................. 297

N.     THE JANUARY 5, 2007 KIDNAPPING ATTACK IN BASRA ATTACK IN
        BASRA (THE ALEXANDER FAMILY AND WITHROW ESTATE)................. 298

O.     THE RYAN FAMILY ............................................................................................ 299

P.     THE LANDECK FAMILY .................................................................................... 301

Q.     THE THOMAS FAMILY AND ESTATE .............................................................. 301

R.     THE FUENTES FAMILY AND ESTATE ............................................................. 304

S.     THE KIRBY FAMILY ........................................................................................... 305

T.     THE MURPHY-SWEET FAMILY........................................................................ 306

U. THE HOLDEN FAMILY ...................................................................................... 307

V. JARED STEVENS................................................................................................... 307

W. JEREMY SMITH.................................................................................................... 308

X. THE STEPHENS FAMILY ..................................................................................... 309

Y. THE PACKER FAMILY .......................................................................................... 310

Z. TAMMY DENBOER ............................................................................................... 311

AA. BRANDEAUX CAMPBELL .................................................................................. 312

BB. THE WILSON FAMILY .......................................................................................... 312

CC. DENISE JACKSON ................................................................................................ 313

DD. JOHNNY CASTILLO .............................................................................................. 314

EE. THE CRAIG FAMILY ............................................................................................. 314

FF. THE TUTWILER FAMILY ...................................................................................... 315

GG. MATTHEW MERGELE .......................................................................................... 316

HH. TAUSOLO AIETI .................................................................................................... 316

II. THE BOUTEN FAMILY ......................................................................................... 317

JJ. TAMMY KINNEY................................................................................................... 317

KK. THE PRICE FAMILY .............................................................................................. 318

LL. COL DANIEL DUDEK............................................................................................ 319

MM. THE NEIBERGER FAMILY ................................................................................... 320

NN. THE CASEY FAMILY ............................................................................................ 321

OO. THE LOONEY FAMILY ......................................................................................... 322

PP. MARIO BOWEN..................................................................................................... 322

QQ. MICHELE WHITE.................................................................................................. 323

RR. JOSHUA WOLD ..................................................................................................... 323

SS. THE MIXSON FAMILY.......................................................................................... 324

TT.    THE MURRAY FAMILY ....................................................................... 325

UU.    THE REEVES FAMILY ........................................................................ 326

VV.    CHARLES GREGSTON ...................................................................... 327

WW.    THE OLGUIN FAMILY AND ESTATE.............................................. 328

XX.    THE JUNEAU FAMILY AND ESTATE ............................................. 329

YY.    THE SHAW FAMILY........................................................................... 330

ZZ.    THE DOHENY FAMILY ...................................................................... 331

AAA.   TANYA EVRARD ............................................................................... 332

BBB.   BILLY JOHNSON................................................................................ 333

CCC.   THE LUKOW FAMILY ....................................................................... 334

DDD.   THE WEST FAMILY........................................................................... 335

EEE.   ANTHONY M. GERBER ..................................................................... 335

FFF.   THE HANLEY FAMILY ...................................................................... 336

GGG.   THE PATRICK MILLER FAMILY ..................................................... 337

HHH.   JIMMY CONNOLLY........................................................................... 338

III.    CARL REIHER .................................................................................... 339

JJJ.    THE ROBINSON FAMILY .................................................................. 340

KKK.   THE VON LETKEMANN FAMILY .................................................... 341

LLL.   THE VAUGHN FAMILY ..................................................................... 342

MMM.  THE BILLITER FAMILY..................................................................... 343

NNN.   THE BOGART FAMILY ...................................................................... 343

OOO.   THE ROSA FAMILY ........................................................................... 344

PPP.   THE THOMSEN FAMILY ................................................................... 345

QQQ.   THE FARINA FAMILY........................................................................ 346

RRR.   ADAM MAGERS................................................................................. 347

SSS.   LUIS GARZA ................................................................................................... 348

TTT.   THE WOODARD FAMILY .............................................................................. 348

UUU.  THE TUCKER FAMILY AND ESTATE ............................................................ 349

VVV.   THE DAGGETT FAMILY .............................................................................. 351

WWW.      THE FARLEY FAMILY .......................................................................... 352

XXX.   THE SUVEGES FAMILY AND ESTATE ........................................................ 353

YYY.  THE CONNELLY FAMILY .............................................................................. 354

**INTRODUCTION**

1.     This lawsuit seeks damages under the federal Anti-Terrorism Act (the "ATA") on behalf of American service members and civilians, and their families, who were killed or wounded while serving their country in Iraq between 2006 and 2010.  Plaintiffs seek to hold five defendants affiliated with a South African telecom company, MTN Group, accountable for their substantial assistance to multiple Foreign Terrorist Organizations targeting Americans in Iraq.

2.     Plaintiffs' allegations are based on information derived from confidential witnesses with direct and indirect knowledge of the alleged facts, internal company documents, declassified military-intelligence reporting, congressional testimony and reports, press accounts, and Plaintiffs' recollections.

3.     MTN Group is a large multinational company that had lucrative business with Iranian entities that MTN knew served as fronts for terrorist finance and logistics, and MTN engaged in illicit, terrorism-sanctions-busting transactions with known terrorist fronts in order to boost their profits.  Those transactions aided and abetted terrorism by directly funding, arming, and logistically supporting a terrorist campaign that stretched for more than a decade, killing and injuring thousands of Americans.

4.     This case reveals conduct that is far more depraved than even the ordinarily culpable ATA defendant.  No other ATA defendant has ever been credibly accused of the full spectrum of behavior identified in this Complaint.  MTN directly contracted with known fronts for designated terrorist organizations.  In serving as a full-spectrum telecommunications and computing partners for Iran's Islamic Revolutionary Guard Corps (the "IRGC"), and thereby the world's worst terrorist groups, Defendants aided *every* facet of the IRGC's terrorist enterprise.

5.     Since 2005, MTN Group has served as the junior partner in a joint venture with Iran's Islamic Revolutionary Guard Corps, including Hezbollah and the Qods Force, through the

1

MTN Irancell consortium between MTN Group (through an MTN corporate buffer) and the Hezbollah and the Qods force (through two notorious IRGC fronts).

6.      For 17 years, MTN Group happily, openly, and notoriously aided the IRGC even while understanding that it was a United States-designated terrorist group.  The U.S. designated the Qods Force – one of MTN Group's effective joint venture partners in MTN Irancell – a Specially Designated Global Terrorist ("SDGT") in 2007; MTN Group responded by expanding its joint venture and publicly lecturing the United States.  From 2009 through 2012, the U.S. intensified the counter-terror sanctions against the IRGC, Hezbollah and the Qods Force; MTN Group responded by devising workarounds for the IRGC to keep the cash flowing.

7.      In 2019, the United States designated MTN's true joint venture partner, the IRGC, as a Foreign Terrorist Organization ("FTO").  Yet MTN Group persists in its aid to MTN Irancell even now.  Today, MTN Group defiantly continues to openly partner with an FTO in an unprecedented act of defiance towards the Anti-Terrorism Act.

8.      MTN Group, Phuthuma Nhleko, and Irene Charnley provided material support to the terrorists and committed themselves, and every MTN entity worldwide, to serving as a global logistics, financial, operational, and technical super-cell for MTN's terrorist business partners, including Hezbollah, the Qods Force, Regular IRGC, and their proxies, by agreeing to assure MTN's provision of "Security" "Cooperation" to their "Iranian Shareholders" – which Defendants knew to be a euphemism that meant supporting the IRGC's industrial scale exportation of terror targeting Americans around the world, but most of all, in the two countries flanking Iran to its west (Iraq) and east (Afghanistan)

9.      MTN Group, Phuthuma Nhleko, and Irene Charnley aided Hezbollah, the Qods Force, and their proxies each time they supplied the IRGC and its proxies with money and cash

equivalents, technical goods like cell phones and telecom infrastructure, technical support as joint ventures with and contractual counterparties to known IRGC fronts, techniques for evading U.S. sanctions in order to do so, as well as each time Defendants attempted to obfuscate their (or other MTN Group persons') respective roles.  When Defendants engaged in such conduct, they facilitated IRGC-sponsored attacks against Americans in Iraq and Afghanistan and furthered the terrorists' shared goal to expel Americans from Iraq and Afghanistan.

10.     MTN Group, Phuthuma Nhleko, and Irene Charnley acted in furtherance of the IRGC's terrorist scheme in open, obvious, programmatic, and enduring ways for well over a decade.  In so doing, MTN Group, Phuthuma Nhleko, and Irene Charnley were one in spirit with their IRGC terrorist partners because each calculated that if they remained aligned with the interests of their partners' "Iranian Shareholders" – fronts for the IRGC – MTN Group would reap billions in easy profits by seizing a monopoly in one of the world's fastest-growing and youngest potential subscriber pools, and Mr. Nhleko and Ms. Charnley, in turn, would collectively earn at least tens of millions (in U.S. Dollar value) of compensation from MTN Group and its affiliates.

11.     Seasoned investors, however, know that any time one shareholder's investment does well, that means somewhere out there is another shareholder on the opposite side of the issue, for whom the investment went badly.  For every shareholder who wins, there must be another shareholder in the world who loses.  But this is not a case about trading shares on the NASDAQ.  In this case, while the Iranian Shareholders "won," the "shareholders" who "lost" were not day traders who got crushed making an unwise stock pick.  They were the Plaintiffs, and others:  patriotic American servicemembers and civilians who volunteered for hard, thankless jobs on the other side of the world in Iraq and Afghanistan.  Some returned, badly

injured.  Some never came back at all.  None will ever be the same again.  Defendants played an enormous role in the sequence of events that led to this outcome.  Plaintiffs are among the victims. This lawsuit followed.

12.     MTN Group, Phuthuma Nhleko, and Irene Charnley knew that their outsized profits came at a price—the vast amounts of American bloodshed in Iraq and Afghanistan that was sure to follow Defendants' decision.  Given their history, Defendants plainly concluded that scores of American deaths and grievous injuries every month in Iraq and Afghanistan for nearly two decades was an acceptable price to pay to yield a profitable outcome for MTN's own shareholders, the "Iranian Shareholders" with whom MTN Group was partnered, and Mr. Nhleko and Ms. Charnley individually.

13.     It is impossible to overstate the magnitude of MTN Group's, Phuthuma Nhleko's, and Irene Charnley's defilement of the Anti-Terrorism Act.  MTN Group's conduct reflects most depraved, expansive, deceitful, and persistent international corporate conspiracies since the end of World War II.  There is little doubt that Defendants changed the trajectory of Afghanistan, Iraq, and countless other countries.

14.     This Anti-Terrorism Act lawsuit outlines the unprecedented nature of MTN Group's conduct, and Plaintiffs' allegations likely remain the tip of the iceberg.  Simply put, no corporate or individual defendant in the history of the Anti-Terrorism Act has ever engaged in conduct as comprehensively violative, for more money, over a longer period, with a more violent counterparty, in a more open and notorious manner, with more devastating consequences, while demonstrating a greater sense of corporate impunity than Defendants.  During all (with respect to the MTN corporate defendants) and most (with respect to the individual defendants) of the seventeen (17) years since 2005 when Defendants MTN Group, funded, partnered with, and

helped develop the technical capabilities for the world's worst terrorist organization – the IRGC – by entering into deals with notorious fronts for the IRGC and pledging to assist with Iran's "security" agenda – all while fraudulently concealing it from MTN Group's shareholders.

15.     MTN Group is one of the worst corporate sponsors of terrorism in the history of the ATA.  As a result, this case is likely to be different than a typical ATA case because of what Defendants have done, and this Complaint is longer than many ATA complaints.  MTN each funneled hundreds of millions in value to the terrorists in nearly every conceivable modality of terrorist fund transfer:  direct transactions with FTO fronts while knowing (and not caring) about the FTO relationship; illicit acquisition of valuable American technologies; procurement bribes; "free goods" kickbacks; black market purchasing; cash flow from the companies; and so on.

16.     The evidence regarding Defendants' intent is even worse.  Defendants made shocking admissions in writing, and then destroyed everything to try to cover their tracks (none succeeded completely).  Some Defendants lied to federal law enforcement.  Witness intimidation was common.  Innocent Canadians were kidnapped to extort the United States and Canada.

17.     MTN's conduct, spending amount, and terrorist tradecraft is startlingly like how a State Sponsor of Terrorism acts—hundreds of millions of dollars in direct funding to terrorists, critical technical support that aids their victory, given with the hope that it will occur, and a commitment to never-ending lies, falsehoods, and deceptions no matter how much evidence accumulates or how ridiculous it becomes.

18.     MTN may have learned this "never stop lying" tactic at the feet of their client, the IRGC, which is notorious amongst national security professionals for, in effect, being some of the world's most persistent long-term liars, capable of sustaining a lie for decades.  MTN made similar choices.

19.     MTN Group continues to openly conspire with multiple FTOs in plain sight.  This is not normal, nor is it acceptable, but it is damning proof that MTN Group, Phuthuma Nhleko, and Irene Charnley intended to provide material support to designated terrorists all along.

20.     MTN Group is currently the joint venture partner of known fronts for an FTO so committed to terror that it midwifed, and controlled thereafter, a mine run of additional FTOs: Hezbollah (FTO); Jaysh al-Mahdi Special Group Ka'taib Hezbollah (FTO); Jaysh al-Mahdi Special Group Asaib Ahl al-Haq (FTO); al-Qaeda-in-Iraq (FTO); and Ansar-al-Islam (FTO).

21.     MTN Group, Phuthuma Nhleko, and Irene Charnley, are unrepentant about their embrace of FTO terrorist fronts for cash, even though: (i) on March 28, 2012, a whistleblower heroically exposed Defendants' secret Security Cooperation Agreement with the IRGC and associated illicit transactions, through a lawsuit filed by MTN's competitor, Turkcell, which resulted in MTN Group's public humiliation in South Africa after the formerly iconic company became a subject of national mockery that year; (ii) in 2019, being sued by hundreds of American victims of terrorist attacks in Afghanistan under the ATA concerning MTN's protection payments in Afghanistan; and (iii) in 2021, being sued by more than 50 American victims of terrorist attacks in Iraq from 2011 through 2015 before (iv) being sued by Plaintiffs in the instant case.

22.     Why would a publicly traded South African company like MTN Group do this?  Money.  MTN Irancell, the joint venture at issue, is MTN Group's cash cow and is, depending on metrics, either the second or third largest subscriber market in MTN Group's entire global portfolio.  MTN Group concluded that it and its shareholders could reap billions of dollars in profits and lock in the single best international telecoms market opportunity in decades if it could achieve a meeting of the minds with the Iranian Shareholders who controlled Irancell.

6

23.     To make billions of dollars running the phone and internet system in partnership with these people, MTN Group had to fully commit itself worldwide to corporate criminality on an almost impossible to comprehend scale.  MTN provided unprecedented aid to terrorists:

- a secret, undisclosed, direct, written, terrorist joint venture agreement signed by an active, senior-ranking Iranian terrorist, on the one hand, and the CEO of one of Africa's largest publicly traded companies, on the other;

- direct contractual obligations with Iranian entities known to be owned and controlled by fronts for the IRGC, whereby substantial banned technology useful to terrorists was transferred, and entire telecommunication systems used by the terrorist conspirators were assembled, used, and maintained;

- a nearly two decade-long terrorist scheme that operationalized the secret deal into a technological, financial, services, and communications supply chain for the world's worst transnational terrorist organization;

- a large publicly traded company that refuses, even now, to exit its agreement with the IRGC, even after it has been publicly outed and even after the IRGC was designated as an FTO; and

- shocking bribery including tens of millions of "free goods" bribes designed to be diverted by terrorists to the black market, and large U.S. Dollar wire transfers after the bribe recipient performed his or her illicit deed.

24.     After the U.S.-led invasions of Afghanistan in 2001 and Iraq in 2003, an alliance of Shiite terrorists led by Hezbollah and its Iraqi proxy, Jaysh al-Mahdi, and funded and armed by the IRGC including its subordinate international "security" branch Qods Force and its subordinate Lebanese Hezbollah Division ("Hezbollah Division" or "Division"), combined forces to pursue a shared terrorist campaign against Americans in Iraq.

25.     The IRGC's ambitions did not stop at Iraq.  As the IRGC grew, it intensified the terror campaign in Afghanistan as well, led by al-Qaeda and its long-time ally, the Taliban.

26.     To attack the citizens protected by the world's most powerful military in Iraq and Afghanistan after 2003, the IRGC, including the Hezbollah Division and Qods Force, organized

a transnational terrorist alliance – a NATO for terrorists – that included both Shiite and Sunni groups, and stretched throughout the Middle East, from Syria to Afghanistan.

27.     In Iraq, the IRGC's Hezbollah Division was responsible for standing up a grand Iraqi Shiite terror group explicitly modeled after Lebanese Hezbollah; Hezbollah succeeded and midwifed what became Jaysh al-Mahdi (or the Mahdi Army), the notorious Shiite terrorist group and Hezbollah proxy in Iraq that was led by Muqtada al-Sadr and responsible, along with Hezbollah and the Qods Force – with whom Jaysh al-Mahdi was effectively fused, through the Joint Cells, in key geographies like Baghdad and Basra – for killing more than 500 Americans in Iraq.  Thereafter, IRGC-backed Shiite terrorists in Iraq formed joint cells comprised of operatives from Jaysh al-Mahdi, Hezbollah, and Qods Force terrorists ("Joint Cells"), which attacked civilians indiscriminately; conducted kidnappings, torture, and executions; and refused to comply with the Geneva Conventions.

28.     The IRGC's terrorist ambitions against Americans in Iraq did not end with the Joint Cells.  Instead, the IRGC unleashed a second terrorist campaign against Americans throughout the country, which was conducted by al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam. Qassem Soleimani's "sinister genius" was his recognition that the universal hatred of Americans and Israelis among Islamist terrorists in the Middle East could, when properly wielded, be turned into a sharp weapon for the IRGC to wield against the U.S. in the Middle East by furnishing a large additional source of terrorists to deploy against Americans throughout the region.

29.     In Afghanistan, the IRGC sponsored a nationwide terrorist campaign targeting Americans there by funding, arming, training, logistically sustaining, and providing havens to, among others, al-Qaeda and the Taliban, including its Haqqani Network.  Like Hezbollah and the

Qods Force, al-Qaeda, the Taliban, and their allies also followed a similar Joint Cells approach in their efforts to form their own terrorist analogue to NATO.

30.    In the twenty years between 9/11 and the American withdrawal from Afghanistan, Islamist terrorists formed their own grand alliance:  a NATO for terrorists.  This terrorist alliance comprised nearly a dozen FTOs and SDGTs associated with Iraq, Iran, Lebanon, the U.A.E., Afghanistan, and Pakistan, which Plaintiffs identify by designation and year:  **Hezbollah** (FTO-1997); **Qods Force** (SDGT-2007; FTO-2019), and **Regular IRGC** (FTO-2019), which collaborated closely with long-time allies **Jaysh al-Mahdi** (considered an FTO for immigration purposes), **al-Qaeda** (FTO-1999), **Ansar al-Islam** (FTO-2001), the **Taliban** (SDGT-2001), including its **Haqqani Network** (SDGT-2001, FTO-2012) – both of which were substantially led by dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani (individually designated an SDGT-2008), all in order to pursue their shared goal of killing as many Americans as possible in Iraq and Afghanistan in order to drive the U.S. out of the Middle East.

31.    To prosecute a grinding, global terrorist campaign against Americans in Iraq and Afghanistan, Hezbollah, the Qods Force, Jaysh al-Mahdi, al-Qaeda, the Taliban, and the IRGC's other FTO proxies above operated a latticework of cells arrayed across six continents.  The grim result:  more than 4,000 Americans were killed in terrorist attacks in Iraq and Afghanistan by designated terrorist groups that were funded, armed, and logistically sustained by Hezbollah, the Qods Force, Regular IRGC, al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and the Taliban, including its Haqqani Network.

32.    While Plaintiffs, or their loved ones, worked to stabilize Iraq nearly a decade after the U.S. invasion, and Afghanistan on the eve of the terrorists' victory there, they were attacked by U.S. Government-designated terrorist organizations that participated in an Iran-backed,

Hezbollah-led terrorist campaign that MTN's transactions helped finance, arm, logistically support, conceal, and upgrade.

33.     MTN helped revolutionize the efficiency of the Big Data management practices and capabilities of Hezbollah and the Qods Force, in addition to the "regular" IRGC inside of Iran.  It is impossible to overstate the scale of the carnage that followed Defendants' decision to midwife the IRGC into the modern, networked, Big Data world.

34.     Prior to Defendants, the IRGC had the will but not the modern gear.  While the IRGC had the scale of a global multinational corporate behemoth – tens of thousands of personnel, consultants, agents, and partners, distributed across dozens of countries on six continents – the IRGC lacked even rudimentary network and computing technologies.

35.     By 2004, the IRGC was surrounded on both flanks by "the Great Satan," and the enormous technological gap between the IRGC and its mortal enemy – the "Big Data Gap" – forced the IRGC to do something drastic, which it had never done before:  bring in foreign companies to revolutionize Iran's computing and telecommunications infrastructure.

36.     Two problems, however, still confronted the IRGC.  *First*, the IRGC knew that most large technology companies would have nothing at all to do with them.  The IRGC also knew what any intelligence operative knows:  that large telecom and networking computing companies come from an exceptionally ethical industry that has never experienced a major terrorist finance scandal and are internationally notorious within the telecoms industry for being unabashed patriots.

37.     *Second*, and worse still, if the IRGC wanted to acquire the key technologies that it had determined were essential to prosecuting its terror campaign, it could not avoid an outcome in which the IRGC, indirectly, needed to reach into America's markets, and acquire embargoed

dual-use technologies on an industrial scale while surmounting three separate detection hurdles, in a race where any stumble would likely result in the exposure of the entire scheme.

38.     The solution to both?  Find some corporate criminals, bring them all the way into the circle of trust, and count on their limitless greed.  Enter, Defendants.  Since 1979, the IRGC has always sought to kill Americans in large numbers.  What it lacked was not the will, but the capability.  After 9/11, the story remained the same – until MTN answered the IRGC's call for multinational corporate assistance to the "security" operations of Hezbollah and the Qods Force.

39.     What the IRGC had never had – until Defendants – were true, established multinational corporate criminal partners.  And Defendants furnished the IRGC with three: MTN Group (a criminal Multinational Corporation partner), Phuthuma Nhleko (a criminal CEO partner), and Irene Charnley (a criminal Commercial Director partner).  One has been raided (MTN Group), and the other two (Mr. Nhleko and Ms. Charnley), on information and belief, were and/or are the subject of one or more law enforcement investigations concerning their conduct while employed by MTN Group.

40.     After 9/11, the IRGC coordinated a grand alliance of Islamist terrorists to attack Americans in the Middle East.  On the eve of the U.S. invasion of Iraq, the IRGC and Hezbollah agreed to prepare, instigate, and sustain a nationwide campaign of terror against Americans in Iraq, which was planned and authorized by the IRGC's lead foreign terror agent, Hezbollah.  To sustain an ever-escalating terrorist campaign against the United States in Iraq, and later Afghanistan, Iran relied upon Hezbollah, which, in turn, depended upon IRGC funding and illicitly sourced gear from a constellation of IRGC, including Qods Force, and Hezbollah terrorist fundraising and logistics cells scattered across dozens of countries on every continent

but Antarctica, which the IRGC, including Qods Force, and Hezbollah relied upon to fund and

equip forward-deployed Hezbollah, Qods Force, and local Jaysh al-Mahdi proxies in Iraq.

41.     To sustain their insurgency, the terrorists relied upon three substantial funding

streams: sources from within Iraq, most of all, the river of cash and free goods that Jaysh al-

Mahdi obtained from corrupt companies doing business with the Iraqi Ministry of Health,

sources from within Iran, and sources from the latticework of IRGC, including Qods Force, and

Hezbollah logistics and fundraising cells that stretch the globe from Dubai to South Africa,

Houston to Syria, and countless other geographies.

42.     This case is about those second and third sources of funding; while the Iraqi

Ministry of Health was the largest overall single source of funding for the terrorists, the second

and third streams were equally potent.  Cash flow from the telecom company Irancell was either

the largest or second largest source of cash flow from any IRGC front and caused hundreds of

millions per year to flow to the IRGC, including $4.2 billion between 2005, when MTN Group

bribed its way to the license, and 2013 – approximately $500 million per year, every year.

Similarly, the fundraising and logistics cells around the world coordinated cash flows from

narcotics smuggling, and the Qods Force's and Hezbollah's various transnational criminal

rackets, e.g., collecting 10%-20% "taxes" known as *khums* from allied businesspeople in Dubai,

U.A.E., or Pretoria, South Africa.

43.     Given the transnational nature of the terrorist campaign they sponsored,

Hezbollah and the Qods Force depended upon illicitly sourced, embargoed American

communications and information technologies, and related management consulting white collar

services, which they acquired through Defendant MTN Group, Defendant Nhleko, and

Defendant Charnley.  Defendants' conduct changed the trajectory of the entire terrorist campaign

in Iraq by revolutionizing the communications capabilities of both the IRGC, including the Qods

Force, and Hezbollah, in Iraq and throughout the Middle East and crippling the ability of U.S.

forces in Iraq to detain Qods Force and Hezbollah operatives in the country – because we could

almost never find them.  Plaintiffs suffered the consequences.

44.     In 2005, Phuthuma Nhleko and Irene Charnley, acting on behalf of Defendant

MTN Group, executed a secret Security Cooperation Agreement with senior IRGC leadership,

under which MTN Group, Defendant Nhleko, and Defendant Charnley personally guaranteed to

the IRGC, including its Hezbollah Division and Qods Force, that MTN Group, Defendant

Nhleko, and Defendant Charnley, would materially aid the "defensive, security, and political"

operations conducted by the "Iranian Shareholders," i.e., the IRGC (the "Security Cooperation

Agreement").  MTN Group, through Defendant Nhleko, executed the secret Security

Cooperation Agreement, on behalf of MTN Group's corporate family.  MTN's "Iranian

Shareholder" counterpart, in turn, similarly signed the Agreement on behalf of the entire IRGC,

necessarily including its external terrorist arms, the Qods Force and Hezbollah Divisions.  *See*

*infra* § VI.A.2 (detailed discussion of Agreement).

45.     After MTN Group, Defendant Nhleko, and Defendant Charnley executed the

secret Security Cooperation Agreement, they fraudulently concealed MTN's literal terrorism

joint venture agreement with the IRGC from MTN Group's shareholders by keeping MTN

Group's copy of the Agreement locked in a safe, concealed from the world (until a whistleblower

bravely exposed it).  Ever since, publicly, MTN Group, Defendant Nhleko, and Defendant

Charnley, variously lied, dissembled, intimidated witnesses, and/or destroyed evidence, all to

avoid admitting the obvious:  that they themselves committed acts of international terrorism that

directly armed, funded, logistically supported, and enabled the concealed and secure

communications of the IRGC and their terrorist proxies, promoting attacks against Americans by IRGC proxies around the world.  Even today, MTN Group remains, effectively, in a joint venture with two fronts for an FTO through its participation in MTN Irancell.

46.     MTN Group, Defendant Nhleko, and Defendant Charnley were one in spirit with the terrorists.  Each pledged, orally or in writing, their commitment to aiding the IRGC's "security" – which all involved understood to be a euphemism for anti-American terror.  They did this because IRGC domination of the Middle East made each of them more money and if the wholesale slaughter of Americans was the necessary price, it was a price each Defendant was willing to impose on unknown Americans serving in Iraq.  Plaintiffs bore the consequences.

47.     Pursuant to its secret Security Cooperation Agreement with the IRGC, MTN Group, Defendant Nhleko, and Defendant Charnley caused MTN Group and its agents, affiliates, and subsidiaries to illicitly transact business with known IRGC fronts, Irancell and the Telecommunications Company of Iran ("TCI"), through partnerships with notorious fronts for Hezbollah and the Qods Force, like the Bonyad Mostazafan.  Through such business and conduct MTN Group, Defendant Nhleko, and Defendant Charnley provided direct financial support, revenue, U.S.-origin embargoed technology and equipment, and training and expertise – all of which the IRGC provided to their terrorist allies operating in Iraq and Afghanistan – and all of which was used to target to kill and injure Americans, including Plaintiffs.

48.     The IRGC used its relationships with MTN Group, and the high-end management consulting provided to the Iranian Shareholders by Phuthuma Nhleko and Irene Charnley to optimize Iran's terrorist enterprise by bolstering the financial and technical capacities of the IRGC's terrorist proxies in Iraq and Afghanistan.

49.     Through the IRGC's transactions with MTN Group, and the various acts of assistance provided by Phuthuma Nhleko and Irene Charnley, Defendants helped Hezbollah, the Qods Force, and the IRGC's terrorist proxies worldwide to evade the international sanctions regime to source weapons for terror, modernize their communications systems to better encrypt signals traffic, improve their surveillance and intelligence capabilities, and generate tens of millions in annual revenue to fund IRGC-supported acts of international terrorism that were committed by Joint Cells comprised of Hezbollah, Qods Force, and Jaysh al-Mahdi operatives, which Hezbollah and the Qods Force used to attack Americans in Iraq from 2005 through 2010.

50.     The total value of the money, technology, and services that Hezbollah, the Qods Force, and Jaysh al-Mahdi obtained via MTN Group's, Defendant Nhleko's, and Defendant Charnley's illicit business with the IRGC collectively extracted likely ranges into the hundreds of millions of U.S. Dollars in cash and cash equivalents – and the terrorists used those resources to aid every facet of the nationwide terrorist campaign against Iraq that the IRGC midwifed in 2003, and then bankrolled ever since, in close partnership with its terrorist proxy allies in Afghanistan (al-Qaeda and the Taliban) and Syria (the Assad Regime), both of whom MTN Group also paid.  The IRGC facilitated violence by all, fueled by Defendants' aid.

51.     But this case is not just about terrorist finance; the technology that MTN Group, provided to the IRGC, which then flowed through its Hezbollah Division and Qods Force to Joint Cells and Jaysh al-Mahdi fighters for use by them in Iraq, was uniquely important to the terrorists, enabling them to inflict maximum damage because, among other things, it allowed them to spy on Americans, avoid detection, clandestinely communicate, travel freely, and build and detonate more effective bombs.  And on top of the money and the technology, Defendants also provided substantial ongoing logistical and operational aid for the IRGC's terrorist

enterprise, which also flowed through to support acts of international terrorism by Hezbollah, the Qods Force, and Jaysh al-Mahdi.

52.     MTN Group's senior executives ran the entire scheme.  Indeed, the two most culpable – Phuthuma Nhleko and Irene Charnley – are co-Defendants alongside MTN because Mr. Nhleko and Ms. Charnley each keyed the success of the IRGC's ability to convert its relationship with MTN Group into a financial, operational, and logistical super-cell that benefited IRGC terrorists globally.  Indeed, Defendant Nhleko even mocked those who raised concerns about the risks associated with two notorious Iranian terror fronts:  When queried by investors about the "risk of doing business with Iran," Mr. Nhleko "laughed off" such questions, joking that "[MTN] hadn't budgeted for bomb shelters or anything like that."

53.     MTN's transactions, and the terrorist attacks they funded, were acts of "international terrorism."  18 U.S.C. § 2333(a).

54.     Plaintiffs are U.S. citizens, and their family members, who served in Iraq between 2005 and 2010, and who were killed or wounded in terrorist attacks committed by Hezbollah, the Qods Force, and Jaysh al-Mahdi in Iraq.  Sometimes the attacks were committed by Joint Cells comprised of Hezbollah, Qods Force, and Jaysh al-Mahdi operatives.  On other occasions, Jaysh al-Mahdi conducted attacks that were planned and authorized by Hezbollah.  As alleged below, Plaintiffs are entitled to recover for their injuries under the federal Anti-Terrorism Act.  MTN Group, MTN Irancell, Defendant Nhleko, and Defendant Charnley are liable under the ATA, 18 U.S.C. § 2333(a), because they provided material support to the IRGC, including its Hezbollah Division and Qods Force, Jaysh al-Mahdi, al-Qaeda, and the Taliban, including its Haqqani Network, in violation of 18 U.S.C. § 2339A.  Each Plaintiff was killed or injured by an international act of terrorism that was committed by designated terrorists who received direct

funding, weapons, weapons components, communications technology, and/or operational support made possible by MTN's conduct.

## DEFENDANTS

### A.    The MTN Defendants

55.    Defendant MTN Group Limited ("MTN Group," together with its subsidiaries, "MTN") is a South African telecommunications company whose stock trades publicly on the Johannesburg Stock Exchange under the ticker symbol MTN:SJ.  Its principal place of business is in Roodepoort, South Africa.

56.    Defendant MTN Irancell is a joint venture between MTN Group, which has a 49% stake and is not in charge, and the Bonyad Mostazafan and Iran Electronics Industries ("IEI"), which collectively own a 51% stake and are fronts for the IRGC (sometimes abbreviated "IRGC-QF").  MTN Irancell is an Iranian company and its principal place of business is in Tehran, Iran.  MTN Irancell operates as, and MTN Irancell's employees and agents work as operatives for, a front for the IRGC.

### B.    The Individual Defendants

57.    Defendant Phuthuma Nhleko is a South African national who served as President of MTN Group Limited at all relevant times and directly aided every facet of the IRGC's terrorist enterprise.  Mr. Nhleko currently resides in South Africa.

58.    Defendant Irene Charnley is a South African national who served as Commercial Director of MTN Group Limited at all relevant times and directly aided every facet of the IRGC's terrorist enterprise.  Ms. Charnley currently resides in South Africa.

## JURISDICTION AND VENUE

59.    This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 2331.

60.     This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1)I and/or 4(k)(2), and 18 U.S.C. § 2334(a).

61.     MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's acts in the United States, including but not limited to, obtaining U.S.-origin phones, computing technologies, internet equipment, and information technology and management consulting services, all exported to the IRGC in Iran, and targeting the United States, including by each Defendant agreeing to the terms of the MTN's secret Security Cooperation Agreement with the IRGC, by each Defendant sponsoring direct payments by MTN to Hezbollah, al-Qaeda and the post-FTO-designation Haqqani Network (when Sirajuddin Haqqani was a senior leader of both groups), and by each Defendant entering into transactions with fronts, operatives, and agents for the IRGC that were intent on harming United States nationals in Iraq, make appropriate this Court's jurisdiction over MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley.

62.     MTN Group, Phuthuma Nhleko, and Irene Charnley, do business in New York, including by procuring U.S.-origin goods and services from companies located in the U.S., including New York, for the IRGC's fronts, agents, and operatives, maintaining accounts with financial institutions located in New York, including, on information and belief, a loan facility with Citibank and a depositary account with the Bank of New York, using the New York-based financial system and institutions to manage cash flow for MTN Group, MTN Irancell, utilizing a bank account in New York to wire funds to an agent of the Hezbollah and the Qods Force, to consummate a bribe relating to MTN's acquisition of the Irancell license, and working with a New York-based financial institution to issue a sponsored American depositary receipt (ADR).

63.     Venue is proper in this District under 18 U.S.C. § 2334(a), because Plaintiff Jimmy Connolly resides in the District of Columbia.

**FACTUAL ALLEGATIONS**

I.     **SINCE THE ISLAMIC REVOLUTION IN 1979, THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, HAS FOMENTED AND SUSTAINED ANTI-AMERICAN TERRORISM**

64.     Iran is politically and ideologically hostile to the United States and its allies.  Iran often acts through its lead terrorist agent, Hezbollah – a designated Foreign Terrorist Organization since 1997 – which Iran funds, arms, and logistically supports.

65.     Iran has been designated as a State Sponsor of Terrorism since 1984.[1]  Iran has remained designated continuously since then.

66.     The 1979 Iranian Revolution was fueled in large part by militant anti-Americanism.  Eliminating the United States' role in the geographic region surrounding Iran – including through violence – was and remains a central tenet of Iranian foreign policy.[2]  Since the Iranian Revolution, Iran has engaged in and supported acts of terrorism directed at the United States and its allies as an instrument of Iran's foreign policy.

67.     Iran's support of terrorist proxies like Hezbollah, Hamas, the Taliban, and al-Qaeda is well-documented.[3]  Iran's support for such groups is especially prevalent in areas where Iran abstains from open conflict.  As a result of Iran's consistent and longstanding support of anti-American terrorism, the U.S. State Department formally designated Iran as a State Sponsor

---

[1] Iran was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control Act (22 U.S.C. § 2780).

[2] Col. (ret.) Richard Kemp and Maj. (ret.) Charles Driver-Williams, *Killing Americans and Their Allies: Iran's Continuing War against the United States and the West*, Jerusalem Ctr. For Public Affairs (2015) ("*Killing Americans and Their Allies*"), http://jcpa.org/killing-americans-allies-irans-war/.

[3] *See* Alireza Nader, Joya Laha, *Iran's Balancing Act in Afghanistan* at 9 (RAND Corp. 2011) ("*Iran's Balancing Act*").

of Terrorism in 1984.[4]  It has maintained that designation at all times since.[5]  In 2007, the U.S. State Department described Iran as "the most active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."[6]

68.     Iran carries out its support of terrorism largely through the IRGC.

69.     The IRGC "has a relatively strict command-and-control protocol and answers directly to the Supreme Leader, Ayatollah Ali Khamenei."[7]  The Supreme Leader serves as head of the IRGC and routinely employs the IRGC to further Iran's global terrorist agenda.

70.     As the U.S. Treasury Department noted in 2010 when it designated certain IRGC officials pursuant to Executive Order 13224, "Iran also uses the . . . IRGC . . . to implement its foreign policy goals, including, but not limited to, seemingly legitimate activities that provide cover for intelligence operations and support to terrorist and insurgent groups."[8]

71.     Iran is politically and ideologically hostile to the United States and its allies. Enmity toward America is foundational for the Iranian regime in general, and most of all, for Grand Ayatollah Khamenei, who is the effective leader of the IRGC, including Hezbollah Division and the Qods Force, both of which report to him personally.  At a 2005 rally, Khamenei explained, "Our people say 'Death to America,' and this is like the saying 'I seek God's refuge

---

[4] *See* 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Sec'y of State George P. Shultz designating Iran); U.S. State Dep't, *State Sponsors of Terrorism*, https://www.state. gov/j/ct/list/c14151.htm.

[5] *Id.*

[6] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

[7] *Iran's Balancing Act* at 10.

[8] Press Release, U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010).

from the accused Satan,' which is recited before any chapter of the Koran, even before 'In the name of Allah the Compassionate, the Merciful.'"  Khamenei said the routine chanting of "Death to America" is designed so that Iranians "will never forget, even for a moment, that Satan is ready to attack him.  . . .  The saying 'Death to America' is for this purpose."[9]

A.    **Islamic Revolutionary Guard Corps**

72.    The 1979 Iranian Revolution was fueled in large part by militant anti-Americanism.  Eliminating the United States's role in the geographic region surrounding Iran – including through violence – was and remains a central tenet of Iranian foreign policy.[10]

73.    The IRGC was established to safeguard the revolution, meaning, to pursue violence inside of Iran, i.e., terrorism against its own people, and external to Iran, i.e., terrorism against the United States and Israel, whom the IRGC considered to be the "Great Satan" and "Little Satan," respectively.  As Monika Gill, a defense researcher, explained in an analysis published by NATO in 2020: "The aphorism that 'war made the state and the state made war' applies to the IRGC; war made the Guard and the Guard made war."[11]

74.    Enmity toward America is foundational for the Iranian regime in general, and most of all, for Grand Ayatollah Khamenei, who is the effective leader of the IRGC, all of which are responsible to him personally.  At a 2005 rally, Khamenei explained, "Our people say 'Death to America,' and this is like the saying 'I seek God's refuge from the accursed Satan,' which is

---

[9] Ali Khamenei, Channel 1, Iranian TV (Mar. 14, 2005).

[10] Col. (ret.) Richard Kemp and Maj. (ret.) Charles Driver-Williams, *Killing Americans and Their Allies: Iran's Continuing War against the United States and the West*, Jerusalem Ctr. For Public Affairs (2015) ("*Killing Americans and Their Allies*").

[11] Monika Gill, *Capitalism, Communications, and the Corps: Iran's Revolutionary Guard and the Communications Economy*, Defence Strategic Communications: The Official Journal of the NATO Strategic Communications Centre of Excellence, at 97 (Autumn 2020) ("Gill, *Capitalism, Communications, and the Corps*").

recited before any chapter of the Koran, even before 'In the name of Allah the Compassionate, the Merciful.'"  Khamenei said the routine chanting of "Death to America" is designed so that Iranians "will never forget, even for a moment, that Satan is ready to attack him.  . . .  The saying 'Death to America' is for this purpose."[12]

75.     Article 176 of the Iranian Constitution provides that Iran's "security policies" sought to "preserv[e] the Islamic revolution" (i.e., export Iran's Islamist revolution abroad through proxy terrorism), through the "[e]xploitation of materialistic and intellectual resources of the country" (i.e., Iranian funds, arms, and training for terror proxies), "for *facing the* internal and *external threats*" (meaning, to target the United States for terrorist violence).

76.     Article 176 is widely understood, in Iran and worldwide, to explicitly enshrine the IRGC's anti-American terrorist mission into Iran's constitution because the IRGC is directed to "fac[e]" (i.e., target) "the" (i.e., an identified object) "external threats" (i.e., the U.S. and Israel).

77.     In her analysis of MTN Irancell, as published by NATO, Ms. Gill explained that under the IRGC's official, publicly-communicated security doctrine, the IRGC's "security" interests are defined as "leading an ongoing resistance" in a zero-sum fight the United States:

> [T]here is a strong feeling of shared Shi'a victimhood driving the IRGC worldview. Ayatollah Khomeini in particular, held the view … This sense of being surrounded by enemies of Iran and therefore, enemies of Shi'ism pervades the strategic narrative of both the neoconservative clerical establishment and the IRGC. Paradoxically, the IRGC's strategic narrative is well served by maintaining enemies and continually reinforcing the notion that the Islamic Republic is under attack. It allows the IRGC to define Iran in *diametric opposition to the enemies of the revolution* and to profess that it is *leading an ongoing resistance*. In this view, the IRGC strategic narrative is a *narrative of resistance*, expressing defiance against threats to the revolution, externally imposed hard and soft war, and the enemies of the Iranian state.[13]

---

[12] Ali Khamenei, Channel 1, Iranian TV (Mar. 14, 2005).

[13] Gill, *Capitalism, Communications, and the Corps* at 97 (emphasis added).

78.     As a result of the IRGC's consistent and longstanding support of anti-American terrorism, Iran was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control Act (22 U.S.C. § 2780).  The United States has maintained that designation at all times since.

79.     On October 29, 1987, President Ronald Reagan issued Executive Order 12613 based upon his finding "that the Government of Iran is actively supporting terrorism as an instrument of state policy," and also as a result of Iran's "aggressive and unlawful military action against U.S.-flag vessels."  Exec. Order 12813, 52 Fed. Reg. 4194D (Oct. 30, 1987).

80.     In 1990, the IRGC transferred activities outside of Iran to its subordinate branch, the Qods Force, which translates to "Jerusalem Force," in reference to the IRGC's desire to destroy the state of Israel and take back Jerusalem.

81.     On March 15, 1995, President Clinton announced that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security … of the United States. …"  Exec. Order 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995).

82.     On August 21, 1997, President Clinton issued Executive Order 13059 to consolidate and clarify Executive Orders 12957 and 12959, and comprehensively prohibit trade intended to benefit, among other things, the IRGC.  Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 21, 1997).  (That same year, the U.S. also designated Iran's lead terror agent, Hezbollah, as an FTO.)

83.     In 1998, Brigadier General Qassem Soleimani was appointed head of the Qods Force, a role in which he served continuously until his death in a U.S. airstrike in 2020.

84.     The Department of the Treasury implemented regulations pursuant to these

Executive Orders which, in general, broadly prohibit any economic transactions with any entities

that are controlled by the Government of Iran.  31 C.F.R. § 560.304 (defining "Government of

Iran"), 31 C.F.R. § 560.313 (defining "entity owned or controlled by the Government of Iran");

31 C.F.R. § 560.314 (defining "United States person").

85.     In 2007, the U.S. State Department described Iran as "the most active state

sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the

Middle East because of its continued support for violent groups."[14]

86.     On May 27, 2009, the U.S. Treasury Department announced additional IRGC-

related sanctions further reflecting the long-standing U.S. conclusion that the IRGC used its

revenue to pay for Hezbollah's operations and training activities:

> The U.S. Department of the Treasury [] designated … two Africa-based
> supporters of the Hizballah terrorist organization, under E.O. 13224. E.O. 13224
> targets **terrorists and those providing support to terrorists or acts of terrorism** by
> … prohibiting U.S. persons from engaging in any transactions with them.
>
> "We will continue to take steps to protect the financial system from the threat
> posed by **Hizballah and those who support it**," said Under Secretary for
> Terrorism and Financial Intelligence Stuart Levey. …  Iran … provide[s]
> significant support to Hizballah, giving money, weapons and training to the
> terrorist organization.  In turn, Hizballah is closely allied with and has an
> allegiance to [Iran].  **Iran is Hizballah's main source of weapons and uses its
> Islamic Revolutionary Guard Corps to train Hizballah operatives in Lebanon
> and Iran.**  Iran provides hundreds of millions of dollars per year to Hizballah.[15]

87.     The U.S. State Department has observed that "Iran used the [Qods Force] to

implement foreign policy goals, provide cover for intelligence operations, and create instability

in the Middle East.  The Qods Force is Iran's primary mechanism for cultivating and supporting

---

[14] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

[15] Press Release, U.S. Treasury Dep't, *Treasury Targets Hizballah Network in Africa* (May 27, 2009) (emphases added).

terrorists abroad."[16]  The Qods Force is the driving force behind Iran's activities in Iraq, as well as in Syria, Afghanistan, and elsewhere in the Middle East.

88.     The IRGC has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing.  It also regularly trains foreign terrorist proxies whose attacks promote Iran's political goals, often working side-by-side with Hezbollah.

89.     The Qods Force is responsible to and directed by the Supreme Leader of Iran. Major General Qassem Soleimani was the chief of the Qods Force for more than twenty years and oversaw the Qods Force's support for Hezbollah and its proxies to promote Iran's policies throughout the region.  Soleimani took his directions from Khamenei, with whom he shared a close personal relationship.  Soleimani was killed in a U.S. airstrike in Baghdad, Iraq on January 3, 2020.  Khamenei then appointed General Esmail Ghaani to replace Soleimani.

90.     The IRGC provides weapons, funding, and training for terrorist operations targeting American citizens, including for Hezbollah and, through Hezbollah, for Jaysh al-Mahdi.  Iran's Supreme Leader and central government are aware of and encourage those acts. Applying pressure against the United States by funding and supplying Hezbollah and other terrorist proxies in the Middle East and Central Asia is an official component of IRGC, including Qods Force, policy.

91.     The Qods Force has four regional commands, with each focused on implementing Iran's foreign policy in a neighboring region.  The First Corps focuses on Iraq, the Second Corps on Pakistan, the Third Corps on Turkey and Kurdistan, and the Fourth Corps on Afghanistan.

92.     The Qods Force's leader until his death, Qassem Soleimani, infamously boasted about his ability to threaten American lives in Iraq by relaying a message, through an

_____

[16] U.S. State Dep't, *Country Reports on Terrorism 2015* at 300 (June 2, 2016).

intermediary, directly to U.S. General David Petraeus, who commanded U.S. forces in Iraq at the time, in which Soleimani taunted: "Dear General Petraeus, You Should know that I, Qassem Soleimani, control the policy for Iran with respect to Iraq, Lebanon, Gaza, and Afghanistan." Soleimani taunted General Petraeus after Iran-backed, Hezbollah-trained Jaysh al-Mahdi terrorists in Baghdad and elsewhere launched an especially brutal wave of terrorist attacks against Americans in Iraq that relied upon using IRGC-manufactured advanced rockets and IEDs built with IRGC-sourced components, which caused the U.S. government to protest Iranian terrorist activity in Iraq.

93.     The IRGC has used Hezbollah and its proxies to commit terrorist attacks.  While it is a Lebanese-based terrorist group, Hezbollah has pledged fealty to Iran's Supreme Leader. Each year the IRGC provides Hezbollah approximately $100 million to $200 million in funding and weapons.  As Ali Akbar Mohtashemi (a Hezbollah founder, former Iranian Ambassador to Syria and Lebanon, and former Iranian Minister of Interior) explained, "[Hezbollah] is part of the Iranian rulership; [Hezbollah] is a central component of the Iranian military and security establishment; the ties between Iran and [Hezbollah] are far greater than those between a revolutionary regime with a revolutionary party or organization outside its borders."[17]

94.     The IRGC intentionally used Hezbollah to lead every aspect of its terrorist campaign against Americans in Iraq, at least in part, because the IRGC wanted "plausible deniability" of Iranian involvement.  To that end, when Defendants MTN Group, Phuthuma Nhleko, and Irene Charnley facilitated the flow of embargoed technology, secure phones, and funds to their Hezbollah, Qods Force, and Regular IRGC counterparties, such value chains created, funded, and managed by each Defendant flowed through to the Joint Cells in Iraq, and

---

[17] *Killing Americans and Their Allies*.

the forward-deployed Hezbollah and Qods Force terrorist operatives and logisticians – in the United States, Iraq, Syria, Lebanon, the U.A.E., Afghanistan, Pakistan, and other geographies from which the IRGC facilitated terrorist attacks against Americans in Iraq – who, in turn, distribute the IRGC's terrorist finance, phones and technologies, arms, and services to Jaysh al-Mahdi, to facilitate attacks against Americas in Iraq.

95.     On April 15, 2019, the U.S. State Department designated the IRGC as a Foreign Terrorist Organization.[18]  Announcing the designation, President Trump explained that "the IRGC *actively participates in, finances, and promotes terrorism as a tool of statecraft*."[19] According to the U.S. State Department's public statement explaining the designation, the IRGC have "been directly involved in terrorist plotting; its support for terrorism is *foundational and institutional*, and it has killed U.S. citizens."[20]  Through the IRGC's support for terrorist organizations throughout the region, "[t]he Iranian regime has made a clear choice not only to fund and equip, but also to fuel terrorism, violence, and unrest across the Middle East."[21]

96.     When the U.S. State Department designated the IRGC a Foreign Terrorist Organization, Secretary of State Michael R. Pompeo stated:

> This is the first time that the United States has designated a part of another government as an FTO. … *[T]he Iranian regime's use of terrorism as a tool of statecraft makes it fundamentally different from any other government.* …
>
> For 40 years, the [IRGC] has actively engaged in terrorism and created, supported, and directed other terrorist groups. The IRGC … regularly violates the laws of armed conflict; it plans, organizes, and executes terror campaigns all around the world. …

---

[18] *See* 84 Fed. Reg. 15,278-01 (Apr. 15, 2019).

[19] Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization (Apr. 8, 2019) (emphasis added).

[20] U.S. State Dep't, *Fact Sheet: Designation of the Islamic Revolutionary Guard Corps* (Apr. 8, 2019) (emphasis added).

[21] *Id.*

The IRGC institutionalized terrorism shortly after its inception, directing horrific attacks against the Marine barracks in Beirut in 1983 and the U.S. embassy annex in 1984 alongside *the terror group it midwifed, Lebanese Hizballah*. Its operatives have worked to destabilize the Middle East from Iraq to Lebanon to Syria and to Yemen. …

The IRGC … supports: Lebanese Hizballah, Palestinian Islamic Jihad, Hamas, Kata'ib Hizballah, among others, all of which are already designated as foreign terrorist organizations. …

Our designation makes clear … that [the] Iranian regime not only supports terrorist groups, but engages in terrorism itself. This designation also brings unprecedented pressure on figures who lead the regime's terror campaign, individuals like Qasem Soleimani. … He *doles out the regime's profits to terrorist groups across the region and around the world*.

*The blood of the 603 American soldiers the Iranian regime has found to have killed in Iraq is on his hands and on the hands of the IRGC more broadly*.[22]

97.    As the world's worst sponsor of terrorism, Iran is unique.  It is not a "normal" country, but a place where the IRGC rely upon their corporate allies to directly enable violence in an open and shocking manner.[23]

98.    The IRGC's terrorist doctrine emphasizes the reliance upon charities, corporations, and endowments, and other ostensibly "civilian" or "economic" entities as covers for the IRGC.

---

[22] Secretary of State Michael R. Pompeo, U.S. Department of State, *Remarks to the Press* (Apr. 8, 2019) (emphasis added).

[23] According to Ambassador Mark D. Wallace, the CEO of United Against Nuclear Iran ("UANI"): "International organizations must also realize that their relationship with Iran is not just … 'business as usual,' …  Put bluntly, Iran is in violation of many of its international treaty obligations, and it should not be treated like a member in good standing of international bodies." Statement of the Honorable Mark D. Wallace, CEO United Against Nuclear Iran before the U.S. U.S. House of Representatives Committee on Foreign Affairs, *Iran Sanctions*, Congressional Testimony via FDCH (May 17, 2012) (emphasis added) ("Wallace May 17, 2012 Testimony"), 2012 WLNR 10405070.

99.     IRGC operatives follow sophisticated tradecraft designed to maximize the IRGC's ability to route funds, materials, and arms obtained through IRGC fronts, including Hezbollah and Qods Force fronts, through Hezbollah to IRGC proxies like the Taliban in Afghanistan and Jaysh al-Mahdi in Iraq.

100.     One such tactic known as the IRGC's **"Orbit" Strategy**, pursuant to which the IRGC, including its Hezbollah Division and the Qods Force, ordinarily structures transactions so that the IRGC is behind one side, one step removed, but fully in control.  This IRGC tradecraft is designed to give the IRGC, and its corrupt corporate and financial enablers, the ability to falsely claim that the IRGC did not directly benefit from an otherwise suspect transaction because the counterparty itself was "not IRGC."

101.     In 2020, NATO confirmed the IRGC's "Orbit" Strategy in Ms. Gill's analysis of the IRGC, which NATO published in *Defence Strategic Communications*, "[t]he official journal of the NATO Strategic Communications Centre of Excellence."[24]  According to Ms. Gill's study of the IRGC's terrorist finance and logistics strategies, the IRGC's practices while exercising control of Iran's heavy construction industry show the IRGC's "Orbit" strategy as being part of their terrorist tradecraft, because the entire point of the strategy is to enable a future accomplice – like a company that gets caught red-handed – to protest that there is no direct linkage between them and the IRGC:

> The IRGC-CF is comprised of a complex network of Orbit 1 companies and Orbit 2 companies. In Orbit 1 companies, the IRGC-CF is directly represented on the board of directors, whilst in Orbit 2 companies, there ***appears to be no direct representation and therefore, seemingly no links*** to the IRGC-CF. Whilst Orbit 2 companies appear independent of the IRGC, they maintain ties to the directly affiliated companies, and therefore remain under indirect IRGC influence. Baharahn Gostar Kish for example, is an information technology and communications company that has no formal links to the IRGC-CF, with no

---

[24] *Id.*

29

IRGC members on the board of directors. However, two board members represent Baharahn and Mowj Nasr Gostar, which are both Orbit 1companies, ***meaning that the company still effectively falls under the IRGC economy***.[25]

102.     When NATO published Ms. Gill's "Orbit" Strategy discussion, NATO essentially vouched for her conclusions because NATO would not have published an article that NATO believed to contain implausible or conclusory assertions.[26]

103.     Ms. Gill's analysis leaves no doubt as to the true nature of MTN Group's, Phuthuma Nhleko's, and Irene Charnley's counterparties. Indeed, it compels the conclusion that, even now, MTN Group's public proclamations that MTN conducts its business in a compliant manner materially supports the IRGC's ability to conduct terrorist attacks against Americans around the world by obscuring the sources of IRGC finances, logistics, personnel, and objectives. Simply put, it is textbook IRGC terrorist tradecraft to structure deals that are designed to route value to the IRGC even when both sides to the transaction are ***not*** IRGC, which is a long-standing IRGC practice from transactions involving companies the IRGC effectively controls even when the IRGC is not a party to the transaction.

### B.     Hezbollah

104.     Hezbollah is a Lebanon-based terrorist group that has pledged fealty to Iran's Supreme Leader. The IRGC has long used Hezbollah (in collaboration with the Qods Force), to

---

[25] *Id.* at 101-102 (emphasis added).

[26] On information and belief, NATO would have only published Ms. Gill's study of the IRGC if the professional staff at NATO, on behalf of NATO, believed that such article: (1) accurately characterized the facts to avoid misleading the contemplated primary audience or making any assertions that are implausible, *e.g.*, a government official working for NATO to defend the U.S. and Europe from, *inter alia*, terrorism; (2) offered reasonable opinions worthy of consideration by responsible parties; and (3) strengthened NATO's ability to fight terrorism, as that was NATO's primary mission for the two decades after 9/11.

establish, expand, and oversee nationwide terror campaigns targeting Americans in the Middle

East, doing so in Afghanistan, Iraq, Lebanon, Yemen, Syria, Israel, and elsewhere.

105.     Hezbollah "first emerged as a militia in opposition to the 1982 Israeli invasion of

Lebanon,"[27] when the IRGC established Hezbollah as a subordinate part of the IRGC known as

the IRGC's "Hezbollah Division,"[28] which IRGC status Hezbollah has maintained ever since.

106.     Hezbollah was and is the IRGC's lead terrorist proxy throughout the world,

including in the U.S., Europe, and Dubai, serving, in effect, as the IRGC's external terrorist

operations arm in conjunction with the Qods Force.

107.     Articles 150 and 154 of the Iranian Constitution enshrines Hezbollah's anti-

American terrorist mission by ordering the IRGC to specifically target Americans in order to

export Iran's Islamic Revolution.  Article 150 empowers the IRGC with the responsibility for

"guarding the revolution and its achievements," (meaning, exporting the Islamist revolution),[29]

while Article 154 confirms that Iran "supports the just struggles of the *mustad'afun*

---

[27] Marc Lindemann (Captain, New York National Guard), *Laboratory of Asymmetry: The 2006 Lebanon War and the Evolution of Iranian Ground Tactics*, Military Review (May 1, 2010), 2010 WLNR 28507137 ("Lindemann, *Laboratory of Asymmetry*").  "Although Iran was engaged in the Iran-Iraq War at the time of the Israeli occupation, Iran's [IRGC] took the lead in organizing, training, and equipping Hezbollah. … 2,500 members of the IRGC [] enter[ed] Lebanon and set up training camps among the Shi'ite population in the Beqa'a Valley … Training at the IRGC camps became a prerequisite for membership in Hezbollah."  *Id.*

[28] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, Combating Terrorism Center at West Point, CTC Sentinel, Vol. 3, No. 11 (Nov. 2010) ("Knights, *The Evolution of Iran's Special Groups in Iraq*").

[29] Under Iran's revolutionary doctrine, the Iranian government posits that it must always remain on the attack with respect to its promotion of insurgents against the Great Satan because, if Iran were to fall back (according to this paranoid theory), the U.S. would overrun Iran. Consequently, inside Iran and around the world, people familiar with Iran and the IRGC understand that references to "guarding the revolution" are ***not*** defense, but rather, are ***offensive*** because, under the paranoid Iranian view, the only way to "guard the revolution" is to go on the attack outside of Iran, through proxy terror campaigns.  Any suggestion to the contrary is, quite literally, IRGC terrorist propaganda.

[downtrodden] against the *mustakbirun* [oppressors] in every corner of the globe." Thus, Iran's constitution directly embraces Hezbollah proxy terror (i.e., "the just struggles of the downtrodden") targeting the United States (i.e., "against the oppressors").[30]

108. Hezbollah's activities have stretched far beyond Lebanon's borders. Hezbollah's primary stated goal is the destruction of the United States and Israel, which it calls the "Great Satan" and the "Little Satan," respectively.[31] Hezbollah also frequently functions as a terrorist proxy for the IRGC committing and orchestrating terrorist attacks abroad with the IRGC's support. Hezbollah's 1985 manifesto proclaims that the "first root of vice is America" and explains that "Imam [Ruhollah] Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."[32]

109. In 2003, Hezbollah Secretary-General Hassan Nasrallah proclaimed: "Let the entire world hear me. Our hostility to the Great Satan [America] is absolute . . . . Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan: Death to America."[33]

110. Hezbollah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies. As Dr. Matthew Levitt has explained, "Hezbollah is extremely adept at

---

[30] When the Iranian government references "the oppressors" without any specification as to whom, that **exclusively** means only two countries: the United States and Israel. This is so because the Iranian regime was founded in direct opposition us and our ally, and Iran's founding documents mention no other hostile actor beyond the U.S. and Israel. Any suggestion to the contrary is, literally, Iranian propaganda designed for a western audience.

[31] *See* Times of Israel, *Nasrallah Proud that PM, Obama Discussed Hezbollah* (Nov. 11, 2015); Ariel Ben Solomon, *Nasrallah 'Proud' that Netanyahu and Obama Discussed Hezbollah in White House Meeting*, Jerusalem Post (Nov. 11, 2015).

[32] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East: A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

[33] Sept. 27, 2002 Al-Manar broadcast, *quoted in* "Hassan Nasrallah: In His Own Words," Committee for Accuracy in Middle East Reporting in America (July 26, 2006).

recruiting members from local populations in areas where they have networks on the ground."[34]
Hezbollah has trained and equipped these local terrorist proxies to carry out terrorist attacks on
Hezbollah's behalf.  Hezbollah has successfully employed this strategy to facilitate attacks by its
proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992);
Khobar, Saudi Arabia (1996); Iraq (2005-present); and Yemen (2012-present).

111.    On January 25, 1995, the United States designated Hezbollah as a Specially
Designated Terrorist.

112.    On October 8, 1997, the United States designated Hezbollah as an FTO, and it has
retained that designation ever since.

113.    Richard Armitage, the Deputy Secretary of State under President George W.
Bush, has described Hezbollah as "the 'A-Team of Terrorists,' "[35] and former CIA director
George Tenet has opined that Hezbollah "is [al-Qaeda's] equal if not far more capable
organization."[36]

114.    Hezbollah was and is the IRGC's lead terrorist proxy in Iraq and the broader
Middle East, serving, in effect, as the IRGC's external terrorist operations arm in conjunction
with Hezbollah's close ally and patron, the Qods Force.

115.    Hezbollah's activities have stretched far beyond Lebanon's borders.  Hezbollah's
primary stated goal is the destruction of the United States and Israel, which it calls the "Great

---

[34] Matthew Levitt, *Hezbollah:  A Case Study of Global Reach*, Remarks to a Conference on
"Post-Modern Terrorism:  Trends, Scenarios, and Future Threats" at 4 (Sept. 8, 2003).

[35] Ed Bradley, *Hezbollah:  "A-Team of Terrorists"*, CBS News (Apr. 18, 2003).

[36] *Current and Future Worldwide Threats to the National Security of the United States:  Hearing
Before the S. Comm. on Armed Services*, 108th Cong.  60 (Feb. 12, 2003) (testimony of George
J. Tenet).

Satan" and the "Little Satan," respectively.[37]  Hezbollah also frequently functions as a terrorist proxy for the IRGC, including its Qods Force, committing and orchestrating terrorist attacks abroad with the IRGC's support.  Hezbollah's 1985 manifesto proclaims that the "first root of vice is America" and explains that "Imam [Ruhollah] Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."[38]  In 2003, Hezbollah Secretary-General Hassan Nasrallah proclaimed:  "Let the entire world hear me. Our hostility to the Great Satan [America] is absolute . . . .  Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan:  Death to America."[39]

116.    Hezbollah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies.  As Dr. Matthew Levitt has explained, "Hezbollah is extremely adept at recruiting members from local populations in areas where they have networks on the ground."[40] Hezbollah has trained and equipped these local terrorist proxies to carry out terrorist attacks on Hezbollah's behalf.  Hezbollah has successfully employed this strategy to facilitate attacks by its proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); and Khobar, Saudi Arabia (1996).

---

[37] *See* Times of Israel, *Nasrallah Proud that PM, Obama Discussed Hezbollah* (Nov. 11, 2015); Ariel Ben Solomon, *Nasrallah 'Proud' that Netanyahu and Obama Discussed Hezbollah in White House Meeting*, Jerusalem Post (Nov. 11, 2015).

[38] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East:  A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

[39] Sept. 27, 2002 Al-Manar broadcast, *quoted in* "Hassan Nasrallah:  In His Own Words," Committee for Accuracy in Middle East Reporting in America (July 26, 2006).

[40] Matthew Levitt, *Hezbollah:  A Case Study of Global Reach*, Remarks to a Conference on "Post-Modern Terrorism:  Trends, Scenarios, and Future Threats" at 4 (Sept. 8, 2003).

117.    Hezbollah is, and has always been widely understood in the U.S., Europe, Middle East, and Asia to be Iran's purpose-built anti-American and anti-Israeli Arabic Shiite terrorist division, which the IRGC designed to integrate within the IRGC's terror architecture, including, but not limited to, its financial, operational, and logistics networks in order to ensure that Hezbollah was inseparable from the Regular IRGC and Qods Force and always remained a formal part of the IRGC.  The IRGC built Hezbollah this way because the IRGC wanted to be able to control Hezbollah's every move while simultaneously maintaining the fiction that Hezbollah were merely "resistance" fighters.  The IRGC's ploy was key to facilitating its worst terrorist plots because the IRGC's primary purpose when it created its Hezbollah Division was to secure the IRGC's plausible deniability on a structural level by interposing a buffer – Hezbollah – between the IRGC and the Americans whom the IRGC wanted to murder.

118.    The IRGC has long relied on Hezbollah to aid the Qods Force's efforts to supply al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and their Taliban terrorist allies,[41] all of whom were targeting Americans in Afghanistan and Iraq:

(i)     The IRGC has relied upon Hezbollah and the Qods Force to aid attacks against Americans by al-Qaeda and its allies since the early 1990s (in the case of al-Qaeda and Ansar al-Islam) and/or shortly after 9/11 (in the case of al-Qaeda-in-Iraq and the Taliban).

(ii)    Before 9/11, the IRGC, al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and their respective affiliates, worked together to broker combined Islamist terrorist training activities at

---

[41] The IRGC was essential to enabling trans-Sunni Islamist cooperation between Afghanistan/Pakistan and Iraq, and maximizing the ability of IRGC Sunni FTO Proxies in Iraq to leverage the personnel, funding streams, resources, and trainers available in Afghanistan and Pakistan in order to enhance the lethality of IRGC Sunni FTO Proxy Attacks in Iraq.  For example, al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam relied upon the funding and logistical support provided by the IRGC to source CAN fertilizer from Pakistan (to use for bombs in Iraq and Afghanistan), secure cell phones from America (to be used for communications or as a cash equivalent "free good" valued at $2,000 per phone), and critical narcotics trafficking and laundering assistance, which funded attacks against Americans in Iraq, including Plaintiffs and their loved ones, by al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.

Taliban sites in Afghanistan, during which time terrorists from Hezbollah, the Qods Force, al-Qaeda, the Taliban, Hamas, and Palestinian Islamic Jihad trained, prayed, and studied together in order to develop the long-term skills and relationships that bin Laden demanded under his corporate "always be closing" model of terror, which emphasized cross-pollination with every possible Islamist terrorist group as long as such group wanted to help al-Qaeda and its allies kill Americans.[42]

(iii)    After 9/11, al-Qaeda, the IRGC, and their respective affiliates, intensified their transnational terrorist alliance; the IRGC acted primarily through its Hezbollah and Qods Force operatives distributed in cells worldwide, while al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam, and the Taliban, for their part, acted primarily through al-Qaeda-related "polyterrorists" who served both al-Qaeda and another organization, e.g., Zarqawi was a member of al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.

119.    It would be improper to suggest that the IRGC's Hezbollah Division is not a part of the IRGC, does not benefit from IRGC funds and resources, and/or does not help flow through such IRGC resources to IRGC proxies like Hezbollah, the Qods Force, and Jaysh al-Mahdi. IRGC leaders, structures, doctrines, other sources confirm the broad understanding amongst Iran-led terrorists that Hezbollah was a part of the IRGC and benefited accordingly:

(i)    **IRGC Structure.**  The IRGC embedded Hezbollah within the IRGC as the IRGC's Hezbollah Division when the IRGC created Hezbollah in the 1980s, maintained the IRGC's "Hezbollah Division" within the IRGC ever since.[43]

(ii)    **Direct IRGC Funding.**  The IRGC directly funds its Hezbollah Division like its Qods Force, as they are two sides of the same IRGC external terror coin.  As the Defense Intelligence Agency ("DIA") concluded with "high confidence" in 2010, "Iran has methodically cultivated a network of sponsored terrorist surrogates capable of conducting effective, plausibly deniable attacks against … the United States," and the DIA "judge[d]" that "Tehran provide[d] support to terrorist and militant groups to support Iran's strategic interests in each situation."[44]  DIA concluded: "[e]lements of Iran's

---

[42] *See*, *e.g.*, Hal Bernton, Mike Carter, David Heath and James Neff, *Going To Camp*, Seattle Times (Aug. 4, 2002) ("By [1998], al-Qaida training was formalized. There was even a textbook, available in Arabic, French and other languages. … Trainees practiced with small arms, assault rifles and grenade launchers provided by the Taliban …. They learned about explosives and land mines. Representatives of terrorist groups, including Hamas, Hezbollah and Islamic Jihad, gave lectures on their organizations."), 2002 WLNR 2584645.

[43] *See*, *e.g.*, Knights, *The Evolution of Iran's Special Groups in Iraq*.

[44] Defense Intelligence Agency, *Unclassified Report on Military Power of Iran* (Apr. 2010).

Islamic Revolutionary Guard Corps []have provided direct support to terrorist groups, assisting in the planning of terrorist acts or enhancing terrorist group capabilities."[45]

(iii) **Hezbollah Founder Statements.** Ali Akbar Mohtashemi (a Hezbollah founder, former Iranian ambassador to Syria and Lebanon, and former Iranian Minister of Interior) confirmed that "[Hezbollah] is part of the Iranian rulership; [Hezbollah] is a central component of the Iranian military and security establishment; the ties between Iran and [Hezbollah] are far greater than those between a revolutionary regime with a revolutionary party or organization outside its borders."[46]

(iv) **Common IRGC Terrorist Tradecraft.** The IRGC long practiced common terrorist tradecraft[47] across every component of the IRGC (regular, Hezbollah Division, and Qods Force) – including the use of Hezbollah as the cell leader and Qods Force as cell funder and logistician – and every geography in which the IRGC or any of its proxies operate.[48]

(v) **Emphasis on Joint Hezbollah/Qods Force Cells.** IRGC doctrine ordinarily calls for Hezbollah and Qods Force terrorists to be co-located out of joint cells when conducting IRGC terrorist operations outside of Iran. The IRGC's joint cell approach is the foundation of the IRGC's terrorist doctrine and the cornerstone of the Hezbollah Division's entire terrorism "business model" when, as in most use cases, the Hezbollah Division and Qods Force are being deployed outside of Iran, or are being deployed inside of Iran but specifically to target Americans. The common practice of Hezbollah and the Qods Force nearly always following the joint cell model when they are within striking distance of American – i.e., when the IRGC perceives its odds of success, and risk of danger, to both be at the highest level – also confirms the Hezbollah-IRGC integration.

(vi) **Hezbollah's Public Declarations.** Like the IRGC, Hezbollah considers itself a part of the IRGC. In 1985, "Hezbollah publicly acknowledged its reliance on Iran," and publicly pledged their loyalty to the IRGC.[49]

---

[45] *Id.*

[46] *Killing Americans and Their Allies.*

[47] "Tradecraft" refers to the methodologies and philosophies of engaging in covert operations (including killings) and general espionage. Terrorists and clandestine intelligence operatives both practice tradecraft.

[48] The IRGC's tradecraft rules governing the IRGC, Hezbollah Division and the Qods Force, are ironclad, inflexible, widely known, and universally applied worldwide, befitting the IRGC's status as the world's largest, most globally distributed, professionalized transnational terrorist organization. IRGC tradecraft emphasizes concealment and cover above all else.

[49] In its 1985 Statement, Hezbollah publicly proclaimed, among other things: "We view the Iranian regime as the vanguard and new nucleus of the leading Islamic State in the world. We abide by the orders of one single … leadership, represented by 'WaIi Faqih' [rule of the jurisprudent] and personified by [Grand Ayatollah] Khomeini," who led Iran's Islamic Revolution and, as such, also served as the head of the IRGC and Hezbollah's sworn leader.

(vii)   **Hezbollah Operatives' Loyalty Oaths to IRGC.**  Hezbollah operatives swear a personal oath of loyalty to Iran's Supreme Leader (and head of the IRGC), Ayatollah Khamenei, and personally pledge to carry out their terrorist missions in his name.

### C.   Qods Force

120.    The IRGC has a special foreign division called the Qods Force.  The U.S. State Department has observed that "Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East.  The Qods Force is Iran's primary mechanism for cultivating and supporting terrorists abroad."[50]  The Qods Force is the driving force behind Iran's activities in Iraq, as well as in Afghanistan and elsewhere in the region.

121.    The Qods Force is responsible to and directed by the Supreme Leader of Iran. Major General Qassem Soleimani, who was the chief of the Qods Force for more than twenty years, oversaw the Qods Force's support for terrorist groups to promote Iran's policies throughout the region.  Soleimani took his directions from Khamenei, with whom he shared a close personal relationship.  Soleimani was killed in a U.S. airstrike in Baghdad, Iraq on January 3, 2020.  Khamenei then appointed General Esmail Ghaani to replace him.

122.    Qassem Soleimani infamously boasted about his ability to threaten American lives in Iraq by relaying a message, through an intermediary, directly to U.S. General David Petraeus, who commanded U.S. forces in Iraq at the time, in which Soleimani taunted: "Dear General Petraeus, You Should know that I, Qassem Soleimani, control the policy for Iran with respect to Iraq, Lebanon, Gaza, and Afghanistan."  Soleimani taunted General Petraeus after

---

[50] U.S. State Dep't, *Country Reports on Terrorism 2015* at 300 (June 2, 2016).

Iran-backed, Hezbollah-trained terrorists launched an especially brutal wave of terrorist attacks against Americans in Iraq that relied upon using IRGC-manufactured weapons.

123.    The Qods Force has four regional commands, with each focused on implementing Iran's foreign policy in a neighboring region.  The First Corps focuses on Iraq, the Second Corps on Pakistan, the Third Corps on Turkey and Kurdistan, and the Fourth Corps on Afghanistan.

124.    The Qods Force provides weapons, funding, and training for terrorist operations targeting American citizens in Iraq, including by supporting terrorist organizations such as al-Qaeda.  As the U.S. government's Joint Improvised Explosive Device Defeat Organization ("JIEDDO") concluded:  "Iran's use of weapons smuggling networks is fairly predictable and meant to shape the manner in which foreign countries deal with Iran."[51]  For that reason, the Qods Force varies the quantity, rate, and types of weapons provided to its proxy terrorist organizations depending on the amount of pressure Iran wants to exert on a particular country. Applying pressure against the United States by funding and supplying terrorist proxies in the Middle East and Central Asia is thus an official component of Iran's foreign policy.

125.    The Qods Force operates a broad global network of front companies, often co-located with Hezbollah.  Indeed, in recognition of the central role of cover to IRGC doctrine, the IRGC created the Qods Force's Unit 400, which was tasked with the mission of facilitating the IRGC's terrorist finance and logistics activities through illicit commercial transactions conducted by a global network of IRGC fronts.[52]

---

[51] Eric Parks, *Iranian Weapons Smuggling Activities in Afghanistan* at 9, JIEDDO J2 Open Source Augmentation and Analysis Cell (Sept. 3, 2009) ("*JIEDDO Report*").

[52] *See.*, *e.g.*, Shahriar Kia, *Global Terrorist Activities Of The Iranian Mullah Regime*, Weekly Blitz (Bangladesh) (Dec. 4, 2021) ("Unit 400 has a network of facilitators and proxies, including elements in organized crime syndicates. These individuals collect information, make preliminary logistical preparations, and carry out operations if necessary. These individuals sometimes are

126.    In October 2007, the U.S. Treasury Department designated the Qods Force as a

SDGT under Executive Order 13224 for providing material support to the Taliban and other

terrorist organizations, including Hezbollah and terrorist groups in Iraq.[53]  The U.S. Treasury

Department also designated multiple Qods Force members as Specially Designated Nationals

pursuant to Executive Order 13224, based on their activities in Afghanistan.[54] Announcing the

Qods Force's SDGT-related designations, Treasury confirmed that "[t]he Qods Force":

(i)     "provide[d] material support to the Taliban, Lebanese Hizballah, Hamas, [and] Palestinian Islamic Jihad";

(ii)    "[was] the [IRGC's] primary instrument for providing lethal support to the Taliban";

(iii)   "provide[ed] weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan";

(iv)    "support[ed] Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support";

(v)     "operate[d] training camps for Hizballah in Lebanon" "and" "trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran";

(vi)    "provide[d] roughly $100 to $200 million in funding a year to Hizballah and" "assisted Hizballah in rearming in violation of UN Security Council Resolution 1701"; and

(vii)   "provide[d] lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target[ed] and kill[ed] Coalition [] forces."[55]

---

trained inside Iran and sometimes in the Quds Force's training camps across the globe.  Unit 400 has various front companies that both provide cover and money for this terrorist entity to operate. Two companies, Arash Zoobin, and Aria Navid, are used to secretly transfer weapons for Unit 400. Besides, the IRGC uses its vast network of front companies, religious or charitable organizations around the world to recruit facilitators."), 2021 WLNR 39679934.

[53] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

[54] *Id.*

[55] *Id.* (emphases added).

127.    In light of the foregoing, the Treasury Department confirmed, on behalf of the

U.S. government, that "[t]hrough Qods Force material support" the United States "believe[d]

Iran [was] seeking to inflict casualties on U.S." "forces" in the Middle East.[56]

128.    Moreover, the Treasury Department emphasized that the U.S. government

intended the Qods Force's newly announced SDGT designation to signal to multinational

corporations and their C-Suites – like Defendants – that they could no longer do business with

the IRGC's commercial fronts.  Among other things, Treasury stated:

(i)     "The U.S. Government is taking [] major actions today to counter Iran's … support
        for terrorism by exposing Iranian … companies and individuals that have been
        involved in these dangerous activities and by cutting them off from the U.S.
        financial system. … The Treasury Department [] designated the IRGC-Qods Force
        (IRGC-QF) under E.O. 13224 for providing material support to … terrorist
        organizations…"

(ii)    "Last week, [] Treasury [] issued a warning to U.S. banks setting forth the risks
        posed by Iran….  Today's actions are consistent with this warning, and provide
        additional information to help [] institutions protect themselves from deceptive []
        practices by Iranian entities and individuals engaged in or supporting … terrorism."

(iii)   "As a result of our actions today, all transactions involving any of the designees and
        any U.S. person will be prohibited … Today's designations also notify the
        international private sector of the dangers of doing business with … the many
        IRGC-affiliated companies that pervade several basic Iranian industries. …"

(iv)    "Support for Terrorism -- Executive Order 13224 Designations E.O. 13224 is an
        authority aimed at freezing the assets of terrorists and their supporters, and at
        isolating them from the U.S. financial and commercial systems."[57]

129.    The U.S. State Department designated the Qods Force as an FTO in April 2019,

along with the IRGC.[58]

---

[56] *Id.*

[57] *Id.*

[58] *See* 84 Fed. Reg. 15278-01 (Apr. 15, 2019).

II.    **AFTER 9/11, THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING HEZBOLLAH AND THE QODS FORCE, AND ITS IRAQI PROXY JAYSH AL-MAHDI, ALLIED WITH AL-QAEDA AND THE TALIBAN, INCLUDING ITS HAQQANI NETWORK, TO WAGE A DEADLY TERRORIST CAMPAIGN AGAINST AMERICANS IN IRAQ AND AFGHANISTAN IN ORDER TO DRIVE THE UNITED STATES OUT OF THE MIDDLE EAST**

130.    The IRGC's "security" agenda is the same in both Iraq and Afghanistan:  kill Americans to drive the United States out of the Middle East.  JIEDDO recognized in a 2009 report that "Iran's intentions are the same in both Iraq and Afghanistan:  to develop, fund and arm proxy networks to leverage against the perceived U.S. aim of pursuing an active regime change doctrine in Iran."[59]

131.    The IRGC pursues its security agenda through the "IRGC Shareholders" whom Defendants materially aided comprised the three constituent parts of the IRGC, i.e., the IRGC's Hezbollah Division, the IRGC's Qods Force, and the Regular IRGC (hereinafter, collectively, the "IRGC Shareholders").[60]  The IRGC Shareholders sought to accomplish their "security" mission of expelling the United States from the Middle East, including Iraq and Afghanistan.

132.    On information and belief, at all relevant times, each of the three IRGC Shareholders made a roughly co-equal contribution to the terrorist campaign with respect to funds, equipment, weapons, terrorist personnel, technologies, and logistics.

133.    **The IRGC's Hezbollah Division**, has the same meaning as Lebanese Hezbollah, and was one of the IRGC's leaders in terror (hereinafter, "Hezbollah Division" or "Hezbollah").

(i)    **Role:**  At all relevant times, Hezbollah was a designated FTO based upon its service as the IRGC's External Security Organization, meaning, Hezbollah's service as the IRGC's lead agent for conducting "External Security" operations (i.e., anti-American

---

[59] *JIEDDO Report* at 5.

[60] The IRGC Shareholders are one and the same with the Iranian Shareholders, defined above, because the Iranian Shareholders were merely fronts for the IRGC Shareholders.

terrorism) worldwide.  At all relevant times, Hezbollah served as the IRGC's "security" proxy specialist worldwide and, as such, was tasked with organizing anti-American "resistance" attack campaigns in, among other places, Iraq, Syria, Lebanon, and Afghanistan.

(ii)      **Leadership:**  At all relevant times, Hezbollah was commanded by **Hassan Nasrallah** ("Nasrallah").  At all relevant times, Nasrallah was internationally notorious (as covered by the media) around the world for being a terrorist, known within Iran for being a terrorist, and, on information and belief, understood by each Defendant to be an IRGC terrorist operative who served as the head of the Hezbollah Division and commanded some of the largest and most important IRGC terrorist finance, logistics, communications, weapons, narcotics, and operations fronts.

134.      **The IRGC's Qods Force,** meaning the IRGC's Iranian-staffed external "Security" Operations Division, which at all relevant times worked in close partnership with the IRGC's Hezbollah Division.

(i)      **Role:**  At all relevant times, the Qods Force was a designated SDGT based upon its service as the IRGC's Iranian-located terror organization that is the flip side of the coin of Hezbollah's External Security Organization and designed to work with Hezbollah through the IRGC's joint cell approach.  At all relevant times, the Qods Force served alongside Hezbollah as the IRGC's "security" proxy specialist worldwide and, as such, was tasked, alongside Hezbollah, with organizing anti-American "resistance" attack campaigns in, among other places, Iraq, Syria, Lebanon, and Afghanistan.

(ii)      **Leadership:**  Until his death in 2020, the Qods Force was commanded by **Brigadier General Qassem Soleimani** ("Soleimani").  At all relevant times, Soleimani was internationally notorious (as covered by the media) around the world for being a terrorist, known within Iran for being a terrorist, and, on information and belief, understood by each Defendant to be an IRGC terrorist operative who served as the head of the Qods Force and commanded some of the largest and most important IRGC terrorist finance, logistics, communications, weapons, narcotics, and operations fronts, and worked closely with Hezbollah pursuant to the IRGC's joint cell model.

135.      **Regular IRGC**, meaning the IRGC's Internal Security Division (hereinafter as an organization, "Regular IRGC," and as individual members, "IRGC Regulars").

(i)      **Role:**  At all relevant times, Regular IRGC and the IRGC Regulars who served within it operated ***exclusively*** within the geographic borders of Iran and served primarily as fronts for IRGC's terrorist finance, logistics, illicit technology acquisition, and intelligence activities, in order to coordinate the logistics and supply chain needs for the other two IRGC Shareholders, i.e., the IRGC's Hezbollah Division and Qods Force, through Regular IRGC's maintenance of various fronts and cover companies,

charities, and foundations, inside Iran, including, but not limited to, the Bonyad Mostazafan, IEI, IEDC, and TCI.

(ii)   **Leadership:**  At all relevant times, Regular IRGC was commanded by the IRGC terrorist, **IRGC Chief of Staff Mohammad Forouzandeh** ("Forouzandeh").  At all relevant times, Forouzandeh was internationally notorious (as covered by the media) around the world for being a terrorist, known within Iran for being a terrorist, and, on information and belief, understood by each Defendant to be an IRGC terrorist operative who served as the IRGC Chief of Staff and commanded the largest and most important IRGC terrorist finance, logistics, and operations front, the Bonyad Mostazafan.

136.    After 9/11, the IRGC organized a transnational terrorist alliance – the Islamists' answer to NATO – to marshal efficiencies across the anti-American terrorists, thereby maximizing the lethality of their shared terrorist campaign.  The IRGC's global terrorist alliance comprised a litany of allied Shiite and Sunni terrorist groups.  Generally, such groups could be divided between, on the one hand, transnational groups which seek to attack Americans anywhere, or regional groups, which focus on a geography.

137.    In all cases, however, the terrorists: (a) sought to attack and kill Americans to force the United States to withdraw from the Middle East, including Iraq and Afghanistan; and (b) relied upon a network of terrorist allies – a Terrorist NATO – necessary to counteract the U.S.-led coalitions in Iraq and Afghanistan, which organized the world's most powerful militaries and intelligence services to confront these terrorists.

138.    Simply put, the IRGC and its terrorist allies in Iraq and Afghanistan knew they needed their own transnational alliance with all the same functionalities as NATO to successfully prosecute a global terror campaign against Americans on multiple continents for decades.

139.    After 9/11, the IRGC's Hezbollah Division and Qods Force led the IRGC's support for this scheme.  With respect to the Hezbollah Division, Hezbollah's terrorist mastermind, Imad Mugniyeh, led this effort until the U.S. and Israel killed him in 2008, after which Mugniyeh was replaced by other well-trained and experienced Hezbollah Division

44

terrorist operatives.  With respect to the Qods Force, the IRGC's terrorist mastermind, Qassem

Soleimani, led the Qods Force-related aspects of the scheme until his own death at the hands of

an American drone strike in 2020.

140.    To operationalize the various nodes of the scheme – including transnational

logistics, financial relationships, arms pipelines, smuggling routes, and the like – Hezbollah and

the IRGC worked together with each other globally (as they have since the IRGC "midwifed"

Hezbollah).  Hezbollah and the Qods Force followed the same terrorist playbook and tradecraft

around the world, which essentially breaks down into two modes of support.

141.    By 2007, under the leadership of Hassan Nasrallah and Qassem Soleimani,

Hezbollah and the Qods Force had organized anti-American and anti-Israeli "resistance" (i.e.,

terror) cells in dozens of countries on six continents.

142.    If Hezbollah and the Qods Force did *not* have a decades-long alliance with the

terrorist proxy and were also not sectarian co-religionists, then the IRGC and Hezbollah followed

a different approach, which was the terrorist equivalent to President Ronald Reagan's famous

maxim: "trust but verify."  Under this approach, Hezbollah and the Qods Force, backed by all the

money and logistics the IRGC could provide, identified Sunni terrorist groups that could serve as

allies of convenience for their shared terrorist agenda against the United States.  The IRGC

terrorist proxies who depended upon the IRGC's material support under this approach included:

(i)      **al-Qaeda**, which Hezbollah and the Qods Force supported through their global
         network of cells with respect to their logistics, funding, transportation, arms supply,
         and which Hezbollah and the Qods Force supported inside of Iran, Iraq, Afghanistan,
         and Pakistan, through the provision of funds, safe haven, communications, and
         logistical support;

(ii)     **the Taliban and its Haqqani Network**, which Hezbollah and the Qods Force
         supported through their global network of cells with respect to their logistics, funding,
         transportation, arms supply, and which Hezbollah and the Qods Force supported

inside of Iran, Iraq, Afghanistan, and Pakistan, through the provision of funds, arms, training, safe-haven, communications, and logistical support;[61]

(iii) **al-Qaeda-in-Iraq**, which Hezbollah and the Qods Force supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Iran, Iraq, Syria, and Turkey, through the provision of funds, arms, training, safe-haven, communications, and logistical support, other than the period from on or about 2013 through on or about 2016 (when they halted all cooperation to kill each another), before resuming on or about 2017;[62] and

(iv) **Ansar al-Islam**, which Hezbollah and the Qods Force supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Iran, Iraq, Syria, and Turkey, through the provision of funds, arms, training, safe-haven, communications, and logistical support, other than the period from on or about 2013 through on or about 2016 (when they halted all cooperation to kill each another), before resuming on or about 2017; which Hezbollah and the Qods Force supported in Iraq; and (collectively, **"IRGC Sunni Terrorist Proxies"**).

---

[61] Hezbollah, the Qods Force, al-Qaeda, and the Taliban, including its Haqqani Network, sometimes combined forces to jointly commit an attack against Americans in Iraq, Afghanistan, or another geography to which every organization could contribute or network connections. On information and belief, all these groups coordinated – in a plot led by Brigadier General Esmail Ghaani of the Qods Force and Sirajuddin Haqqani of al-Qaeda and the Taliban, including its Haqqani Network – to facilitate one or more joint Qods Force/Haqqani Network attacks in Afghanistan in 2020 and/or 2021 as explicit retaliation for the January 2020 U.S. drone strike in Iraq that killed Qassem Soleimani (head of Qods Force) and Abu Muhandis (head of Jaysh al-Mahdi Special Group Kataib Hezbollah).

[62] One of the signal mistakes that Western analysts routinely make is to assume that terrorist groups in the Middle East are not willing to cooperate with one another while other arms of the same organization are murdering each other. The examples of this phenomenon are legion, and the common glue binding it all together is the Islamists' universal hatred of the United States and Israel, which typically motivates the leading Islamist groups in the Middle East to put aside their differences to kill a common foe. This pattern asserted itself in Iraq after the U.S. departure in 2011. Even at the height of the Sunni-Shiite violence in Iraq from 2012 through 2016, Sunni and Shiite groups still routinely cooperated with one another. For example, ISIS and Jaysh al-Mahdi operatives were reputed for negotiating cease fires so that they could barter with one another and replenish their stocks before resuming the slaughter (e.g., a Jaysh al-Mahdi terrorist trading a few thousand dollars' worth of "free goods" in the form of a pharmaceuticals that serve as pre-attack stimulants to get the terrorist jacked up and ready to kill) with an ISIS terrorist, who trades his own lucrative "free goods" (in the form of an untraceable American smartphone that has a black market street resale value of $2,000). Opposing terrorists did this because they often had differing strengths and weaknesses in their respective supply lines and bartering with even a hated enemy was better than any other alternative.

143.     To facilitate terrorist attacks against Americans by the Joint Cells and Jaysh al—Mahdi, the IRGC depended upon the large flow of money, equipment, weapons, and logistical support, as well as the "cover" provided by the corporate entity, from the complicit corporate partners, including MTN Group, MTN Irancell, Defendant Nhleko, Defendant Charnley, and any corporate allies that conspired with the IRGC to create and operate these terrorist fronts.

> **A.    The IRGC, Including Its Hezbollah Division And Qods Force, And Jaysh Al-Mahdi Waged A Deadly Terrorist Campaign Against Americans In Iraq, Iran, Syria, Yemen, And Lebanon**

144.     On March 19, 2003, the United States invaded Iraq.  U.S. troops seized control of Baghdad less than three weeks later, and on April 9, 2003, Saddam Hussein's government fell. Shortly thereafter, the Coalition Provisional Authority ("CPA") began overseeing the reconstruction of a democratic Iraqi government, ultimately transitioning to Iraqi rule.

145.     Formal armed hostilities between the United States and the Iraqi government ended on May 1, 2003.  After that date, American troops deployed to Iraq performed a peacekeeping and nation-building function, rather than a warfighting function.  American troops' primary purpose was to create the political and security conditions conducive to Iraqi democracy. The official end of major combat operations was important because it allowed civilian reconstruction teams to enter the country.

146.     The U.S. invasion of Iraq was watched closely by Qassem Soleimani, the Qods Force, and the Qods Force's lead terrorist agent, Hezbollah.  Even before the invasion began, as early as September 2002, the Qods Force and Hezbollah plotted to undermine the anticipated U.S. presence in Iraq.  For example, the leaders of Hezbollah and the Qods Force, Hassan Nasrallah and Qassem Soleimani, regularly coordinated the Qods Force's support for the Hezbollah-directed terrorist campaign in Iraq in which Jaysh al-Mahdi helped commit attacks.

47

147.    Immediately after Saddam's government fell in April 2003, Hezbollah dispatched its chief terrorist mastermind, Imad Mugniyeh, to Iraq.  Mugniyeh's assignment was to contact Muqtada al-Sadr, an influential Shiite cleric, and to work with Sadr to build a terrorist organization modeled on Hezbollah capable of carrying out sophisticated attacks on Americans in Iraq.  Mugniyeh contacted Sadr shortly thereafter and the two immediately began work on creating the terrorist organization that would become known as Jaysh al-Mahdi.  An Israeli intelligence report confirmed in October 2003 that Hezbollah was already planning to "set up a resistance movement that would cause mass casualties" among American forces in Iraq.

148.    Drawing on this influence, Muqtada al-Sadr became the leader of masses of impoverished Iraqi Shi'a after Saddam's fall in April 2003.  Sadr's followers took over Saddam City – the two-million-person slum in eastern Baghdad, which is the most densely populated area in Iraq – and renamed it "Sadr City" after Muqtada's father, Sadiq al-Sadr.  During this time period, Sadr's public sermons in the Shiite holy city of Najaf decried the U.S. invasion of Iraq, labeled U.S. troops as an illegal occupying force, and urged Iraqis to expel Americans from the country.  Sadr's rallies commonly ended with public "Death to America" chants.

149.    By the summer of 2003, Sadr had channeled his popularity into a nascent organization called the "Sadrist Trend" (members of the Sadrist Trend and related groups are known as "Sadrists").  The Sadrist Trend was modeled expressly on Hezbollah.  Like Hezbollah, the Sadrist Trend had both a political wing, called the Office of Martyr Sadr, and a terrorist wing, called "Jaysh al-Mahdi" (Arabic for "the Mahdi Army") or "JAM."  And, like Hezbollah, the Sadrists seized control of important neighborhoods (such as Sadr City) and used Jaysh al-Mahdi to attack U.S.-led Coalition forces.

150.    By early 2004, Sadr's growing influence, along with the escalating violence

employed by his terrorist militia, threatened the U.S. strategy in Iraq.  That led the CPA, on

March 28, 2004, to order a 60-day closure of *al-Hawza*, the Sadrist newspaper that Sadr used to

proselytize anti-American and anti-Israeli violence.  Sadr reacted by intensifying his

denunciations of the U.S. government and urging his followers to "'terrorize' their enemy."

According to *The Endgame:  The Inside Story of the Struggle For Iraq, From George W. Bush to

Barack Obama* ("*Endgame*"), Michael Gordon and General Bernard Trainor's celebrated

account of the Iraq war, Sadr's Friday sermon on April 2, 2004, was a "bitter invective against

the United States, denouncing the Americans and even praising the September 11 attacks."[63]

151.    From that point forward, Sadr and Jaysh al-Mahdi increased their attacks on

Americans in Iraq, resulting in mass casualties among U.S. citizens (both military and civilian)

working to stabilize and rebuild the country.  By late 2004, Sadr had effectively seized control of

large swaths of Iraq, including but not limited to Basra, Amarah, Najaf, Wasit, Kufa, Nasiriyah,

and the entire eastern half of Baghdad.  By early 2005, Sadr controlled 20 Jaysh al-Mahdi

brigades – all of which were trained by Hezbollah – operating out of his command-and-control

safe-haven in Sadr City, from which Jaysh al-Mahdi coordinated and launched Hezbollah-

supported attacks against Coalition forces throughout Iraq.

152.    In service of its terrorist agenda, and relying on Hezbollah training, weapons, and

personnel, Jaysh al-Mahdi mastered several types of attacks that proved especially deadly for

U.S. troops and civilians, including the attacks that killed and injured Plaintiffs.  As one

commentator explained, Jaysh al-Mahdi was "[a]nalogous to the Sunni terrorist organization, al

Qaeda," "committed thousands of bombings," "detonated roadside explosives," and "fired

---

[63] *Endgame* at 67.

mortar shells toward the Green Zone."[64]  In total, Jaysh al-Mahdi's terrorist attacks throughout Iraq likely killed more than 500 Americans and wounded thousands more.  The death toll inflicted by Jaysh al-Mahdi became so severe that, by July 2007, General David Petraeus concluded that "JAM is more of a hindrance to long-term security in Iraq than is [al-Qaeda-in-Iraq]," the Sunni terrorist group that became ISIS.[65]

153.    Hezbollah's proxy in Iraq was Jaysh al-Mahdi.  The IRGC, including its Hezbollah Division and Qods Force, relied upon Hezbollah and Jaysh al-Mahdi to impose maximum terrorist violence against Americans in Iraq while simultaneously maintaining "plausible deniability" by reducing the public-facing IRGC, including Qods Force, role inside Iraq.  Rather than directly engage in armed conflict with the U.S. or other Coalition Forces, the Persian IRGC, including its Hezbollah Division and Qods Force, usually attempted to present an Arab face in its efforts to undermine U.S. peacekeeping efforts by supporting terrorism and sectarian violence in Iraq.

154.    Hezbollah, funded and logistically supported by the IRGC, including its Hezbollah Division and Qods Force, trained Jaysh al-Mahdi, at sites in Iran, Lebanon, and Iraq, to create and use sophisticated IEDs, EFPs, rockets, and other advanced weaponry.  While Jaysh al-Mahdi terrorists who had completed IRGC-funded, Hezbollah-provided training were sometimes referred to as "Jaysh al-Mahdi Special Groups" or "Special Groups," Hezbollah also provided, and the IRGC (including its Hezbollah Division and Qods Force) also funded, the same Hezbollah training regime for Jaysh al-Mahdi terrorists who were not in a Special Group.

[64] Birgit Svensson, *The Mahdi Army:  Turbans, Kalashnikovs and Plans to 'Slaughter'*, Deutsche Welle (June 22, 2014).

[65] *See Endgame* at 422.

50

155.     Continuing the joint attack planning exemplified by Hezbollah's provision of Qods Force-funded training to Jaysh al-Mahdi terrorists operating in Iraq, the IRGC (including its Hezbollah Division and Qods Force), Lebanese Hezbollah, and Jaysh al-Mahdi (including Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Ka'taib Hezbollah) formed and sustained the Joint Cells.  They operated in key regions where Hezbollah emphasized bombing and rocket attacks against Americans in Iraq including, but not limited to, Baghdad Province (Baghdad), Basra Province (Basra and Amarah), Diyala Province (Baqubah), and Babil Province (Hilla).

156.     The Joint Cells had broad geographic reach and were not limited to committing attacks just in their own locales.  For example, the Joint Cell operating in Babil Province (where Hilla is located) also committed attacks in nearby Qadisiyah Province (where Diwaniyah, about an hour away from Hilla via Route 8, is located), and the Joint Cell in Basra Province (where Basra and Amarah are located) committed terrorist attacks throughout southern Iraq.

157.     Each attack that injured Plaintiffs was committed by a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and IRGC, including Qods Force, operatives, and was planned and authorized by Hezbollah.

158.     The IRGC's, including the Qods Force's, support for Hezbollah and Jaysh al-Mahdi – including the Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Ka'taib Hezbollah – ensured that the terrorist campaign had maximum effect.  Due to Hezbollah's planning, authorization, and joint commission of the attacks in this case as supported by the local muscle of Jaysh al-Mahdi, Qods Force funds benefited Hezbollah and Jaysh al-Mahdi attacks, and Qods Force support for Hezbollah supported Jaysh al-Mahdi, and vice versa.

159.     Hezbollah and the IRGC, including its Hezbollah Division and Qods Force, recognized those interrelationships and so the IRGC, including its Hezbollah Division and Qods

Force, could comfortably ramp up the spending for Hezbollah's campaign in Iraq knowing that the professional Hezbollah terrorists would retain command-and-control of the Joint Cells in Sadr City, Basra, and elsewhere.  The IRGC, including its Hezbollah Division and Qods Force, has used the same joint cell approach – combining Shiite terrorists into a single unified command structure under Hezbollah's leadership to support wide-ranging attacks – in other conflict zones bordering Iraq, most notably Syria.

160.    Hezbollah's support of terrorists in Iraq – made possible by IRGC, including Qods Force, funds, weapons, technologies, and logistical support – likely collectively accounted for more Americans killed or injured in terrorist violence after 9/11 than any other single terrorist campaign.  As Karim Sadjadpour of the Carnegie Endowment explained in an interview, given the IRGC's, including the Qods Force's, support for anti-American terror under Soleimani,

> That's why you have … one, if not two, generations of American military forces whom if you were to ask them, who is your worst adversary in the world, the person you see as the greatest threat to the United States? Even when Osama bin Laden was living and Baghdadi [the leader of ISIS] was living, they would have still said Qassem Soleimani.[66]

161.    Plaintiffs identify below the principal terrorist groups that participated in the Joint Cells that committed, planned, and/or authorized the attacks that killed and injured them and their family members.

### 1.    Jaysh al-Mahdi

162.    Jaysh al-Mahdi, translated as "the Mahdi Army," including the notorious Jaysh al-Mahdi "Special Group" cells Asaib Ahl al-Haq and Ka'taib Hezbollah, was Hezbollah's most dangerous terrorist proxy group in Iraq.  In this Complaint, Plaintiffs refer to Jaysh al-Mahdi,

---

[66] Karim Sadjadpour, *quoted in* National Public Radio, *'Throughline': The Origins Of Iran's Gen. Qassem Soleimani* (Jan. 30, 2020) ("NPR, *Throughline*").

Jaysh al-Mahdi Special Group Asaib Ahl al-Haq, and Jaysh al-Mahdi Special Group Ka'taib Hezbollah collectively as "Jaysh al-Mahdi."[67]

163.    Jaysh al-Mahdi was at all relevant times led by the notorious radical anti-American terrorist, Muqtada al-Sadr.

164.    Sadr founded Jaysh al-Mahdi in April 2003 with the assistance of Imad Mugniyeh, the chief terrorist mind of Hezbollah.  From the beginning, Jaysh al-Mahdi's publicly stated, primary goal was the expulsion of Americans from Iraq.  In July 2003, Sadr publicly announced the founding of Jaysh al-Mahdi by calling for a "general mobilization to fight" the so-called "American and British occupiers."[68]  During Sadr's Friday sermons on March 26, 2004, among other things, Sadr:

- exalted in "[t]he date of September 11th," which he explained "is the date of the collapse of the Two Towers, and therefore is a miracle from God, who never disappoints his servants but allows infidels time before striking them;"

- pledged his fealty to Hezbollah, which he couched in Shi'a Islamist terms such that he was communicating to his followers that support for Hezbollah is a religious duty, stating at one point, "our victorious party, Hezbollah;" and

- called for violent resistance to, and "jihad" against, the American "occupiers" and "invaders" of Iraq, invoking multiple passages from the Koran to provide a purported religious justification for attacking Americans in Iraq.

---

[67] All references to Jaysh al-Mahdi in this Complaint are inclusive of Asaib Ahl al-Haq and Kataib Hezbollah, both of which were "Special Groups" of Jaysh al-Mahdi that were created by Hezbollah using funds, arms, and logistical support provided by the IRGC, including the Qods Force, and the Special Groups were led by senior Jaysh al-Mahdi commanders (Qais and Laith Khazali in the case of Asaib Ahl al-Haq and Abu Mahdi al-Muhandis in the case of Kataib Hezbollah), and supportive of Hezbollah's overall terrorist agenda for its terrorist proxies in Iraq. Often, the same terrorist operatives worked for multiple Jaysh al-Mahdi cells, such as a terrorist who commands a Jaysh al-Mahdi battalion, while also leading a Jaysh al-Mahdi Special Group Asaib Ahl al-Haq cell, acting under the direction of Hezbollah as supported by the IRGC, including the Qods Force.

[68] Mahan Abedin, *Dossier: The Sadrist Movement*, Middle East Intell. Bull. (July 2003).

In a later sermon delivered by an aide on August 6, 2004, Sadr amplified Hezbollah's "Great Satan" narrative in Iraq by calling America "the greatest of Satans" and proclaimed: "America is our enemy and the enemy of the people, and we will not accept its partnership."[69]

165.     Like many terrorist organizations, Jaysh al-Mahdi was structured as an integrated network of cells, militias, and "Special Groups," each of which served the mission of the broader organization.  As Dr. David E. Johnson, a former Army Colonel who has studied Jaysh al-Mahdi's tactics, explained, "[Jaysh al-Mahdi] was mostly a franchise operation, nationally integrated in support of al-Sadr's political program, but locally owned and operated."[70]  The most prominent Jaysh al-Mahdi "Special Groups" were Asaib Ahl al-Haq and Ka'taib Hezbollah.

166.     Despite its cellular structure, Jaysh al-Mahdi maintained a basic hierarchical command structure.  As two counterterrorism scholars explained in June 2008, "although Sadr frequently gives [Jaysh al-Mahdi cells] autonomy over their local actions, he maintains the ability to control them when he chooses."[71]  Formally separate Jaysh al-Mahdi cells also shared membership and leadership, relied on common sources of financing and institutional support from the broader Sadrist organization, and frequently operated together in coordinated attacks.[72]

167.     Jaysh al-Mahdi cells were also unified ideologically by radical Shiite ideology, devotion to Sadr, and violent opposition to American presence in Iraq.  According to an

---

[69] Abdul Hussein al-Obeidi, *Rebel Shiite Cleric Blames 'Occupier' for Church Attacks, Kidnappings in Iraq*, Assoc. Press (Aug. 6, 2004).

[70] David E. Johnson *et al.*, *The 2008 Battle of Sadr City: Reimagining Urban Combat* 23 (RAND Corp. 2013) ("*2008 Battle of Sadr City*").

[71] Daveed Gartenstein-Ross & Bill Roggio, *Sadr's Special Groups*, Weekly Standard (June 9, 2008).

[72] *See, e.g.*, *2008 Battle of Sadr City* at 25-26.

unclassified (as redacted) summary of an interview with a detained Jaysh al-Mahdi operative from 2008, the operative "look[ed] to Muqtada al-Sadr (MAS) for guidance . . . [and] ha[d] no knowledge of who would replace MAS as the leader of [Jaysh al-Mahdi] should anything happen to MAS," because "[t]here is no one who can replace MAS."[73]  A March 2008 U.S. State Department cable (as published online) similarly reported that Jaysh al-Mahdi's various elements "are different faces of the same group controlled by a single hand, who assigns each a role."[74] And a U.S. military-intelligence officer told the *Washington Post* in May 2008 that Jaysh al-Mahdi's various cells "all have direct communication with [Sadr]."[75]

168.    Jaysh al-Mahdi's cellular structure prevented Coalition forces from engaging Jaysh al-Mahdi in a conventional military manner, especially in urban settings.  For example, when Coalition forces took control of Sadr City in 2008, Jaysh al-Mahdi cells disappeared underground and hid among civilians while continuing to attack American forces.

169.    Jaysh al-Mahdi operatives acting in the Joint Cells used a variety of tactics and weaponry against Americans in Iraq, including IEDs, EFPs, rockets, mortars, complex attacks, sniper attacks, and kidnapping operations.

170.    In 2008, Sadr rebranded Jaysh al-Mahdi as the "Promised Day Brigades," which operated as a Special Group of his own whose purpose was to carry out attacks against Americans in Iraq. The Promised Day Brigades also received funding, training, and weapons from Hezbollah, which was paid for and provided to Hezbollah by the IRGC, including its

---

[73] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 010, at 1 (Spring 2007-Early 2008).

[74] U.S. State Dep't Cable, *PM Chief Of Staff Abdallah Tells Ambassador GOI Will Continue Basra Military Operations* (Mar. 31, 2008).

[75] Amit R. Paley, *U.S. Deploys a Purpose-Driven Distinction*, Wash. Post (May 21, 2008).

Hezbollah Division and Qods Force.  The Promised Day Brigades actively targeted U.S. forces to disrupt security operations and further destabilize Iraq, and actively participated in the Joint Cells.[76]

171.    Jaysh al-Mahdi has received significant funding, training, arms, and communications technology from Hezbollah, which was made possible by Hezbollah's receipt of such money and goods from the IRGC, including its Hezbollah Division and Qods Force, including the terrorist fronts that engaged in transactions with MTN.

### 2.    Asaib Ahl Al-Haq, A Jaysh Al-Mahdi Special Group

172.    Jaysh al-Mahdi Special Group Asaib Ahl al-Haq (also called "Asaib Ahl al-Haq" or "AAH"), translated as "the League of the Righteous," was a Jaysh al-Mahdi Special Group supported by the IRGC, including its Hezbollah Division and Qods Force, through Hezbollah, that conducted terrorist attacks against Americans.  As such, the allegations concerning Jaysh al-Mahdi apply with equal force to Jaysh al-Mahdi Special Group Asaib Ahl al-Haq.

173.    Jaysh al-Mahdi Special Group Asaib Ahl al-Haq has targeted U.S. personnel at the direction of Hezbollah, acting as their proxy in Iraq.  As a Jaysh al-Mahdi Special Group, Asaib Ahl al-Haq operatives in the Joint Cells deployed the same attack types used by Jaysh al-Mahdi, including IEDs, EFPs, rockets, and hostage-taking, attacking Americans through the Joint Cells in attacks that were planned and authorized by Hezbollah.

174.    The 2007 arrest of Jaysh al-Mahdi Special Group operatives, and AAH leaders, Qais and Laith Khazali, alongside their handler, senior Hezbollah operative Ali Musa Daqduq,

---

[76] Because the Promised Day Brigades name change was about branding rather than substance, Plaintiffs refer to the Promised Day Brigades as "Jaysh al-Mahdi."

demonstrated the Joint Cells in action:  Jaysh al-Mahdi terrorists and their direct Hezbollah sponsor were detained in Iraq because they had been working together to attack Americans.

175.    On January 10, 2020, the U.S. government designated Jaysh al-Mahdi Special Group Asaib Ahl al-Haq as a Foreign Terrorist Organization.  85 Fed. Reg. 1,369, 1,369 (Jan. 10, 2020).

176.    Jaysh al-Mahdi Special Group Asaib Ahl al-Haq has received significant funding, training, arms, and communications technology from Hezbollah, which was made possible by Hezbollah's receipt of such money and goods from the IRGC, including its Hezbollah Division and Qods Force, including the terrorist fronts that engaged in transactions with MTN.

### 3.    Ka'taib Hezbollah, A Jaysh Al-Mahdi Special Group

177.    Jaysh al-Mahdi Special Group Ka'taib Hezbollah (also called "Ka'taib Hezbollah" or "KH"), translated as "the Hezbollah Brigades," was a Jaysh al-Mahdi Special Group that was stood up by Hezbollah, with funding and arms from the IRGC, including its Hezbollah Division and Qods Force, to help commit terrorist attacks against Americans in Iraq. Jamal al-Ibrahimi, more commonly known by his *nom de guerre*, Abu Mahdi al-Muhandis ("Muhandis"), was an Iraqi Shiite who lived in Iran after he was involved in a plot bomb a U.S. embassy in the 1980s, and later led his own Jaysh al-Mahdi Special Group.

178.    Muhandis was an Iran-backed Shiite terrorist in Iraq who was an agent of multiple allied Shiite terrorist organizations.  As of 2011, when all but one of the attacks in this case occurred, Muhandis was an operative and/or agent of:  (1) Jaysh al-Mahdi, for which he led numerous Special Groups; (2) Jaysh al-Mahdi Special Group Ka'taib Hezbollah, which he led before and after its FTO designation in 2009; and (3) Hezbollah and the IRGC, including its Hezbollah Division and Qods Force, for which he was an operative.  Muhandis served all roles simultaneously, and there was no firewall between his activities relating to these terrorist groups.

179.     Supported by Hezbollah, Jaysh al-Mahdi, and the IRGC, including its Hezbollah Division and Qods Force, Muhandis established Ka'taib Hezbollah to be a Jaysh al-Mahdi Special Group, supported by Hezbollah training, planning, and direction, and IRGC, including Qods Force, funds and logistics (which the IRGC, including its Hezbollah Division and Qods Force, provided through its network of forward deployed operatives inside Iraq) to carry out attacks against Americans in Iraq.  As such, the allegations concerning Jaysh al-Mahdi apply with equal force to Ka'taib Hezbollah.

180.     Jaysh al-Mahdi Special Group Ka'taib Hezbollah was led by Jaysh al-Mahdi commanders who received specialized training from Hezbollah cells in Iran and Lebanon and was part of Jaysh al-Mahdi in its capacity as a Jaysh al-Mahdi Special Group.  Jaysh al-Mahdi Special Group Ka'taib Hezbollah regularly relied upon Jaysh al-Mahdi resources and personnel to commit terrorist attacks, and often used operatives who were members of multiple terrorist groups, including Hezbollah, who were all operating in support of the Joint Cells.

181.     Jaysh al-Mahdi Special Group Ka'taib Hezbollah received significant funding, training, arms, and communications technology from Hezbollah, which help from Hezbollah was funded and sourced by the IRGC, including its Hezbollah Division and Qods Force, including by IRGC, including Qods Force, fronts that transacted business with MTN.

182.     On July 2, 2009, the U.S. government designated Jaysh al-Mahdi Special Group Ka'taib Hezbollah as an FTO and a SDGT, also designating Muhandis individually as an SDGT. 74 Fed. Reg. 31,788, 31,788 (July 2, 2009) (FTO designation); 74 Fed. Reg. 34,639, 34,639 (July 16, 2009) (SDGT Designations).

183.     On January 2, 2020, Muhandis was killed by a U.S. drone strike that targeted a terrorist convoy in which he was riding, along with Qassem Soleimani, outside of Baghdad

58

International Airport.  The U.S. government conducted the drone strike because, among other reasons, Soleimani and Muhandis had worked closely with Hezbollah to orchestrate a campaign of terror against Americans in Iraq, and the terrorists were working together to plan more attacks against Americans in Iraq at the time.  Indeed, just days prior to the U.S. drone strike that killed Soleimani and Muhandis, a Joint Cell fired a rocket attack against an American target in the northern Iraqi city of Kirkuk, killing an American contractor.

      **B.**      **The IRGC's, Including its Hezbollah Division's And Qods Force's, Aid To Jaysh Al-Mahdi To Facilitate Attacks Against Americans In Iraq And Afghanistan**

      184.    Hezbollah, funded and supported by the IRGC, including its Hezbollah Division and Qods Force, used Defendants' resources to carry out the Joint Cells' terrorist attacks against Americans in Iraq.  As a scholar summarized in the 2010 journal published by the Combating Terrorism Center at West Point, "it is clear that Iran has a proven ability to commission violence inside Iraq" because "Iraqi government Harmony records collated by the Combating Terrorism Center at West Point illustrate [that] Iran has been in the business of sponsoring Iraqi paramilitary proxies for 30 years, practically the government's entire existence."[77]

      185.    When U.S. forces arrived in Iraq, Iran's nationwide terror campaign against Americans there was assigned to the Qods Force under the command of Soleimani, who answered directly to Ayatollah Khamenei.  Soleimani caused the IRGC, including its Hezbollah Division and Qods Force, to partner with Hezbollah in Iraq so that Hezbollah would serve as the bridge between the IRGC, including its Hezbollah Division and Qods Force, and Jaysh al-Mahdi.

      186.    According to the U.S. State Department's 2008 Country Reports on Terrorism: "The Qods Force, an elite branch of the [IRGC], is the regime's primary mechanism for

---

[77] Knights, *The Evolution of Iran's Special Groups in Iraq*.

cultivating and supporting terrorists abroad.  The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hizballah, Iraq-based militants, and Taliban fighters in Afghanistan."[78]

187.    The First Corps of the Qods Force, one of its four regional commands, executes Iran's terrorist agenda in Iraq.  During the relevant timeframe, the Qods Force did so largely by providing Hezbollah the funding, weapons, and logistical support it needed to facilitate the attacks by the Joint Cells.  The First Corps' al-Ramazan Headquarters is based across several sites in Iran's largest city (and capital), Tehran, a short trip from the border with Iraq.

188.    Raids conducted in Iraq by the elite U.S. Joint Special Operations Command ("JSOC") also proved that the IRGC, including its Hezbollah Division and Qods Force, directly deployed their own terrorists inside Iraq to augment the Hezbollah-led Joint Cells attacks on Americans there.  For example, in a late 2006, during a JSOC raid in central Iraq, U.S. forces detained **Mohsen Chizari, the Qods Force's Head of Operations and Training**, as well as the Qods Force's station chiefs for Baghdad and Dubai.  In another raid in northern Iraq, U.S. forces captured five Qods Force terrorists.

---

[78] U.S. State Dep't, *Country Reports on Terrorism 2008* at 182-83 (Apr. 2009).

III.   **THE ISLAMIC REVOLUTIONARY GUARD CORPS AND ITS TERRORIST PROXIES DEPENDED UPON ROBUST ACCESS TO UNITED STATES TECHNOLOGY, FINANCIAL MARKETS, AND PERSONS TO CARRY OUT ATTACKS AGAINST AMERICANS IN THE MIDDLE EAST**

A.   **After The U.S. Invasions Of Afghanistan And Iraq, The IRGC Concluded That It Needed To Revolutionize Its Access To Sensitive American Technologies Through Corrupt Corporate Allies**

189.   In the decade prior to the U.S. invasion of Iraq in 2003, the technological gap between IRGC, including Hezbollah and Qods Force, "security" operatives, on the one hand, and the counter-terrorist forces hunting them (and protecting against their threats), on the other, grew from large (in the 1980s) to vast (in the 1990s).

190.   The "Revolution in Military Affairs" or "RMA" refers to a widely accepted military hypothesis that emerged in the 1990s and posited that Western militaries needed to prepare for future asymmetrical threats by maximizing the technological gap between Western militaries and local hostile forces, e.g., terrorist cells in Iraq, in order to achieve objectives such as increasing the speed with which forces can maneuver, increasing the flow of intelligence to troops, facilitating real-time information sharing amongst allied friendly forces, and promoting "interoperability" between the militaries of different nations, e.g., making sure that British forces in southern Iraq can communicate on the same channels as their American counterparts.

191.   By 2003, the U.S. finished its own Revolution in Military Affairs, and the tech-gap between the "security" operatives deployed by the IRGC on the one hand, and American counter-terrorists, law enforcement, and intelligence officers, on the other, was so vast it was as if Americans and the IRGC "security" operatives targeting them lived on two different technological planets: "Earth 1" and "Earth 2".

192.   After the fall of Saddam Hussein in 2003, U.S. personnel in the Middle East practiced their counter-terror tradecraft on **Earth 1** where Americans wielded 24/7 surveillance

61

powers that were difficult to overstate, possessed unparalleled intelligence networks, and had

real-time data analytic abilities that played a key role in reducing the threat of Islamist terror.

The single most important contributor to America's dominant technological edge – and greatest

barrier to the IRGC's terrorist scheme succeeding – was the fact that America could count on

achieving close, reliable, and robust cooperation from the iconic, well-capitalized, and patriotic

American telecommunications and network computing companies, which have historically

worked as responsible partners with the U.S. government to prevent terror.

193.    Meanwhile, on **Earth 2** – where IRGC "security" operatives practiced their

tradecraft – the world was upside down and terrifying.  A sloppy phone call could result in a

precision American airstrike a few minutes later.  An errant text message could enable the "Great

Satan" to take down a Joint Cell.  A carelessly documented transaction could reveal an important

laundering scheme.  Most of all, the "security" operatives of the IRGC were caught in a digital

cage from which they could not carry out their religious, and constitutionally prescribed duty –

attack and kill Americans.

194.    The IRGC knew that the U.S. telecom and network computing industry would not

solve their problem – if anything, the American industry would only widen the gap even more

between the IRGC and the Americans it wanted to kill.  For decades, large U.S. telecom and

network computing companies have been reliable partners of the U.S. government with respect

to reducing the threat from terrorism.  Indeed, the anti-terrorism track records of America's

telecommunications and network computing companies have been among the best of any

industry anywhere in the world.[79]

---

[79] Plaintiffs are not aware of any federal criminal terrorism-related prosecutions, civil Anti-Terrorism Act allegations, or analogous anti-terrorism matter brought by any government against any such companies.

195.    This matters because the robust commitment of American telecom and network computing companies to anti-terrorism compliance was known to the IRGC (and all other industry participants), which meant that the terrorists knew they would be unable to count on their normal strategy for illicitly acquiring something – pay a bribe, threaten extortion, engage in fraud – because none of those strategies held the promise of working at the industrial scale that the IRGC required for their global terrorist plot against American.

196.    By 2003, the IRGC knew that Hezbollah and Qods Force operatives would never be able to sustain the global terrorist attack campaign it had planned against America after 9/11 unless the IRGC could find a way to break out of the digital detention cell that was effectively created by the wall of compliance offered by America's telecommunications and network computing companies.

197.    By 2003, the IRGC had tasked Hezbollah[80] with solving a riddle:  how do they, the terrorists, establish the reliable, secure, and covert pipeline needed to illicitly acquire the tens of thousands of state-of-the-art U.S. smartphones and network computing technologies *each year* necessary to sustain their decades-long, global terrorist campaign against America? The answer: Identify potential multinational corporate partners who would be willing to provide the American technology, finances, and services needed by the IRGC.

198.    As the IRGC spun up its own Revolution in Terrorist Affairs, the leadership of Regular IRGC, the Qods Force, and Hezbollah worked together to develop a comprehensive plan to revolutionize their respective terrorist capabilities to prepare for a decades-long terrorist

---

[80] Lebanese Hezbollah ordinarily serves as the IRGC's illicit procurement agent of choice for a litany of reasons including, but not limited to, deniability, cultural affinities, and the presence of a Lebanese diaspora broadly dispersed around the world, upon which Hezbollah, like most Islamist groups, heavily relies.

campaign against Americans throughout the Middle East. The IRGC faced two critical requirements to eject the United States from the entire Middle East through a campaign of terror.

199. *First*, the IRGC and its terrorist proxies needed a generational upgrade in the security of their computer systems and network technologies, especially the state-of-the-art American servers that were **the** condition precedent for the IRGC's ability to execute its Revolution in Terrorist Affairs, and without which, the IRGC's efforts would be less effective, would be less efficient, would be more expensive, and would produce, ultimately, fewer dead Americans. Given the sheer scale of the IRGC's terrorist mission targeting Americans in Iraq, Afghanistan, Syria, Yemen, Israel, and elsewhere, even marginal improvements in IRGC computing power translated to more plots being shared, more fundraising solicitations, more recruits, and ultimately, more attacks.

200. *Second*, the IRGC and its terrorist allies needed a reliable, replenishable, untraceable source of suppliers for illicit high-quality American-manufactured mobile phones sold in markets inside the United States, and then illegally reexported to eventually flow through the Qods Forces logistics channels – as intended – before reaching Hezbollah, who relied upon American phones to coordinate the IRGC's global terrorist operations, logistics, cash flows, communications, and media, all of which substantially assisted the IRGC's ability to facilitate terrorist attacks by the IRGC Shiite Terrorist Proxies against Americans in Iraq.

201. Given the transnational nature of the IRGC's terrorist architecture, Hezbollah, the Qods Force, and the leadership of IRGC terrorist proxies like al-Qaeda (in Iraq and Afghanistan) and the Taliban (in Afghanistan), faced a simple, but potentially fatal, problem confronting their post-9/11 terrorist enterprise against America: how to facilitate the free movement of key terrorist leaders, attack planners, fundraisers, and logisticians between the various hubs of the

IRGC's scheme to facilitate attacks against Americans, who were located throughout the Middle East, by the IRGC's Shiite and Sunni proxies, who were also located throughout that region, all while avoiding detection by U.S. military and intelligence agencies.

202.    While most people think of false identification papers as being the most indispensable thing to freely traveling, that's analog thinking.  The IRGC understood that, in the modern terrorist era, their operatives were at one critical disadvantage:  Hezbollah and the Qods Force lacked the industrial scale supply, and re-supply, of secure mobile phones, and therefore Hezbollah and the Qods Force were at an enormous disadvantage because their operatives were hemmed in with Americans in Iraq and Afghanistan and unable to freely travel where they needed to be for fear their cell phones, laptops, and other electronic devices were compromised by the Americans (as they likely were).

203.    Consider the case of a hypothetical senior Hezbollah operative who is tasked with global logistics responsibilities.  Over the course of a few months, this Hezbollah operative must depart Beirut, Lebanon (where he, and Hezbollah, are based, and where he receives his instructions), safely travel undetected to the Syrian side of the Iraqi/Syrian border crossing near al-Qaim, Iraq (where Hezbollah, the Qods Force, and the Assad Regime maintain a joint listening post to spy on Americans in Iraq), before secretly entering Iraq and safely traveling on to Kirkuk, in Northern Iraq (to meet with long-standing IRGC proxy Ansar al-Islam), before moving south Diyala (to meet an al-Qaeda-in-Iraq logistician to exchange useful information or materials), and then further south to Baghdad (where Joint Cells of Hezbollah, Qods Force, and Jaysh al-Mahdi terrorists widely operated), before continuing on to Najaf (to meet with more Jaysh al-Mahdi leaders) and then onto the southern port city of Basra (a Shiite terrorist stronghold dominated by Joint Cells), before entering Dubai, U.A.E. (to solicit donations to fund

attacks), after which traveling from the U.A.E. to Pakistan by boat, where the Haqqani Network has facilitated the Hezbollah operative's travel and meetings with the Taliban and al-Qaeda (whom the Haqqani Network were hosting).  After that terrorist roadshow, the hypothetical Hezbollah operative must now safely travel back to Lebanon, either retracing the same steps, or taking an overland route through Afghanistan, over the western border crossing at Herat, and continuing through Iran, Iraq, Syria, and finally returning to Beirut.

204.    This hypothetical isn't the plot of a spy movie: it describes the relatively ordinary travel patterns of senior IRGC-related terrorists, including Hezbollah, Qods Force, al-Qaeda, and others, every year, and shorter versions of similar journeys (e.g., a three- or four-country trip) were common for thousands of IRGC-supported terrorists each year.

205.    Worse, the IRGC lacked any easy solutions because America dominated the mobile phone industry and was not open for business to the IRGC.  Shut off from the U.S. marketplace, the IRGC was unable to build their own phones and unwilling to place the lives of their most prized operatives – the people who led Joint Cells and coordinated operations – in the hands of the junky, unreliable, and often prone-to-failure mobile phones being made outside of the United States at the time.

206.    Thus, the IRGC embarked on a comprehensive strategy designed to achieve its Revolution in Terrorist Affairs, obtain reliable industrial scale supplier relationships that could source American mobile phones, close the communications gap with the "Great Satan," and enhance the lethality of its global terrorist campaign against America.  To do so, the IRGC needed to source tens of thousands of untraceable mobile phones *every year* to ensure the secure and untraceable communication lines between combined cells of Hezbollah, Qods Force, and local proxy terrorist allies operating in dozens of countries worldwide and, among other people,

their local organized crime allies (e.g., narco-traffickers), corrupt politicians (essential for things like passports and permits), and terrorist headquarters, as examples.[81]

207.   Unfortunately for the IRGC who were responsible for the scheme's transnational logistics, weapons, financial, personnel flows, they could not source the tens of thousands of advanced American smartphones they needed every year with a few purchase orders on Bonyads Mostazafan letterhead, because the terrorists were sanctioned.  Even if the IRGC were not sanctioned, as a matter of IRGC terrorist tradecraft, lawful purchases of American phones inside U.S. markets by the precious Hezbollah or Qods Force assets inside the United States (for whom exposure was not to be risked lightly), while viable in small increments, was impossible at the commercial scale necessary for the terrorist campaign to succeed.  Moreover, direct purchases by Hezbollah or Qods Force assets themselves would leave an evidentiary paper trail and risk the terrorists' operatives being rolled up by law enforcement or intelligence operatives – a potential catastrophe for the IRGC.

208.   Logically, that left the IRGC in a predicament.  The IRGC could only satisfy its various operational requirements through the bulk acquisition of thousands of high-end American mobile phones every year but if the IRGC attempted to do so directly, even using IRGC front companies, the terrorist enterprise would not be nearly as effective or yield nearly as many American phones, because the black-market cell phone trade is a volume business where deals and goods must move rapidly.  Thus, the IRGC needed front companies that offered the

---

[81] Standard terrorist tradecraft practiced broadly by the IRGC, al-Qaeda, and groups instructs that their terrorist operatives, especially leadership, (a) should always have a large assortment of mobile phones (5-10 or more) from which to rotate; and (b) should completely overhaul their phone supply on a regular basis. As a result, even sustaining the phone needs of 1,000 IRGC, Hezbollah, and IRGC Sunni Proxy Group terrorists (a tiny fraction of their collective labor pool) likely required – at least – tens of thousands of untraceable cell phones every year.  And these numbers do not account for the IRGC's voracious need for cell phones to commit IED attacks.

agility, resources, global networks, and executives with willingness to aid the world's worst terrorists for profit.[82]

209. Accordingly, the IRGC's ability to prosecute a global terrorist campaign against the United States required the services of corrupt multinational corporate partners, with deep resources, large logistics chains, and a willingness to conspire with anti-American terrorists. The following characteristics keyed the IRGC's ability to operationalize illicit commercial transactions into anti-American terrorist violence in Iraq:

(i) **New terrorist cash flow** generated by taking over a "civilian" company, to make it *easier* to illicitly acquire American technology (that's the point of being a cover) and make it *harder* for the IRGC's enemies to mobilize effective sanctions against the funding source (because IRGC apologists, like MTN Group, could publicly spread disinformation to undermine any pressure campaigns (as MTN Group did, and continues to do to this day);

(ii) **Illicit acquisition of critical American technologies**, including secure American smartphones, computer networks, and sensitive dual-use American technologies to accomplish the IRGC's own Revolution in Terrorist Affairs; and the

(iii) **Robust logistics capabilities** befitting the operation of the IRGC as a multinational terrorist corporation that had a constant need to manage and rationalize the flow of illicit funds, arms, communications, narcotics, and personnel across six continents, all in support of the shared terrorist enterprise stretching from Syria to Iraq to Afghanistan.

210. At bottom, decrepit telecommunications, network computing, and associated technologies posed an immediate, and dire, threat to Iran's ability to kill as many Americans as possible in Iraq and Afghanistan because they were generations behind the United States on virtually every key class of communications and computing technologies necessary to sustain a modern transnational terrorist campaign stretching from Syria to Afghanistan.

---

[82] Because the global market for the sale of illegal American smartphones was vulnerable to law enforcement shocks that could rapidly suppress (temporarily) the supply chain – e.g., a raid in Detroit that removed one of the largest dealers from servicing the black market – it was imperative for the IRGC that its purchasing agents have the agility, financial resources, and global assets to source illicit American-exported cell phones in black markets worldwide, including, but not limited to, illicit cell phone markets on every continent but Antarctica.

211.    By early 2004, the IRGC's terrorist alliance with al-Qaeda and its affiliates in Iraq and Afghanistan was in full bloom.  Hezbollah, the Qods Force, and Regular IRGC embraced its own take on the Revolution in Military Affairs but repurposed RMA principles for use by Iran-backed terrorists.  Hezbollah, the Qods Force, and Regular IRGC concluded that the IRGC needed to overhaul IRGC terrorists' – and IRGC proxies' – communications, computing, internet, and cyber capabilities to enable the IRGC and its al-Qaeda allies (and guests inside their Iranian haven) to continue facilitating attacks against Americans in Iraq and Afghanistan.

212.    Hezbollah, the Qods Force, and Regular IRGC had no choice but to seek U.S. technology because America held the dominant position with respect to the world's computers, mobile phones, servers, routers, and the like, and the IRGC understood that it needed to illicitly acquire vast amounts of embargoed American technologies to commit terrorist attacks.

213.    By late 2004, the IRGC was desperate to upgrade its telecommunications because it understood that its ability to help kill and maim Americans at scale in Iraq, Afghanistan, and elsewhere depended upon the ability of its Hezbollah and Qods Force operatives, and their proxies to solve their American mobile phone access crisis.  The IRGC's terrorist proxy Jaysh al-Mahdi was routed by U.S. forces twice that year.  Moreover, the escalating gap between American counter-terrorists and IRGC "security" operatives, i.e., Hezbollah and Qods Force terrorists, threatened to eviscerate the ability of the IRGC to facilitate terrorist violence against the United States in Iraq and Afghanistan.

214.    Indeed, the IRGC watched, with escalating alarm, as its communications and computing gap widened, and threatened its ability to attack and kill Americans in Iraq and Afghanistan and, viewed the need to find a long-term technology supply fix as on par with Iran's purported need to build a nuclear weapon and was one of the highest priorities of the IRGC.

**B.     The Islamic Revolutionary Guard Corps Secured Terrorist Funds, Logistics, And Operational Support By Militarizing The Iranian Telecommunications Industry And Seizing Control Of Iran's Largest Telecommunications Companies**

215.     In 2004, the IRGC embarked on a two-step solution.  ***Step One:*** the IRGC seized Iran's large state-owned telecom companies and converted them into tools of terrorist finance, logistics, propaganda, recruiting, and operations.  As Ms. Gill explained, "just prior to [Mahmoud] Ahmadinejad's election in 2005":

> Ayatollah Khamene'i issued a decree … ordering 25% of state-owned assets to be privatised within 5 years.  $120 billion worth of government assets were sold … Yet, the ***largest purchaser of privatised government assets was the IRGC***, which received favourable terms from the Ahmadinejad regime. Under the ***guise*** of de jure privatisation, state-owned assets were ***de facto militarised***.[83]

216.     ***Step Two***: the IRGC secured the agreement of complicit, corrupt telecommunications companies, including Defendants MTN Group, Phuthuma Nhleko, and Irene Charnley, which were willing to do business with fronts for the IRGC's transnational terrorist logistics, technology, and financial enterprise and help the terrorists illicitly source the comprehensive suite of state-of-the-art American technologies that the IRGC determined were necessary to the ability of its own Revolution in Terrorist Affairs, so that Hezbollah and the Qods Force could do what they ended up doing:  launch a devastating wave of violence against Americans throughout Iraq and Afghanistan.

217.     The IRGC's two most important telecom front company targets were Irancell and TCI, and the IRGC quickly assumed full control of both companies, completely converting each to its terrorist enterprise.

---

[83] Gill, *Capitalism, Communications, and the Corps*, at 104 (emphasis added).

### 1.    MTN Irancell

218.    In 2004, the IRGC negotiated with Turkcell, a mobile phone company based in

Turkey, hoping Turkcell would be the corrupt corporate partner the IRGC required in order to

extract a vast digital armory of embargoed American technologies.  As negotiations progressed,

however, Turkcell made it clear that they would not enable the IRGC's "security" agenda.

Among other things, Turkcell refused to act as a communications technology logistics front for

the IRGC.  While Turkcell was willing to help build a modern Iranian phone system, it was not

willing to provide direct "security" assistance to the IRGC.

219.    MTN Group, Phuthuma Nhleko, and Irene Charnley had no such scruples.

Sensing weakness in the IRGC's negotiations with Turkcell, MTN Group, Phuthuma Nhleko,

and Irene Charnley hatched a comprehensive plan, which they internally called "Project

Snooker," designed to steal the Irancell license from Turkcell – and the billions of dollars in

profits that would flow to MTN Group thereafter.  Ms. Gill explained the result:

> the **IRGC asserted their role** in the communications economy through two
> significant developments in telecommunications infrastructure involving MTN
> Irancell and TCI. MTN Irancell was launched in 2005, at the start of
> Ahmadinejad's presidency, as a … joint venture between … MTN Group and the
> Iran Electronic Development Company (IEDC).  A subsidiary company of the
> Iranian Ministry of Defence, IEDC maintained **close ties with the Revolutionary
> Guard**.  **Following the IRGC's opposition** to foreign involvement in Iran's
> strategic telecommunications sector, IEDC negotiated 51% ownership of the
> MTN Irancell joint venture, ensuring that **the military had a majority stake in the
> newly formed telecommunications infrastructure**.[84]

220.    In her article documenting how the IRGC converted MTN Irancell and TCI into

tools of terrorist finance and logistics, published by NATO, Ms. Gill explained:

> Communications infrastructure, particularly media and telecommunications
> licenses, are a source of state revenue.  … [T]he communications economy is
> lucrative for those involved. Ahmadinejad's regime faced a dichotomy between

---

[84] *Id.* at 105 (emphasis added).

reaping the 'business benefits of a modern information infrastructure', whilst simultaneously preventing the communication of political criticism of the regime or of the broader Islamic revolutionary system.  Therefore, communications infrastructure was treated as a political asset. Whilst the regime de jure separated telecommunications providers and regulators from the direct control of the Iranian state, de facto control was 'rarely surrendered by privatisation'.  Khamene'i's Article 44 decree shows that the legal separation between state and assets allowed leaders to remain influential in the communications economy by appointing politically like-minded affiliates.  By ***militarising, rather than privatising the economy***, the regime transferred ownership from 'relatively transparent parts of the public sector to ***other parts of the public sector shielded from public scrutiny', such as the Revolutionary Guard***.  It is in this ***fictional separation between the public and private sector in Iran that the invisible hand of the IRGC can be assessed***.  ***Power projection and realpolitik*** remained central to the Guard's strategic thinking to the same extent as their ideological devotion.[85]

221.    The IRGC's takeover of MTN Irancell and TCI produced a financial windfall for

the IRGC.  Ms. Gill explained that:

> From a business perspective, the IRGC … create[ed] a military-commercial complex in which the Guard benefitted from the construction of a perceived and persistent threat. … Whilst publicly promoting rhetoric about national ***security*** and the defence of Shi'ite Islamic culture, the IRGC was ***sustaining a military-commercial complex that benefited them financially***. The IRGC and the Iranian communications economy maintained a ***close partnership***, with both taking advantage of the articulation of a soft war. …[T]here [was] a notably profit-driven motive to the Guard's economic involvement. … the involvement of the IRGC in the communications economy under Ahmadinejad was reflective of an ideological, but also increasingly opportunistic Revolutionary Guard.[86]

222.    "[T]he IRGC became a moneymaking machine" after it deliberately blended the

commercial and terrorist functions of MTN Irancell and TCI in order to ensure that the IRGC

could use MTN Irancell and TCI revenues to furnish off-books cash to, among other things, keep

former members of the IRGC on the IRGC's payroll.  According to Ms. Gill:

> The IRGC acts as a business fraternity within which members of the Guard can progress along a prescribed career path.  Following active service, IRGC members are offered senior positions in state-affiliated media organisations and telecommunications networks ***such as IRIB, TCI, and MTN Irancell***.

---

[85] *Id.* at 108-109 (emphasis added).

[86] *Id.* at 110-111 (emphasis added).

*Accordingly, 'no one ever leaves the IRGC'*; its senior officers are viewed as an Iranian 'freemasonry' and 'Ivy League network', signalling that the IRGC exceeds ideological devotion. … When 'privatising' the national media and telecommunications infrastructure, the Ahmadinejad regime sold its majority stake to the IRGC, ***blending its mission of national security with 'investor profits'.*** In holding senior economic positions in communications infrastructure companies and accruing profits, ***the IRGC became a 'moneymaking machine*** … The IRGC's opportunistic and exploitative involvement in the communications economy facilitated a system of military crony capitalism within Ahmadinejad's Iran. … The IRGC ***grew to depend on the communications economy to support the personal and financial endeavours of the Guard***, who valued safeguarding their own self-interest to the same extent as they valued safeguarding the revolution.[87]

223.    In sum, according to Ms. Gill, "the IRGC as an institution was reliant on the communications economy as a source of capital gain" and "the IRGC used the fictional separation between the public and private sectors in Iran to facilitate its rise as an economic conglomerate."[88] At bottom, the IRGC's control over MTN Irancell and TCI was not just about propaganda – the IRGC depended upon such control to support its "security" agenda, i.e., anti-American terror by using the fronts to raise money:

whilst the Guard relied on the communications economy to propagate their ideology, they also ***acquired and monopolised*** communications infrastructure as a ***source of capital gain***. The Guard's involvement with the communications economy moved beyond the projection of revolutionary ideology, becoming equally a matter of realpolitik and of ***accruing military capital***.[89]

### 2.    Telecommunications Company Of Iran (TCI)

224.    In 2009 – four years after the IRGC's strategy to illicitly source terrorist material through Irancell relied upon "using IEDC as a front" in the IRGC's 2005 agreement with MTN

---

[87] *Id.* at 111-12 (emphasis added).

[88] *Id.* at 112.

[89] *Id.* at 112 (emphasis added).

Group – the IRGC emerged from its previous position of cover on Irancell to publicly assume a majority stake in Iranian telecom company, TCI:

> In addition to rejecting foreign majority ownership in Iranian telecommunications infrastructure, IRGC telecommunications activity was driven largely by 'lucrative no-bid contracts awarded by the Iranian government'. Testament to this, in September 2009, shortly after the violent protests following Ahmadinejad's re-election, the government announced plans to privatise TCI. Amongst the investors were **numerous IRGC-backed institutions**, including the IRGC-CF, the Mostazafan Foundation, and the Execution of the Imam's Order company. Minutes after TCI was privatised, **the IRGC acquired 51% of the company** in a $5 billion deal—the 'largest trade in the history of the Tehran Stock Exchange'. This represented **'yet another calculated step' in the IRGC's campaign to dominate Iran's communications economy**. Rather than using IEDC as a front, as they had done in 2005, the **IRGC had overtly purchased a majority stake** in TCI's monopoly over Iranian telecommunications.[90]

C.    **The Islamic Revolutionary Guard Corps Relied Upon A Transnational Network Of Terrorist Finance, Logistics, Operations, And Communications Cells To Fund, Arm, Logistically Sustain, And Facilitate Attacks Against Americans In Iraq**

225.    The IRGC relies upon a global network of cells, operatives, cover companies, and allied criminals in the corporate world (like Defendants) and the criminal world (like narcotraffickers and transnational crime organizations).

226.    The IRGC operated the scheme in the same manner as a multinational corporation, seeking to leverage geographic efficiencies, networks, and distributed competencies to maximize the lethality of the IRGC-sponsored terrorist campaigns against Americans in Iraq, Yemen, Syria, Europe, Afghanistan, Pakistan, and elsewhere.  This section briefly outlines how the IRGC leveraged terrorist finance, logistics, technical and communications support from around the world to directly aid the terror campaign against Americans in Iraq, Yemen, Syria, Europe, Afghanistan, Pakistan, and elsewhere.

---

[90] *Id.* at 105-06 (emphasis added).

### 1.    United States

227.    The IRGC depended upon its ability to access technologies, markets, and systems that were found exclusively in the United States to execute key parts of the scheme.  Simply put, they needed as much access to America as possible to kill as many Americans as possible.

228.    **American Technologies.**  The IRGC relied upon American-designed, protected, manufactured, and/or assembled technologies, including but not limited to, mobile phones, smartphones, enterprise level servers, computer networking technologies, and software, because they have been the gold standard from 9/11 through today.  No other country made a credible version of a competing device, that is available for sale to the public as opposed to their own "security" agencies at any point in time between 2001 and 2022, e.g., enterprise level servers and secure encrypted smartphones that can access the full panoply of universally sought-after "apps", at any point in time between 2001 and 2022.

229.    **American Markets.**  The IRGC relied upon in-person and online sales markets in the United States, including but not limited to currency markets (relying upon the U.S. Dollar as the IRGC's preferred currency), technology markets (relying on U.S. goods as the IRGC's preferred technology source), financial markets (relying on U.S. financial markets because U.S. banks have connectivity to the 50+ countries on six continents in which Hezbollah and the Qods Force operates), labor markets (relying on skilled laborers, particularly information technology consultants, to service the IRGC's illicitly acquired U.S. technologies), and black markets (relying on the ability to acquire some of the above items that can only be purchased in the U.S.).

230.    In every instance, the IRGC depended upon its ability to access American markets at home to kill Americans abroad because such U.S. markets have unique power to set the terms and pricing for the world, and were often also the only location where the IRGC could acquire a key item in the covert manner needed under the IRGC's terrorist tradecraft.  For example, the

IRGC did not have the ability to source large amounts of U.S. Dollars or access state-of-the-art American technologies without the IRGC, or one of its corporate co-conspirators, reaching into the United States to secure resources and services key to the success of the entire scheme.  This case concerns the various nodes and modalities by which the IRGC accomplished that.

231.    **American Systems.**  The IRGC relied upon its ability to access certain financial, technical, and knowledge systems that were stored exclusively inside the United States.  For example, the IRGC depended upon the ability of its terrorist computer programmers to be able to access certain proprietary databases located inside of the United States in order to complete the design of a particular part necessary for a new type of bomb being developed by the IRGC.

**2.    U.A.E.; Iraq; Iran; Lebanon; Yemen; Syria; Afghanistan; Pakistan**

232.    From 9/11 through the present, attack planners, logisticians, and financiers for the IRGC as well as nearly every other major Islamist terrorist group, including but not limited to al-Qaeda, the Taliban (including its Haqqani Network), and others, have relied upon the U.A.E., especially Dubai, as a logistical, financial, and operational hub, from which they could organize their terrorist campaigns in Iraq, Iran, Lebanon, Yemen, Syria, Afghanistan, and Pakistan.

233.    With respect to the IRGC Shiite Terrorist Proxies' terrorist campaign against Americans in Iraq, Iran, Lebanon, Yemen, and Syria in furtherance of the IRGC's scheme, the U.A.E. served as a logistical, financial, and operational hub for the campaign, and the U.A.E. was functionally part of one interlocking geography of extreme terrorist finance and logistics risk and hub of activity,[91] comprised for purposes of the IRGC Shiite Terrorist Proxies' terror campaign of the U.A.E., Iraq, Iran, Lebanon, Yemen, and Syria.

---

[91] For the avoidance of all doubt, the government of the U.A.E. was, and remains, an ally of the U.S. in the fight against terrorism.  The terrorists' use of the U.A.E. as a hub was based on a

234.    With respect to the IRGC Shiite Terrorist Proxies' terrorist campaign against Americans in Iraq, Iran, Lebanon, Syria, Europe, Afghanistan, and Pakistan in furtherance of the IRGC's scheme, the U.A.E. served as a logistical, financial, and operational hub for the campaign, and the U.A.E. was functionally part of one interlocking geography of extreme terrorist finance and logistics risk and hub of activity, comprised for purposes of the IRGC Shiite Terrorist Proxies' terror campaign of the U.A.E., Iraq, Iran, Lebanon, Yemen, and Syria.

235.    Simply put, the terrorists did not respect the borders of any of these countries – other than Iran and Syria, with whom they were allied rendering the issue moot – and viewed the entire geography as one combined theater.

### 3.    South Africa

236.    "While Iran may seem diplomatically isolated, in Africa it has used unconventional tactics to support its terror network" and "success[fully] plant[ed] footholds the for the Islamic Revolutionary Guard Corp and Hezbollah."[92]

237.    The IRGC relied upon illicit commercial transactions and relationships in Africa to facilitate the provision of IRGC assistance to Shiite and Sunni terrorist proxies in the Middle East, including its IRGC Shiite Terrorist Proxies.  According to the Israeli publication *Tower Magazine* in 2013:

(i)     "In Africa, as in the Middle East, … [e]ven in the absence of any solid diplomatic alliances or victories, Iran is using its relationships … to organize and advance its ambitious aims and terrorist networks. With its traditional diplomacy stifled, Iran has

---

range of other factors, including, but not limited to, geography, history, particular trading networks, transportation channels, and an advanced infrastructure for conducting transactions and moving goods and monies throughout the Middle East.  The terrorists, like many multinational corporations, set up their regional headquarters in Dubai for these reasons.

[92] Armin Rosen, *Desperate For Allies and Secret Assets, Iran Penetrates Africa*, The Tower (Aug. 2013), http://www.thetower.org/article/desperate-for-allies-and-secret-assets-iran-penetrates-africa/.

exhibited a worrying ability to overcome … setbacks — to accumulate asymmetrical victories for its aggressive, anti-western agenda. …"

(ii)    "[Iran] clearly understands the need for alliances outside of its immediate neighborhood — and it appreciates the opportunities embodied in developing countries in need of cheap oil, foreign investment and powerful friends. …"

(iii)    "Iran has gotten exactly what it needs out of Sudan … Sudan is a beachhead for the IRGC — a transit point for weaponry [to flow to] Hezbollah …, and Hamas to rain Fajr 5s on … Israel's civilian population. …"

(iv)    "All across the continent, Iran's expansionist foreign policy is in direct conflict with its economic and soft power outreach—and Iran has succeeded is using Africa to advance its interests anyway. …"

(v)    "Iran and the IRGC are still leveraging their relationship with South Africa … [A]ccording to Mark Dubowitz of the Foundation for Defense of Democracies, [South Africa] is 'a very hospitable place for Iranian sanctions-busting.' In early June, the U.S. Treasury Department added 37 Iranian front companies to its sanctions list. Three were based in South Africa. …"

(vi)    "In Africa, Iran has also found a way of overcoming its pariah status. The Islamic Republic is using Africa to extend Hezbollah's reach, … and arm its proxies."[93]

238.    Indeed, the IRGC has long operated openly and notoriously in South Africa. "Iran and South Africa have cooperated on a number of fronts in recent decades, including at the U.N., where South Africa has at times advocated for Iran" and "[t]he pair also have a military relationship."[94]

239.    The IRGC's freedom of movement in South Africa is a legacy of Ayatollah Khomeini, who stood against the Apartheid regime while, unfortunately, the United States (for a time) did not.  For decades, the IRGC leveraged Iran's historical feat of standing up to Apartheid, in much the same way that the Soviet Union exploited Jim Crow to undermine the America's image as a bastion of liberty during the Cold War.  Both messages were effective.

---

[93] *Id.*

[94] Nahal Toosi and Natash Bertrand, *Officials: Iran Weighing Plot To Kill U.S. Ambassador To South Africa*, Politico (Sept. 13, 2020).

240.     Because of this unique Iranian-South African history, the IRGC has viewed South Africa as a veritable home away from home for the IRGC, as South Africa was one of the few major democracies to have abstained from joining the sanctions regime against Iran and to afford the IRGC relatively unfettered freedom of movement.  As a result, the IRGC has operated clandestine fundraising, logistics, and operations networks in South Africa for decades.

241.     In an interview with *Politico*, American intelligence officials confirmed on background that "[t]he Iranian government [] operate[d] clandestine networks in South Africa," "and has had a foothold there for decades."[95]  "In 2015, *Al Jazeera* and *The Guardian* reported on leaked intelligence documents that detailed an extensive secret network of Iranian operatives in South Africa."[96]

242.     According to leaked documents from the South African intelligence service, Hezbollah and the Qods Force operate cells in South Africa showing "confirmed" links between Iranian operatives in overseas embassies and "terrorists."

243.     In or about 2020, American intelligence services detected that the IRGC was planning a terrorist attack in South Africa to kill the U.S. ambassador there as retaliation for the killing of Qassem Soleimani earlier that year.

244.     Hezbollah's choice of South Africa as the potential attack site is revealing, as the terrorists had the chance to survey the entire world to choose the best location to kill an American ambassador.  As *Politico* noted, the U.S. ambassador to South Africa "may also [have] be[en] an easier target than U.S. diplomats in other parts of the world, such as Western Europe,

---

[95] *Id.*

[96] *Id.*

where the U.S. ha[d] stronger relationships with local law enforcement and intelligence services."[97]

### 4. Europe

245.    Europe has long been a hub for terrorist finance, logistics, and operational support for the IRGC as well as al-Qaeda, the Taliban, including its Haqqani Network, and their allied Syndicate terror partners in Afghanistan and Pakistan.  Europe's proximity to many of the attack theaters and ease of travel make it a key site for the terrorist campaign.

### 5. The Americas

246.    The IRGC, through Hezbollah and the Qods Force, maintains a substantial presence in the Americas, including, but not limited to, in Venezuela, Colombia, Paraguay, and other nations.

247.    Hezbollah and the Qods Force maintained operational, finance, and logistics cells throughout multiple nations in the Americas, through which Hezbollah operated an array of money-making criminal schemes, e.g., narcotics trafficking, in order to repatriate money back to the terrorist campaign.

248.    Hezbollah and the Qods Force support the terrorist campaign in the Middle East from their cells in the Americas.  Indeed, that is the purpose of the cells far from Hezbollah's home in Beirut – cash and logistics flow for the terror campaign.

### 6. Southeast Asia

249.    The IRGC, through Hezbollah and the Qods Force, maintains a substantial presence in Southeast Asia.  Hezbollah and the Qods Force maintain operational, finance, and logistics cells throughout multiple Southeast Asian nations, including Malaysia and Singapore.

---

[97] *Id.*

250.     Hezbollah and the Qods Force support the terrorist campaign in the Middle East

from their Southeast Asian cells.  Indeed, that is the purpose of the cells far from Hezbollah's

home in Beirut – cash and logistics flow for the terror campaign.

## IV.     DEFENDANTS TRANSACTED BUSINESS WITH FRONTS, OPERATIVES, AND AGENTS CONTROLLED BY THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING HEZBOLLAH AND THE QODS FORCE

### A.     The Islamic Revolutionary Guard Corps, Hezbollah, And The Qods Force Operate As An Integrated Transnational Terrorist Organization With A Common Doctrine, Strategy, Financial Structure, Logistics Structure, And Command-And-Control

#### 1.     The Islamic Revolutionary Guard Corps' Transnational Terrorist Strategy, Doctrine, And Tactics Emphasizes The Deployment Of Joint Cells Of Terrorists Led By Hezbollah, Funded And Resourced By The Qods Force, And Supported By Local Iranian Terrorist Proxies

251.     The IRGC has long followed a common terrorist strategy and doctrine, which

deploys common tactics across every component of the IRGC (Regular, Hezbollah Division, and

Qods Force) – including the use of Hezbollah as the cell leader and Qods Force as cell funder

and logistician – and every geography in which the IRGC or any of its proxies operate.

252.     The IRGC adheres to an integrated global terror strategy, and follows the same

rules for terrorist tradecraft, out of a recognition that the IRGC and its proxies were likely to

always suffer from a resource deficit, which meant that the intelligent deployment of its human

assets was paramount because unlike, say, China, the IRGC did not have limitless resources or

an enormous pool of human capital from which to draw.  Given these "equipment and logistical

constraints, Hezbollah – with the guidance of Iranian advisors – adopted a doctrine of guerrilla

warfare against the Israeli occupation."[98]

---

[98] Lindemann, *Laboratory of Asymmetry*.

253.     The Joint Cell approach is the foundation of the IRGC's terrorist doctrine and the cornerstone of the Hezbollah Division's entire terrorism "business model" when, as in most use cases, the Hezbollah Division and Qods Force are being deployed outside of Iran, or are being deployed inside of Iran but specifically to target Americans, e.g., to torture an American hostage being held in Iran, or to plan for a raid targeting Americans from a site in Iran.

> **2.     The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division And Qods Force, Follow Common Terrorist Techniques, Tactics, And Procedures And Use The Same Terrorist Tradecraft To Ensure Concealment And Cover Around The World**

254.     "Tradecraft" refers to the methodologies and philosophies of engaging in covert operations (including killings) and general espionage.  Terrorists and clandestine intelligence operatives both practice tradecraft.

255.     The tradecraft rules that govern the IRGC are ironclad, inflexible, widely known, and universally applied worldwide, befitting the IRGC's status as the world's largest, most globally distributed, professionalized transnational terrorist organization.  IRGC tradecraft emphasizes concealment and cover above all other operational imperatives.

256.     While Islamist terrorists and western intelligence officials do not agree on much, they concur on the core doctrinal point that the two ***absolute requirements*** for nearly any successful operation by terrorists or intelligence operatives are **(i) Concealment**, i.e., something or someone that protects something (or someone) else from being identified; and **(ii) Cover**, i.e., something that provides protection or shelter to someone otherwise at risk.

257.     Amongst counter-terror professionals, it is axiomatic that "cover" and "concealment" are a necessary ingredient to any successful long-term terrorist finance and logistics strategy that depends upon commercial transactions to facilitate terror.

258.     Nearly everything a terrorist does requires cover and concealment in some form: meeting with cell members, communicating with leadership, surveilling targets, traveling across an international border to attend a training camp, and so on.

259.     Since its founding, the security doctrine followed by the IRGC has consistently emphasized cover and concealment as the essential aspect of any successful terrorist operation in light of the unique, violent, and affirmative need for the IRGC to "go on offense" and attack Americans abroad.

260.     The IRGC adheres to cover and concealment as the two most important principles in terrorist tradecraft for a simple reason:  from inception, and ever since, the IRGC's security policy was specifically built on paranoid, antisemitic, Islamist aggression that explicitly targeted America (sometimes by name, sometimes in code), and posited that an alliance between Christians (Americans) and Zionists (Israelis) was bent on taking over the Middle East and defiling Islam, and thus each member of the IRGC (including its Hezbollah Division and Qods Force) must always be attacking Americans, and always focusing specifically on targeting the United States for terror.

261.     The IRGC (including its Hezbollah Division and Qods Force) was built purposely for the specific task of attacking America and Israel in order to protect Iran's Islamic Revolution by staying on a perpetual state of "offense," i.e., a never ending campaign of terror against Americans and their allies in the Middle East and around the world designed to strike the "infidels" on their own ground – rather than fight on Iranian soil – via terrorist attacks usually carried out through a Joint Cell approach that outsources much of the violence to local IRGC proxies, but always under the control of Hezbollah and the Qods Force.

262.    The IRGC adhered to the above-described security policy for the purported purpose of preventing "Christians" and "Zionists" from overrunning the Middle East, ending Iran's Islamic Revolution, and forcibly converting every Muslim in the world to Christianity and Judaism.[99]  At all times, and continuing to this day, the Iranian Shareholders with whom MTN Group, Phuthuma Nhleko, and Irene Charnley conspired, i.e., fronts for the IRGC (including its Hezbollah Division and Qods Force), have adhered to this doctrine.

263.    The ability of the IRGC to depend upon the reliability of its covers – corrupt corporate partners – was essential to the scheme's ability to obtain the vast storehouse of high-tech American smartphones, network computing technologies.

### i.    Concealment

264.    Every principle of terrorist tradecraft practiced by the IRGC begins with concealment.  While every Foreign Terrorist Organization, like the IRGC, prioritizes concealment, few have more practical experience accomplishing concealment.  And, from experience, organizations grow (for good or ill).  The IRGC has decades of terrorist experience and is the most experienced, practiced terrorist organization in the world today with respect to concealment, a status it earned in the 1990s and has maintained ever since.

265.    Under the "security" doctrine universally practiced at all times by the IRGC, including Hezbollah and Qods Force, IRGC terrorists are taught as a matter of terrorist tradecraft that, if they are faced with a choice between: (a) possibly blowing the concealment of an IRGC, including Hezbollah and Qods Force, cover, plot, operative, or transaction, and exposing the

---

[99] The last point reflects a particularly ominous aspect of the theological doctrine underpinning the "security" doctrine adhered to by the IRGC, including Lebanese Hezbollah and Qods Force.  Under the theology espoused by Iran's radical clerics, a Muslim conversion to Christianity (forcibly or not) is viewed as an apostasy, the worst possible thing someone can do, and the worst possible fate that could befall someone in return.

IRGC asset in question to capture by the hated "Great Satan," i.e., the U.S., and "Little Satan," i.e., Israel, or detection by the "Christians," i.e., the United States, and/or the "Zionists," i.e., Israel, or (b) simply lying, cheating, stealing, defrauding, burning, kidnapping, or murdering your way out of the problem, there is *no choice at all* for any terrorist who is a member of the IRGC.  For such a terrorist, IRGC doctrine commands them to maintain concealment of the asset to prevent discovery by the U.S.

266.    To be clear, Plaintiffs do not allege that the IRGC, including Hezbollah and Qods Force, have any discretionary authority in the immediately preceding hypothetical.  *Just the opposite*:  a well-trained terrorist following the tradecraft of the IRGC is *affirmatively compelled* to lie, cheat, defraud, kidnap, torture, rape, and murder – whatever is necessary to maintain concealment – as a religious duty, analytically no different from other pious acts because the crime in question was purportedly in service of the Islamic Revolution and the IRGC's holy mandate to "preserve" the Revolution since 1979 by conducting waves of terror campaigns coordinated by Hezbollah's External Security Organization.

267.    The IRGC's obsession with preserving concealment underpins this case.  Because the IRGC prioritizes concealment above all else, an operative of the IRGC would never truthfully reveal their "security"-related status – i.e., that they were a terrorist operative assigned to the IRGC's Hezbollah Division's External Security Office or through the IRGC's Qods Force and currently on a mission.

268.    The ordinary "use case" for most Foreign Terrorist Organizations, including the IRGC, assumes that the FTO's forward deployed terrorists worked in-country with local proxies to attack Americans nearby, and that the FTO's operatives are often highly motivated, but isolated and poorly resourced.  IRGC (including Hezbollah and Qods Force) tradecraft

85

emphasizes the intense vulnerability of Iranian terrorists considering America's military power, intelligence capabilities, surveillance prowess, dominance of the global financial system through New York banks, and status as the world's most technologically advanced country.

269.    IRGC (including Hezbollah Division and Qods Force) "security" operatives (i.e., terrorists) were (and are) paranoid about their concealment and went to extreme lengths to preserve it.

270.    When a forward-deployed intelligence operative or terrorist is operating under concealment, as most do, one key challenge involves how to develop reliable partners outside of the terrorist group (e.g., a partner who helps Hezbollah but is not himself a member) or intelligence service (e.g., a source).

271.    The IRGC does not lightly accept foreigners in their terrorist "circle of trust." And the IRGC did not do so here.

272.    To earn – and keep – the trust of the IRGC the IRGC insisted that MTN Group sign the same IRGC template, in which each Defendant pledged to facilitate the "security" operations of the IRGC, i.e., Hezbollah and Qods Force attacks against Americans worldwide.

273.    IRGC concealment doctrine emphasizes an "Orbit" strategy under which the IRGC, including its Hezbollah Division and the Qods Force, structures transactions so that the IRGC is behind one side, one step removed, but fully in control.  This IRGC tradecraft is designed to give the IRGC, and its corrupt corporate and financial enablers, the ability to falsely claim that the IRGC did not directly benefit from an otherwise suspect transaction because the counterparty himself was not a member of the IRGC.  NATO confirmed the IRGC's orbit strategy in a 2020 analysis that NATO published.  *Supra* § I.A.1 (discussion of article).

ii.     **Cover**

274.    The IRGC's terrorist doctrine emphasizes the reliance upon charities, corporations, and endowments, and other ostensibly "civilian" or "economic" entities as covers for the IRGC.

275.    In recognition of the central role of cover to IRGC doctrine, the IRGC created Unit 400 within the Qods Force.  As one regional newspaper explained in 2021:

> Unit 400 has a network of facilitators and proxies, including elements in organized crime syndicates. These individuals collect information, make preliminary logistical preparations, and carry out operations if necessary. These individuals sometimes are trained inside Iran and sometimes in the Quds Force's training camps across the globe. Unit 400 has various front companies that both provide cover and money for this terrorist entity to operate. Two companies, Arash Zoobin, and Aria Navid, are used to secretly transfer weapons for Unit 400. Besides, the IRGC uses its vast network of front companies, religious or charitable organizations around the world to recruit facilitators.[100]

276.    As a consequence, the IRGC, including its Hezbollah Division and the Qods Force, relied upon the importance of using crooked corporate partners to provide "cover" to facilitate, among other things:  **(i) illicit financial transactions to acquire and distribute U.S. Dollars**, e.g., laundering and recycle U.S. Dollar-denominated drug profits to finance Hezbollah operations; **(ii) illicit purchases of embargoed American technology**, e.g., bulk purchasing thousands of black market secure American mobile phones; **(iii) illicit movement of terrorist operatives**, e.g., a Hezbollah attack planner whose need to visit Europe requires a visa supplied by a credible front company; **(iv) illicit safe havens**, e.g., a fictitious company used as cover for an al-Qaeda safehouse in Afghanistan; and **(v) illicit cache sites**, e.g., Hezbollah attack planner whose need to visit Europe requires a visa supplied by a credible front company.

---

[100] Shahriar Kia, *Global Terrorist Activities Of The Iranian Mullah Regime*, Weekly Blitz (Bangladesh) (Dec. 4, 2021), 2021 WLNR 39679934.

### iii.        Slush Funds For "Off-Books" Terrorist Finance

277.    Given the IRGC's programmatic emphasis on deception and the use of "slush funds," core IRGC doctrine emphasizes that the IRGC, including its Hezbollah Division and the Qods Force, must draw a substantial portion of the funds, arms, personnel, and logistical support for anti-American terrorism globally from "off-books" sources, with the Bonyad Mostazafan being the most notorious – and important – terrorist slush fund of them all.

278.    Moreover, "all the IRGC's economic activities are monitored only by internal IRGC auditors and that the corps pays no taxes."[101]

### iv.        Corruption As Terrorist Tactic And Tool

279.    The terrorist tradecraft practiced and taught by the IRGC has long used corruption, bribery, kickbacks, "taxes," and protection money as a core strategy to facilitate terrorist attacks against Americans in Iraq, Afghanistan, and elsewhere through:  (1) terrorist finance, including raising funds, concealing funds, converting funds to U.S. Dollars (the currency of choice for all terrorists), and moving the Dollars to the necessary terrorist cell; (2) terrorist logistics, including acquiring the embargoed technologies necessary to improve the bombs, rockets, communications, and surveillance capabilities necessary to kill or kidnap Plaintiffs; and (3) terrorist freedom of movement, including securing visa and other government papers necessary to a plot, bribing law enforcement to prevent the roll-up of a cell, and the like.

280.    Decades of Hezbollah operations, investigations, and prosecutions confirm how the IRGC converted income from the transnational corruption economy for terror, including, but not limited to, examples ranging from Hezbollah's role in the Lebanese banking system

---

[101] Rasool Nafisi, *Iran's Revolutionary Guard Has A Lot To Lose*, Radio Free Europe Documents (Sept. 18, 2009), 2009 WLNR 18604289.

(Hezbollah dominated it), to Hezbollah's sponsorship of narcotics trafficking (Hezbollah serves as an elite global management consulting company for narcotraffickers), to Hezbollah's involvement in transnational organized crime worldwide (where Hezbollah serves as both partner, client, and management consultant).

281.    By 2004, the IRGC had spent more than two decades developing and refining their shared tradecraft, networks, strategies, and tactics relevant to using corruption as a tool for terror.  As a result, the IRGC already had a purpose-built transnational infrastructure enabling to convert the economic profits they derive from the "corruption economy" in one country into attacks in that country, but also others.

### v.    Required Donations (*Khums*) From All IRGC Members

282.    Shiite theological traditions call for donations (*khums*), usually equal to twenty percent (20%) of a person's income on every transaction, to support the cause.  The IRGC, however, has twisted this religious tradition, like tithing in Christianity, into something far different.

283.    Under the longstanding IRGC doctrine that Hezbollah teaches to Iranian proxies like Jaysh al-Mahdi, the IRGC emphasizes the need to consistently collect donations (or taxes) as something that is universally required from all profit-generating activities and transactions – *without exception* – including, but not limited to, profits generated through official business, criminal rackets, bribery and kickbacks, and a broad array of other illicit cash flow schemes. The IRGC's "no exceptions" rule ensures that the terrorist have an administratively simple scheme (analogous to a terrorist flat tax), which ensures ease of implementation, and comports with the broader IRGC emphasis on its terrorists and proxies embracing administrative simplicity in their jihad.

284.     Under IRGC doctrine, *khums* donations are mandatory on multiple different transaction types, all of which ultimately flow back to fund the IRGC, including its Hezbollah Division and the Qods Force.  *First*, if income flows through an IRGC-controlled front (i.e., MTN Irancell) to the IRGC shareholders behind that front (i.e., the IRGC, including its Hezbollah Division and the Qods Force), the respective shareholders provide a donation to the others.  Thus, for example, if MTN Irancell flowed through $100 million to the IRGC, one may infer that the IRGC would, in turn, donate approximately twenty percent (20%) – $20 million – to its Hezbollah Division and the Qods Force in order to export Iran's Islamist revolution abroad through anti-American terror.

285.     *Second*, if a member of the IRGC – or a cutout acting on their behalf – receives a substantial economic benefit, such as a $400,000 bribe, IRGC doctrine mandates that the bribe recipient kickback, mafia-style, twenty percent of their income to the IRGC.  Thus, for example, an IRGC member (or cut-out) who received a $400,000 bribe could ordinarily be expected to kickback $80,000 to the IRGC, or likely meet the same fate that would befall a captain in the Gambino crime family who tried to keep a nearly half-million-dollar score from the Don (death).

**B.  The Terrorist Tradecraft And Doctrine Of The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division And Qods Force, Has Historically Relied On Fronts, Operatives, Agents, Cut-Outs, And Orbits To Fund, Arm, And Operationally Support Iran's Anti-American Terrorist Proxy Attacks Against Americans**

286.     The terrorist tradecraft and doctrine of the IRGC has a long and notorious history of relying on fronts, operatives, and agents to obtain funding, weapons, and operational support to benefit the IRGC's terrorist operations and Anti-American proxies around the world, most of all Hezbollah.

90

287.     On February 10, 2010, the U.S. Treasury Department announced additional IRGC

front-related designations and stated that the IRGC were using illicit commercial transactions to

bolster Iran's terrorist enterprise:

> The U.S. Department of the Treasury [] took further action to implement existing
> U.S. sanctions against Iran's [IRGC] by designating an individual and four
> companies affiliated with the IRGC …  "As the *IRGC consolidates control over
> broad swaths of the Iranian economy*, … *it is hiding behind companies … to
> maintain vital ties to the outside world*," said Under Secretary for Terrorism and
> Financial Intelligence Stuart Levey.  "Today's action … will help *firms
> worldwide avoid business that ultimately benefits the IRGC and its dangerous
> activities*." …  The U.S. has previously acted against the IRGC and the IRGC-
> Qods Force for their involvement in proliferation and terrorism support activities,
> respectively. In joint actions on October 25, 2007, the State Department
> designated the IRGC, under E.O. 13382, for having engaged, or attempted to
> engage, in proliferation-related activities, and *Treasury designated the IRGC--
> Qods Force pursuant to E.O. 13224 for providing material support to …
> terrorist organizations*. …[102]

288.     On August 3, 2010, the U.S. Treasury Department announced additional IRGC-

and Qods Force-related terrorist designations that bolstered the U.S. message that the "IRGC and

IRGC-QF" provided "Support for Terrorist Organizations," including Hezbollah, and relied upon

illicit commercial transactions to fund and arm the Hezbollah-led terrorist campaign against

Americans in Iraq:

> The U.S. Department of the Treasury announced [] a set of designations targeting
> the Government of Iran's support for terrorism and terrorist organizations,
> including Hizballah … Iran is the primary funder of Hizballah and has long been
> recognized as the most active state sponsor of terrorism. Today's designations
> expose Iran's use of its state apparatus – including the Islamic Revolutionary
> Guard Corps-Qods Force – and state-run social service organizations to support
> terrorism under the guise of … economic development …
>
> **IRGC and IRGC-QF Support for Terrorist Organizations:**
> The IRGC-QF is the Government of Iran's primary arm for executing its policy of
> supporting terrorist and insurgent groups. The IRGC-QF provides material,
> logistical assistance, training and financial support to militants and terrorist

---

[102] U.S. Treasury Dep't, *Treasury Targets Iran's Islamic Revolutionary Guard Corps* (Feb. 10,
2010) (emphasis added).

operatives throughout the Middle East and South Asia. It was designated by Treasury pursuant to E.O. 13224 in October 2007 for its support of terrorism.

The Government of Iran also uses the Islamic Revolutionary Guard Corps (IRGC) and IRGC-QF to implement its foreign policy goals, including, but not limited to, *seemingly legitimate activities that provide* cover for intelligence operations and *support to terrorist and insurgent groups. These activities include economic investment … implemented by companies and institutions that act for or on behalf of, or are owned or controlled by the IRGC and the Iranian government*.

- … In Iraq, the Government of Iran trains, equips, and funds Iraqi Shia militant groups.
- In the Levant, the IRGC-QF continues to support designated terrorist groups such as Hizballah…[,] the largest recipient of Iranian financial aid, training, and weaponry; and Iran's senior leadership has cited Hizballah as a model for other militant groups.[103]

289.   On December 21, 2010, the U.S. Treasury Department announced additional IRGC-related designations, and stated once again that IRGC relied upon illicit commercial transactions, including through the Bonyads like Bonyad Mostazafan, to facilitate Iran's terrorist enterprise:

The U.S. Department of the Treasury announced [] a set of designations targeting the financial networks of the Islamic Revolutionary Guard Corps (IRGC) … Today's actions further expose the continued engagement of the IRGC … in illicit activities and deceptive behavior.

"[T]he IRGC … [is a] major institutional participant[] in Iran's illicit conduct and in its attempts to evade sanctions.  We will therefore continue to target and expose [its] networks," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. …  The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role it plays in Iran's … support for terrorism ….  The U.S., UN, EU, Japan, South Korea and others have all targeted the IRGC for sanctions because of this illicit activity. With the IRGC's expanding influence and control over broader segments of the Iranian economy … increasing numbers of Iranian businesses are subsumed under the IRGC's umbrella and identified with its illicit conduct.

---

[103] U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010) (emphasis added).

… Iranian bonyads are opaque, quasi-official organizations controlled by key current and past government officials and clerics. Bonyads receive benefits from the Iranian government but are not required to have their budgets publicly approved. They account for a significant portion of Iran's non-petroleum economy. …  Treasury has designated 14 IRGC-affiliated individuals and entities since June 2010 for facilitating Iran's nuclear and ballistic missile program or support for terrorism.[104]

290.    On June 23, 2011, the U.S. Treasury Department announced additional IRGC-

related designations that reinforced the U.S. message that illicit transactions with IRGC

commercial fronts directly aided terrorism against Americans by Iranian terrorist proxies:

**_Treasury Targets Commercial Infrastructure of IRGC, Exposes Continued IRGC Support for Terrorism_**

Today, the U.S. Department of the Treasury took action to designate … Iranian commercial entities … owned by [IRGC] … The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role it plays in all forms of Iran's illicit conduct, including Iran's … support for terrorism …  As Iran's isolation has increased, the IRGC has expanded its reach into critical sectors of Iran's economic infrastructure – to the detriment of the Iranian private sector – **_to generate revenue and conduct business in support of Iran's illicit activities_**.  Today's actions target core commercial interests of the IRGC, while also undermining the IRGC's ability to continue using these interests to facilitate its … illicit conduct. …  The IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests …, controlling billions of dollars in corporate business.  Given its increased involvement in commercial activity, imposing financial sanctions on commercial enterprises of the IRGC has a direct impact on revenues that could be used by the IRGC to facilitate illicit conduct.[105]

---

[104] U.S. Treasury Dep't, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010).

[105] U.S. Treasury Dep't, *Fact Sheet: Treasury Sanctions Major Iranian Commercial Entities* (June 23, 2011) (emphasis added).

C. **The Islamic Revolutionary Guard Corps', Including Hezbollah's And The Qods Force's, Transnational Terrorist Enterprise Depended Upon Complicit Multinational Corporations' Willingness To Transact With Known Islamic Revolutionary Guard Corps Front Companies Operating In Iran's Mobile Phone, Landline, Internet, And Network Computing Sectors**

291.    The IRGC controlled the entire Iranian telecom sector from top to bottom.  The following IRGC, including Hezbollah and Qods Force, fronts, operatives, and agents played especially prominent roles in ensuring that any telecom transactions that flowed cash to the IRGC's "Orbit" fronts benefited Hezbollah's and the Qods Force's global terrorist agenda.

1. **The Bonyad Mostazafan Was, And Remains, A Front For The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force**

292.    The Bonyad Mostazafan, also known as the *Bonyad Mostazafan va Janbazan*, Mostazafan Foundation, and Alavi Foundation (herein, the "Bonyad Mostazafan"), was established after the Islamic Revolution to steal and manage property, including that originally belonging to religious minorities in Iran such as Baha'is and Jews, to fund the export of the Iran's Islamist Revolution around the world.

293.    The Bonyad Mostazafan was and is a front for Hezbollah, the Qods Force, and Regular IRGC.  The Bonyad Mostazafan's purpose was and is to raise funds and obtain weapons (including weapons components) for the IRGC's terrorist operatives and proxies, including Hezbollah.  As a front for the IRGC funds and weapons (including weapons components) provided to the Bonyad Mostazafan through its commercial transactions inevitably flowed through the Bonyad Mostazafan to Hezbollah (through the IRGC) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2005 through 2016.

294.    At all times, the Bonyad Mostazafan has been led by an agent or cut-out for the IRGC and has served as a central hub of IRGC fund raising, weapons development and

acquisition, computing, and communications infrastructure for Iran's terrorist enterprise, which value has flowed through to Hezbollah and, through Hezbollah, to Jaysh al-Mahdi.

295.    The Bonyad Mostazafan is currently led by IRGC Brigadier General Parviz Fattah, who is also, on information and belief, a Qods Force operative.

296.    Serious counter-terrorism scholars have publicly confirmed that the Bonyad Mostazafan serves as an IRGC front for directly funding Iranian terrorist proxies in the Middle East.  For example, in 2014, Jonathan Schanzer, the Vice President of Research at the Foundation for Defense of Democracies, testified that "[t]he Bonyad-e Mostazafan" was "a splinter of Iran's IRGC" and had "reportedly opened its coffers to Hamas, providing critical financial support."[106]

297.    Indeed, South Africa's own intelligence service concluded that the Bonyad Mostazafan funded and logistically sustained both local Islamist terrorists operating in the same South African city where MTN Group was headquartered, and the IRGC's globally-oriented terrorist proxies and allies, who often used South Africa's permissive financial crime environment as a "home away from home."[107]

298.    On November 18, 2020, the U.S. Treasury Department designated the Bonyad Mostazafan, observed that it served as a "bridge to the IRGC," and announced as follows:

> The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) took action today against a key patronage network for the Supreme Leader of Iran, the Islamic Revolution Mostazafan Foundation (Bonyad Mostazafan, or the

---

[106] Statement of Jonathan Schanzer, Vice President of Research at the Foundation for Defense of Democracies, Committee on House Foreign Affairs Subcommittee on Terrorism, Nonproliferation, and Trade. Subcommittee on the Middle East and North Africa, *Hamas and Terrorism*, Congressional Testimony via FDCH (Sept. 9, 2014), 2014 WLNR 24926764.

[107] A broad array of Islamist terrorist groups, both Shiite and Sunni, have long relied upon South Africa as a financial, logistical, and operational hub for supporting terrorist attacks in Africa, the Middle East, Europe, and Asia.  Such FTOs include, but are not limited to, Hezbollah, the Qods Force, al-Qaeda, and the Haqqani Network.

Foundation) …   While Bonyad Mostazafan is ***ostensibly*** a charitable organization charged …, its holdings are expropriated from the Iranian people and are used by [Ayatollah] Khamenei to …  enrich his office, reward his political allies, and persecute the regime's enemies. …  "Iran's Supreme Leader uses Bonyad Mostazafan to reward his allies under the ***pretense of charity***," said Secretary Steven T. Mnuchin. …

**PARVIZ FATTAH, BONYAD MOSTAZAFAN'S BRIDGE TO THE IRGC**
Bonyad Mostazafan maintains close ties to the IRGC, personified by current Foundation president and former IRGC officer **Parviz Fattah**.  Appointed to the presidency of the Foundation by the Supreme Leader in July 2019, Fattah previously . . . . served as head of the Imam Khomeini Relief Committee, whose Lebanon branch was designated pursuant to ***counterterrorism authorities in 2010 for being owned or controlled by, and for providing financial and material support to, Hizballah***.  Known for his loyalty to the Supreme Leader, Fattah has also forged ties to senior IRGC-Qods Force (IRGC-QF) officials.  According to Fattah, former IRGC-QF commander Qassem Soleimani sought Fattah's assistance to finance the Fatemiyoun Brigade, an IRGC-QF-led militia composed of Afghan migrants and refugees in Iran coerced to fight in Syria under threat of arrest or deportation. . . .  The Fatemiyoun Brigade, like the IRGC-QF itself, is designated pursuant to [] counterterrorism … authorities. …

**SANCTIONS IMPLICATIONS**
As a result of today's action, … OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked or designated persons.  In addition, persons that engage in certain transactions with the individuals or entities designated today may themselves be exposed to sanctions. …[108]

299.    The Bonyad Mostazafan primarily serves as a front for terror and performs little legitimate charitable work.  As the Treasury Department found when it imposed sanctions, "[w]hile the Supreme Leader enriches himself and his allies, the Foundation's primary mission to care for the poor has ***become a secondary objective***. According to the Foundation's previous president, in past years as little as ***seven percent of the Foundation's profit*** has been spent on projects aimed at reducing poverty."[109]

---

[108] U.S. Treasury Dep't, *Treasury Targets Vast Supreme Leader Patronage Network and Iran's Minister of Intelligence* (Nov. 18, 2020) (emphases added).

[109] *Id*. (emphases added).

300.    The Bonyad Mostazafan directly funds Iranian terrorist proxy military activities outside of Iran.  Fattah, who currently runs the Bonyad Mostazafan, has publicly admitted it.

301.    Fattah was separately designated for his terrorism-related connections in 2010.[110]

302.    The Bonyad Mostazafan's participation in Irancell helped persuade the State Department to conclude (as published online) that Irancell was "fully owned by the IRGC."[111]

303.    Apart from its key role in Irancell, the Bonyad Mostazafan is also a key shareholder in TCI and MCI, using the IRGC's Orbit strategy to exercise its control of TCI and MCI in furtherance of the IRGC's terrorist agenda.

### 2.    Iran Electronics Industries Was, And Remains, A Front For The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force

304.    Iran Electronics Industries, also known as IEI, Sanaye Electronic Iran, Sasad Iran Electronics Industries, or Sherkat Sanayeh Electronics Iran ("IEI"), was and is a front for the IRGC.

305.    IEI's express purpose was and is to raise funds and obtain weapons (including weapons components) for the benefit of the IRGC's terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by IEI through its commercial transactions inevitably flowed through IEI to Hezbollah (through the IRGC) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2005 through 2016.

---

[54] U.S. Treasury Dep't, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010) ("Parviz Fattah, the Executive Director of Bonyad Taavon Sepah was designated today for acting on behalf of, and providing services to, Bonyad Taavon Sepah.").

[111] U.S. State Dep't Cable, *U/S Levey Seeks Turkish Cooperation Against Iranian Terrorism Finance & Nuclear Proliferation* (Dec. 18, 2006).

306.     Since the 1990s, IEI has been widely understood in business, diplomatic, military, and media circles to be a front for Iranian terrorism through the IRGC.

307.     On or about 2006, a Treasury official, Stuart Levin, told representatives of MTN's competitor, Turkcell, that IEI was "fully owned" by the IRGC.

308.     On information and belief, Undersecretary Levin communicated to MTN Group that IEI was "fully owned" by the IRGC and that economic interactions with IEI foreseeably aided Iranian proxy terrorist attacks against Americans.

309.     Beginning in the mid-2000s, U.S. federal criminal investigations and prosecutions also linked Irancell and IEI to the procurement of sensitive weapons technologies that were found in IEDs in Iraq and Afghanistan.

310.     On September 17, 2008, the U.S. Treasury Department designated IEI and explained that it builds weapons intended for use against the U.S. military.[112]

311.     IEI's participation in Irancell helped persuade the State Department to conclude (as published online) that Irancell was "fully owned by the IRGC."[113]

> **3.      MTN Irancell Was, And Remains, A Front For The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force**

312.     MTN Irancell is a joint venture between two IRGC, including Qods Force, fronts, the Bonyad Mostazafan and IEI, which collectively own 51% of MTN Irancell, and MTN Group Ltd., which owns 49% of MTN Irancell ("MTN Irancell").

313.     MTN Irancell was and is a front for the IRGC.

---

[112] U.S. Treasury Dep't, *Treasury Designates Iranian Military Firms* (Sept. 17, 2008).

[113] U.S. State Dep't Cable, *U/S Levey Seeks Turkish Cooperation Against Iranian Terrorism Finance & Nuclear Proliferation* (Dec. 18, 2006).

314.    MTN Irancell's express purpose was and is to raise funds and obtain weapons (including weapons components) for the benefit of the IRGC's terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by MTN Irancell through its commercial transactions inevitably flowed through MTN Irancell to Hezbollah (through the IRGC) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2005 through 2016.

315.    The U.S. State Department purportedly referred to Irancell (as published online) as being "fully owned by the IRGC."

316.    IRGC specialists agree.  For example, in 2015, Dr. Emanuele Ottolenghi, of the Foundation for Defense of Democracies, identified "telecommunications" as a "sector where the IRGC [was] bound to reap economic benefits" because "all three mobile operators in Iran" – including MTN Irancell – "are directly or indirectly partners with IRGC-affiliated companies."[114]

### 4.    The Telecommunications Company Of Iran Was, And Remains, A Front For The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force

317.    The Telecommunications Company of Iran (or TCI) was and is a front for the IRGC.

318.    TCI is the parent company of MTN Irancell's nominal competitor in Iran, MCI.

319.    TCI's express purpose was and is to raise funds and obtain weapons (including weapons components) for the benefit of Iran's terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by TCI through its

---

[114] Statement of Dr. Emanuele Ottolenghi Senior Fellow Foundation for Defense of Democracies, Committee on House Foreign Affairs Subcommittee on Middle East and North Africa, *Iran Nuclear Deal*, Congressional Testimony via FDCH (Sept. 17, 2015), 2015 WLNR 27612447 ("Dr. Ottolenghi Sept. 17, 2015 Testimony").

commercial transactions inevitably flowed through TCI to Hezbollah (through the IRGC) and

Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against

Americans in Iraq from 2011 through 2016.

320.    TCI is known to be an IRGC, including Qods Force, front.  The *Economist*'s due

diligence unit, the *Economist Intelligence Unit*, reported in 2009 that "[t]he question of possible

IRGC involvement in the TCI acquisition was raised in subsequent discussion in the Iranian

majlis (parliament)," where "[t]he speaker, Ali Larijani, [was] quoted by Aftab-e Yazd, an

Iranian newspaper, as saying that the IRGC was a direct party to the deal."[115]  The same report

also noted the  "[b]lurred distinctions" between the IRGC and Iranian telecom companies:

> [In 2006,] the Supreme Leader, Ayatollah Ali Khamenei, lent his personal support
> to the proposed asset sales. As with many other privatisation programmes in
> authoritarian states, there are strong grounds to suspect that elite groups are
> manipulating the process to advance their own interests unfairly. It is clear that
> over the past few years much political and economic power has flowed towards
> the IRGC. … The telecoms sector in Iran has expanded rapidly over the past five
> years, in particular in the mobile segment, which recorded a compound annual
> growth rate of 65% between 2003 and 2008. There is still room for expansion of
> mobile telephony as the penetration rate is only about 70%, and broadband
> services are notably underdeveloped. ***This makes telecoms one of the most
> attractive targets for investment in Iran***. At the same time, telecoms is a critical
> sector for the security forces, as the Islamic Republic faces unprecedented
> domestic opposition along with growing external threats. ***If the IRGC is indeed
> behind the TCI deal, it would make sense from both the commercial and the
> security perspective.***[116]

321.    IRGC specialists concur.  For example, when Dr. Ottolenghi identified

"telecommunications" as "[a]nother sector where the IRGC [was] bound to reap economic

benefits," Ottolenghi also noted that "[t]he IRGC control[led] Iran's largest telecom company,

the Telecommunication Company of Iran or TCI," which the "[t]he Guards bought … in

---

[115] Economist Intelligence Unit, *Iran Telecoms: Dial I for IRGC?*, Telecoms and Technology
Forecast (Oct. 12, 2009), 2009 WLNR 20135393.

[116] *Id.* (emphasis added).

September 2009 in a controversial bid that at the last minute disqualified the only non-IRGC

offer."[117]   As Dr. Ottolenghi further explained:

> TCI's main shareholder is now Toseye Etemad Mobin (50%), a company **controlled by the IRGC** jointly with the supreme leader's financial network, through two companies - the Tadbir Group-owned Gostaresh Electronic Mobin and Shahriar Mahestan Company.  TCI has a monopoly over Iran's landlines, and thus controls much of the country's Internet traffic.  As *Al-Monitor* reported in August 2013, **all three mobile operators in Iran are directly or indirectly partners with IRGC-affiliated companies**.[118]

322.    The Bonyad Mostazafan was (and is) also a member of the TCI consortium.  As a

result, Defendants routed money and technology to the IRGC's terrorist proxies through the

Bonyad Mostazafan's involvement in the TCI consortium.

### 5.    Exit40 Was A Front For Hezbollah

323.    The IRGC have active cells in India, Switzerland, and the U.A.E., and rely upon

all three as critical geographies to flow through precious U.S. Dollars and illicitly acquired

American technologies, ultimately flowing back to the IRGC's Hezbollah Division and Qods

Force, to be used to aid the attack campaigns in Iraq, Afghanistan, and elsewhere in furtherance

of the IRGC's scheme.

324.    Exit40 was a company with letter box offices in the U.A.E., Florida, India, and

Switzerland.  On information and belief, Exit40 was a front company created by or for Hezbollah

and the Qods Force, and owned, controlled, and operated by Hezbollah.

325.    On information and belief, Exit40 was purpose-built by Hezbollah and the Qods

Force, following IRGC terrorist tradecraft, to serve as a Hezbollah front for illicit fundraising

and acquisition of embargoed U.S. technologies including American smartphones and servers.

---

[117] Dr. Ottolenghi Sept. 17, 2015 Testimony.

[118] *Id*. (emphasis added).

326.     On information and belief, Exit40 supplied the described Security Aid to Hezbollah, the Qods Force, and other IRGC-affiliated terrorists and/or proxies in order to, among other things, aid attacks by the IRGC Shiite Terrorist Proxies in Iraq.

327.     On information and belief, Hezbollah and the Qods Force used Exit40 to extract millions of U.S. Dollars and tens of millions worth of American technologies, from inside the United States, through a hub location overseas (e.g., Singapore) before reaching the relevant terrorist cell in Iraq, Afghanistan, Iran, Pakistan, or the U.A.E.

**V.     DEFENDANTS' TRANSACTIONS WITH FRONTS, OPERATIVES, AND AGENTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED WEAPONS, FINANCING, LOGISTICAL, AND OPERATIONAL SUPPORT FOR ATTACKS AGAINST AMERICANS IN IRAQ BY JOINT CELLS AND JAYSH AL-MAHDI**

**A.     The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force, Sourced Arms, Raised Funds, And Obtained Logistical And Operational Support Through Illicit Corporate Transactions In The Telecom, Communications, And Information Technology Sectors**

328.     As Western sanctions clamped down on Iranian terror fronts, the IRGC responded by expanding its efforts to obtain funds, purchase arms, and manage illicit logistics chains vital to the IRGC's ability to fund its proxies in Iraq through illicit transactions in the United States, U.A.E., Germany, South Africa, and Iran.

329.     In so doing, the IRGC relied on transactions with multinational corporations, like Defendants MTN Group, supported by corrupt and complicit members of the C-Suite, like Defendants Nhleko and Charnley, which operated in key sectors for the dual-use technologies that were essential to the IRGC's, including Hezbollah's and the Qods Force's, communications, surveillance, bombmaking, rocket attacks, intelligence gathering, and project management – everything a transnational terrorist group needs to coordinate attacks against Americans in the Middle East.

330.    Sadegh Zibakalam, a professor of political science at the University of Tehran, explained to the BBC in 2012 that "[d]uring the past decade Iran has come up with various ways of getting around international sanctions."[119]  Per the BBC, Professor Zibakalam "said Iranian companies had been able to source many American … goods through international markets, especially companies based in Dubai … He added that international companies have been eager to assist Iran with equipment it needs."[120]

331.    The IRGC relied upon the use of concealment and corporate covers to illicitly acquire the technologies necessary to sponsor IRGC Shiite Terrorist Proxy attacks against Americans in Iraq at the nationwide scale necessary to potentially drive the U.S. out of the region as is the IRGC's Iranian constitutional duty.  At all relevant times, the IRGC has operated purpose-built units designed to extract American technology for use by Hezbollah and the Qods Force by coordinating with organized crime and facilitators.  Indeed, the IRGC's use of crooked corporations as fronts is consistent with longstanding IRGC terrorist doctrine, which emphasizes the use of mafia-like "buffers," cut-outs, and fraud schemes designed to route value and services without leaving a paper trail: in short, IRGC terrorist tradecraft.

332.    It is widely understood globally that illicit transactions that route money or technology to the IRGC inevitably result in the IRGC's Hezbollah Division and Qods Force receiving money, technology, or services that it can use in its terrorist enterprise, and vice versa.

333.    Scholars who have studied the IRGC concur that both benefit from illicit transactions and that the purported distinction between them is largely immaterial when it comes to Iran's terrorist enterprise and support for terrorist proxies.  British researcher Ben Smith

---

[119] BBC News, *Iran Mobile Operator Irancell 'Secures US Technology'* (June 6, 2012).
[120] *Id.*

studied the IRGC for the House of Commons and identified telecoms as a key area that
financially benefits all:

> [T]he Revolutionary Guards, have **large and expanding business interests** … The
> Iranian economy is "marked by a bloated, inefficient state sector".  That has
> allowed the president to appoint allies and old colleagues from the Revolutionary
> Guard into key positions in the public sector, and to award government contracts
> to companies owned **or** controlled by Guard members, many of which are
> involved in dual use technology … **including telecommunications** … The **al-**
> **Quds force is thought to be no less involved in the business world than the rest**
> **of the Revolutionary Guard**, and analysts suspect that these growing business
> interests provide **clandestine sources of funding to be channelled to overseas**
> **groups and individuals, hidden from [] scrutiny** …[121]

334.    Prominent media reports also support this conclusion.  According to a 2007 report

in the *New York Times*, "[s]ome specialists even question whether the Quds Force exists as a

formal unit clearly delineated from the rest of the Revolutionary Guard."[122]  As one such Iran

specialist, Vali R. Nasr of the Naval Postgraduate School, explained to the *Times*, "[i]t could be

that anyone with an intelligence role in the Revolutionary Guard is just called Quds."[123]

335.    Moreover, any lines between the IRGC and the Qods Force blur when it comes to

Iran's support for Islamist terrorists outside of Iran.  As the same *New York Times* report noted in

2007, "[w]hether properly identified as part of the Quds Force or not, members of the

Revolutionary Guard mobilized intelligence and paramilitary agents in Lebanon in the 1980s,

where they trained the Shiite militia Hezbollah; in Afghanistan, during the anti-Soviet jihad in

---

[121] Ben Smith (International Affairs and Defence Section of the UK House of Commons
Library), *The Quds Force of the Iranian Revolutionary, Guard -- Standard Note: SN/IA/4494*,
UK House of Commons Library Standard Note (Oct. 30, 2007) (emphasis added).

[122] Scott Shane, *Iranian Force, Focus of U.S., Still a Mystery*, N.Y. Times (Feb. 17, 2007).

[123] *Id.*

the 1980s and episodically since then; in the former Yugoslavia, supporting the Bosnian Muslims against Serbian forces; and in other trouble spots."[124]

336.     As the Foundation for Defense of Democracies similarly concluded, given the tight nexus between IRGC commercial activity and violence by Iranian proxies, that any transaction with IRGC fronts benefits Iran's terrorist enterprise – even when it does not result in the IRGC or Qods Force directly obtaining any embargoed arms or technology:

> IRGC front companies … have stakes in telecommunications ….   of which Iran is the largest manufacturer in the Middle East. … Many IRGC projects are military in nature, and the group ***diverts much of the technology and expertise it acquires from Western companies for seemingly innocuous projects to unsavory ends***. … Any company that does business in Iran risks becoming an unwitting accomplice to the IRGC's nefarious activities … Yet ***even when companies provide services and technologies that cannot be diverted to illicit projects, partnering with the IRGC entails some complicity with its activities***. In June 2006, [the head of an IRGC-owned company] confirmed in an interview with a local daily that the ***organization's funds finance various national defense projects, including arming and training Hezbollah***.[125]

**B.     Defendants Made Illicit Deals With Fronts, Operatives, Agents, And Cut-Outs Of The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division And Qods Force, That Caused Secure American Smartphones, Enterprise Level Servers, Network Computing Technologies, And Weapons To Flow Through The IRGC Fronts To Reach Hezbollah, The Qods Force, Regular IRGC, The Joint Cells, And Jaysh Al-Mahdi In Iraq**

337.     Beginning in 2005, after the IRGC had intensified its support of the terrorist campaign in Iraq, MTN Group, Phuthuma Nhleko, and Irene Charnley made illicit deals with IRGC fronts, operatives, agents, cut-outs, and Orbits in the telecom, communications, and network computing sectors.  Those deals directly benefited MTN Group and its subsidiaries and affiliates, Phuthuma Nhleko, and Irene Charnley and caused tens of millions of dollars' worth of

---

[124] *Id*.

[125] Mark Dubowitz and Emanuele Ottolenghi (Foundation for Defense of Democracies), *The Dangers Of Doing Business With Iran's Revolutionary Guards*, Forbes (June 15, 2010) (emphasis added).

embargoed American technologies to flow into the IRGC's (including its Hezbollah Division's and Qods Force's) terrorist enterprise each year.

338.    The IRGC leveraged Defendants' insatiable appetite for Iran's telecom market, which was widely understood to represent a unique opportunity.  As the *Economist* explained in 2004, "[w]ith a population of some [70 million people] and a mobile-phone penetration rate of below 5%, ***Iran offers a unique opportunity for telecommunications investors***. … However, the wrangles with … Turkcell illustrate the difficulties in assessing the political risk associated with trying to enter the Iranian market."[126]

339.    MTN Group's, Phuthuma Nhleko's, and Irene Charnley's transactions provided financial, technical, logistical, and operational support to the Hezbollah, the Qods Force, and Regular IRGC worth tens of millions of U.S. dollars per Defendant each year, which funds flowed to their terrorist proxies including, but not limited to, Jaysh al-Mahdi in Iraq, al-Qaeda (worldwide), and the Taliban, including its Haqqani Network, in Afghanistan.

340.    MTN Group, Phuthuma Nhleko, and Irene Charnley furthered the scheme by ensuring its concealment for years through their rigorous adherence to the core principles of terrorist tradecraft specifically practiced by the IRGC, including its Hezbollah Divisions and Qods Force, while performing "security"-related operations, e.g., Joint Cell attacks against Americans in Iraq, or Qods Force facilitation of al-Qaeda/Taliban attacks in Afghanistan. Defendants' rigorous adherence to IRGC terrorist tradecraft furthered the terrorist scheme because it provided concealment to the fronts, operatives, and illicit transactions that channeled

---

[126] Economist Intelligence Unit, *Iran: Putting Up The Shutters*, Business Middle East (Sept. 1, 2004) (emphasis added), 2004 WLNR 10893473.

millions through to the IRGC and through them, to the IRGC's Shiite and Sunni Terrorist proxies worldwide.

341.    MTN Group, Phuthuma Nhleko, and Irene Charnley deployed numerous illicit strategies to covertly transfer embargoed American smartphones, servers, network computing systems, and the associated technical support services without which their high-end gear was of little value.  While the strategies differed over time, each shared a common specific intent:  to cause tens of millions in valuable state-of-the-art American technologies, services, and currency to flow from the United States to the IRGC and through them, to the IRGC's Shiite and Sunni Terrorist Proxies worldwide, in order to sustain the terrorist campaigns in Iraq, Afghanistan, Yemen, Syria, and Europe.

342.    While Defendants pursued several different strategies for flowing terrorist finance through the MTN Irancell and TCI fronts to the IRGC terrorists standing behind it, two had the greatest impact.

343.    Defendants' illicit deals with the IRGC fell into three broad categories of deal type: (1) weapons procurement through sham deals; (2) financing through illicit transactions; and (3) operational support obtained through the legitimacy of the companies helping the IRGC.

344.    Defendants also knowingly helped the IRGC source hundreds of distinct items of state-of-the-art embargoed American technology that were illicitly acquired within the U.S. and then re-exported to Defendants' respective IRGC-front counterparties, to be given to terrorists. Plaintiffs offer representative examples of the "security" assistance that Defendants provided MTN Irancell and TCI (including MCI).

345.    For decades, the IRGC have recognized the centrality of cell phones to the modern terrorist.  Hezbollah has long widely deployed mobile phones as a tool of terror.

346.    MTN Group, Phuthuma Nhleko, and Irene Charnley deliberately engaged in complex schemes to acquire sensitive American technologies on the black market and route the "security" assistance to the IRGC.

347.    As one strategy, MTN Group instructed its cut-outs to **out-spend** the other black market cell phone buyers – meaning that MTN Group, under Mr. Nhleko's lead, was literally willing to pay **above black market rates** to acquire the sheer volume of high-tech American phones demanded by Defendants' key business partner, the IRGC, to facilitate anti-American terror attacks by Hezbollah, the Qods Force, and their proxies in Iraq and Afghanistan.

      C.     **Defendants Made Illicit Deals With Fronts, Operatives, Agents, And Cut-Outs Of The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division And Qods Force, That Caused Funds To Flow Through The IRGC Fronts To Hezbollah, The Qods Force, The Joint Cells, And Jaysh Al-Mahdi In Iraq**

348.    Beginning in 2005, after the IRGC had intensified its support of the terrorist campaign in Iraq, MTN Group, Phuthuma Nhleko, and Irene Charnley made illicit deals with IRGC fronts, operatives, agents, cut-outs, and Orbits in the telecom, communications, and network computing sectors.  Those deals directly benefited MTN Group, Phuthuma Nhleko, and Irene Charnley, and caused tens of millions of U.S. dollars to flow into the IRGC's (including Hezbollah's and the Qods Force's) terrorist enterprise each year.

      1.     **Procurement Bribery**

349.    At all relevant times, the IRGC operated one of the most corrupt procurement environments in the world.

350.    The IRGC's approach was not out of line with prevailing Iranian corruption practices.  As one trade publication explained, "[c]orruption" is [a] [k]ey [c]oncern," in Iran "[a]nd [w]ill [l]ikely [w]orsen" because "[a]n endemic culture of corruption appears to pervade all areas of society in Iran, presenting a major obstacle for private and foreign-owned

businesses."[127]   Indeed, "Iran provides a highly conducive environment for corruption to flourish, primarily due to the opaque and complex nature of government, and the convoluted process of completing bureaucratic procedures."[128]

351.    Under official IRGC policy, the IRGC follows a mafia-style financial approach under which all IRGC components share a percentage of all income they realize with the IRGC – like how a mafia lieutenant kicks up a portion of his earnings to the mob boss.  For example, in 2003, the IRGC issued a directive decreeing those profits realized by IRGC fronts, operatives, and agents must be shared with the broader IRGC organization, i.e., its Hezbollah Division and Qods Force.  The IRGC issued this directive as it was ramping up for a long multi-front terrorist campaign against the United States, and the point of the directive was to escalate the flow of funding supporting the IRGC's proxies in Iraq and Afghanistan.

352.    The IRGC have long emphasized weaponizing their control (directly or indirectly) of procurement processes to generate cash flow.

353.    Acting through its Hezbollah Division, the IRGC has long counseled its terrorist proxies about the utility of seizing government ministries, state-owned-enterprises, and private commercial businesses in order to convert them into tools of terrorist finance.

354.    IRGC Shiite Terrorist Proxies made this a calling card of IRGC-backed terror, having deployed the strategy in every IRGC-backed terror campaign since the Islamic Revolution in 1979, including Hezbollah's control of social services in Lebanon, Jaysh al-Mahdi's control of the Iraqi Ministry of Health, and the Houthis' control of certain geographies in Yemen, as three examples.

---

[127] Emerging Monitor Online, *Iran: Major Barriers To Investment* (Feb. 19, 2016), 2016 WLNR 5299681.

[128] *Id.*

355.    From the perspective of an operative, agent, cut-out, cover, or proxy ally of the IRGC the IRGC's procurement bribery tradecraft usually calls for the following principles:

(i)      for ordinary procurement projects, e.g., a captive ministry purchasing a supply of commodities, the terrorist should extract a bribe or kickback of ten percent or more, often styled as a *khums* and delivered in cash (U.S. Dollars required) or "free goods";

(ii)     for mega-blockbuster procurement projects, e.g., build the complete nationwide infrastructure for a communications device, the terrorist should extract whatever the terrorist can get, but should not get greedy or let the perfect be the enemy of the good (the terrorist analogue to the maxim "pigs get fat, hogs get slaughtered"); and

(iii)    regardless of project type, follow similar terrorist tradecraft, including, but not limited to, emphasis on concealment and covers.

## 2.    "Free Goods"

356.    The IRGC have long emphasized manipulation of local and regional black markets as an ideal source of cash flow.

357.    The IRGC has long preferred "free goods" bribes as a tool of terrorist finance because "free goods" serve as cash equivalents given the ease of black-market access throughout the region, and "free goods" do not leave as large (or any) of a paper trail.

358.    The IRGC, and every IRGC Shiite Terrorist Proxy, has deep experience monetizing every conceivable type of "free good" on the black market because every such terrorist group draws most of its members from geographies where black markets have been endemic for decades, including several where certain goods could only be acquired on the black market (e.g., medicine in Syria).

359.    The IRGC specifically trained its operatives with respect to terrorist tradecraft concerning cell phones, including, but not limited to, how a terrorist can treat cell phones as cash equivalents to be sold or traded like any other precious commodity, e.g., gold, to facilitate attacks against Americans in the Middle East.

360.    The IRGC also taught its operatives that they could use their mobile phones as cash equivalents.

361.    This is important because each Defendant caused thousands, if not tens of thousands, of secure American mobile phones, to flow through MTN Irancell and/or TCI to the terrorists.

362.    The going rate for a "clean" American cell phone on the black market is a 10-fold markup.  The phones that get busted out into this market are ordinarily priced at around $200 per phone (because the annual contract heavily subsidizes the device itself).  Thus, when black market sellers flip an ordinary American cell phone, they can expect to earn about $2,000 per black market cell phone.

363.    The IRGC's historic preference for "free goods" as a form of terrorist finance was met by Defendants' willingness to spend their own money to buy American mobile phones for the IRGC.  Each Defendant understood that it could curry favor with its IRGC business partner by flooding the zone with untraceable American smartphones.

364.    On information and belief, Defendants supplied free mobile phones to the IRGC because Defendants understood that the IRGC, as well as Shiite terrorist proxies like Jaysh al-Mahdi, have long emphasized the exploitation of black markets to derive untraceable terrorist cash flow.  Such a view comports with the IRGC's intense doctrinal focus on concealment as the first virtue of a "security" operatives, and the paranoia that IRGC personnel could be detected by the "Great Satan."  Black markets are safely anonymous.

365.    Moreover, for decades, corrupt companies in the Middle East have leveraged "free goods" schemes to route bribes to Iran-backed terrorists, and as a result, at all relevant times there has been a thriving "corruption economy" that roughly traces the "Shia crescent"

from Iran through Iraq into Syria and terminating in Lebanon.  Given the pervasive black markets that flourish here, and throughout the Middle East, Asia, and Africa, so-called "free goods" bribery schemes offer several ideal features for the hardened corporate criminal (or terrorist), including built-in cover if detected (e.g., "we are just a civilian phone company").

366.     Indeed, free goods are an especially potent form of terrorist finance for the IRGC because free goods (in the form of technologies like mobile phones) are usually compact, lucrative, odorless, valuable, and easy to unload on the black market.  Moreover, free goods offer an enormous tradecraft benefit for terrorists – no paper trail and no electronic or data signature for the Americans to capture.

### 3.     Exit40

#### i.      Exit40 Was An Islamic Revolutionary Guard Corps Finance And Logistics Front For Hezbollah And The Qods Force

367.     The IRGC have active cells in India, Switzerland, and the U.A.E., and rely upon all three as critical geographies to flow through precious U.S. Dollars and illicitly acquired American technologies, ultimately flowing back to the IRGC's Hezbollah Division and Qods Force, to be used to aid the attack campaigns in Iraq, Afghanistan, and elsewhere in furtherance of the IRGC's scheme.

368.     Exit40 was a company with letter box offices in the U.A.E., Florida, India, and Switzerland.  On information and belief, Exit40 was a front company created by or for Hezbollah and the Qods Force, and owned, controlled, and operated by Hezbollah.

369.     On information and belief, Exit40 was purpose-built by Hezbollah and the Qods Force, following IRGC terrorist tradecraft, to serve as a Hezbollah front for illicit fundraising and acquisition of embargoed U.S. technologies including American smartphones and servers.

370.     On information and belief, Exit40 supplied the described Security Aid to Hezbollah, the Qods Force, and other IRGC-affiliated terrorists and/or proxies in order to, among other things, aid attacks by the IRGC Shiite Terrorist Proxies in Iraq.

371.     On information and belief, Hezbollah and the Qods Force used Exit40 to extract millions of U.S. Dollars and tens of millions worth of American technologies, from inside the United States, through a hub location overseas (e.g., Singapore) before reaching the relevant terrorist cell in Iraq, Afghanistan, Iran, Pakistan, or the U.A.E.

### ii.   Defendants Knowingly Used, Or Concealed The Use Of, Exit40 To Finance Hezbollah And The Qods Force

372.     MTN Group had a business relationship with Exit40.

373.     On information and belief, on or about 2005, MTN Group, Phuthuma Nhleko, and Irene Charnley caused Exit40 to be hired as a consultant or a distributor on behalf of MTN Group, MTN Irancell, and/or another MTN subsidiary.

374.     MTN Group, Phuthuma Nhleko, and Irene Charnley have gone to extreme lengths to conceal MTN's relationships and transactions with Exit40.  Among other things, one or more of MTN Group's and/or MTN's affiliates,' officers, directors, employees and/or agents have been instructed not to mention Exit40 over the phone or in an email.

375.     On information and belief, one or more of MTN Group's officers, employees, or agents discouraged any telephonic or email discussions concerning Exit40 because such person (whose knowledge was imputed to MTN Group) knew that MTN Group's relationship with Exit40 was illegal because Exit40 was acting, directly or indirectly, on behalf of Hezbollah and the Qods Force to enable large value transfer chains between MTN Group and MTN Irancell, on the one hand, and Hezbollah, the Qods Force, among other FTOs, on the other hand.

376.    On information and belief, an operative, employee, agent, or cut-out from MTN Irancell, TCI, the Bonyad Mostazafan, or another IRGC-controlled entity, made MTN Group aware that MTN Group should use Exit40 in order to help source the U.S. Dollars and American technologies, including secure cell phones and encrypted communications technologies, that Hezbollah and the Qods Force deployed to facilitate IRGC proxy terrorist attacks against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

377.    On information and belief, MTN Group, Phuthuma Nhleko, and Irene Charnley caused the retention of Exit40 by MTN Group, MTN Dubai, or MTN Mauritius, or a cut-out acting on their behalf, so that Exit40 would serve as MTN Group's, MTN Dubai's, MTN Irancell's and TCI's agent or cut-out in order to intentionally route U.S. Dollars and embargoed American technologies through the MTN-related entities (or cut-outs for MTN-related entities), so that some or all of the associated funds or technologies flowed through to Hezbollah and the Qods Force to be deployed in furtherance of the IRGC's sponsored attack campaigns against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

378.    On information and belief, MTN Group, Phuthuma Nhleko, and Irene Charnley caused MTN Group personnel, MTN Dubai, or an MTN subsidiary, affiliate, agents, cut-out, or business partner to pay millions of U.S. Dollars to Exit40 in order to cause Exit40 to procure the embargoed American technologies identified by the IRGC in order to support the IRGC's sponsored terrorist campaigns against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

379.    On information and belief, Exit40 routed tens of millions of U.S. Dollars in value (in cash, goods, and services) through MTN Group, MTN Dubai, MTN Irancell or another MTN entity, at the direction of MTN Group, Phuthuma Nhleko, and Irene Charnley, which flowed through these entities to Hezbollah from 2005 until on or about 2012.  Hezbollah, in turn, shared

such resources to facilitate, among other things, IRGC Shiite Terrorist Proxy attacks against Americans in Iraq and Afghanistan intended to expel the U.S. from the Middle East.

380.    On information and belief, such Exit40 transactions and services facilitated by MTN Group, Phuthuma Nhleko, and Irene Charnley, routed millions of U.S. Dollars' worth of value in U.S. Dollar currency and embargoed American technologies and services from the United States to Hezbollah, the Qods Force, and the IRGC Shiite Terrorist Proxies overseas from on or about 2005 through on or about 2012, which discovery should reveal.

## VI.    DEFENDANTS PROVIDED DIRECT AID TO COUNTERPARTIES WHOM DEFENDANTS KNEW WERE STRUCTURED TO FINANCE, ARM, AND/OR OPERATIONALLY SUPPORT JOINT CELLS AND JAYSH AL-MAHDI ATTACKS AGAINST AMERICANS IN IRAQ

381.    MTN Group, Phuthuma Nhleko, and Irene Charnley provided material support to Hezbollah, the Qods Force, Regular IRGC, al-Qaeda, and the Taliban, including its Haqqani Network through transactions entered, or facilitated by, MTN Group and MTN Irancell.   MTN Group held itself, and Phuthuma Nhleko, out as responsible for how MTN Group affiliates worldwide manage "security" issues.

382.    MTN Group follows a hub-and-spoke business model where the Group headquarters in South Africa provides a substantial amount of financial, operational, technical, and personnel support to every other MTN subsidiary and affiliate.[129]  Indeed, MTN Group regularly loaned large sums of money to Irancell, roughly equal to Irancell's paper profits, and as

---

[129] In such a business model, one can ordinarily infer a reasonable estimate regarding the range of monies the hub (here, MTN Group) can be presumed to be reinvesting back into the spoke (here, MTN Irancell), so that the latter can sustainably grow.  On information and belief, MTN Group reinvests at least five percent (5%) of MTN Group's net income derived directly or indirectly from MTN Irancell back into MTN Irancell.

a result, MTN Group loaned monies to Irancell in other currencies (e.g., Iranian riyals) equal to more than one hundred million U.S. Dollars on an annual basis.

383.    MTN Group worked closely to coordinate the technical buildout of MTN Irancell, and senior executives from MTN Group regularly coordinated their financial, technical, and logistical support to MTN Irancell.

384.    Plaintiffs use the term "MTN" in this section to refer collectively to the MTN family of companies.  Unless otherwise specified, when Plaintiffs use that term to describe MTN's conduct in Afghanistan, "MTN" refers to conduct that was implemented on the ground by MTN Afghanistan and approved by both MTN Group, and when Plaintiffs use that term to describe MTN's conduct in Iraq and concerning Irancell, "MTN" refers to conduct that was implemented on the ground by MTN Irancell and approved by both MTN Group.

385.    MTN Group also provided strategic communications services to, and/or for the benefit of, the Regular IRGC, Hezbollah, and the Qods Force, which provided concealment for the IRGC's terrorist activities by reaching into the United States to communicate IRGC disinformation concerning, among other things, whether MTN Irancell is an IRGC front (it is, and MTN Group sponsored disinformation suggesting the opposite).

**A.    MTN Group Knowingly Served, And Still Serve, As A Joint Venture Partner With MTN Irancell And Its Iranian Shareholders, The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force, Through MTN Group's Participation In MTN Irancell**

386.    MTN Group's business model depends on MTN Group's ability to remain well-resourced in order to make significant investments as necessary.  This model recognizes that many MTN joint ventures and subsidiaries may have capital expenditures ("CapEx") challenges as they scale their business – a classic corporate function where MTN Group can, and ordinarily does, contribute funds and personnel.

387.    During the 2010s, MTN Irancell tore through its CapEx.  In a business model similar to that of MTN Group, MTN Irancell's CapEx issues were beneficial for MTN Group as it reflected growth and profit.  On information and belief, MTN Group provided one or more infusions of cash to MTN Irancell.

388.    From 2003 through 2018, MTN Group served in an over-sized role compared to other competitors' parents:  Global CEO (recall that MTN Group's CEO committed every MTN entity to the Security Cooperation Agreement); Global Logistics and Supply Chain, Global Back-Office; and Global Financier.  Simply put, MTN Group did it all.

389.    From 2004 through 2018, MTN Group operated in a top-down manner that regularly disregarded the corporate form when necessary to support the IRGC and fulfill MTN Group's, Phuthuma Nhleko's, and Irene Charnley's obligations to the IRGC pursuant to Defendants' performance of MTN's obligations to Hezbollah, the Qods Force, and Regular IRGC under the Security Cooperation Agreement.  Examples include, but are not limited to:

- MTN Group disregarded the corporate form when MTN Group's President & CEO executed the secret Security Cooperation Agreement with the IRGC, *infra*, including Hezbollah and the Qods Force, on behalf of every "MTN" entity worldwide.

- MTN Group and MTN Mauritius disregarded the corporate form when MTN Group's President & CEO instructed another MTN executive to approve a $400,000 "necessary payment" (i.e., a bribe) out of the MTN Mauritius account after MTN Group secured the Irancell license.  The decision by MTN Group's President and CEO to take the key $400,000 bribe off MTN Group's books reflected the MTN Group President and CEO's consciousness of guilt.

- MTN Group disregarded the corporate form when MTN Group routinely made decisions on behalf of MTN Nigeria while the Nigerian government investigated allegations concerning allegation that MTN Nigeria facilitated operations by Boko Haram.

390.    Beginning in 2004, MTN Group, Phuthuma Nhleko, and Irene Charnley pursued an aggressive expansion in the Middle East, in which Defendants worked together to dominate the "virgin" mobile markets of Iran, Afghanistan, Lebanon, Syria, and Yemen.

391.     By 2004, few "virgin" market opportunities remained in the world.  The collective market share attributed to this Iranian-dominated "Shiite crescent" of Iran, Syria, and Lebanon, combined with the two other nations where Iran actively fomented terrorist proxies (Afghanistan and Yemen), was by far the most lucrative "virgin" mobile phone market opportunity in the world at the time.

392.     MTN Group, Phuthuma Nhleko, and Irene Charnley knew that the IRGC, through its subordinate divisions, Hezbollah and the Qods Force, actively sponsored anti-American terrorism in all five of the markets they coveted:  Iran, Syria, Lebanon, Afghanistan, and Yemen.

393.     Mobile phone companies like MTN Group are heavily dependent upon infrastructure vulnerable to terrorist attacks.  As a result, MTN Group, Phuthuma Nhleko, and Irene Charnley knew they would have to reach an agreement with the IRGC, which was the only way MTN Group, Phuthuma Nhleko, and Irene Charnley could win the business, not just in Iran, but also in its client states (e.g., Syria, Lebanon), or where it played a spoiler role (e.g., Afghanistan).  This meant MTN Group, Phuthuma Nhleko, and Irene Charnley knew that MTN Group had to make a deal with the IRGC as the latter exercised a de facto veto over the telecoms' procurement decisions in Syria and Lebanon (among other places).[130]

---

[130] Defendants MTN Group, Phuthuma Nhleko, and Irene Charnley each have deep experience doing business throughout Africa and the Middle East.  As such, they knew of the widespread, and often reported, practice of the IRGC, through Lebanese Hezbollah and the Qods Force, to regularly interfere in the ministerial decisions of countries in both geographies concerning commercial, military, and political matters.  MTN Group, Phuthuma Nhleko, and Irene Charnley therefore knew that all roads to the business in Lebanon, Syria, Afghanistan, and Yemen traveled through the "Iranian Shareholders," i.e., the IRGC, including its Lebanese Hezbollah division and the Qods Force.

1. **In 2005, MTN Group, Through Phuthuma Nhleko, Promised To Provide "Security" "Cooperation" To Hezbollah, The Qods Force, And Regular IRGC On Behalf Of MTN Group, Himself, And Every MTN Entity Worldwide When He Executed The IRGC's Security Cooperation Agreement On Behalf Of MTN Group and its affiliates**

394.    In 2004, Iran awarded a cellular-phone license to MTN's competitor, Turkcell. MTN then engaged in a corrupt scheme to take the license away from Turkcell and enter the Iranian market itself.  MTN's efforts were successful and led it to acquire a 49% stake in Irancell – a joint venture with an Iranian government-controlled consortium.  MTN internally called its corrupt scheme to enter the Iranian market "Project Snooker".[131]

395.    MTN threw itself into Project Snooker with abandon, dedicating senior MTN Group executives to the mission, including, but not limited to, its President and CEO, Commercial Director, and the regional head responsible for the Middle East.

396.    On November 16, 2004, MTN's Commercial Director, Irene Charnley, documented MTN's aggressive support for the terrorist agenda of the IRGC.  In a fax to Iranians, Ms. Charnley provided MTN's help to Iranian efforts to violate terror-related sanctions against the IRGC by sourcing "major components" for American-made "Bell" and "Sikorsky" helicopters that were intended, in part, for "military use" by the IRGC.

397.    Project Snooker required close cooperation between MTN and the Iranian government.  On July 5, 2005, MTN sent a letter from its CEO to two Iranian terrorists, one of whom was the former Chief of Staff of the IRGC who had led the Bonyad Mostazafan and the IEI, which were the two terrorist fronts with which MTN was attempting to join in the Irancell

---

[131] *See* Memorandum from Phuthuma Nhleko to Sifiso Dabengwa *et al.*, *Overview & Way Forward – Project Snooker* (Sept. 21, 2005) ("*Project Snooker Mem.*").

joint venture (the "July 5, 2005 Letter").  In the July 5, 2005 Letter, MTN Group wrote to its

prospective IRGC, including Qods Force, joint venture partner:

> We appreciated the very hospitable manner that you received the MTN Group
> executive team.  During the course of my visit it became clear to me that your
> organisations play a very important role in the economy of the Islamic Republic
> of Iran.  I was also convinced that your organizations together with MTN could
> create a partnership that would be **mutually beneficial** in **meeting all our
> objectives** in the telecommunications sector in Iran.
>
> I would be honoured if you could find the time to pay a visit to the MTN Group
> Head Office in … South Africa … [in] July 2005. … [D]uring your visit, … [t]he
> two key discussion points are:
>
> 1. The nature and extent of **financial assistance that the MTN Group could
>    provide to the Iranian partners** in the Second Mobile licence in Iran.
>
> 2. The nature and extent of the co-operation between your esteemed
>    organizations and the MTN Group in current and future
>    telecommunications projects in Iran.  [Emphases added.]

398.    The negotiations were successful.  On September 18, 2005, MTN Group signed a

Security Cooperation Agreement with the IRGC and Qods Force fronts with whom MTN had

been negotiating.    It gave MTN the right to participate in the MTN Irancell joint venture as a

junior partner with a 49% stake, leaving 51% collectively – and all decision-making authority –

to MTN's two partners that MTN knew were IRGC and Qods Force fronts (hereinafter, the

"Security Cooperation Agreement" or "Agreement").  MTN's Security Cooperation Agreement

with the IRGC is attached hereto as Exhibit A.

399.    The Security Cooperation Agreement was drafted by the IRGC and constitutes the

IRGC's "template" for the terms under which IRGC terrorist fronts in industries vital to the

terrorist enterprise were permitted to enter joint ventures with foreign companies like MTN.  The

Security Cooperation Agreement is replete with indicia that it was drafted by the IRGC rather

than a sophisticated multinational corporation like Defendants.  Such indicia include but are not

limited to: (1) the reference to God at the start of the Agreement; (2) the inclusion of the Islamic calendar date (27/06/1384) in the Agreement; (3) the generic reference to "Iranian shareholders," rather than any specific reference to any specific Iranian entity; and (4) the inclusion of a blank space for the handwritten insertion of certain terms.[132]  Here is how the Agreement begins:

> *In the Name of God*
>
> **Letter Agreement**
>
> On September 18, 2005 (27/06/1384)  this letter agreement is concluded between local shareholders of Irancell Consortium and MTN, regarding the manner and conditions of transfer of 49% of Irancell Consortium shares to MTN. Parties herein agreed as follows:

400.    The Security Cooperation Agreement pledged broad cooperation between MTN Group and its IRGC, including Qods Force, partners in furtherance of Iran's terrorist agenda. Section 8 obligated MTN Group to assure that, with respect to its new "Iranian shareholder[]" partners, "[t]he cooperation between MTN and Iranian shareholders should be in the line of defensive, security and political cooperation."  Notably, Section 8 expressly contemplated that MTN would work with new IRGC partners outside of Iran: "MTN shall fully support cooperation regarding the aforementioned issues in South Africa."

401.    Thus, MTN officers, employees, and agents directly partnered with Qods Force operatives because when MTN "fully" cooperated on "security" matters with IRGC operatives

---

[132] Plaintiffs do not allege that the Security Cooperation Agreement's reference to God or use of the Islamic calendar is in any way wrong or suggestive of terrorism, simply that it demonstrates that the template reflected by the Security Cooperation Agreement was one created by its "Iranian Shareholders" (i.e., the IRGC) rather than MTN Group, because the religious indicia is consistent with the templates of the former but not the latter.

and agents outside of Iran as it contractually promised to do, MTN was directly aiding Qods

Force terrorists because IRGC personnel acting outside of Iran are Qods Force.

402.    MTN Group executed the Security Cooperation Agreement with the Iranian

Shareholders on behalf of the entire MTN corporate family.  MTN Group, acting through

Defendant Nhleko, in his capacity as the President of MTN Group, was compelled to do so

during an in-person meeting at the Bonyad Mostazafan office in Tehran, Iran, when an IRGC

Regular Brigadier General communicated to MTN Group's President, Mr. Nhleko, that the

Iranian Shareholders insisted that MTN Group execute the Security Cooperation Agreement on

behalf of the entire MTN corporate family.

403.    The Security Cooperation Agreement reflects the Iranian Shareholders' template

"Security Aid" agreement, and the Iranian Shareholders specifically styled MTN Group as

"MTN" in the Security Cooperation Agreement to reinforce to MTN Group and its President,

that he was committing the entire MTN corporate family to the deal.

404.    It would not be proper to interpret the reference to MTN Group's performance of

its "security" related services for the Iranian Shareholders to be limited to being "in South

Africa."  That passage was a reference by the Iranian Shareholders to their prior frustration with

Turkcell, whose C-Suite leadership, on information and belief, refused to commit to providing

"security" services to the Iranian Shareholders.

405.    Separately, Hezbollah and the Qods Force rely heavily on South Africa-to-Middle

East routes, networks and relationships to manage the IRGC's transnational financial, logistics,

and technical enterprise.  Funds and technology sourced by Hezbollah and the Qods Force in

South Africa will ordinarily follow back to the IRGC to be shared with the IRGC's proxy

terrorists, including the IRGC Shiite Terrorist Proxies in Iraq and the al-Qaeda/Taliban Syndicate in Afghanistan.

406.   The Security Cooperation Agreement's deliberate ambiguity through its repeated generalized references to "Iranian shareholders," rather than the Iranian entities with which MTN Group was reportedly partnering, was itself an indication of, and evidence that, the Iranian shareholders in MTN Irancell were fronts, operatives, and agents for the IRGC.  Indeed, the execution of the Agreement was deliberately designed to obscure each signatory:



407.   The Security Cooperation Agreement did not merely obligate MTN Group to help the IRGC source weapons in furtherance of the IRGC's "security" agenda.  It also obligated MTN to both pay its new IRGC front partners as well as serve in effect as their financial manager:

- Section 2 required that MTN Group "agreed to put in trust twenty-one (21) percent of Irancell Consortium before Bank Melli as trustee."  Bank Melli is another IRGC, including Qods Force, front and has been sanctioned by the U.S. government.

- Section 3 required that MTN pay the IRGC hundreds of millions of dollars in up-front license fees as a condition for becoming the new junior partner in the Irancell joint venture, and that "MTN and Bank Melli shall be responsible for arranging project financing."

- Section 7 set forth an additional catch-all provision designed to route additional money from MTN Group to the IRGC and provided that:  "[t]he costs and expenses incurred by Iranian shareholders" – i.e., Irancell's two IRGC, including Qods Force, fronts – "if any, due to transfer of Irancell's share to MTN shall be compensated by MTN."  On information and belief, MTN routed millions of additional dollars to the IRGC under Section 7.

123

408.    Although MTN was the IRGC's junior partner in the MTN Irancell joint venture, the Security Cooperation Agreement nonetheless empowered MTN with the legal authorities it needed to effectively shut down the IRGC's ability to weaponize MTN Irancell as an instrument of terror.  Most directly, MTN could immediately and unconditionally announce its plans to rapidly exit the joint venture.

409.    MTN is also responsible for MTN Irancell's conduct because MTN had (and continues to have) veto power over most of the major decisions at MTN Irancell, similar to the veto possessed by its joint venture partners, the terrorist fronts Bonyad Mostazafan, and IEI.  For example, Section 5.1 of the Agreement provides that:

The resolutions on the below mentioned issues require the affirmative votes of MTN:

- Annual business plans and budgets of [MTN Irancell], including, but not limited to, medium and long term financing;

- Major acquisitions, partnerships, formation of joint ventures or consortiums;

- Discontinuation of business activities;

- Entering into any agreement with persons, individuals or entities that are directly or indirectly related to Non-Iranian or Iranian Shareholders;

- Charging the assets of the Company in any manner which could have significant impact on the Company's ability to use or benefit from its assets in its ordinary course of business;

- Profit appropriates and dividend policy; and

- Approval of annual accounts.

410.    The Security Cooperation Agreement confirmed that MTN promised to provide other "off-the-books" value to the Iranian Shareholders with whom MTN had partnered in MTN Irancell, which was itself another obvious reference to MTN's support for the IRGC's terrorist enterprise.  Section 9 provides, "for this agreement to be effective, it is necessary that the above-

mentioned documents and related agreements be signed by MTN as well as to pay license fee and equity as provided in item 3 above [i.e., Section 3 of the Agreement] within 20 days from the signature of Addendum No. 1 to [sic] license agreement, simultaneously, the parties try to finalize the other relevant operational agreements."[133]

411.    MTN Group, Phuthuma Nhleko, and Irene Charnley, and MTN's "Iranian shareholder[]" joint venture partners went to great lengths to keep the Security Cooperation Agreement a secret.  The Security Cooperation Agreement was a "close hold" document at MTN Group and was only known to a select group of senior MTN Group executives because MTN understood that it memorialized an obviously illegal scheme between MTN Group and two fronts for the IRGC.  MTN Group also conspicuously failed to obtain any sign-off from any of MTN's elite, white-shoe global law firms, none of which would have approved the Security Cooperation Agreement.

412.    Before MTN Group, through Phuthuma Nhleko, executed the Security Cooperation Agreement, a senior official on behalf of the IRGC stated to MTN Group, in sum and substance, that the Security Cooperation Agreement was the standard template that the Iranian Shareholders used when a counter-party agreed to assist, among other things, the Iranian Shareholders' "security" operations.

413.    MTN Group, Phuthuma Nhleko, and Irene Charnley knew this statement to be a direct reference to IRGC proxy terrorist attacks targeting Americans around the world.

414.    MTN Group, Phuthuma Nhleko, and Irene Charnley deliberately concealed the fact that Mr. Nhleko signed the Security Cooperation Agreement.  On information and belief,

---

[133] In the Security Cooperation Agreement, the number "1" in this sentence is handwritten into what was obviously a placeholder.

MTN Group, Phuthuma Nhleko, and Irene Charnley never publicly admitted that Mr. Nhleko signed the Security Cooperation Agreement until MTN Group was compelled to by another.

415.    MTN Group's, Phuthuma Nhleko's, and Irene Charnley's attempts to conceal the Security Cooperation Agreement, and the fact that Phuthuma Nhleko signed the Security Cooperation Agreement, reflects consciousness of MTN Group's guilt and MTN Group's recognition that its promise to assist the Iranian Shareholder's "security" operations, i.e., anti-American terrorism, was illegal.

416.    One MTN executive later stated that MTN recognized that it was dealing with a counterparty that was comprised of violent killers (referencing the "Iranian Shareholders") whom MTN Group knew ordinarily went around making people mafia-like an "offer they could not refuse," which referred to the negotiating strategy of a violent mafia crime family in the iconic mafia movie, *The Godfather*, in which Don Vito Corleone secured favorable commercial terms that advanced his mafia empire by making a counterparty "an offer he could not refuse," in which he promised to murder the counterparty if he did not give Don Corleone what he desired.[134]  On information and belief, officers, managers, employees, and agents of MTN Group regularly expressed similar sentiments.

417.    MTN Group, Phuthuma Nhleko, and Irene Charnley secured its joint venture with the IRGC – i.e., MTN Irancell – through MTN Group's and Phuthuma Nhleko's direct contractual promise to the IRGC, including its Hezbollah Division and Qods Force.  This was done to aid the IRGC and Qods Force terrorist enterprise and MTN's corrupt payments to one or more IRGC and Qods Force agents.

---

[134]   In the movie, a recalcitrant counterparty refuses to sign a contract demanded by Don Corleone, who dispatches his muscle to communicate to the counterparty that "either his brains or his signature" will be on the contract, which causes the contract to be executed.

418.    A leaked report from a South African intelligence agency confirmed MTN Group's terrorism quid-pro-quo with the IRGC.  One month after the September 2005 – when MTN Group's CEO signed the secret Security Cooperation Agreement pledging "security" assistance to the "Iranian shareholders" (i.e., the IRGC) – an Iranian delegation led by the head of Iran's Supreme National Security Council, Hassan Rouhani, traveled to South Africa and met with MTN Group executives.  Thereafter, South African intelligence confirmed the existence of MTN's secret "security" deal with the IRGC in a memorandum that was later publicly leaked.

**2.      After Executing The Islamic Revolutionary Guard Corps' Security Cooperation Agreement In 2005, MTN Group, Phuthuma Nhleko, and Irene Charnley Routinely Acted On Behalf Of, Or For The Benefit Of, Hezbollah, The Qods Force, And Regular IRGC**

419.    MTN Group's executives quickly got to work after MTN Group executed the Security Cooperation Agreement.  Three days later, on September 18, 2005, Phuthuma Nhleko, acting as President and CEO of MTN Group, circulated a memorandum from himself to five senior MTN Group executives, including Irene Charney (the "September 18, 2005 Memo"), which captioned "**STRICTLY CONFIDENTIAL**" with the subject "**OVERVIEW AND WAY FORWARD – PROJECT SNOOKER**," and provided, in part, as follows:

1.  **OPPORTUNITY**
    Project Snooker still presents *one of the most significant "virgin" mobile opportunities in the world*.  … [N]otwithstanding the significant challenges that lie ahead, [MTN] must continue to pursue this opportunity vigorously.

2.  **CURRENT STATUS**
    *The signing of the various agreements this week [under duress]* was to "book our place at the foot of the mountain – we still need to scale it to get to the peak."  It was a choice between inheriting an advanced arrangement [Turkcell revenue share and various negotiated agreements] or taking the chance that the window of opportunity may close on us whilst we try to reconstruct the deal and arrangements from scratch.  We chose the former.

3.  **RISK AND REWARD**
    *Snooker is "no normal country".*  The Ministry of Defense, Government controlled banks and companies, together with Government *essentially*

*control all the commercial activity in the country*.  *Consequently, a conventional mindset, orthodox financial and operational approach to this project is unlikely* to provide us with an outcome that I would feel comfortable to recommend to the board on an investment of over €400 million [license fee and working capital] into Snooker.  It is therefore imperative to *think laterally on how we can secure the investment* … in a manner that allows us to penetrate the market achieving an acceptable IRR [i.e., "internal rate of return," a measure of investment profitability]. …

4.  **TIMING**
   The expectation is that the license fee should be paid within weeks and the operation launched commercially within a six month period. … The implied time scale can only be achieved through a well thought out and coordinated project management structure up …

5.  **PROJECT MANAGEMENT**
   *Given the size of the market*, limited time to launch and all that has to be reviewed and completed before the MTN Group board ratifies the revised business plan, *a special project structure must be put in place*. …

   5.1.2   **Finance Structure, project funding and ancillary loan agreements**
   The Group CFO should take responsibility for this area, primarily in the following categories:
   - Flow of license fee and working capital
   - Appropriate security arrangements for funding of local partners together with the loan agreements
   - Arranging the project finance …

6.  **PROJECT STEERING COMMITTEE** [sic]
   I will chair a project steering committee that will have the responsibility of meeting regularly to oversee both Phase I and Phase II until the project is passed onto the MD / COO.  The Steering Committee shall comprise of:
   CEO
   COO
   CFO
   CTO
   Commercial Director
   Group Executive HR …

8.  **CONCLUSION**
   *This is one of the most significant opportunities the Group will undertake* and will require teamwork to achieve these objectives.  [Emphases added; formatting adjusted.]

420. After MTN's executive team successfully executed Project Snooker, the conservative-dominated and Qods Force-applauding Iranian parliament determined that MTN's operation of Irancell would improve Iran's "security."

421. Project Snooker was successful not only because MTN pledged strategic cooperation with the Iranian government, but also because MTN made corrupt payments to government officials, at least one of which it structured as a sham consultancy payment.

422. On December 11, 2006, MTN Group, acting through Phuthuma Nhleko, instructed MTN Group's CFO to "finalise all agreements with the consultants" who had "assisted the Company" in securing its joint venture with the IRGC via the Irancell license. The first agreement called for MTN Group to make a $400,000 payment for the benefit of an Iranian government operative. The payment was effectuated through an MTN Group subsidiary, MTN International (Mauritius) Limited, and sent to a consulting firm owned by the Iranian operative's associate. Both steps reflected the parties' desire to conceal the transaction, as it did not rest on MTN Group's books, which was another example of MTN Group following the IRGC's "Orbit" tradecraft strategy. On April 4, 2007, MTN Group executed Mr. Nhleko's instruction and wired the $400,000 bribed to the putative "consultant." Defendants have never proffered a legitimate explanation for that payment.

423. MTN Group's second corrupt payment was to South Africa's ambassador to Iran. MTN Group's former Iran Director has admitted to paying the Ambassador $200,000 in cash out of his own funds, which he tied to cooperation in helping MTN Group secure its equity interest in Irancell.

424. MTN Group's senior executives, including Phuthuma Nhleko and Irene Charnley, knew of, and approved, MTN Group's bribes to the Qods Force agents who helped MTN Group

secure the Irancell joint venture.  For example, on December 11, 2006, Phuthuma Nhleko, on

behalf of MTN Group, wrote a memorandum to Irene Charnley in which Mr. Nhleko authorized

the bribes that MTN Group paid to steal the Irancell license (the "December 11, 2006 Memo"):



# MEMORANDUM

| TO | : | IRENE CHARNLEY |
|---|---|---|
| DATE | : | 11 DECEMBER 2006 |
| FROM | : | PHUTHUMA NHLEKO |
| **SUBJECT** | : | **CONSULTANCY AGREEMENTS** |

Dear Irene

With reference to the process in terms of which MTN International (Mauritius) Limited acquired a 49% equity interest in Irancell, you are authorized to finalise all agreements with the consultants that assisted the Company during the run up to and actual negotiating period, and to effect the necessary payments.

Kind regards

**PHUTHUMA F. NHLEKO**
**GROUP PRESIDENT & CEO**

130

425.     The phrase "necessary payments" in the December 11, 2006 Memo was a direct admission that the consultancy payments were bribes.  Indeed "necessary payments" has long been understood to refer to bribery.

426.     A host of other highly confidential internal MTN Group documents, leaked by a whistleblower, also confirm that Phuthuma Nhleko, Irene Charnley, and other MTN Group executives directed MTN's financial, technological, and operational support for Hezbollah, the Qods Force, and their terrorist proxies, through transactions with fronts that controlled Irancell. For example, a March 25, 2007 memorandum from MTN's regional manager responsible for Iran, Chris Kilowan, and Phuthuma Nhleko extensively documented MTN Group's, Phuthuma Nhleko's, and Irene Charnley's illicit activities (the "March 25, 2007 Memo").

427.     The March 25, 2007 Memo was intended to remain highly confidential, as reflected by what is set forth at the top of it:

| MTN GROUP LIMITED | |
| --- | --- |
| **MEMORANDUM – HIGHLY CONFIDENTIAL** |  |

| | |
| --- | --- |
| **To:** | Phuthuma Nhleko |
| **From:** | Chris Kilowan |
| **Date:** | 25 March 2007 |
| **Re:** | Ambassador Briefing: Larijani, Mottaki and MTN |

428.     In the March 25, 2007 Memo, Chris Kilowan, MTN's regional director responsible for Iran and later whistleblower, confirmed to MTN Group, through Phuthuma Nhleko, that "it was the [President of South Africa's] view that the matter of MTN has nothing to

do with the Government of South Africa as it is a private business in which the Government of South Africa plays no role."

429.    In the March 25, 2007 Memo, Chris Kilowan confirmed to Phuthuma Nhleko that Mr. Kilowan had met with "Mr. Motakki" on behalf of the "Minister of Foreign Affairs."  On information and belief, "Mr. Motakki" was an IRGC, including Qods Force, cut-out who was either relaying a message from the IRGC or acting as an IRGC operative himself.  In the Memo, Mr. Kilowan relayed to Mr. Nhleko that Mr. Motakki "re-iterated [the IRGC's] understanding that MTN Group was allowed to replace Turkcell in exchange for defence co-operation," and that "the office of the Supreme Leader" had personally intervened based upon the conclusion by the IRGC "that there are significant defence benefits in it for [the IRGC] were MTN to be allowed into the process.  On that basis [the IRGC] withdrew their objections [to a foreign company playing a role in the Iranian telecom sector] and allowed the process to proceed in MTN's favour."

430.    In the March 25, 2007 Memo, Chris Kilowan confirmed to Phuthuma Nhleko that MTN had only become a candidate for the Irancell joint venture after it had promised to pledge to aggressively support the "security" needs of the IRGC fronts that controlled the Bonyad Mostazafan and IEI.  He noted, as a "brief recap of history," that "MTN only seriously got back into the [bidding] process" after its Iranian counterparties perceived that MTN would affirmatively aid their "security" needs.

431.    In the March 25, 2007 Memo (emphases added), Chris Kilowan underscored to MTN Group, through Phuthuma Nhleko, that MTN would need to serve as a weapons supplier for its Iranian counterparties if it wanted to win and maintain its position in the joint venture:

> It would seem clear that the issue of ***defence co-operation*** has become a pressing matter with the government of Iran.

132

If regard is had to the latest UNSC [i.e., U.N. Security Council] Resolution there is a clear move towards dealing with Iran's conventional weapons capability. … Russia has traditionally played the *role of key weapons supplier* to Iran.  Given recent developments …, [Russia] is actively looking at more secured suppliers of defence materials. … Because the entire political situation has now deteriorated significantly it is highly unlikely that the Government of South Africa will be prepared to sign any defence agreements or deliver defence materials to Iran.

Given the *clear linkage that the Government of Iran has drawn between the defence assistance and allowing MTN into the country the likelihood that there will be serious blowback for MTN is increasing*.

Because there has been a recognition of the *non-business imperatives that drove MTN's entry into Iran*, the Distant Thunder … projects have been developed to deepen MTN's position, as opposed to and distinct from Irancell, inside Iran so that MTN would be able to rely on broad popular support for its continued presence.  More recently a more mid to long range strategy has been proposed to ensure that MTN puts in place an exit strategy that would ensure that it not be caught in a situation where it loses its entire investment in the country. …

I am preparing a document that spell out the range of actions that can be taken against MTN and will submit that to you as soon as it is complete.  In summarized form it can be said that there is every possibility that MTN could be effectively isolated from Irancell with very little negative effect on Irancell.

While 1 million subscribers will act as a defensive buffer for Irancell, it does not provide the same protection for MTN.  This is because these subscribers are reflected locally as Irancell subscribers and not MTN.  *All the innovations are not sold as MTN innovations but as Irancell's*. …

To give MTN a realistic chance to navigate through what is potentially going to be a difficult few months (if not years until the end of the current presidency in 2009), I make the following recommendations:

1. Implementation of Project Distant Thunder at the earliest opportunity.  We could pre-empt some of the activity that is almost certain to be started in the public sphere against MTN. … (Dimension 1)

2. Approval of the creation of the committee to pursue mid to long term strategies for MTN's investment in Iran. (Dimension 2)

3. Finalisation of the diplomatic support initiative.  The *first consultant is still waiting for the transfer of the agreed amount.  This is causing considerable anxiety in his mind and going forward we are going to need his support*. We still have not given the second consultant any indication whether we are

seriously considering his request.  He too is developing some anxiety and I have to field almost daily questions on it. (Dimension 3)

432.    A November 10, 2007 memorandum from Chris Kilowan to Phuthuma Nhleko, further documented MTN Group's open support for the illicit activities conducted by the fronts operating on behalf of the IRGC with whom MTN had partnered in Irancell, including MTN partners whom MTN nicknamed "Short John" and "Long John" (the "November 10, 2007 Memo").  On information and belief, the Iranian operative whom MTN derisively nicknamed "Short John" was an agent for the IRGCs.

433.    The November 10, 2007 Memo was labeled "**STRICTLY CONFIDENTIAL**" in bright red bolded all-caps font and was titled "**SUBJECT: OUTSTANDING ISSUES**" in bolded all-caps black font.  In it, MTN's executive for Iran communicated to MTN's CEO that:

> Pursuant to [our] last communication … I set out below the issues that I believe are still outstanding [] and will have an impact … on MTN's investment. …
>
> **2.  FINALISATION OF CONTRACT WITH SHORT JOHN**
>
> Subsequent to our last discussion on this matter [in early 2007] I did not do anything about the agreement, preferring to wait until December [2007] to do an agreement … I can certainly state that [Short John] has ***come to the party on every occasion that I called upon him***.  The fact that the ***quid pro quo that has threatened at one stage to be the primary stick with which we could be hit has now largely disappeared*** because of his efforts.
>
> The initial concessions on promised support for the revenue share issue was ***because of his direct involvement*** … With me out of the picture he will probably be the only friendly source of information and interaction for MTN on this side.  I would recommend that ***MTN finalise arrangements with him and offer fair compensation commensurate with the huge role he has played right from the outset***.
>
> **3.  RENEWED APPROACH BY LONG JOHN**
>
> I have communicated this to you a few weeks ago and recently forwarded an SMS from him.  The background to this new approach is centered in planned developments within the area that he is currently working.  Whatever his motivations, it is not something that should be ignored.  While he has very

little power to do anything positive, ***he can be a destructive force*** or simply an unnecessary distraction. …

### 6.   PERSISTENT NEGATIVE VIEWS ABOUT SOME MTN EXPATS

I beg your forgiveness if I sound like a record with a stuck needle but I … alert[] you to a serious risk to MTN's investment. … In [Mr. Mokhber's] view MTN made a mistake and inflicted a huge insult on Iran by placing [a woman] here [as Chief Operating Officer of MTN Irancell]. …

(Bolded all-caps emphases in original; bolded italicized emphases added.)

434.    In June 2018, South Africa's anti-corruption police – called the "Hawks" – raided the offices of MTN and its outside counsel as part of an investigation into Irancell-connected bribery.  Roughly eight months later, the Hawks also arrested the former Ambassador whom MTN had bribed.  On information and belief, that investigation remains ongoing.

435.    One reason MTN chose to become the IRGC's joint venture partner was the potential for enormous profits.  As the *Financial Times* reported at the time in 2013, "[a]s the international community was weighing whether to impose yet more sanctions on Iran over its nuclear programme, [MTN President and CEO] Phuthuma Nhleko was making other plans. Instead of seeing a country with mounting political problems, Mr Nhleko saw a nation with relatively few mobile phone users.  Iran, he reckoned, could quickly add 2.5m-3m new customers for MTN Group, the mobile phone company he was running in 2006."[135]

436.    After MTN secured its joint venture with two fronts for the IRGC, MTN's President and CEO, Defendant Phuthuma Nhleko, "laughed off questions about the political risk of doing business with Iran."[136]  As he chuckled in a discussion with investors after closing the

---

[135] Lina Saigol and Andrew England, *Telecoms: Dealings in the Danger Zone; MTN of South Africa's Ventures in Iran and Syria Have Dented Its Reputation and Rattled Shareholders*, Financial Times (July 2, 2013) ("Saigol and England, *Telecoms: Dealings in the Danger Zone*").
[136] *Id.*

deal with the Iranians, he stated "[MTN] hadn't budgeted for bomb shelters or anything like that."[137]  MTN's CEO's choice to literally "laugh off" questions about the obviously dire risks associated with MTN's new joint venture in Iran typifies MTN's deliberate choice to align itself with anti-American terrorists as the cost of doing business as the IRGC's junior partner in the MTN Irancell joint venture.

437.    MTN continued to pursue Project Snooker even after the U.S. Undersecretary of the Treasury told Turkish officials that Irancell was "fully owned" by the IRGC.  Undersecretary Levey did so as part of a campaign in which he alerted every major western business and financial partner of the IRGC about the inherent terrorism risks attendant to any transactions with fronts for the IRGC.  On information and belief, Undersecretary Levey told MTN Group that Irancell was "fully owned" by the IRGC and, by extension, when Irancell operated outside of Iran, Qods Force operatives were in charge.

438.    MTN's bribes and alliance with the IRGC "is a saga that illustrates the extraordinary risks MTN has taken to profit from doing business with pariah states."[138]

439.    MTN Group, Phuthuma Nhleko, and Irene Charnley committed MTN Group (and themselves) to the Security Cooperation Agreement more than 16 years ago, in 2005, when Mr. Nhleko, acting in his capacity as MTN Group's President and CEO, executed the IRGC's terrorist template contract on behalf of all MTN entities worldwide.  In so doing, MTN Group, through Mr. Nhleko, committed MTN Group, its CEO, Mr. Nhleko, Irene Charnley, and every other MTN entity or person globally to provide "Security" "Cooperation" aid to the "Iranian Shareholders," which Defendants knew meant Hezbollah, Qods Force, and Regular IRGC.

---

[137] *Id.*

[138] *Id.*

440.     After MTN Group, Phuthuma Nhleko, and Irene Charnley agreed to aid the IRGC under the Security Cooperation Agreement, each Defendant acted as an international financial, logistics, technical, and management agent who knowingly acted on behalf of, or to ultimately benefit, Hezbollah, the Qods Force, Regular IRGC, and their Sunni terrorist proxies in Iraq and Afghanistan. In doing so, MTN Group, Phuthuma Nhleko, and Irene Charnley, acted within the scope of the instruction from MTN Group (the principal) in the Security Cooperation Agreement from the "Iranian Shareholders," committing the MTN Group to assist the "security" operations (i.e., terrorist attacks) of Hezbollah and the Qods Force.  Indicia of MTN Group's service as an agent for the IRGC include, but are not limited to:

(i)      MTN Group represented the Iranian Shareholders as their purchasing agent, and coordinated efforts to obtain vital U.S. technology that aided bomb and rocket construction and terrorist surveillance, as requested by IRGC-QF and Hezbollah, reaching into U.S. to acquire such gear;

(ii)     MTN Group repeatedly sourced precious U.S. dollars to funnel to IRGC-QF as bribes ($400,000) or to pay to others as bribes in order to help further conceal IRGC-QF front companies, including pursuing a scheme to bribe the South African UN delegation in order to successfully kill a UN resolution that would have sanctioned IRGC-QF front companies necessary to the terrorist enterprise;

(iii)    MTN Group provided public relations support and crisis management services designed to benefit the IRGC-QF front, MTN Irancell, by coordinating the strategic communications response to media stories, government investigations, and/or lawsuits that exposed MTN Irancell as an IRGC-QF front;

(iv)     MTN Group organized IRGC-QF finances and managed IRGC-QF assets through Irancell, and MTN Group had to reach into the United States to do so because of the complicated technology that MTN used, which relied on purloined American technology;

(v)      MTN Group coordinated the secret use of U.S. IT experts to handle sensitive tasks that Irancell personnel could not, knowing that such contractors were performing their work from the U.S. (indeed that was the point, since MTN needed people who had U.S. tech expertise); and

(vi)     MTN Group prepared detailed studies at the request of the IRGC-QF that were designed to improve Iranian weapons capabilities, with a specific understanding that the IRGC-

QF's primary target was the United States, and therefore that the weapons studies they were sharing would target the U.S.

**B. Defendants Knowingly Assumed A Financial, Logistical, And Operational Role In The Islamic Revolutionary Guard Corps', Including Hezbollah's And The Qods Force's, Terrorist Enterprise Against Americans Worldwide That Funded, Armed, And Logistically Sustained Joint Cell And Jaysh Al-Mahdi Attacks In Iraq**

441.    For more than fifteen years, MTN Group, Phuthuma Nhleko, Irene Charnley served as a reliable joint venture partner for the world's worst terrorist organization, the IRGC.

442.    Phuthuma Nhleko and Irene Charnley were instrumental in operationalizing the latticework of terrorist finance, logistics, and operational support that MTN Group and its affiliates and agents routed to Hezbollah, the Qods Force, and their terrorist proxies, like al-Qaeda.  Through their careful construction and maintenance of the latticework of value streams flowing from MTN Group through MTN Irancell and ultimately being received and deployed by Hezbollah, the Qods Force, and the IRGC's terrorist proxies, Phuthuma Nhleko and Irene Charnley ensured that the terrorists received regular flows of funds, weapons and parts, secure cell phones and American smartphones, information technologies, transnational logistical support, and professional services.

443.    MTN Group, Phuthuma Nhleko, and Irene Charnley coordinated with MTN Dubai, and representatives and agents of the IRGC, among others, to manage the procurement scheme.  MTN Group directed the conduct of the purported "third parties" in the U.A.E. who were, in fact, shared corporate covers acting on behalf of both MTN Group, MTN Irancell, and the IRGC.  On information and belief Phuthuma Nhleko and Irene Charnley coordinated these activities while knowing that MTN's counterparties were fronts, operatives, agents, or cut-outs for Hezbollah and the Qods Force.

444.     MTN Group, Phuthuma Nhleko, and Irene Charnley specifically decided that MTN Group, through Phuthuma Nhleko, Irene Charnley and other MTN Group officers, managers, employees, or agents, would closely coordinate to extract vast amounts of state-of-the-art U.S. technologies from the American marketplace on behalf of MTN Group's, Phuthuma Nhleko's, and Irene Charnley's IRGC partners.  In its Special Report, *Reuters* explained, "[a]ccording to a person familiar with the matter, ***MTN [Group] was determined that MTN Irancell procure substantial amounts of U.S. equipment***:  The U.S. products had ***performed well in its other networks***, and the ***company's technicians were familiar with them***."[139]

445.     MTN Group, Phuthuma Nhleko, Irene Charnley, and MTN employees and agents acting at their instruction deliberately set out to source items requested by Hezbollah and the Qods Force while evading America's IRGC-related terrorism sanctions.  According to *Reuters*, "internal [MTN Group] documents" "show that MTN [Group] employees created presentations for meetings and wrote reports that openly discussed circumventing U.S. sanctions to source American tech equipment for MTN Irancell."[140]

446.     MTN Group, Phuthuma Nhleko, Irene Charnley, and MTN's employees understood that their transaction activities on behalf of the IRGC were illegal.  According to *Reuters*, "internal [MTN Group] documents" "show that MTN [Group] employees" "address[ed] the potential consequences of getting caught" in written MTN Group documents.[141]

---

[139] Steve Stecklow, *Special Report: Documents Detail How MTN Funneled U.S. Technology to Iran*, Reuters (Aug. 30, 2012).

[140] *Id*.

[141] *Id*.

447.    MTN Group, Phuthuma Nhleko, Irene Charnley, and other MTN executives and

employees, reported *Reuters*, knew that Defendants and other MTN persons faced potential

"civil and criminal consequences" if their scheme were exposed – and still pressed forward:

> **"CIVIL AND CRIMINAL CONSEQUENCES"**
> According to [] internal procurement documents, right from the start MTN was
> well aware of what it termed "embargo issues" and the ***inherent risks involved***.
> A December 2005 PowerPoint presentation marked confidential and emblazoned
> with MTN's logo noted that the ***"Consequences of non compliance" included***
> ***"Civil and criminal consequences."***  The PowerPoint slide added that the U.S.
> government could blacklist MTN, "which could result in all MTN operations
> being precluded from sourcing products/services from U.S. based companies."[142]

448.    *Reuters* concluded that MTN Group's C-Suite, including Phuthuma Nhleko and

Irene Charnley, directed MTN's support for the IRGC's terrorist scheme, and continued doing so

even after MTN Group finished pilfering the Irancell license from Turkcell in 2005:

> The new MTN documents appear to detail an ***intentional effort to evade***
> ***sanctions***.  For example, a January 2006 PowerPoint presentation prepared for the
> project steering committee - ***comprised of then top-level MTN executives*** -
> includes a slide titled "Measures adopted to comply with/bypass US embargoes."
> It discussed how the company had decided to outsource Irancell's data centre after
> receiving legal advice.  "In the absence of applicable U.S. consents, it is a less
> risky route to MTN for Irancell to outsource data centre than it is to purchase
> restricted products," the PowerPoint slide says.[143]

449.    MTN Group, Phuthuma Nhleko, Irene Charnley, and other MTN employees had

actual knowledge of the scheme.  MTN Group personnel routinely prepared or received written

materials that memorialized the illicit importation of embargoed U.S. technologies, for the

specific purpose of flowing the technology through to Iran, where MTN Group, Phuthuma

Nhleko, Irene Charnley, and other MTN personnel knew there would be only one end recipient:

the IRGC, including its Hezbollah and Qods Force.  According to *Reuters*:

---

[142] *Id*.

[143] *Id*.

A delivery schedule also dated June 2006 lists U.S. equipment needed for "value-added services," including voice mail and a wiretapping system. The schedule states that the equipment would be "Ready to Ship Dubai" that July and August. It estimates it would take two weeks to arrive in the southern Iranian port of Bandar Abbas by "Air or Sea/Road," and then up to 30 days to clear Iranian customs. According to a person familiar with the matter, the equipment ultimately arrived by boat. "It all showed up," this person said.[144]

450.     MTN Group maintained "a lengthy spreadsheet of '3rd Party' equipment dated June 2006 that list[ed] hundreds of U.S. components - including servers, routers, storage devices and software - required for a variety of systems."[145]  On information and belief, Phuthuma Nhleko and Irene Charnley regularly received such spreadsheets, or briefings relaying details contained in such spreadsheets, as part of their close oversight of the rollout of MTN Irancell, which depended upon copious illicit technology acquisition activities in the United States.

451.     MTN Group, Phuthuma Nhleko, and Irene Charnley remained committed to its Hezbollah, Qods Force, and Regular IRGC partners even after withering U.S. pressure.  For example, in or around 2010 or 2011, MTN Group representatives met with senior executive officials from the U.S. government.  During these meetings, MTN representatives falsely assured the U.S. government that they were not helping the IRGC or supplying it with any embargoed U.S. technology in violation of U.S. sanctions against Iran that were intended to deprive the IRGC of the money and technology useful to their terrorist proxies' attack campaigns.  MTN Group provided the U.S. such false assurances even after "MTN ha[d] carried out orders from the regime to shut off text messaging and Skype during times of political protest, and reportedly ha[d] a floor in its Tehran headquarters controlled by Iranian security officials."

---

[144] *Id.*

[145] *Id.*

452.    As the IRGC joint venture partner responsible for sourcing the most important technological items for modern terrorism – the communications, computing, and encryption technologies that were vital to attacking Americans – MTN Group assumed a key financial and operational role in Hezbollah's, the Qods Force's, and the Regular IRGC's terrorist enterprise, including their technological support of Hezbollah's efforts to build sophisticated new computer networks, data centers, and media sites.

453.    Under the structure of the MTN Irancell joint venture, the two fronts for the IRGC that exercised 51% control of MTN Irancell – the Bonyad Mostazafan and IEI – had the mandate to promote the IRGC's "security" agenda, including the obligation to block any significant MTN Irancell-related transaction or commercial relationship unless it improved the IRGC's terrorism capabilities.  Given the IRGC's view that MTN Irancell was essential to IRGC, including Qods Force, "security" operations, the terrorist fronts that controlled MTN Irancell (Bonyad Mostazafan and IEI) would not have approved any material MTN Irancell transaction unless they determined that, on balance, the particular transaction improved the IRGC's ability to execute terror operations as the central element of the IRGC's "security" agenda.  As a result, one may infer that every significant commercial transaction and business relationship that MTN Irancell entered into was: (1) vetted by the IRGC; and (2) determined by the IRGC to advance the IRGC's "security"-related capabilities, which was a specific Iranian euphemism for external terror operations.

454.    From 2005 through the present, MTN's joint venture with MTN Irancell, and MTN's illicit transactions with MTN Irancell, the Bonyad Mostazafan, IEI, TCI, and the Akbari Fronts, each provided tens of millions of dollars annually in illicit funds, weapons, and

operational support to Hezbollah, Jaysh al-Mahdi, and the IRGC which the Joint Cells used to attack Americans in Iraq, including Plaintiffs and their loved ones.

      **1.**      **Defendants Assumed A Financial Role In The Terrorist Enterprise**

455.    MTN assumed a financial role in the terrorist enterprise by, among other things, bribing its IRGC, including Qods Force, joint venture partners to win the Irancell license in the first instance, paying large license fees, and generating revenue for MTN Irancell throughout the operation of the joint venture.

456.    "In Iran, MTN has been accused of paying bribes to South African and Iranian officials to secure a licence there in 2005."[146]

      **i.**      **Defendants Used "Orbits" To Transmit Bribes to Hezbollah, The Qods Force, And The Regular IRGC Through Payoffs To Purportedly Unrelated Third Parties**

457.    On information and belief, the recipient of MTN's $400,000 wire acted as a front, operative, or agent for the IRGC.  On information and belief, the recipient of MTN's $400,000 wire was a cut-out for MTN to route value to "Iranian shareholders" who were the IRGC.  The IRGC ensures that all economic value is shared amongst constituent parts of the organization, and would not have permitted such value transfer here relating to a contract decision-making process the IRGC controlled without obtaining their share of the payment under the IRGC's mafia-like revenue sharing practices.

458.    MTN knew, or recklessly disregarded, that the recipient of MTN's $400,000 wire was acting as a cut-out to allow money to flow through for the benefit of the IRGC which had proved vital to MTN's successful campaign to steal Turkcell's license.

---

[146] Agence France Presse English Wire, *South African Telecom MTN Gains Clients Despite Scandals* (Mar. 7, 2019).

459.    MTN also knew, or recklessly disregarded, that the recipient of MTN's $400,000 wire instructed MTN to wire the money, in U.S. Dollars, to a bank account in the U.A.E., and therefore that the recipient of MTN's $400,000 wire was specifically acting as a pass-through for the benefit of the Qods Force because MTN's $400,000 wire instruction, on information and belief, caused a bank in the United States to send $400,000 to a bank account controlled by a cut-out for the IRGC acting in Dubai, which was the Qods Force's most notorious financial and logistical hub in the Middle East outside of Iran.

460.    On information and belief, MTN regularly makes similar sham "consulting" payments like one that MTN used to attempt to justify MTN's $400,000 wire. Such payments benefitted fronts, operatives, or agents for the IRGC in their MTN Irancell-related terrorist fundraising efforts from 2005 through today.

> **ii.    Defendants Caused a $300 Million "License Fee" Payment To The Islamic Revolutionary Guard Corps Fronts That Controlled MTN Irancell, Flowing Tens Of Millions Of U.S. Dollars Through Such IRGC Fronts To Hezbollah, The Qods Force, And Their Sunni Terrorist Proxies In Iraq And Afghanistan**

461.    After it corruptly secured the 15-year Irancell license, MTN Group Ltd. paid the IRGC, through the Bonyad Mostazafan and IEI, an approximately $300 million license fee when it secured its 49% status as the junior partner in the MTN Irancell joint venture.  This money benefited the IRGC's terrorist enterprise, and the Qods Force received a substantial amount per standard practice by the IRGC, including Qods Force.

> **iii.    Defendants Caused Regular Large Cash Transfers To Flow Through MTN Irancell And Benefit Hezbollah And The Qods Force's Sponsorship Of Sunni Terrorist Proxies In Iraq And Afghanistan**

462.    MTN reaped enormous profits from its involvement in MTN Irancell, and sourced copious amounts of dual-use technology to benefit MTN Irancell and the IRGC.  Indeed, by

2013, "MTN has faced a huge headache in seeking to get dividends out of Iran because stringent sanctions prevent[ed] banks from moving cash easily in and out of the country. MTN … ***was virtually printing money in Iran***, where it has a 46% share of the market."[147]

463.    Under MTN's joint venture with its two IRGC, including Qods Force, front partners in MTN Irancell, for every dollar (or Iranian Rial) MTN generated for the joint venture, MTN's terrorist partners received 51 cents to invest in their terrorist enterprise. Indeed, during periods when MTN Irancell was "printing money" but could not repatriate it, MTN Group made "loans" to MTN Irancell to ensure that Irancell – and therefore the IRGC – obtained 100% of the profits that were owed to MTN Irancell's Iranian Shareholders, i.e., the IRGC, and therefore, the MTN Group's "loans" to MTN Irancell ensured the IRGC received 100% of its profits as working capital for the duration of the sanctions.  Thus, every dollar in profit for MTN Irancell inevitably helped fund Hezbollah's coordination of a nationwide insurgency against Americans in Iraq, the IRGC's industrial-scale production of EFP components, advanced rockets, and other high-tech weapons for use by Shiite terrorists against Americans in Iraq, and the aggressive forward deployment of IRGC, including Qods Force, operatives throughout Iraq to partner with Hezbollah and Jaysh al-Mahdi to maximize the effectiveness of the Joint Cells maintained by the terrorist groups in Sadr City, Basra, and elsewhere.

464.    Through its participation in MTN Irancell, MTN caused the IRGC to realize tens of millions of dollars per year in income that the IRGC used to fund terrorist operations against Americans in Iraq including, among other things, by funding Hezbollah and Jaysh al-Mahdi, including Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Ka'taib Hezbollah.

---

[147] Business Day Live, *Iran Deals Forced MTN Boss to Quit* (July 28, 2013) (emphasis added).

### 2.    Defendants Assumed An Operational Role In The Terrorist Enterprise

465.    MTN Group, Phuthuma Nhleko, and Irene Charnley deliberately provided "security" assistance to its JV partners, the "Iranian Shareholders," i.e., the IRGC.

466.    MTN Group, Phuthuma Nhleko, and Irene Charnley extensively collaborated with other sanctions busters in Iran, by sharing U.S.-origin technology between 2007 and the present day.  As early as 2004, MTN Group created a UK-based shell company called Surizon. Surizon's co-owners, its CEO, and "head of international business development" were previously members of MTN Group's founding board, including its General Counsel and the architect of its international expansion.

467.    Surizon's primary products were two software applications: Fast Access to Content, Trends and Statistics ("FACTS") and Network Management System ("NMS").  FACTS was, and still is, an "intelligence system."  NMS enables companies to manage and monitor networks like Irancell's and TCI's, which have a mix of incompatible US, European, and Chinese-supplied hardware, enabling them to supply meaningful data to FACTS.

468.    According to statements by Surizon and multiple MTN and Irancell employees, Surizon's products were, in essence, interfaces and data manipulation scripts wrapped around U.S.-origin technologies created by, *inter alia*, Oracle, Roambi, and BMC.  On information and belief, between 2006 and 2007, Surizon and MTN Group 'negotiated' a "21-country deal" to provide "FACTS… across all MTN Group operators."

469.    Surizon and MTN Group customized and deployed FACTS and NMS to each and every one of MTN Group's operating companies, including Sudan, Syria, and Iran, and specifically including the companies whose facilities are integrated into Iran's transnational signals intelligence network.

146

470.     On information and belief, MTN continues to use and share FACTS and NMS software with third parties.

471.     The U.S.-origin technologies used by MTN Irancell and supplied by MTN, enabled the IRGC to collect surveillance data and deliver intelligence in real time to terrorist agents in the field via smart phone applications.  Use of the U.S.-origin technology, as provided by MTN, allowed the terrorists to monitor, track, and target Americans.  Indeed, the U.S.-origin technologies enabled FACTS users and Iranian third parties to receive text message alerts under user-specified conditions, and to access network data, including interactive maps of subscriber activity using their smart phones, and to query and mine the data its network operations centers collected (which themselves were also based on U.S.-origin technologies).

472.     On information and belief, MTN also provided FACTS to TCI and MCI, and to its local Iranian partners, as well as to agents of the IRGC. FACTS and NMS enabled the partnership to manage its highly complex multi-vendor network, and to collaborate seamlessly, avoiding serious compatibility issues that would have arisen from using their own in-house applications.

473.     A series of blockbuster reports by *Reuters* corroborates Plaintiffs' allegations.  In its blockbuster Special Report breaking one MTN Group scandal, *Reuters* revealed that "internal documents seen by *Reuters*," showed that "MTN Group" "***plotted to procure embargoed U.S. technology products for an Iranian subsidiary through outside vendors*** to circumvent American sanctions on the Islamic Republic."[148]

---

[148] Steve Stecklow, *How A Telecom Gian Got Round Sanctions On Iran*, Reuters (Aug. 30, 2012).

474.    According to *Reuters*, "[h]undreds of pages of internal documents reviewed by *Reuters* show that MTN employees created presentations for meetings and wrote reports that openly discussed circumventing U.S. sanctions to source American tech equipment for MTN Irancell. … [and] also address[ed] the potential consequences of getting caught."[149]  Indeed, "[t]he documents show that MTN was well aware of the U.S. sanctions, wrestled with how to deal with them and ultimately decided to circumvent them by relying on Middle Eastern firms inside and outside Iran."[150]

475.    On August 30, 2012, MTN Group issued a statement to *Reuters*, in which "MTN denied any wrongdoing."[151]  According to *Reuters*, "Paul Norman, MTN Group's chief human resources and corporate affairs officer," issued a statement to *Reuters*:

> MTN denies that it has ever conspired with suppliers to evade applicable U.S. sanctions on Iran or had a policy to do so.  MTN works with reputable international suppliers.  Our equipment is purchased from turnkey vendors and all our vendors are required to comply with U.S. and E.U. sanctions.  We have checked vendor compliance procedures and continue to monitor them and we are confident they are robust.[152]

476.    MTN Group's denial was a lie, and MTN Group, Phuthuma Nhleko, and Irene Charnley (all of whom, on information and belief, were involved in the statement) intended to conceal MTN Group's, Mr. Nhleko's, and Ms. Charnley's direct assistance to, and secret Security Cooperation Agreement with, the IRGC, which MTN Group has faithfully honored – while concealing such frauds from MTN Group's shareholders – for about 17 years.

---

[149] *Id*.

[150] *Id*.

[151] *Id*.

[152] *Id*.

477.    Moreover, MTN Group's public denials, including public denials by Phuthuma

Nhleko, among others, aided Hezbollah's and the Qods Force's terrorist finance and logistics

scheme by engaging in strategic communications targeted at the United States, which maintained

MTN Group's, Phuthuma Nhleko's, and Irene Charnley's statuses as viable "covers" for the

illicit fundraising and acquisition of embargoed American technologies by the IRGC while MTN

Group was under close scrutiny.  Essentially, MTN Group, Mr. Nhleko, and Ms. Charnley

helped reputation-wash IRGC fronts by imbuing them with the credibility of MTN Group which,

while terrible, remains superior to that of a Foreign Terrorist Organization like Hezbollah and the

broader IRGC organization in which it sits.

478.    As the IRGC's chief outside telecommunications partner and service provider,

MTN helped the IRGC grow their cellular-phone capabilities, evade American sanctions, and

acquire embargoed U.S.-made communications technology.

479.    From 2005 through the present, MTN has illegally sourced embargoed dual-use

U.S. technology at the request of the IRGC in coordination with MTN's Qods Force handlers in

the U.A.E., where MTN and the IRGC coordinate their technical collaboration.  Plaintiffs' belief

is based upon, among other things, information and inferences based upon statements made by

one or more witnesses, MTN's own internal documents, financial records, and investigations by

major global media outlets.

480.    For example, on June 4, 2012, *Reuters* reported on MTN leading efforts to

illegally acquire hundreds of dual-use, military-grade embargoed communications, telecom, and

computer technologies for the IRGC:

> A fast-growing Iranian mobile-phone network managed to ***obtain sophisticated
> U.S. computer equipment despite sanctions that prohibit sales of American
> technology to Iran***, interviews and documents show.  MTN Irancell, a joint
> venture between MTN Group Ltd of South Africa and an Iranian government-

149

controlled consortium, sourced equipment from Sun Microsystems Inc, Hewlett Packard Co and Cisco Systems Inc, the documents and interviews show.  MTN owns 49% of the joint venture but provided the initial funding. …

Chris Kilowan, who was MTN's top executive in Iran from 2004 to 2007, said in an interview … [that] ***MTN's parent company, MTN Group, was directly involved in procuring U.S. parts for MTN Irancell***, which launched in 2006 and is now Iran's second-largest mobile-phone operator.  ***"All the procedures and processes around procurement were established by MTN,"*** he said.  He said the company ***agreed to allow its Iranian partners and MTN Irancell*** to set up a local Iranian company with the ***"basic" purpose of evading sanctions on Iran.*** …

*Reuters* provided MTN with the names of four current MTN Group executives believed to have knowledge of the procurement of U.S. parts by MTN Irancell. MTN declined to make any of them available for interviews. …

Kilowan's claims regarding how MTN Irancell obtained U.S. parts for its network … were supported in documents and numerous interviews conducted by *Reuters*. For example, *Reuters* reviewed an 89-page MTN Irancell document from 2008 that shows the telecom carrier was specifically interested in acquiring embargoed products.  … In a section on managing product-support agreements for third-party equipment, ***the MTN Irancell document states, "This should include embargo items."***  The document also includes ***lists of network equipment, including Cisco routers, Sun servers and products from HP***. …[153]

481.    *Reuters* "documented … how Iranian telecoms - including the MTN joint venture

– [] managed to obtain embargoed U.S. computer equipment through a network of Chinese,

Middle Eastern and Iranian firms."[154]  As *Reuters* put it, "[t]he Turkcell-MTN case offers further

evidence that there are always companies willing to do business with a country even when it

becomes an international pariah."[155]

482.    MTN's technical assistance to the IRGC had a devastating impact on the U.S.

government's ability to protect Americans in Iraq from IRGC proxy terrorist attacks in Iraq and

---

[153] Steve Stecklow, *Exclusive:  Iranian Cell phone Carrier Obtained Banned U.S. Tech*, Reuters (June 4, 2012) (emphasis added; formatting adjusted).

[154] Steve Stecklow and David Dolan, *Special Report: How An African Telecom Allegedly Bribed Its Way Into Iran*, Reuters (June 15, 2012).

[155] *Id*.

Afghanistan.  By helping to revolutionize the IRGC's communications capabilities, MTN helped the IRGC better conceal their communications with their Hezbollah and Qods Force operatives and, through Hezbollah, to the IRGC's proxies in Iraq and Afghanistan, which made it nearly impossible for American counter-terror forces in Iraq and Afghanistan to monitor the IRGC-backed cells attacking Americans in both countries – and crossing borders to magnify the impact of the other's campaign (e.g., the Haqqani Network hosting bombmakers from Ansar al-Islam). By making it easier for Hezbollah and its proxies to securely communicate with one another, MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley made it easier for IRGC-backed terrorists to attack Americans – and they did.  Defendants accomplished this "communications concealment" assistance to the IRGC which flowed through to Hezbollah and, through Hezbollah, to IRGC proxy terrorists in Iraq and Afghanistan, in at least three ways.

483.  *First*, Defendants facilitated MTN Group's illicit acquisition and transfer of acquired advanced American-made encryption technologies to the IRGC and their agent, Hezbollah, for sharing with their proxies in Iraq and Afghanistan.  The terrorists used the MTN-acquired, U.S.-manufactured and embargoed technologies to encrypt their communications.

484.  *Second*, MTN sourced more than one thousand (1,000) advanced, encrypted American smart phones each year from 2006 through 2017 that were intended to be used, and were in fact used, by the IRGC and Hezbollah, for terrorism targeting Americans.  The American smart phones sourced by MTN for the IRGC and Hezbollah, were used to increase the effectiveness of Hezbollah-designed, IRGC-funded (including and Qods Force-funded) IEDs and EFPs in Iraq and Afghanistan by making it easier for terrorists to detonate them and harder for American counter-IED technologies to prevent their detonation by "jamming" them.

485.     *Third*, MTN lied to the U.S. government about its ongoing cooperation with and work on behalf of the IRGC and Hezbollah.  This furthered the Joint Cells' terrorist campaign by preventing the U.S. government from knowing and understanding what technology the terrorists had, and when it was obtained.

486.     Even as of the date of this Complaint, MTN continues to dissemble about its relationship with the IRGC.  Even after the United States designated the IRGC as a Foreign Terrorist Organization on April 19, 2019, MTN stubbornly refused to acknowledge any need to change its business practices in Iran for more than a year, instead rolling out a host of new offerings designed to ***increase revenue*** flowing to MTN Irancell and, by extension, the two newly-designated-FTO-fronts that controlled MTN Irancell.

487.     Finally, on August 6, 2020 – ***475 days after the IRGC's FTO designation*** – MTN announced that it was exiting the Middle East.  Even then, however, MTN refused to condemn the IRGC refused to promise a rapid withdrawal from its terrorist joint venture, MTN Irancell, and merely offered a blithe promise that MTN would eventually exit MTN Irancell in four or five years (i.e., sometime in 2024 or 2025).

488.     On information and belief, MTN declined to immediately exit its joint venture with two FTO fronts after the IRGC's FTO designation because MTN determined that MTN would lose, at least, hundreds of millions of dollars if MTN rapidly withdrew from its MTN Irancell joint venture with the Bonyad Mostazafan and IEI.

489.     As alleged, MTN knew, or recklessly disregarded, that it was dealing with Qods Force fronts, but given the IRGC's designation as an FTO in 2019, MTN's ongoing relationship with two widely recognized IRGC fronts proves MTN deliberately chose to join the IRGC's

terrorist enterprise against the United States, which MTN self-evidently views as an acceptable cost of doing business.

490.     MTN's ongoing refusal in 2022 to immediately and unconditionally (as in weeks, not months or years) exit its joint venture with fronts for the IRGC even after the IRGC had been designated as an FTO in 2019, and nearly every other multinational corporation had withdrawn from such joint ventures with Iranian fronts nearly a decade earlier, further confirms that MTN meant to support Iran-backed terror all along.

491.     On March 12, 2012, MTN Group issued a press release that stated, in part:  "On human rights, the [MTN] group takes direction from and adheres to the policies of both the South African government and the United Nations.  South Africa has human rights enshrined as fundamental principles within its Constitution."  MTN then shamefully invoked South Africa's history of apartheid to suggest that it was a responsible corporate citizen, stating:  "Given South Africa's own recent history and our struggle against apartheid, the centrality of civil rights is at the core of our culture as a company and as individuals."  MTN further defiantly – and absurdly – claimed that there was no "evidence that the Iranian government has used the data [MTN] collected [and shared with the IRGC via Irancell] to identify and locate citizens or dissidents."

492.     After issuing its press release, MTN subsequently scrubbed any presence of it from MTN's websites.  On information and belief, MTN did so because it knew that its statement was a damaging admission that MTN believed that although it was violating U.S. law, it could not be held accountable under U.S. law regardless of what it did with Iranian terrorist fronts like the IRGC.

493.     On March 28, 2012, Turkcell filed suit against MTN Group in United States District Court for the District of Columbia.  *See* Complaint [Dkt. 1], *Turkcell İletişim Hizmetleri*

*A.Ş. and East Asian Consortium B.V v. MTN Group, Ltd. and MTN International (Mauritius) Ltd.*, No. 1:12-cv-00479-RBW, (D.D.C. Compl. Filed Mar. 28, 2012) ("*Turkcell v. MTN*").[156]  In its complaint (at 1), Turkcell alleged that MTN "violat[ed] … the law of nations through bribery of sitting Iranian … officials and trading influence to steal the first private Iranian Global System for Mobile Communications ("GSM") license (the "License") from Turkcell," which included MTN's "promis[e] [to] Iran [MTN would source] defense equipment otherwise prohibited by national and international laws" and MTN's "outright bribery of high-level government officials in both Iran and South Africa," which "acts … deliberately resulted in Turkcell losing its rightfully-won valuable telecommunications opportunity and in MTN's taking over the License."

494.    In its complaint (at ¶ 9), Turkcell alleged that, "[b]etween the end of 2004 and receiving the License in November 2005, MTN through 'Project Snooker' made at least five illegal bribes and trades in influence to government officials with the intention and belief that the bribes would cause the Iranian government to grant the License to MTN rather than Turkcell."

(i)    Paragraph 9(B) – labeled "Illicit Arms for the GSM License" – alleged that "MTN struck a deal to deliver 'The Fish' the Iranian Ministry of Defense in August 2004.  'The Fish' was a code name for a combination of military cooperation and big ticket defense equipment, including … frequency hopping encrypted military radios, sniper rifles, … radar technology, … and other defense articles—particular items including U.S. systems or components.  This equipment was unavailable to Iran through legitimate means because of U.S. and international restrictions at the time.  MTN officials … promise[d] delivery of the elicit [i.e., illicit] arms and technology in exchange for the License."

(ii)    Paragraph 9(C) – labeled "Bribe of Iranian Deputy Foreign Minister" – alleged that "MTN promised in May 2005, and later paid through a sham consultancy, the Iranian Deputy Foreign Minister, Javid Ghorbanoghli, $400,000 in U.S. dollars for his efforts to politically undermine and destroy Turkcell's position as the license-holder and to deliver the License to MTN."

---

[156] Turkcell subsequently voluntarily dismissed the case to pursue the matter in South Africa. *See* Notice of Voluntary Dismissal (Dkt. 47) and Minute Order (Dkt. 48) in *Turkcell v. MTN*, No. 1:12-cv-00479-RBW (D.D.C. May 1, 2013).

154

(iii)    Paragraph 9(D) – labeled "<u>Bribe of South African Ambassador to Iran</u>" – alleged that, "[i]n June 2005, MTN promised, and later paid, the South African Ambassador to Iran, Yusuf Saloojee, the equivalent of U.S. $200,000 to help MTN deliver on the nuclear vote and the weapons trafficking and to support MTN within the Iranian government. Ambassador Saloojee was integral to MTN's ultimate success in securing the License."

(iv)    Paragraph 9(E) – labeled "<u>Bribes of Iranian Defense Organizations</u>" – alleged that, "MTN promised the Iranian Ministry of Defense through its state-owned defense company Sairan (also known as Iran Electronics Industries or 'IEI') and the 'Bonyad' (one of the five Iranian quasi-independent 'Charitable Foundations,' an organization integral to the Iranian defense establishment), that MTN would pay all of Sairan [i.e., the IEI's] and the Bonyad's 51% share of the €300 million license fee, plus its entire capitalization cost and a share transfer tax, in exchange for their assistance within the Ministry of Defense and with the Supreme Leader. MTN later paid these amounts. These promises and payments, made through sham loans MTN knew at the time would not be repaid, were essential to MTN's takeover of Turkcell's License."

495.    Turkcell's complaint against MTN also specifically alleged that MTN had engaged with an IRGC-controlled company. For example, Turkcell alleged that to

establish[] itself within Iran[,] … [MTN] reached out to … Mr. Mohammed Mokhber, the Deputy President of a major "charitable foundation" controlled by the Supreme Leader of Iran, known as the Bonyad Mostazafan ("the Bonyad"), which is … ***controlled by the Iran Revolutionary Guard Corps***, the Iranian military complex formed by Iran's Supreme Leader Ayatollah Ali Khamenei, which is believed to control approximately one third of the Iranian economy. … The Bonyad ***reports directly to the Supreme Leader*** and MTN was confident that its relationship with Mr. Mokhber and the Bonyad he controlled provided direct access to the Supreme Leader. ***The Bonyad is well known for engaging in "Iran's shadow foreign policy."***[157]

496.    Turkcell's complaint against MTN alleged that MTN's senior executives, including its CEO, met with Iranian agents in South Africa (whom, Turkcell alleged, MTN

---

[157] *Id.* ¶ 65 (emphasis added; citations omitted). Similarly, Turkcell also alleged (at ¶ 86), that "[t]hroughout 2004 and 2005, MTN regularly met with … the Bonyad [Mostazafan] and Sairan [i.e., IEI]," during which time MTN's "goal was to entice those entities to support MTN and abandon Turkcell, on the promise that MTN had more to offer than Turkcell." *Turkcell v. MTN* Complaint at ¶ 86. Turkcell continued: "The Bonyad and [IEI] responded exactly as MTN planned: They not only used political leverage to increase delay and shift Turkcell's regulatory requirements, but also they directly began disengaging from their relationship with Turkcell. After mid-2005, the Bonyad and [IEI]'s involvement with Turkcell was merely a charade along the path to forming its venture with MTN." *Id.* ¶ 86.

invited to South Africa on a "trip" that "MTN funded"), during which time MTN's executives "[t]ogether [] promised [the Iranian agents] that South Africa would deliver 'heaven, earth, and the fish,' meaning whatever military equipment [Iran] desired." *Id.* ¶ 93.  Turkcell continued: "The entire trip was organized and coordinated by MTN so that they could corruptly induce the Iranian government to eliminate Turkcell … and replace it as the owner of the GSM opportunity." *Id.*

497.    On April 5, 2012, the *Mail & Guardian* Centre for Investigative Journalism in South Africa published a detailed expose on MTN's partnership with Iranian terrorists, titled "Iran 'Puts the Screws' on MTN," which reported that MTN "fac[ed] a storm over claims that it helped the Iranian government in 2009 and 2010," and reported that:

> Sources close to MTN's Iranian business have [] described ***an Orwellian environment in the company's Tehran headquarters***, where it allegedly ***gave military intelligence officials "open" access*** …. [S]ources claimed:
>
> - Because MTN Irancell and its data centre were part-owned by the Iranian military, subscriber data was shared "on a collegial basis" with the intelligence sector;
>
> - A shadowy ***"second floor" in MTN's building was populated by military intelligence officials***, the volunteer militia known as the Basij ("morality police") and clerics;
>
> - During the 2009 and 2010 Green movement protests, men from the second floor, accompanied by Irancell chief executive Alireza Dezfouli, allegedly approached data warehouse staff regularly to demand detailed records for individuals;
>
> - In one case, they demanded the number of a known Green Party activist, who could not be reached after his information had been given to military intelligence; and
>
> - Third parties listened in to staff calls over Irancell SIMs and would intervene and demand that the staff speak in English and not in other South African languages. …

[Turkcell's lawsuit] accuses MTN of bribing South African and Iranian officials, facilitating weapon trade agreements between the two countries and influencing South African foreign policy … in a bid to stop Turkcell from being awarded a second cellular network licence in Iran. …  MTN is a 49% shareholder in Iran-cell.  Fifty-one percent is held by an Iranian state-linked consortium, which is dominated by a subsidiary owned by the defence ministry known as Sairan, or Iran Electronics Industries.  Sairan is subject to US and European Union sanctions that target proliferators of "weapons of mass destruction".  It also holds a share in consortium Arya Hamrah, which owns and runs MTN Irancell's data centre that houses the company's servers and hardware. …

**Military intelligence**
The sources familiar with MTN's Iranian operations said that, because of these ownership structures, Irancell readily gave information about subscribers to intelligence officials. …  One of the sources said:  ***"MTN's data centre in Iran is effectively run by the military and military intelligence.  None of the intelligence organisations needs to go through normal procedures to access subscriber data and track individuals."***

Describing the climate at MTN's headquarters, a senior official said it was ***dominated by the presence of Iran's military intelligence officials and the "morality police".***

"There was a tea lady who just stood at the printer all day. Her job was to watch us."  The woman, understood to be a member of the "morality police", would scold female staff whose clothing was considered too revealing and signaled her displeasure over "inappropriate" behaviour.

Communicating by email, the source said:  "The people on the second floor are from military intelligence and the Basij and some clerics.  They oversee the intelligence and moral activities of the employees of Irancell. All emails, telephone conversations and SMSes of employees are monitored on an ongoing basis.  This is then exposed to MTN against the threat that they will kick out MTN when they need concessions from it."

The staffer described how men from the second floor would accompany Dezfouli to collect data on individuals and political dissidents:  "On several occasions someone from the second floor and [Dezfouli] would come to the managed services group and say 'give us all the details for this number', and they would have to."  The staffer said subscription and location data and call and SMS histories were handed over. …[158]

---

[158] Craig McKune and Sharda Naidoo, *Iran 'Puts the Screws' on MTN*, Mail & Guardian (Apr. 5, 2012) (emphases added).

On information and belief, the *Mail & Guardian*'s investigative report accurately described operations at MTN Irancell.

498.    Shortly before the *Mail & Guardian*'s investigative piece was published, MTN issued a written statement to the *Mail & Guardian* from MTN Human Resources Head Paul Norman that was replete with falsehoods designed to conceal MTN's ongoing joint venture with the IRGC including MTN's awareness that such a business partnership could conceivably result in violence.  In that statement, MTN's head of HR stated:

> MTN's role in Iran is mostly as a technical partner.  It is a non-controlling shareholder.  Fewer than 30 MTN expats (not all South African) are employed in Irancell, out of around 2000. … MTN works hard, with international legal advisors, to ensure that it is sanctions compliant. … Civic and human rights are vital to the company …  We expect all our business partners to abide by our code of ethics.  Mobile telecoms has been a force for political and economic liberation …  But we accept the ethical complexities around telecoms in this new environment, and the potential for their manipulation for unethical means.[159]

499.    MTN remained defiant even though nearly every other major multinational corporation exited their own joint ventures with fronts for the IRGC after the Bush and Obama administration ramped up sanctions enforcement in the 2000s.  As Ambassador Wallace explained in May 2012,

> despite the action of other responsible telecommunication companies, South African telecom company MTN continues to openly partner with sanctioned Iran entities affiliated with the brutal Iranian regime.  ***Companies like MTN deserve the condemnation of the American public and concerned citizens worldwide as well as the attention of this Congress, which should investigate MTN`s collaboration with the Iranian regime***.  Nevertheless, UANI will continue to educate citizens and apply pressure against recalcitrant companies that pursue short-term profits at the expense of global security.[160]

---

[159] *Id.*

[160] Wallace May 17, 2012 Testimony (emphasis added).

500.     Even after a decade of Iran-backed terrorism against the United Sates, MTN's
President and CEO told interviewers in 2013 that the company had no regrets about doing
business with the Iranian and Syrian regimes that sponsored anti-American terror.  As the
*Financial Times* reported at the time, "[y]et [MTN's CEO] Mr Dabengwa says MTN has few
regrets about entering Iran or Syria and includes them among countries that will be important to
MTN's growth.  'The starting point for entering frontier markets is the business case.  ***The other
risks, we can manage***,' he says."[161]  This view reflected MTN's corporate DNA that emphasizes
taking risks that the rest of the industry thinks are too great:  "Venturing into areas where others
might fear to tread is a characteristic that has been at the heart of MTN's rapid expansion since it
was established in 1994, the year South Africa held its first democratic election."[162]

501.     As the *Financial Times* reported in 2013, even the prospect of "deadly conflict"
did "little to diminish MTN's appetite for risk."[163]  Indeed, MTN's CEO admitted, in effect, that
MTN believed that American lives in Iraq and Afghanistan did not count in MTN's calculations.
Specifically, commenting on how MTN operates in conflict zones, MTN's President and CEO
stated: "I would say, is our presence there enhancing anybody's position in this conflict? That,
for me, would be the test.  If you could turn around and say our presence there is enhancing the
government's position or it's enhancing the other side's position, then I guess it's an issue.
Walking out today is not an option."[164]

502.     On or about November 2012, the Treasury Department announced additional
sanctions targeting the IRGC's use of the telecommunications industry to help inflict violence

---

[161] Saigol and England, *Telecoms: Dealings in the Danger Zone*.

[162] *Id*.

[163] *Id*.

[164] *Id*.

upon innocent civilians.  As was reported in real time by the South African media, MTN understood that these new Treasury sanctions punished MTN's counterparty for its support of terrorism.  For example, according to the South African financial publication Fin24, these "[s]anctions announced … by the US treasury against Iranian individuals and companies have led to panic at mobile operator MTN," because MTN "believed" that the Treasury announcement "target[ed] 17 individuals believed to be related to human rights abuses by the Iranian government, as well as to supporting terrorism and the Islamic Revolutionary Guard."[165]  As *Fin24* reported at the time, "the mobile operator [was] concerned sanctions will cause a hardening of attitudes in the US against the company," which was problematic for it as "MTN [was] being sued in the US for allegedly bribing Iranian officials to obtain an operating licence, while it [was] negotiating with the US treasury to allow the operator to expatriate its cash profits from Iran before the Iranian rial completely bottom[ed] out."[166]

503.    Incredibly, even after MTN understood the Treasury Department to be sanctioning its business partners in Iran for sponsoring terror, MTN sources still complained to the media about the audacity of the United States expecting MTN to follow U.S. law.  As one anonymous "MTN source[]" complained to *Fin24* that "[t]his is a [South African] company that ***should not be subjected to US foreign policy decisions***."[167]

504.    By the end of 2012, MTN was nearly alone as one of the few large multinational corporations that remained willing to work – openly or surreptitiously – as an IRGC, including Qods Force, joint venture partner.  As Nathan Carleton, communications director for UANI,

---

[165] Fin24, *Panic at MTN Over US Treasury Sanctions* (Nov. 11, 2012).

[166] *Id*.

[167] *Id*. (emphasis added).

summed it up at the time, "MTN stands out as one of the single most irresponsible businesses in the world and should be ashamed of the depths it has gone to in pursuit of profit."[168]

505.    MTN is virtually alone in the corporate world as a multinational corporation that rarely explicitly and unambiguously condemns terrorist violence against Americans, for the obvious reason that openly condemning anti-American terror would anger MTN's joint venture partners in Iran.  Instead of expressing any sympathy for Americans killed and maimed in Iraq and Afghanistan – which, on information and belief, MTN never publicly did prior to being sued by victims of Taliban terrorism in 2019 – MTN instead showered its business partner, Ayatollah Khamenei, with adulation.  For example, MTN Irancell was the lead sponsor of an Ayatollah-backed contest, which MTN Irancell as offering a chance "to visit the Supreme Leader of the Islamic Revolution Ayatollah Seyyed Ali Khamenei during [the competitors'] stay in Tehran."[169]

### C.    Defendants Knowingly Assumed A Financial, Logistical, And Operational Role In The Taliban's, Including The Haqqani Network's, Terrorist Enterprise In Afghanistan That Funded, Armed, And Logistically Sustained IRGC Sunni Terrorist Proxy Attacks In Iraq And Afghanistan

506.    The transnational alliance between the IRGC, including its Hezbollah Division and Qods Force, on the one hand, and al-Qaeda and its allies, including the Taliban and Haqqani Network (in Afghanistan) and al-Qaeda-in-Iraq/ISIS and Ansar al-Islam (in Iraq), on the other hand, ensured that MTN Group's material support to an FTO in one country directly aided acts of terrorism that the same FTO sponsored in another.  For example, payments made by MTN Gorup to a senior al-Qaeda terrorist in Afghanistan (Sirajuddin Haqqani) benefited al-Qaeda's terrorist enterprise in Iraq as well as Afghanistan and therefore aided attacks in both countries.

---

[168] *Id*.

[169] Tehran Times, *Reciters From 75 Countries to Participate in Tehran Quran Competition* (May 14, 2015), 2015 WLNR 14128237.

In this section, Plaintiffs first outline the financial and operational support that MTN Group provided to al-Qaeda and the Taliban before then detailing how MTN's aid to Sunni terrorists in Afghanistan benefited their sectarian allies in Iraq.

### 1. Defendants Facilitated Protection Payments To The Taliban

507.    MTN has become one of the world's most valuable telephone companies by "wading into nations dealing with war, sanctions and strife."[170]  Success in unstable markets, including Afghanistan, has yielded profits.  MTN is now, due to this business model, "bigger by some measures than its U.S. counterparts."[171]

508.    MTN followed that model in Afghanistan.  In mid-2006, MTN Group bought Areeba, a Lebanese telephone company that had recently won a license to provide cellular-telephone service in Afghanistan.  MTN entered the Afghan market shortly thereafter and began as the country's third-largest provider (consistent with its status as the third entrant), well behind the two incumbents.  But MTN grew quickly, and by late 2010 it had obtained an estimated 32% market share – the largest of Afghanistan's then-five cellular-phone providers.  As MTN grew, it rebranded Areeba as MTN Afghanistan, and it expanded its geographical footprint throughout the country.  By 2012, MTN had a presence in virtually every province in Afghanistan, including many that were under Taliban control or influence.

509.    MTN Group keyed MTN's rapid growth in Afghanistan by sponsoring a vast stream of payoffs to the Haqqani Network from 2006 through today.  Under Sirajuddin Haqqani's leadership, the Haqqani Network was responsible for collecting "taxes" from Afghanistan's telecom companies, which were the single largest (legal) industry and tax base in

---

[170] Alexandra Wexler, *Telecom Giant Pushes Into Dangerous Areas*, Wall St. J. (Aug. 10, 2019).

[171] *Id*.

162

Afghanistan – and thus a key source of funding and power for the Taliban and al-Qaeda, both of which were effectively led by Sirajuddin Haqqani in Afghanistan and Pakistan.

510.     The logic behind MTN's payoffs to the Haqqani Network matched the logic motivating MTN's joint venture with the IRGC.  MTN Group, Phuthuma Nhleko, and Irene Charnley intended to harm American interests in Afghanistan (like Iraq), and supporting the Taliban allowed them to do so.  MTN Group, Phuthuma Nhleko, and Irene Charnley caused MTN Group, through MTN Dubai, MTN Mauritius, MTN Afghanistan and/or other MTN subsidiaries and affiliates, to route monthly protection payments to al-Qaeda (via Sirajuddin Haqqani and his immediate family members) and the Taliban or face the risk that terrorists commanded by Sirajuddin Haqqani would destroy some of MTN's cell phone towers. Ordinarily, the going protection payment rate was usually around $2,000 per cell tower per month.  In some areas, MTN caused payments to be made to local Taliban, including Haqqani Network, commanders.  In other places, where MTN operated in a Taliban-controlled environment, the payments would have to be sent to the Taliban's Quetta Shura for southern Afghanistan, e.g., Helmand, or the Taliban's Miram Shah Shura for eastern Afghanistan, e.g., Paktia (Sirajuddin was involved in the former and led the latter).

511.     Even by hyper-corrupt Afghan standards, MTN was a particularly aggressive practitioner of protection payments.  Rather than invest in expensive security for its transmission masts, MTN purchased cheaper "security" by buying it from the Taliban.  Indeed, MTN declined to use armed guards to protect its towers.  Without paying for physical security, MTN both had the free cash flow and the incentive to buy peace with the Taliban.

512.     MTN's practice of making protection payments to the Taliban extended to the Haqqani Network.  From at least 2010 through today, MTN operated towers in Haqqani-

163

controlled territory in southeast and eastern Afghanistan, and it purchased security for those towers by paying the Haqqani Network.  The Network's chief financial operative, Nasiruddin Haqqani, oversaw those payments, and they typically occurred on a semi-annual basis.

513.    MTN negotiated its protection payments in direct discussions between MTN Afghanistan's security department and Taliban commanders.  MTN's security department consisted of roughly 600 total staff in Afghanistan, which included both local Afghan employees of MTN Afghanistan and a South African security component from MTN Group.  The security department consisted of three different layers:  provincial, regional, and a Tactical Operations Center in Kabul.  Security personnel throughout those levels orchestrated pay offs to the Taliban. For example, one high-ranking MTN Afghanistan official conducted at least 38 telephone negotiations (which he recorded) with Taliban officials from 2007-2014, in which he engaged in so-called "security coordination" with the insurgency.  The MTN employees who witnessed those conversations knew they were illegal, so they typically went to the roof of MTN Afghanistan's Kabul headquarters building – where they could maintain absolute privacy – to conduct their Taliban negotiations in secret.  In addition, on at least one occasion, MTN negotiated its payments at an in-person meeting held with Taliban officials near Quetta, Pakistan. MTN employees in Afghanistan understood that those negotiations involved MTN agreeing to make both cash payments and in-kind bribes (including equipment) to the Taliban.

514.    The Afghan Threat Finance Cell (or "ATFC") gathered evidence from 2008-2012 confirming MTN Afghanistan's practice of paying off the Taliban.  The ATFC generated intelligence products, memorialized in DEA Form 6's and Intelligence Information Reports, describing the common practice among Afghan telecommunications firms of paying the Taliban. According to the ATFC's evidence, MTN Afghanistan was the worst offender of all the

companies.  The ATFC confirmed MTN Afghanistan's frequent insurgent payments both in interviews with MTN employees and in wire intercepts collected by the Afghan government's Sensitive Investigative Unit.  In witness interviews with ATFC investigators, MTN employees admitted that MTN Afghanistan paid insurgents not to threaten its cell towers.  They justified those payments by appealing to MTN's commercial interests:  MTN sources told the ATFC that it was cheaper to pay the Taliban than it would have been to rebuild the towers in the face of Taliban threats.

515.    The U.S. government strongly opposed MTN's practice of paying the Taliban. International Security Assistance Force Afghanistan ("ISAF")'s leadership was aware of cell phone companies making protection payments to the Taliban and pressured the companies to stop.  On information and belief, the U.S. government exerted that pressure in direct discussions between the U.S. government and MTN, and also through the Afghan Ministry of Communications.  On one occasion, an ISAF commander raised the issue directly with President Karzai.  In such conversations, ISAF's leadership specifically rejected the argument that protection payments represented an acceptable price of MTN maintaining its network in Afghanistan.  ISAF and the Afghan government warned MTN Afghanistan that its business practices were supporting the insurgency and were threatening Coalition forces, and both entities instructed MTN to stop.  MTN refused.

516.    MTN supplied the Taliban with more substantial assistance than its competitors did.  MTN's 2006 entry into Afghanistan set the stage for the Taliban's cellular-tower rackets by adding another participant to the Afghan cellular marketplace.  Until that point, the Taliban's ability to extract money from the two incumbent providers had been limited.  Once MTN emerged in 2006, it became the third cellular company in Afghanistan, which gave the Taliban

165

additional leverage to execute on its protection racket.  That is because, with MTN agreeing to pay the Taliban, the Taliban was free to follow through on its threats against other companies without the risk that doing so would cut off all cellular service in Afghanistan – service on which the Taliban itself relied.  Indeed, because Taliban fighters commonly preferred to use MTN's network for their own communications, the Taliban did not want to destroy MTN's network.

517.    A review of available cell-tower attack data supports the same conclusion. Plaintiffs have analyzed all of the available purported U.S. military Significant Activities reports, as published online, that describe attacks between 2004 and 2010 against or in the immediate vicinity of a cellular tower in Afghanistan.  The data shows a clear disparity between MTN and its two main competitors, Roshan and Afghan Wireless Communication Company ("AWCC"). From 2004 to 2009, AWCC and Roshan suffered at least 6 and 7 "significant" attacks on their towers, respectively, whereas MTN – which did not even pay guards to protect its towers – faced only 1 (non-lethal) attack.  The disparity is consistent with Roshan's accusation that MTN paid protection money to the Taliban.

518.    That attack disparity existed despite MTN's and Roshan's deployment of transmission masts at similar times in similar locations.  For example, in May 2008, the Taliban attacked one of Roshan's towers in Wardak Province, yet two similar nearby towers (including one belonging to MTN) were not attacked.  The most likely explanation for the difference is that MTN had paid protection money, whereas Roshan had not.  Indeed, in 2009, Roshan maintained company rules that prohibited it from paying off terrorists.  Because Roshan refused to pay, the Taliban destroyed 18 of Roshan's towers in and around the 2009 Afghan elections.

519.    MTN Group knowingly oversaw and authorized MTN Afghanistan's practice of providing support to the Taliban, as well as MTN Group 's aid routed through MTN Irancell, Exit40, and the other sources of MTN Irancell-related cash-flow alleged in this Complaint.

520.    MTN Group maintained direct contact with the MTN Afghanistan security official responsible for interfacing with the Taliban, and MTN Group officials encouraged and approved MTN Afghanistan's practice of paying off the Taliban.

521.    The senior MTN Afghanistan security official who oversaw many of MTN Afghanistan's protection payments to the Taliban reported directly to the head of MTN Group's head of business risk management, in Johannesburg, South Africa.  MTN Group was specifically aware of, and approved, MTN Afghanistan's practice of paying the Taliban for security.  In fact, MTN Group compensated MTN Afghanistan's security team with cash bonuses reflecting its success at resolving "security issues" involving the Taliban.  Those bonuses typically had three levels:  Level 1 ($1,500, for local operatives); Level 2 ($5,000, for regional operatives); and Level 3 ($10,000, for national operatives).  The head of MTN Afghanistan's security group received roughly $66,000 in such bonuses during the relevant timeframe, which specifically compensated him for negotiating with the Taliban successfully.  MTN Group even gave him an award for best "display[ing] the Group's values in MTN Afghanistan."

522.    MTN Group, MTN Afghanistan, and Phuthuma Nhleko, among others, have effectively admitted that MTN Group, and those acting on its behalf, paid off the Taliban, including its Haqqani Network, through statements that manifested an understanding that MTN was not a target of the Taliban and did not have any reason to fear the security environment in Afghanistan or Iran included, but were not limited to:

(i)     MTN Group regularly assured its shareholders that MTN Group and its affiliates could successfully manage the security climate in every part of Afghanistan as to MTN Group's

(inclusive of its subsidiaries and affiliates) risks in a manner that was legal and compliant, which MTN Group could only do because MTN Group fraudulently concealed from MTN Group's shareholders that MTN Group and its affiliates sponsored regular direct payments to an FTO (the Haqqani Network) in violation of the laws of the U.S. and a host of other nations.

(ii)     MTN Group and MTN Afghanistan publicly stated that they understood that the Taliban did not target MTN and its personnel and it was enough for an MTN person to show the terrorists a note on MTN letterhead that confirmed MTN had made the necessary payments to the Taliban, which MTN Group could only do because MTN Group fraudulently concealed from MTN Group's shareholders that MTN Group was a large regular monthly taxpayer to the Taliban, including its Haqqani Network (and FTO) in violation of the laws of the U.S. and a host of other nations.

(iii)    After Sirajuddin Haqqani led the Taliban's takeover of Afghanistan, MTN Group stated that MTN could continue to operate inside Afghanistan successfully and profitably, which MTN Group and its affiliates could only do because MTN Group fraudulently concealed from its shareholders that MTN Group and its affiliates had a long-term, and illegal, practice of paying off the Taliban, including its Haqqani Network.

(iv)    Phuthuma Nhleko, in his capacity as President and CEO of MTN Group, admitted that MTN had purchased its security when he joked about not needing protection from bomb blasts, which joke presumably was only amusing (to Mr. Nhleko) given that he knew MTN was protected because MTN had bribed the Haqqani Network and therefore was not in any danger from the Taliban, which protection payment relationship Mr. Nhleko fraudulently concealed from MTN's shareholders.

(v)     Even after it was sued for paying off the terrorists in 2019, MTN Group repeatedly assured its shareholders that it could continue to invest in Afghanistan in a compliant manner, which assurance MTN Group could only make because MTN Group fraudulently concealed its regular payments to the Taliban from MTN Group's shareholders.

523.    In total, MTN Group approved hundreds of millions of U.S. dollars in overall payments to the Taliban.  Applying the standard rate of $2,000 per tower per month to MTN's collection of roughly 1,300 towers yields an estimated payment of $2.6 million per month.  At that rate, MTN's total payments to the Taliban from 2007 through 2022 surpassed $400 million.

524.    MTN Group caused a substantial percentage of the $400 million in protection money – on information and belief, at least 20%, if not more – to be directly paid to the Haqqani Network after the U.S. designated the Haqqani Network as an FTO in September 2012.

168

Applying the standard rate of $2,000 per tower per month to MTN's towers in geographies controlled or contested by the Haqqani Network yields an estimated payment of $1 million per month directly to the post-FTO-designation Haqqani Network.  At that rate, MTN's total payments to the post-FTO-designation Haqqani Network in the 114 months from the September 2012 designation and present well surpassed $100 million.

### 2. Defendants Supported The Taliban, Including Its Haqqani Network, By Deactivating MTN's Cellular Towers At Night

525.    MTN Group also provided material support to the Taliban by deactivating MTN Afghanistan's cell towers at the Taliban's request.  In or about 2008, the Taliban began demanding that Afghanistan's major cellular-phone providers switch off their towers at night. The Taliban justified that demand by arguing that Coalition forces were "using the cellular networks to track its insurgents throughout the war-torn country."[172]  Coalition forces, a Taliban spokesman stated, were "misusing the cell towers for their intelligence works."[173]  Because the Taliban believed that shutting down nighttime service would impede Coalition intelligence efforts, it demanded that the cellular-phone companies deactivate their towers from 5 p.m. until 3 a.m.  Later, the Taliban ordered that the companies keep their masts deactivated until 6:30 a.m.

526.    MTN granted the Taliban's requests.  In early 2008, MTN Group issued a statement that it was "aware of reports of the Taliban communicating a need for mobile operations to be suspended at certain times during the night in sensitive areas.  We are evaluating

---

[172] Paul Vecchiatto, *MTN Concerned By Afghanistan Threats*, ITWeb Cape Town (Feb. 28, 2008) ("*MTN Concerned By Afghanistan Threats*"), https://www.itweb.co.za/content/dgp45MaYRYZMX9l8.

[173] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

the situation and liaising with our executives and the relevant authorities in Afghanistan."[174]   The "executives" apparently decided to accommodate the Taliban's "need" and shut down MTN's transmission masts at night.   When the Taliban ordered cellular-phone companies to "switch off the signal," MTN Afghanistan's head of legal and government affairs told the media:   "We decided to obey the orders and we have been shut down since yesterday."[175]   Since 2008, MTN's policy has remained consistent:  it has followed the Taliban's, including its Haqqani Network's, directives and switched off its transmission masts for the Taliban's benefit – typically at night.

527.   MTN Group specifically instructed MTN Afghanistan to comply with the Taliban's directives to switch off its cell towers at night.   On information and belief, Phuthuma Nhleko personally decided on behalf of MTN Group to instruct MTN Afghanistan to make protection payments to the Taliban, including its Haqqani Network.

528.   MTN Group, under Phuthuma Nhleko leadership, shut down its towers for the same reason it paid protection money:  to maintain good relations with the Taliban, including its Haqqani Network.   MTN Group and Mr. Nhleko, through MTN Afghanistan, made no effort to hide their shared motivation in that regard.   When asked about shutting down its network, MTN Afghanistan's head of legal and government affairs publicly stated that MTN could not be seen as taking sides between the Afghan government and the Taliban, including its Haqqani Network, but instead, MTN believed that it must remain purportedly "neutral" between the two.

529.   Even MTN's claims of "neutrality" between the Afghan government and the Taliban terrorists targeting were another lie orchestrated by MTN Group:  MTN explicitly favored its ally, the Taliban, and its IRGC sponsor (and MTN's joint venture partner), over the

---

[174] *MTN Concerned By Afghanistan Threats*.

[175] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011).

United States and the Afghan government.  *First*, MTN Group and its affiliates were solicitous of the Taliban, including its Haqqani Network, but scornful of America.  MTN Group personnel and/or agents regularly followed the Taliban's instructions (e.g., by shutting down towers), and routinely met with Taliban personnel when requested.  When it came to America, however, MTN Group refused U.S. entreaties to halt its aid to the Taliban and could not even be bothered to attend a U.S. military-hosted meeting with Afghanistan's cell companies to even discuss the Taliban threat.  *Second*, on information and belief, MTN Group caused MTN to pay ***more*** in protection "taxes" to the Taliban than MTN paid in legal taxes to Afghanistan's lawful government—simply put, discovery is likely to reveal that MTN made far more regular, and larger, tax payments to the terrorists than the Afghan government.

530.    MTN went to great lengths to maintain its purported "neutrality" and do what the Taliban asked of it.  Even in 2011, after President Karzai issued a decree formally demanding that MTN (and its competitors) reactivate their towers at night, MTN refused the recognized government's directive and continued to follow the Taliban's requests.  One executive summed up MTN's (and others') refusal to follow President Karzai's directive:  "We're not going to turn on our masts and become part of the army of the Afghan government."[176]  By shutting down its towers, MTN decided, it could reduce the risk that the Taliban would threaten MTN's commercial interests.

531.    MTN Group and its affiliates could act this way because MTN's personnel in Afghanistan supported the Taliban and the IRGC more than the United States and the Afghan government.  During the decade prior to the Haqqani Network's seizure of Kabul in 2021,

---

[176] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

MTN's professional staff in Kabul conspicuously mirrored Taliban cultural behaviors, including Talban-inspired attire and facial hair, even while most professionals in Kabul did not maintain similar appearances, and discovery is likely to reveal that MTN personnel in Kabul often dressed and acted like Taliban because they were regularly meeting with Taliban to pay them, sympathetic to the Taliban, and/or were members of the Taliban themselves.  On information and belief, one or more MTN employees in Kabul is a member of the Taliban.

532.    The ATFC gathered evidence confirming that MTN was switching off its transmission masts at night to comply with Taliban demands.  Based on intelligence reporting, wire intercepts, and interviews with MTN sources, the ATFC concluded that MTN Afghanistan was deactivating its cell towers in coordination with the Taliban.  The justification offered by MTN Afghanistan employees was, again, financial:  turning off the towers helped MTN save money by avoiding the need for MTN to invest in expensive security or to rebuild its towers.  The ATFC observed that the security threat MTN faced was not primarily to its employees; it was to equipment that MTN did not want to spend the money to protect or rebuild.

533.    MTN Afghanistan implemented tower shutdowns through a secretive process that originated with its security team.  The head of MTN Afghanistan's security division would negotiate with the Taliban to determine which towers (called "Base Transceiver Stations" by MTN's technical team) to shut down, and at which times.  Then, based on information received from the Taliban, MTN's security team relayed instructions to MTN Afghanistan's technical team directing them to implement the shutdowns.  The instructions pinpointed the particular quadrant(s) within particular MTN towers' coverage areas in which Taliban operatives were located, specifying that MTN should turn off the signal within those quadrants.  That enabled MTN to satisfy the Taliban's demands while also allowing MTN to continue earning revenue

172

from customers in the other quadrants – and also to deceive the government about the extent of its shutdown.  MTN employees further avoided memorializing these instructions over company email or in memos; they instead used phone calls or text messages with the purpose of avoiding a paper trail that would document their cooperation with the Taliban.

534.    At all relevant times, MTN Group was aware of, and approved, MTN Afghanistan's practice of shutting down its towers to comply with the Taliban's requests.  MTN Afghanistan would not have maintained that policy without specific buy-in from MTN Group's senior management in South Africa.

535.    MTN's conduct strengthened the Taliban and undermined U.S. counterinsurgency efforts.  By 2010, the Taliban was deploying MTN's cell phone network as a terrorist weapon against Americans in Afghanistan.  The insurgents, one Army officer told the *New York Times*, used MTN's cell towers "as a weapons system" against Coalition forces.[177]  Indeed, cell phones were crucial to the Taliban – they provided a convenient form of communication and helped insurgents coordinate attacks – but they also came with two major downsides.  *First*, U.S. intelligence tracked the Taliban's phone signals and used them to locate high-level targets for capture-or-kill missions.  *Second*, cell phones provided Afghan civilians with the ability to call Coalition tip lines and provide valuable human intelligence.

536.    Nighttime deactivation was the Taliban's solution to both problems.  U.S. Special Forces typically execute high-value raids at night, and deactivated cell signals impeded those missions by making the insurgent targets harder to track.  That was the Taliban's stated rationale for demanding nighttime signal deactivation:  its spokesman argued that Taliban fighters had

---

[177] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

173

"been increasingly targeted by foreigners recently and we know they are using the services of these phone companies against us.'"[178]  As another Taliban spokesman explained publicly, the Taliban viewed the "cutoffs as a line of defense," in which its "'main goal is to degrade the enemy's capability in tracking down our mujahedeen.'"[179]  Consistent with that statement, *AFP* reported that "Taliban militants regularly demand that mobile phone companies switch off their networks at night, fearing that NATO-led forces can track them through phone signals."[180]

537.    Similarly, nighttime deactivation obstructed Coalition efforts to gather human intelligence.  Cell phones provided a key conduit for Afghan civilians to pass intelligence to Coalition personnel.  But, as the U.S. military director of the Telecommunication Advisory Team explained, "[i]f the masts are off Afghans can't report anything . . . If you see an insurgent you can't call the police to say check this out."[181]  And Afghan informants were usually scared to phone in tips during the day when they could be seen by Taliban supporters.  Human intelligence thus typically flowed to the Coalition at night.  By agreeing to shut down its transmission masts, MTN knowingly deprived Coalition forces of that vital intelligence.

538.    MTN's tower shutdowns substantially contributed to the Taliban's ability to commit the attacks that killed and injured Plaintiffs.  The Taliban targeted its shutdown orders at key districts and provinces with tactical importance for ongoing Taliban operations.  As MTN knew, tower deactivation in those areas impeded Coalition forces from locating Taliban

---

[178] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011) ("*Taliban Shut Down Cell Phones*").

[179] Alissa J. Rubin, *Taliban Using Modern Means To Add To Sway*, N.Y. Times (Oct. 4, 2011).

[180] *Taliban Shut Down Cell Phones*.

[181] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

174

operatives and degraded the Coalition's ability to interdict Taliban ongoing attacks. Indeed, the U.S. intelligence benefits gleaned from active cell towers were so potent that ISAF often executed operations designed specifically to induce Taliban operatives to use their phones. By the same token, the operational impact of MTN's tower-shutdown policy was so extreme that ISAF, U.S. Embassy, and Afghan government personnel repeatedly pressured MTN to stop. ISAF command considered such shutdowns to be a significant threat to U.S. counterinsurgency efforts. And those shutdowns occurred in the key provinces and districts in which Plaintiffs (or their family members) were operating when they were killed and injured. By defying the U.S. government and obeying the Taliban in the contested areas in which the insurgents were fighting Americans, MTN materially supported the Taliban attacks that killed and injured Plaintiffs.

539.    The U.S. government tried to address those problems by encouraging Afghanistan's cellular-phone providers to move their transmission masts onto secure U.S. bases. As the U.S. government explained in proposing the idea, securely located transmission masts would be difficult for the Taliban to attack – and could thus eliminate the putative reason MTN was deactivating its cell towers when the Taliban told it to. Roshan, according to a purported 2009 U.S. State Department cable (as published online), was "keen to develop this partnership with the USG and sees it as a way to promote mutual security, communications, and commercial strategies for Afghanistan."[182]  MTN, by contrast, refused to participate and declined even to join Roshan and AWCC at the U.S. government-brokered meeting to discuss the idea.

540.    Neither the U.S. government nor the Afghan government ever condoned or conveyed approval of MTN's tower-shutdown policy. Although news reports on occasion

---

[182] U.S. State Dep't Cable ¶ 11, *Using Connection Technologies To Promote US Strategic Interests In Afghanistan* (July 23, 2009).

quoted individual Afghan government officials suggesting a resignation to the reality of MTN's shutdown policy, the official Afghan government position – conveyed at in-person meetings held with MTN, including at least one with President Karzai himself – was that cell phone companies must keep their towers active at night.  The U.S. government was even more strongly committed to that position.  ISAF leadership especially rejected the suggestion that MTN's conduct represented an acceptable way of protecting its network.  ISAF expected MTN to keep its towers on, invest in security to protect them itself rather than paying the Taliban, and ultimately rebuild them if necessary.  ISAF considered that course of action not only feasible, but mandatory for a company like MTN reaping profits in an insurgency-afflicted country like Afghanistan.

### 3.     Defendants' Assistance To The Taliban, Including Its Haqqani Network, Substantially Assisted Islamic Revolutionary Guard Corps' Sunni Terrorist Proxy Attacks Against Americans In Iraq

541.    When MTN Group and its agents and affiliates aided the Taliban, including its Haqqani Network, MTN substantially assisted Hezbollah's, the Qods Force's, and Jaysh al-Mahdi's terrorist attacks against Americans in Iraq.

542.    MTN's payments to the Taliban, including its Haqqani Network, funded, among other things, the network of terrorist training camps in Afghanistan and Pakistan that Sirajuddin Haqqani ran to instruct al-Qaeda's Islamist terrorists in Afghanistan, Iraq, and globally.  From 2005 through 2022, hundreds, Sirajuddin's network of MTN-funded terrorist training camps trained hundreds of Hezbollah, Qods Force, and Jaysh al-Mahdi terrorist leaders, field operatives, logisticians, bombmakers, financiers, and propagandists in order to facilitate their attacks against Americans in Iraq.

543.    The Taliban, including its Haqqani Network, maintained a vast logistics, training, and safe haven program for allied terrorist groups worldwide, including al-Qaeda, Lashkar-e-Taiba, Hezbollah, the Qods Force, that increased the lethality and unit cohesion of the terrorist

176

cells they trained by imparting al-Qaeda and Haqqani Network expertise to Iraqi terrorists who did not have nearly the same level of tactical knowledge of experience upon which to draw. Moreover, the al-Qaeda/Taliban Syndicate sites *in Afghanistan/Pakistan* keyed the rapid upward scaling of al-Qaeda's terrorist enterprise *in Iraq* by allowing the al-Qaeda/Taliban Syndicate to apply a "train-the-trainer" paradigm to instruct Jaysh al-Mahdi terrorists, who received training at al-Qaeda/Haqqani sites in Afghanistan and Pakistan, and then returned to Iraq to use their new skills to attack Americans more effectively.

544.    Large networks of terrorist training camos that cater to hundreds of terrorists at a time – universities for terror – cost a lot of money and requires the best logistics.  Thus, the IRGC provided substantial financial and logistical aid to al-Qaeda's, al-Qaeda-in-Iraq's, and Ansar al-Islam's terrorist attacks against Americans in Iraq by helping these FTOs operating in Iraq by, among other things, facilitating their movement of money and logistical pipeline to al-Qaeda's leadership in Pakistan in order to provide them training and bombmaking classes at Sirajuddin Haqqani's network of al-Qaeda/Haqqani Network bomb factories and training camps in Afghanistan and Pakistan.  The IRGC also worked with the Haqqani Network to promote the development of mutually beneficial logistics pipelines and swaps, for example, trading commodities useful for bombmaking logistics (like trading commercial CAN fertilizer from Pakistan for specific electronics from Iran).  Thus, when MTN Group provided hundreds of millions of dollars and logistical aid to the Taliban, including its Haqqani Network, millions of dollars of such aid to the Taliban flowed through to facilitate terrorist violence by Hezbollah, the Qods Force, and Jaysh al-Mahdi by supporting such groups' training, travel, and logistics.

545.    Moreover, when MTN Group and Defendant Nhleko approved MTN's policy of siding with the Taliban, including its post-FTO-designation Haqqani Network, and shutting

down MTN cell towers upon Taliban demand, MTN and Mr. Nhleko helped build a digital

express-lane for use by the Taliban and its IRGC allies to travel back and forth from Pakistan

through Afghanistan for ultimate arrival in Iran or Iraq.  MTN Group's policy of tower

shutdowns directly aided the IRGC and ***every other terrorist group*** that needed or wanted to

travel inside Afghanistan because any such group knew that, in effect, they could travel without

leaving any digital footprint at night.  When MTN Group blinded the U.S. military to the

nighttime movements of the Hezbollah and Qods Force operatives inside Afghanistan

responsible for coordinating the movement of terrorists, funds, and arms between Iraq and

Afghanistan/Pakistan, through Iran – all the while concealing such activity from the world's

most powerful military and intelligence service – MTN Group provided devastating, impossible-

to-overstate assistance to Hezbollah, the Qods Force, and their terrorist proxies in Iraq.

>    **D.      Defendants' Assistance To The Islamic Revolutionary Guard Corps**
>    **Including Hezbollah And The Qods Force, And Their Sunni Terrorist**
>    **Proxies Al-Qaeda, Al-Qaeda-In-Iraq, Ansar Al-Islam, And The Taliban,**
>    **Including Its Haqqani Network, Comports With MTN's Historical Business**
>    **Practices in International Markets**

546.     MTN's conduct above reflected a willingness to facilitate unspeakable violence,

or support America's enemies, as a way to increase profits in Iran.

>    **1.      MTN Aided the Regular Islamic Revolutionary Guard Corps's**
>    **Terroristic Violence Against Peaceful Iranian Pro-Democracy**
>    **Demonstrators**

547.     MTN enabled the terroristic violence deployed by IRGC agents against peaceful

pro-democracy and human rights protestors in Iran during the 2009 uprising popularly known as

the "Green Revolution."

548.     As the *L.A. Times* explained at the time, while Iran "brac[ed] for further

confrontations between security forces and supporters of Mousavi …[,] [o]ne of the country's

main cellphone operators, Irancell, co-owned by South Africa's MTN, warned customers [] that

178

it would be suffering unspecified 'technical' problems over the next three days, which coincide[d] with the anticipated unrest."[183]  MTN was lying to its customers and the world – there were no "technical" problems but, rather, simply the IRGC's desire to shut down any avenue for mass democratic mobilization against it – which MTN happily obliged.

549.     MTN went beyond merely lying to its customers when it shut down its network at the request of the IRGC.  MTN actively aided the IRGC by helping it develop sophisticated tools for monitoring, eavesdropping, and surveilling targets.  MTN's technical services for the IRGC did not merely benefit its domestic regime suppression; the exact same functions also benefit foreign intelligence gathering, surveillance, and communications – critical competencies relevant to the success of a terrorist attack against Americans in Iraq.

## 2.     MTN Aided Terrorists in Nigeria

550.     MTN also aided terrorists in Nigeria.  On or about October 26, 2015, the Nigerian Communication Commission fined MTN Group $5.2 billion for failing to meet a deadline to disconnect 5.1 million unregistered subscribers in Nigeria.  Nigeria imposed the deadline on all cellular operators in the country due to evidence that unregistered phones were facilitating the activities of criminal gangs and terrorists, including Boko Haram.  The requirements that MTN violated, the *Wall Street Journal* reported, were "meant to combat terrorism."[184]  MTN eventually negotiated the criminal fine down to $1.67 billion and agreed to pay it in seven installments.

---

[183] Borzou Daragahi, *Iran Court Warns Against Criticizing Proceedings*, L.A. Times (Aug. 3, 2009), 2009 WLNR 14945080.

[184] Alexandra Wexler, *Nigeria Reduces MTN Group Fine By $1.8 Billion*, Wall St. J. (Dec. 3, 2015).

E.     **Defendants' Assistance To The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division And Qods Force, Had A Substantial Nexus To The United States**

1.     **Defendants' Conduct Targeted The United States**

551.   MTN's joint venture with the IRGC and its related assistance for Hezbollah and Jaysh al-Mahdi, relied on significant contacts with the United States.  MTN Group was a key player in orchestrating both those U.S. contacts and MTN's material support to the IRGC Hezbollah, and Jaysh al-Mahdi, as well as MTN's direct payments to al-Qaeda and the Haqqani Network via their payoffs to dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani.

552.   MTN employs a top-down management structure in which MTN Group centralizes operational control over the functions performed by its various subsidiaries.  During the relevant timeframe, MTN Group divided responsibility for its subsidiaries into six business groups; MTN Irancell (and Afghanistan) fell under the purview of the Middle East and North Africa ("MENA") group.  The MENA group's functional units resided in Dubai and reported directly to senior management in South Africa.

553.   MTN Group made the decision to enter a joint venture with the IRGC in 2004, when it began plotting "Project Snooker" to eject Turkcell from the existing deal.  As part of "Project Snooker" – negotiated and executed by MTN Group's senior management – MTN ejected Turkcell from Irancell.  MTN Group later rebranded Irancell as MTN Irancell.

554.   Because MTN's business model depends on unstable countries, including Iran, one of MTN Group's core management responsibilities is to manage operational and political risk in the countries MTN enters.  Assessments of those risks occur both before the decision to enter a market – here, as MTN entered Afghanistan in the mid-2000s – and on an ongoing basis. In mitigating those risks – which here included designing a strategy for coordinating MTN's operational support for the IRGC in Dubai and Iran – MTN Group implemented a number of

measures, including the "appointment of a Group crisis manager"; the implementation of "physical and staff security measures"; and "[c]ontinual monitoring of the political environment in operating countries."[185]  MTN Group, not its operating subsidiaries, decided to do business with the IRGC, and Qods Force, fronts, and developed MTN's strategy related thereto.

555.    Those policies required MTN Group's close supervision of MTN's payments to Qods Force fronts, operatives, and agents, and MTN Irancell's joint venture with the IRGC.  As explained above, MTN Group made the decision – and instructed its subsidiary – to enter into a joint venture with the IRGC.  MTN Group also approved its subsidiary's practice of providing payments and operational support to the IRGC including sourcing hundreds of sensitive dual-use items for IRGC, including Qods Force fronts, operatives, and agents inside and outside Iran in Dubai to benefit the Iranian IRGC's terrorist enterprise.  Those decisions had a substantial connection to the United States for the reasons explained below.

556.    MTN's provision of material support to the IRGC (including its Hezbollah Division and Qods Force), Hezbollah, and Jaysh al-Mahdi, was expressly aimed at the United States.  At all relevant times, MTN knew that the IRGC (including its Hezbollah Division and Qods Force), Hezbollah, and Jaysh al-Mahdi were targeting the United States.  The Joint Cells operated by the Qods Force, Hezbollah, and Jaysh al-Mahdi did not conduct an indiscriminate terrorist campaign that merely injured Americans by chance.  Instead, these Joint Cells directed attacks at *Americans* with the specific intent of killing *Americans* in particular – so that they could inflict pain in the United States and influence U.S. policy.  As the Treasury Department stated when it announced the Qods Force's designation as a SDGT in 2007, "the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups

---

[185] *Id.*

181

of Iraqi Shi'a militants who target and kill Coalition … forces…."[186]   The Qods Force's, Hezbollah's, and Jaysh al-Mahdi's ultimate, shared, publicly-stated goal was to effect a withdrawal of American forces from Iraq.  Each terrorist attack that killed and injured Plaintiffs was part of that campaign of anti-American terrorism.

557.    MTN's decision to reach into the United States to obtain embargoed dual-use technology to aid the IRGC's terrorist enterprise was also expressly aimed at the United States. MTN knew, based on conversations with IRGC, including Qods Force, agents that the IRGC viewed MTN's assistance to the IRGC as vital to Iran's ability to protect the "security" of its Islamist revolution, *i.e.*, external terror operations aimed to spread the revolution and counteract the Great Satan (the United States).  MTN knew that the IRGC's understanding of what was needed to protect Iranian "security" inherently involved terrorist violence against Americans as part of Iran's effort to export its Islamist revolution and drive the U.S. out of the Middle East.

558.    MTN also knew, based on conversations with U.S. officials, that it was assuming an active role in an IRGC, including Qods Force, plot to develop cash flow and to source vital dual-use components for the IRGC and its proxies.  MTN further knew of the key importance that communications and computing technology plays for terrorists.

559.    When MTN sourced embargoed technology that the United States had publicly declared could benefit IRGC's, including Qods Force's, efforts to kill others, it intentionally helped arm terrorists it knew were targeting the United States.  Indeed, the IRGC's direct statement in their contract with MTN obligated MTN to help the IRGC protect Iran's "security." MTN at all times knew or recklessly disregarded that "security" was a euphemism for IRGC,

---

[186] U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

including Qods Force, terrorist operations outside of the territorial borders of Iran.  When MTN obtained the technology requested by its partners in the IRGC MTN targeted the United States by helping the terrorists improve their bombs, rockets, communications, and intelligence gathering.

560.     Although MTN's primary motivation for assisting the IRGC was financial, it also intended to harm Americans in Iraq.  One reason MTN cooperated with the IRGC was to align itself with their effort to drive Americans out of the country.  MTN had two distinct but related reasons for desiring that outcome.

561.     *First*, MTN intended to harm Americans because it decided that was the necessary price of maintaining a good relationship with the Ayatollah and the IRGC.  The Ayatollah and the IRGC were explicit – both in public, and in conversations with MTN – that it wanted MTN's financial and technical help in fighting against U.S. forces in particular.  Thus, for MTN to achieve its business objectives vis-à-vis its joint venture partners the Ayatollah and the IRGC MTN needed to disassociate itself from the United States and prove that it could deliver value to the Shiite terrorist campaign against U.S. forces in Iraq.

562.     *Second*, MTN Group's support for attacks against U.S. citizens by the Joint Cells advanced the foreign policy interests of MTN Group's most important business partner, the Bonyad Mostazafan and IEI, which MTN at all times knew to be IRGC fronts.

563.     MTN Group depends on its partnership with the Ayatollah and the IRGC.  As of 2012, Iran was MTN's fastest-growing market and its third-largest source of revenue overall.  Today, Iran is MTN's second-biggest market by subscribers.  MTN Group's financial incentive to satiate the Ayatollah and its IRGC, including Qods Force, partners has led it to take a number of illegal steps to assist the Iranian regime.

564.     MTN Group cooperates with the Ayatollah, and the IRGC, and including the Qods Force, despite knowing that the Ayatollah, and the IRGC, and including the Qods Force, are collectively the world's worst sponsor of anti-American terrorism.

565.     MTN Group's agreement to aid the IRGC served the IRGC's agenda of inflicting death and injury on U.S. forces.  It also fulfilled MTN Group's contractual obligation to engage in "defensive, security and political cooperation" with its IRGC, including Qods Force, partner.[187]  Such cooperation offered MTN Group additional motivation for becoming joint venture partners with the IRGC.  MTN's support for the IRGC did not merely grow its profits by allowing it to obtain the Irancell business in the first instance; it also benefited MTN's business by inflicting harm on an enemy (the United States) of MTN's most lucrative business partner (the IRGC fronts that controlled MTN Irancell) in order for MTN to curry Iranian favor to gain market share for a potentially uniquely lucrative telecom and communications market in Iran.

**2.      Defendants' Conduct Relied On American Contacts**

566.     Defendants also connected MTN Group's support of the Hezbollah, the Qods Force, Regular IRGC, and Jaysh al-Mahdi, to the United States by obtaining technology and vital operational support in reliance on U.S. contacts.  MTN Group orchestrated a complex scheme to surreptitiously supply technology and operational support for MTN Irancell through various U.S. agents.  In doing so, MTN Group tied MTN's unlawful conduct to the United States in several ways.

567.     Even while MTN Group was reaching into the United States to launch a multifaceted campaign to facilitate the flow of U.S. dollars to and from MTN Irancell, its CEO

---

[187] MTN-Irancell Consortium Security Cooperation Agreement § 8 (Sept. 18, 2005), attached as Exhibit A.

continued expressing his contempt for the United States.  Instead of exiting MTN Group's secret Security Cooperation Agreement and alliance with the IRGC, Phuthuma Nhleko, as MTN Group's President and CEO, defiantly pronounced that "U.S. sanctions should not have unintended consequences for non-U.S. companies."[188]  MTN Group's, and Phuthuma Nhleko's, public statement furthered the terrorist's scheme, and fraud on MTN Group's shareholders, because MTN Group, through Mr. Nhleko, spread IRGC disinformation while simultaneously fraudulently concealing the existence of MTN Group's illicit deal with its Hezbollah, Qods Force, and Regular IRGC counterparties, i.e., the "Iranian Shareholders," from MTN Group's own shareholders.

> **i.    From 2012 Through 2019, Defendants Regularly Reached Into America To Unlock The U.S. Financial System So That Defendants Could Aid MTN Group's Attempts To Repatriate Hundreds Of Millions Of Dollars Out Of MTN Irancell**

568.    MTN Group regularly engaged in large six- and seven-figure U.S. dollar transactions that flowed through the New York financial system before leaving the United States to flow into accounts controlled by an IRGC "buffer" such as an agent, operative, cut-out, front, and Orbit company.

569.    MTN Group's, Phuthuma Nhleko's, and Irene Charnley's use of the New York financial system was not incidental.  On information and belief, beginning on or about 2012 and continuing through on or about 2019, MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley routinely relied upon banks in New York to manage the cash flow of MTN Group, MTN Dubai, and MTN Irancell, the latter of which was MTN Group's most important (and cash-intensive) investment in the Middle East – and, on information and belief, an important

---

[188] Steve Stecklow, *How A Telecom Gian Got Round Sanctions On Iran*, Reuters (Aug. 30, 2012).

component of the compensation earned by Phuthuma Nhleko and Irene Charnley while they served at MTN Group.

570.    MTN Group established banking relationships with U.S. financial institutions and multinational financial institutions with U.S.-based subsidiaries or offices no later than 2013.

571.    For example, MTN Group disclosed that it has a relationship with the Bank of New York, located at 101 Barclay Street, New York, NY 10286, as its depository bank. Similarly, in 2015, MTN Group disclosed its relationship with Citibank, whereby it guaranteed a syndicated loan facility worth $1 billion, the same facility from which MTN International (Mauritius) Limited, the MTN Group subsidiary used to make corrupt payments to Iranian officials, had drawn $670 million.

572.    Following the easing of sanctions, in January 2016, MTN focused on repatriating funds from Iran.  Indeed, Defendants saw the easing of sanctions as an opportunity to "normalize" its repatriation of monies from MTN Irancell.

573.    On October 24, 2016, MTN Group admitted that "MTN has commenced the repatriation of funds from MTN Irancell to MTN Group."[189]  On December 14, 2016, "Bloomberg report[ed] that MTN Group … extract[ed] several hundred million dollars with the help of European banks, and it [was] looking to take a total of around USD1 billion by the end of March 2017," which "include[d] a *USD430 million loan repayment from MTN* Irancell."[190]

574.    The MTN Irancell profits that MTN Group withdrew covered the period when nearly every Plaintiff was injured.  When MTN Group coordinated a global strategy to facilitate

---

[189] MTN Group Ltd., Mtn Group Limited - Quarterly Update For The Period Ended 30 September 2016, South African Company News Bites – Stock Report (Oct. 24, 2016).

[190] CommsUpdate, *MTN Extracts First Cash From Iran* (Dec. 14, 2016), (emphasis added) 2016 WLNR 38124973.

the repatriation of its MTN Irancell profits, MTN Group reached into the United States to obtain

an enormous benefit – the money it made – that was itself the motivation for the terrorist finance

that killed and injured Plaintiffs.

575.    On information and belief, MTN Group utilized its banking relationships with

U.S. financial institutions and/or financial institutions with U.S. subsidiaries or offices, including

but not limited to the Bank of New York and Citibank, to facilitate the repatriation of funds from

MTN Irancell to MTN Group.

576.    Each time MTN Group used New York's financial system, they did so in a

context where they benefited from the New York financial system, and New York laws, and they

knew that the New York financial system imparted extra value to every transaction based upon

its stability and reputation.

577.    MTN Group also maintained a long-term relationship with Deutsche Bank in New

York.  From the mid-2000s through at least 2017, Deutsche Bank served as one of MTN Group's

primary bankers and provided a comprehensive suite of financial services to MTN Group,

including, but not limited to:

(i)     Deutsche Bank provided financial advisory services to MTN Group from the United
        States that directly increased the profitability and efficiencies of MTN Group and MTN's
        most important investments, including MTN Irancell;

(ii)    Deutsche Bank personnel and entities in the United States sponsored key acquisitions by
        MTN Group that facilitated MTN Group's expansion in the Middle East, which Deutsche
        Bank knew was intended to increase, and did increase, the income that flowed to MTN
        Irancell through MTN Group; and

(iii)   Deutsche Bank worked with MTN Group to facilitate MTN Group transactions in the
        United States that were necessary to preserve the cash stockpiles necessary for MTN
        Group to continue financing MTN Irancell's breakneck expansion.

578.    MTN Group, Phuthuma Nhleko, and Irene Charnley regularly reached into the

United States to transact business with Deutsche Bank so that MTN could take advantage of

Deutsche Bank's access to the New York financial markets, expert personnel, strong legal protections, and unmatched international credibility given New York's status as the world financial capital.  Through this conduct, Defendants repeatedly leveraged their contacts with the United States to obtain more resources to fund the IRGC's terrorist mission.

> ii.     **Defendants Facilitated A $400,000 Bribe That Flowed Through The New York Financial System To A Cut-Out For The Islamic Revolutionary Guard Corps And Into The Budget Of The IRGC**

579.     MTN Group's U.S. contacts were essential to the initial bribe that allowed MTN Group to pilfer the Irancell license from Turkcell in the first instance and was the proximate and but-for cause of MTN Group's subsequent ability thereafter to assist the IRGC's, terrorist enterprise, and facilitate IRGC proxy attacks against Americans in Iraq and Afghanistan.

580.     MTN Group relied upon bank accounts in New York to complete the $400,000 wire that MTN Group sent to a recipient in 2007 who acted on behalf of the IRGC.  That payment depended upon MTN Group's use of bank accounts in New York, which cleared the dollar transaction.

581.     MTN Group caused the issuance of the $400,000 wire to the cutout for the IRGC also aided the IRGC's efforts to covertly obtain U.S. dollars – the vital common currency of terrorist finance – to fund Joint Cell attacks against Americans in Iraq.

582.     It would be improper to suggest that the absence of a direct on-paper linkage between the IRGC's cutout and the IRGC plausibly suggests that the $400,000 did not flow through to the IRGC.

> ### iii. Defendants Conspired To Provide, And Did Provide, A Stable, Robust, And Devastating Pipeline Of Illicitly Acquired State-of-the-Art American Technologies To The Islamic Revolutionary Guard Corps, Including Hezbollah And The Qods Force, Including Untraceable American Smartphones

583.     MTN Group's co-conspirators have already confessed to the crimes they committed in coordination with MTN Group's joint offenses with MTN Group.  For example, Mohammad Hajian testified "that he sold super-computers worth about $14-million to 'a South African cellphone company in Iran [a reference to MTN]', rather than to the regime itself."[191]  At the time, his "alleged co-conspirator [was] also on trial in the US on charges that he serviced embargoed US technology for a 'front company' of MTN Irancell."[192]

584.     Like MTN Group , Mr. Hajian's legal "memorandum" "stated that the network was geared solely for a deal with MTN Irancell: 'All the merchandise was for non-military use and was intended to facilitate a joint venture between a South African cellphone company and a non-governmental Iranian entity related to the provision of civilian cellular telephone service within Iran.'"

585.     United States District Judge Virginia Hernandez-Covington rejected the suggestion that MTN Irancell was a civilian phone company that was not under the control of the IRGC, and "ruled that the ["[e]nterprise level server"] equipment sold to MTN Irancell in 2009 'could be dangerous' in Iran, whether controlled by the government or by MTN Irancell."[193]

586.     Federal "[p]rosecutors" also rejected the suggestion that MTN Irancell was a civilian phone company that was not under the control of the IRGC, and told the district court"

---

[191] Rowan Philp and Craig McKune, *US Trial Turns Heat On MTN*, Mail & Guardian (Feb. 15, 2013), https://mg.co.za/article/2013-02-15-00-us-trial-turns-heat-on-mtn-1/.

[192] *Id.*

[193] *Id.*

"that the ['[e]nterprise level server'] equipment sold to MTN Irancell in 2009 could have military applications and be used to spy on citizens."[194]  Prosecutors explained:  "Even if used by [MTN] Irancell now, Iran could redeploy the equipment at any time …  The equipment is capable of being used by Irancell, or others, to access private information about subscribers and possibly communications content."[195]  Indeed, "[t]he equipment Hajian was found to have illegally sold included a Sun Microsystems M9000 'enterprise level server, the largest and most powerful Unix processor that Oracle Sun sells," and a "Hitachi Data Systems array," which prosecutors "described as having the capacity to support various applications and 'store vast amounts of data useful for large companies and [defense] departments.'"[196]

587.     After pointedly noting Judge Hernandez-Covington's ruling that the provision of U.S.-sold enterprise level server equipment to MTN Irancell "could be dangerous," the *Mail & Guardian* journalists who followed Mr. Hajian's trial also rejected the suggestion that MTN Irancell was a civilian company rather than an IRGC front:

> In any event, Hajian's assertion that Irancell was a civilian, non-governmental partnership was ***inaccurate***.  Although MTN owns 49% of the company, the balance is held by a consortium owned by two state-linked partners.  The first, the purportedly charitable Bonyad Mostazafan Foundation, is ***understood to be controlled by the Iran Revolutionary Guard*** and the second, the state-owned defence company Sairan, reports directly to Iran's minister of defence.[197]

---

[194] *Id*.

[195] *Id*.

[196] *Id*.

[197] *Id*. (emphasis added)

iv.    **Defendants Worked Directly With Hezbollah And Qods Force Operatives To Facilitate Hezbollah's And the Qods Force's Illicit Acquisition Of U.S. Technology To Benefit Their Terrorist Enterprise**

588.    MTN's U.S. contacts were essential to the technological assistance it provided to the IRGC and Hezbollah and, through Hezbollah, to Jaysh al-Mahdi.  At all relevant times, MTN relied upon U.S. agents to illegally source dual-use technology from the United States that benefited the Joint Cells' terrorist enterprise.

589.    As a condition of its contract with the IRGC MTN promised to obtain embargoed U.S. technology to benefit the IRGC's terrorist enterprise.

590.    Between 2009 and 2012, one or more purchasing agents working for the IRGC in the U.A.E. and elsewhere, spending money provided by MTN Group, and acting at the direction of MTN Group and its IRGC, including Qods Force, ally, collectively wired more than $5 million into America to associates in the U.S. who purchased embargoed technology for the IRGC's, including the Qods Force's benefit, which was then shipped from the U.S. to the U.A.E., where the IRGC assumed possession of the technology for use in its terrorist enterprise.

591.    On information and belief, MTN and/or MTN's agents routed millions of dollars each year to its U.S. agents to pay for the embargoed dual-use U.S. technology it illegally obtained for the IRGC via transactions through the New York banking system, by causing money to be wired to MTN's U.S. agents to pay for MTN's U.S. agents to illegally obtain embargoed dual-use U.S. technology for the benefit of the Qods Force's terrorist enterprise.

v.    **Defendants Facilitated Illicit Efforts By Hezbollah And Qods Force Fronts To Obtain Essential U.S. Services That Was Vital To Hezbollah's, The Qods Forces, And Their Proxies' Terrorist Campaign.**

592.    MTN's U.S. contacts were also key to its ability to obtain technical support from U.S. persons operating inside America, without which the IRGC could not have derived the

191

terrorist benefits they did from MTN Irancell, including the cash flow, network reliability, and enterprise computing benefits.

593.    Between 2009 and 2012, and on information and belief ever since the mid-2000s, MTN Irancell relied upon one or more U.S. persons to service MTN Irancell's enterprise-level computers and associated networks, relying on one or more U.S. persons to maintain MTN Irancell's network remotely from the U.S. and, on at least one occasion, having such U.S. person travel to meet with MTN's IRGC, including Qods Force, allies in the U.A.E. to provide training to the Qods Force.  MTN, or agents acting at MTN's direction, sourced embargoed technology for the IRGC's benefits from, among others, Akbari, Patco, MSAS, and TGO.

594.    MTN routed millions of dollars each year to its U.S. agents, and sourced the sensitive dual-use U.S. technology, via transactions through the New York banking system, by causing money to be wired to MTN's U.S. agents to pay for MTN's U.S. agents to provide services, or obtain sensitive dual-use U.S. technology, to aid the IRGC's terrorist enterprise.

595.    On information and belief, MTN and/or MTN's agents routed millions of dollars each year to its U.S. agents in order to pay for the technology support services it illegally obtained for the IRGC via transactions through the New York banking system, by causing money to be wired to MTN's U.S. agents to pay for MTN's U.S. agents to illegally provide technological support to maintain MTN Irancell for the benefit of the IRGC's terrorist enterprise.

**VII.   DEFENDANTS KNEW THAT THEIR SECRET SECURITY COOPERATION AGREEMENT WITH THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, WAS AN ACT OF INTERNATIONAL TERRORISM THAT SUBSTANTIALLY ASSISTED TERRORIST ATTACKS AGAINST AMERICANS BY HEZBOLLAH, THE QODS FORCE, AND TERRORIST PROXIES**

    **A.   Defendants Knew That Their Secret Security Cooperation Agreement With The IRGC Was An Act Of International Terrorism Because Defendants Knew That Iran's "Security" Mission Comprised Internal And External Attack Operations Against Americans By Hezbollah, The Qods Force, And Their Proxies**

596.   Defendants knew that their secret Security Cooperation Agreement with the IRGC, Hezbollah, and Qods Force, and on behalf of those terrorists and their proxies, like al-Qaeda, was an act of international terrorism that was illegal under U.S. and South African law, and violated their own, and their co-Defendants' legal, contractual, and fiduciary obligations to MTN Group and its shareholders.

597.   From when Defendants completed their secret Security Cooperation Agreement with the IRGC in 2005, to when their fraudulently concealed secret deal was publicly exposed to the world on March 28, 2012, Defendants further knew that the IRGC, and the proxy terrorists whose attacks against Americans the IRGC facilitated, depended upon each Defendant's concealment of the Security Cooperation Agreement to maximize the terroristic utility of the Agreement to the IRGC and its proxies.  Simply put, Defendants knew that the IRGC terrorists needed MTN Group, Mr. Nhleko, and Ms. Charnley to keep their mouths shut and hide the Security Cooperation Agreement from MTN Group's shareholders.  When Defendants did so for approximately seven years from 2005 through 2012, they knew that their concealment of the Security Cooperation Agreement directly facilitated terrorist operations targeting Americans by keeping secret their key logistical, financial, and operational relationship.

598.   Indeed, that was the entire point of why the IRGC brought Defendants to the table:  to give the IRGC and those it helped the cover and concealment provided by the ability

conduct their activities through purportedly responsible commercial fronts (concealment) and then, if caught, to protest that they were merely "nothing but a phone company" rather than what they are:  a financial, logistical, and operational super-cell for the IRGC.  In this way, Defendants knew that the IRGC would use MTN Group, Defendant Nhleko, and Defendant Charnley to camouflage the IRGC's ongoing (then and now) terrorist campaign against Americans around the world.

599.    Moreover, South African law enforcement raided one or more of MTN Group's outside lawyers and/or law firms in connection with their investigation of MTN Group's illicit conduct relating to Irancell.  South African law enforcement raided the office of MTN's lawyers because MTN Group, acting through Phuthuma Nhleko and Irene Charnley, attempted to conceal key aspects of MTN Group's aid to terrorists by burying it through sham work with a compromised lawyer and/or law firms—i.e., the lawyer and firms who were raided.  This is so because South African law enforcement could not have conducted the raid unless law enforcement had a good faith basis to believe the raided lawyers were not just involved but serially implicated in the scheme.  MTN Group, Mr. Nhleko, and Ms. Charnley followed most of the classic European and Middle Eastern strategies for concealing bribery and money laundering, and near the top of the playbook in both regions is to use tainted lawyers to negotiate, paper over, and move, dirty money (e.g., complicit in-house or complicit captive outside counsel), and then to invoke attorney-client privilege and confidentiality protections to conceal their crime.

600.    Defendants knew that their secret Security Cooperation Agreement to guarantee the Security Cooperation demanded by the IRGC facilitated IRGC terrorist operations targeting Americans worldwide because Defendants knew that Iran's "Security" agenda comprised the use of violence against internal and external enemies to spread Iran's Islamic Revolution by Regular

IRGC (inside Iran) and Hezbollah, the Qods Force, and their proxies (outside of Iran). Defendants also knew that "Cooperation" with the IRGC's "Security" agenda meant that Defendants agreed to, and intended to, facilitate Regular IRGC, Hezbollah, Qods Force, and IRGC Proxy operations targeting Americans worldwide.

601.    Defendants knew the foregoing points in this section based on their own observations, experiences, and communications.  Indeed, the only way Defendants could not have known is if they undertook an elaborate 17-year long effort to avoid interacting with their counterparty, being exposed to the media, or learning about Iran. By 2005, Defendants knew that Iran's "security" was controlled by the IRGC, Hezbollah, and the Qods Force, and that "security" was widely known as a euphemism for terrorism generally, and IRGC terrorist operations targeting Americans in particular.

602.    *First*, Defendants' **direct in-person communications with IRGC terrorists** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC.  Under standard principles of IRGC terrorist tradecraft, each of the "Iranian Shareholders," including but not limited to each Defendants' handlers and contacts at the IRGC, including its Hezbollah Division and the Qods Force, communicated to Defendants the core price of doing business with Irancell and TCI:  that they would have to aid the "security" agenda of Iran, and in particular, Iran's transnational terrorist logistics enterprise.  MTN Group's, Defendant Nhleko's, and Defendant Charnley's experience negotiating with the IRGC from 2004 through 2005 proves it.  As a result, MTN Group, Mr. Nhleko, and Ms. Charnley knew the deal.

603.    *Second*, Defendants' knowledge of **common understandings concerning Iran's Constitution** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian

Shareholders" aided terrorist attacks sponsored by the IRGC.  Defendants knew that Iran's

constitution[198] distinguishes "security" from other Iranian governmental functions consistent

with what Defendants knew – that "security" in Iran means "terror" against Americans outside of

it.  Examples drawn from Iran's constitution include, but are not limited to:

(i)   Preamble:  "[T]he Islamic Revolutionary Guards Corps are to be … responsible …for fulfilling the ***ideological mission of jihad*** in God's way; that is, ***extending the sovereignty of God's law throughout the world*** (this is in accordance with the Qur'anic verse 'Prepare against them whatever force you are able to muster, and strings of horses, striking fear into the enemy of God and your enemy, and others besides them' [8:60])."[199]

(ii)  Article 145:  "No foreigner will be accepted into the Army ***or security forces*** of the country."

(iii) Article 172:  "Military courts will be established by law to investigate crimes committed in connection with military ***or security duties*** by members of the Army, the Gendarmerie, the police, and the Islamic Revolution Guards Corps."

604.   *Third*, Defendants' knowledge of **basic facts about Iran's National Security Council** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC.  Among other things, Iran's National Security Council is responsible for its terrorist agenda, including the IRGC's routine deployment of proxies like Hezbollah to coordinate attack campaigns against Americans globally.[200]

---

[198] https://www.constituteproject.org/constitution/Iran_1989.pdf?lang=en.

[199] The emphasized passages are widely understood, inside Iran and around the world, to refer to the IRGC's foundational mission of attacking the United States around the world in order to advance the Iranian Islamic Revolution.

[200] *See, e.g.*, Ali Reza Nader (Senior International Policy Analyst at RAND Corp.), *Iran Vote is Cause for Optimism, Realism*, Star Tribune (June 19, 2013) ("A 20-year parliamentarian, Rowhani formerly led ***Iran's security council***, so he has had direct knowledge and/or involvement in Iran's internal repression and ***external support of terrorist organizations like Hezbollah.***"), (emphasis added), 2013 WLNR 15146323.

605.    *Fourth*, Defendants' knowledge of **broadly-known facts about Hezbollah** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC.  Among other things, Hezbollah's organizational chart confirmed that Defendants knew that "security" was a euphemism for terror.  As the "Hezbollah Division" of the IRGC, Hezbollah was (and is) a subordinate branch of the IRGC, and therefore because the IRGC is in charge of "security" in Iran, it necessarily follows that "security" matters in Iran also include Hezbollah and the Qods Force.  Moreover, from the 1990s through the present, the structure of Hezbollah's purported "terrorist wing"[201] has always been officially and publicly referred to as Hezbollah's "External *Security* Organization."

606.    *Fifth*, Defendants' knowledge of **basic points about IRGC doctrine** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC. Unlike nearly every other terrorist group, the IRGC was founded and explicitly committed to anti-American terror as a matter of Iranian national security doctrine, targeting the United States (the "Great Satan") for external terrorist attacks in order to advance Iran's Islamic Revolution globally.  As Dr. Mark Silinsky, a 36-year veteran military intelligence analyst of the U.S. Department of Defense and an affiliated professor at the University of Haifa, explained in 2019:

> The third **major goal** of the IRGC is **combatting Iran's declared enemies, the most reviled of whom are the United States**, Israel, and Saudi Arabia. A leading IRGC-controlled media outlet claims that those three countries "finance terrorists and provide them with weapons."  Iranian hatred of the United States is deep and enduring. Early in his adulthood, Khomeini named the United States the "Great Satan," a moniker that endures today. … Iranian leaders often clamor that the United States has dominated weaker countries for centuries and proclaim that the

---

[201] Like its IRGC overlords, and Iranian terror proxies like Jaysh al-Mahdi, Lebanese Hezbollah maintains a fictional separation between their "terrorist" and "political" wings, but this is just terrorist tradecraft designed to provide concealment for Hezbollah operatives, and there is no meaningful firewall between the two wings.

United States intends to destroy Islam and the Islamic Republic of Iran. In Iran, there are broadcasts, television shows, movies, songs, and video games with the theme of destroying America.[202]

607.    *Sixth*, Defendants' awareness of the **widely-known views of Iran scholars**

alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders"

aided terrorist attacks sponsored by the IRGC. Defendants knew that Iran scholars broadly

understood that "security" ordinarily was understood, by anyone familiar with Iran's special

context, to refer to IRGC-related terror operations against Americans carried out by Hezbollah,

the Qods Force, and associated IRGC terrorist proxies.  For example:

(i)     Tony Badran, September 2011:  "[T]he Qataris also ran their initiative by Tehran, in order to … assure the Iranians that Syria's ***'security doctrine'*** meaning its policy of ***support for so-called 'resistance movements' sponsored by Iran*** would remain intact."[203]

(ii)    Ambassador R. Nicholas Burns, January 2016:  "[T]he people who ***actually run Iran's security policies***, their intelligence networks, their ***support to the terrorist groups like Hezbollah and Hamas, are in the Iranian Revolutionary Guard Corps***. That group of people has a ***fundamentally more anti-American***, cynical, brutal view of the future of Middle East politics."[204]

(iii)   Nakhleh Emile, June 2017:  "Iran has supported Sunni and Shia terrorist organizations over the years … in the service of its national interest.  ***Supporting proxy terrorist groups has been a principle of Iran's security doctrine for years***, especially during the period when Iran was threatened with the possibility of regime change."[205]

---

[202] Dr. Mark Silinsky, *Iran's Islamic Revolutionary Guard Corps: Its Foreign Policy and Foreign Legion*, Marine Corps University, Expeditions with MCUP (Digital Journal) (Jan. 2019) (emphasis added), https://www.usmcu.edu/Outreach/Marine-Corps-University-Press/Expeditions-with-MCUP-digital-journal/Irans-Islamic-Revolutionary-Guard-Corps/.

[203] Tony Badran (Research Fellow Foundation for Defense of Democracies), *U.S. Human Rights Policy in Iran and Syria*, Congressional Testimony via FDCH (Sept. 22, 2011) (emphasis added), 2011 WLNR 24786203.  Syria and Iran share a common "security doctrine," which is dictated by the IRGC, including Lebanese Hezbollah and the Qods Force.

[204] R. Nicholas Burns, *quoted in interview with* Ashish Kumar Sen (Atlantic Council), *Dealing with Iran: A Policy of Engagement and Deterrence*, Harvard Belfer Center for Sci. & Int'l Affairs, States News Service (Jan. 19, 2016).

[205] Nakhleh Emile, *Aligning With Iran Necessary to Combat Sunni Extremism*, Iran Times International (June 9, 2017) (emphasis added), 2017 WLNR 23277897.

(iv) <u>Dr. Ronen Bergman and Dr. Raz Zimmt, July 2018</u>:  "While the Iranian nuclear program isn't under the ***IRGC's command***, its ***security definitely is***."[206]

(v) <u>Seth Frantzman, July 2020</u>:  "Iran said it hoped Iraq would play a greater role in ***regional security, apparently meaning*** helping Iran work with Syria and perhaps be a conduit for Iran's weapons trafficking to Syria.  Iran has sent ballistic missiles to Iraq in 2018 and 2019 and trafficking precision guided munitions via Iraq's Al-Qaim border area with Syria. Iraq has recently tried to replace some units on the border to make the border more secure. ***Regional security, for Iran, means regional Iranian hegemony***. Iraq is Iran's 'near abroad' in this equation. The pressure on Kadhimi was intense during the recent visit and ***Iran showed it means business in terms of pressuring the US to leave Iraq***."[207]

(vi) <u>Ariane Tabatabai, November 2020</u>:  "[Qassem] Soleimani and [Mohsen] Fakhrizadeh," the "head of research and innovation at Iran's Ministry of Defense," "were the architects of ***two pillars*** of ***Iran's security policy***: its ***proxy*** and nuclear programs … Both helped ***create the infrastructure*** and develop the programs. But their deaths won't lead to a fundamental change, as institutions will continue the projects."[208]

608.    *Seventh*, Defendants' awareness of the **public statements by IRGC terrorists** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC.  Examples of IRGC, Hezbollah, and the Qods Force terrorists' public statements indicating that "security" was an IRGC euphemism for the IRGC's, Hezbollah's, and the Qods Force's anti-American terrorist operations in the Middle East, included, but were not limited to:

(i) <u>BBC, July 2013</u>:  "Iran's MP on ***security*** and foreign affairs denounce[d] an EU decision to include Hezbollah military wing in the list of terrorist organizations."[209]

---

[206] Dr. Ronen Bergman and Dr. Raz Zimmt, *Israel's Most Dangerous Enemy: Who Are You, Hajj, Qasem Soleimani?*, Yedioth Ahronoth (Israel) (July 3, 2018) (emphasis added), 2018 WLNR 20323696.

[207] Seth J. Frantzman, *Iran's Maximum Pressure on Iraq to Remove US Forces*, Jpost.com (Jerusalem Post online) (July 22, 2020) (emphasis added), 2020 WLNR 20379547.

[208] *Quoted in* Arkansas Democrat Gazette, *Iran Claims Israel, U.S. Linked To Slaying Of Key Nuclear Scientist* (Nov. 28, 2020) (emphasis added), 2020 WLNR 34141033.

[209] BBC International Reports (Central Asia), *Programme Summary of Iranian Gorgan Radio News 1600 gmt 24 Jul 13* (July 25, 2013) (emphasis added).

(ii)   Fars News Agency (Iran), February 2014:  "An Iranian deputy foreign minister blasted Washington for raising baseless allegations against Tehran, and said the US which supports terrorist groups with financial, political and arms aids cannot accuse others of advocating terrorism. … '***The Hezbollah is strongly fighting terrorism in support of the country's security and stability***,' the Iranian official added."[210]

(iii)  IRIB World Service (Iran), March 2016:  "Iran says a decision by Persian Gulf Arab states to brand Lebanon's Hezbollah as a terrorist group is a 'new mistake' that will undermine peace in the region and unity in Lebanon. … '***Those who call Hezbollah terrorists***, have intentionally or unintentionally targeted the unity and ***security*** of Lebanon,' Iran's Deputy Foreign Minister Hossein Amir-Abdollahian said."[211]

(iv)  Naharnet (Lebanon), March 2016:  "A top Iranian security official … hailed … 'Hizbullah has played a key role in … protecting Lebanon's ***security***,' said Ali Shamkhani, the head of the Supreme National Security Council of Iran."[212]

(v)   Seth Frantzman, July 2020:  "The Ayatollah stressed that while Iran does not interfere in Iraq, it is the 'corrupt' Americans who are interfering in Iraq and who only sow destruction in the region. … [Iraqi Prime Minister] Kadhimi also met with Ali Shamkhani, the head of the Supreme National ***Security*** Council. Shamkhani has visited Iraq earlier this year to ***pressure Iraq to expel US forces.*** …  Shamkhani's meeting with Kadhimi was meant to be yet another piece of Iran's ***maximum pressure to get US forces out of Iraq. Shamkhani said the Us was 'evil' and that it was a 'malicious, terrorist' element in Iraq that was leading to insecurity***."[213]

609.   *Eighth*, Defendants' awareness of the **Iran-related "Security" media coverage**

alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders"

aided terrorist attacks sponsored by the IRGC. Regular media discussions also specifically

alerted Defendants that "security" was a code word for anti-American terror operations by the

IRGC, Hezbollah, and the Qods Force, including, but not limited to:

---

[210] Fars News Agency (Iran), *Iran Raps US Double-Standard Policy Towards Terrorism* (Feb. 12, 2014) (emphasis added).

[211] IRIB World Service (Iran), *[P]GCC Branding of Hezbollah as Terrorist a New Mistake: Iran* (Mar. 3, 2016), (emphasis added), 2016 WLNR 6748676.

[212] Naharnet (Lebanon), *Iran: Hizbullah Played Key Role in Eradicating Terror in Syria*, Protecting Lebanon (Mar. 17, 2016), (emphasis added), 2016 WLNR 8288436.

[213] Seth J. Frantzman, *Iran's Maximum Pressure on Iraq to Remove US Forces*, Jpost.com (Jerusalem Post online) (July 22, 2020), (emphasis added), 2020 WLNR 20379547.

(i)     _Denver Rocky Mountain News_, April 1992:  "Imad Mughniyeh, **chief of security** for Hezbollah, the Iranian-sponsored Party of God, and **head of its terrorist arm**, Islamic Jihad (Holy War)."[214]

(ii)    _San Francisco Chronicle_, September 2001:  "… Arranges security for meeting between bin Laden and Imad **Mughniyeh, security chief for the Iran-sponsored terrorist group Hezbollah**."[215]

(iii)   _Washington Post_, November 2001:  "Iran's foreign and **security policies** … back terrorist groups such as Hezbollah and Hamas … Ayatollah Mahmoud Hashemi Shahroudi, the head of Iran's judiciary, recently summed up the view of this wing of the government: '**Our national interests lie with antagonizing the Great Satan**,' he stated. … It would be a mistake for the Bush administration to warm relations without serious progress in reining in Iran's … terrorist links."[216]

(iv)    _Jerusalem Post_, June 2002:  "Once in southern Lebanon, the 1992 Palestinian deportees, like Jenin Islamic Jihad leader Sheikh Bessam Sa'adi learned **bomb-making and terror techniques** from Hizbullah militants and **Iranian security agents**."[217]

(v)     _Boston Herald_, March 2004:  "All this would be news for Iranians and specialists were it not for [the] fact[] [that] **Iran's security agencies … are the biggest backers of terrorism in the Middle East**, notably through … Hezbollah…."[218]

(vi)    _Newsweek_, June 2004:  "While the link to Iran has been publicly known for some time, the 9/11 commission has uncovered evidence that in the mid-1990s Osama bin Laden cast aside religious differences with the Iranians and arranged to have his terror operatives conduct training in explosives and **security at Iranian-backed camps run by Hizbullah in Lebanon**."[219]

---

[214] Holger Jensen, _Sanctions Target Libya, Ignore Other Terrorist Regimes_, Denver Rocky Mountain News (Apr. 16, 1992), (emphasis added), 1992 WLNR 425546.

[215] Lance Williams and Erin McCormick, _Bin Laden's Man in Silicon Valley_, San Francisco Chronicle (Sept. 21, 2001), (emphasis added), 2001 WLNR 5755282.

[216] Washington Post (Op-Ed), _The Irony of Iran_ (Nov. 11, 2001), (emphasis added), 2001 WLNR 13678266.

[217] Matthew Gutman, _Packing Up Our Troubles_, Jerusalem Post (June 28, 2002), (emphasis added), 2002 WLNR 164656.

[218] Boston Herald (Op-Ed), _Taking First Steps in Iran_ (Mar. 21, 2004), (emphasis added), 2004 WLNR 393400.

[219] Michael Isikoff and Mark Hosenball, _Terror Watch: Friends of Al Qaeda_, Newsweek Web Exclusives (June 16, 2004), 2004 WLNR 3641416.

(vii)    _Express on Sunday_, March 2005:  "[T]he terrorist group Hezbollah and [] **_Iranian security chiefs_** … are **_key sponsors of international terrorism_**."[220]

(viii)   _AP Worldstream_, August 2006:  "State Department spokesman Sean McCormack … denounced Iran as a **_supporter of terror groups_** in defiance of U.N. resolution.  That support, he said, was '**_an integral part_**' of Iran's foreign and national **_security policy_**."[221]

(ix)     _Khaleej Times_, September 2009:  "The Middle East Times reported … that the [U.S.] was stepping up scrutiny of **_Iranian security_** and military personnel in the Lebanese communities of Latin America. … US officials said that in addition to boosting rates of recruitment, Hezbollah agents, supported by Iran, are using **_very effective routes to smuggle drug profits to the Middle East to aid anti-US counterparts_** …"[222]

(x)      _Australian_, April 2010:  "An ASIO assessment included in the [Australian] federal government's recent counter-terrorism white paper drew attention to the presence in Australia of the Hezbollah **_External Security_** Organisation (ESO), an Iranian-sponsored group described on the federal government's national security website as '**_among the best-organised terrorist networks in the world_**' … ASIO pinpointed ESO as a group 'with a long history of engaging in terrorist acts.'"[223]

(xi)     _American Forces Press Service_, April 2010:  "Defense officials have described the **_security threats_** posed by Iranian proxies operating in the Middle East -- Hamas in Gaza and Hezbollah in Lebanon -- which the United States and Israel consider terrorist organizations."[224]

(xii)    _Reuters_, October 2017:  "The Revolutionary Guards (IRGC) are Iran's most powerful internal and external security force."[225]

---

[220] Tim Shipman, _How Real is Terror Threat to Britain?_, Express on Sunday (UK) (Mar. 6, 2005), (emphasis added), 2005 WLNR 3482170.

[221] Barry Schweid, _U.S. Foresees Further Defiance By Iran To U.N. Demands On Uranium Enrichment_, AP Worldstream (Aug. 8, 2006), (emphasis added).

[222] Khaleej Times, _The Enemy at the Gates - Fear of the Unknown in Latin America_ (Sept. 27, 2009), 2009, (emphasis added), WLNR 19020314.

[223] Australian, _Iranian Embassy 'Spying on Activist Students'_ (Apr. 6, 2010), (emphasis added), 2010 WLNR 7047177.

[224] John J. Kruzel, _Gates Satisfied with U.S. Planning to Counter Iran_, American Forces Press Service, Defense Department Documents (Apr. 27, 2010), (emphasis added), 2010 WLNR 8757413.

[225] Reuters, Yedioth Ahronoth (Israel), _Iran Warns US Against Imposing Further Sanctions_ (Oct. 8, 2017), (emphasis added), 2017 WLNR 30811998.

610.     *Ninth*, Defendants' awareness of the **"Security" euphemisms in media and culture** alerted Defendants that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC.  Defendants could not possibly have missed the meaning of "security" in their dealings with the IRGC because decades of media discussions, television, and film events across a broad array of cultures, religions, and languages in the U.S., Europe, the Middle East, and Africa, where Defendants' employees and agents live and work, alerted Defendants that "security" was a famously common euphemism for "terrorism" in unstable environments or uncertain times, including, but not limited to:

(i)     *Miami Herald*, July 1992:  "[T]he FMLN has created what the government calls *'terror squads' euphemistically* named '*security commissions.*'"[226]

(ii)    *Journal of Commerce*, November 2002:  "The Maritime Transportation Security Act gives us a new *euphemism*. Inside the Beltway, a '*terrorist* attack' is now a 'transportation *security* incident.'"[227]

(iii)   *Aberdeen American News*, June 2004:  "'On the roller coaster ride that Iraq has become, …[w]hat's *euphemistically* referred to as '*security concerns*' … *would be referred to as violent, bloody terrorism* in most other parts of the world.'"[228]

(iv)    *Jerusalem Post*, August 2004:  "'The term '*security* prisoners' is … a *euphemism* for ideologically motivated murderers convicted of *terrorist* activities against Israelis.'"[229]

(v)     *Toronto Star*, May 2005:  "In an extraordinary trip to Abu Ghraib prison … she encounters the now-notorious U.S. Army General Janis Karpinski, who tells her that

---

[226] Miami Herald, *Peace on a Razor's Edge* (July 30, 1992), (emphasis added), 1992 WLNR 2253569.

[227] R. G. Edmonson, *Washington View: Port Security Bill a Good Start*, Journal of Commerce (Nov. 18, 2002), (emphasis added), 2002 WLNR 1291549.

[228] Aberdeen American News (SD), *U.N. Vote Brings Glimmer of Hope* (June 10, 2004), (emphasis added), 2004 WLNR 18926896.

[229] Efraim Inbar (Professor of Political Studies at Bar-Ilan University), *Let Them Starve*, Jerusalem Post (Aug. 22, 2004), (emphasis added), 2004 WLNR 237090.

'*security* detainees,' the **euphemism for terrorism** suspects held by the U.S. forces, are 'relaxed, comfortable, and had everything they need.'"[230]

(vi)   <u>*Times of India*, November 2006</u>:  "To paraphrase Chesterton, there are an infinity of angles at which Anglo-Pakistani relations fall but there is only one - *security* - at which they stand.  **The 'S' word is a euphemism for the 'T' word.  Terrorism, as sponsored by Pakistan**."[231]

(vii)   <u>*New American*, April 2008</u>:  "Lieutenant General Keith Dayton, the Bush administration's Security Coordinator for Palestine, testified … on the supposed need to fund President Abbas' **'security forces,' a euphemism for the collection of terrorist thugs** from the al-Aqsa Martyrs Brigades, Islamic Jihad, Force 17, and various other PLO/Fatah militias."[232]

(viii)   <u>*Birmingham Post*, October 2008</u>:  "[A]n event … sought to consider **'security and community cohesion' a euphemism for extremism and terrorism, natch**)."[233]

(ix)   <u>*BBC International Reports (Latin America)*, October 2013</u>:  "Although paramilitary forces could serve the interests of the State, its members act as mercenaries, assault squads, thugs, and private **security groups**, the latter a **euphemism for terrorists**."[234]

(x)   <u>*Electronic Intifada (Palestine)*, August 2021</u>:  "The term 'ISF' – which stands for 'Israeli security forces' – is a total misnomer and euphemism for occupation forces who provide anything but 'security.'  Their job, rather, is to terrorize and repress."[235]

---

[230] Olivia Ward, *Finding Dignity Amid the Chaos; Iraq Journal*, Toronto Star (May 22, 2005), (emphasis added), 2005 WLNR 8118912.

[231] Rashmee Roshan Lal, *TomKat Nuptials Like Blair-Mush Compact*, Times of India (Nov. 19, 2006), (emphasis added), 2006 WLNR 27474749.

[232] William F. Jasper, *A Bad Investment: U.S. Support For So-Called "Moderate" Terrorists as the Alternative to Worse Terrorists, as we have Given in Palestine, is a Recipe for Disaster*, New American (Apr. 28, 2008), (emphasis added), 2008 WLNR 25511423.

[233] Chris Allen, *Freedom of Expression is Built on the Right to Offend*, Birmingham Post (UK) (Oct. 16, 2008), (emphasis added), 2008 WLNR 19647906. "Natch" means "naturally; as may be expected."

[234] BBC International Reports (Latin America), *Costa Rican Daily Warns Caution Over Alleged Presence of Paramilitary Group* (Oct. 3, 2013) (emphasis added).

[235] Electronic Intifada (Palestine), *Video Shows Israeli Shooting That Killed 11-Year-Old Boy* (Aug. 4, 2021), (emphasis added), 2021 WLNR 25165762.  Plaintiffs categorically reject the antisemitic bile displayed in this quotation and offer it merely to show the widespread euphemistic use of "security."

(xi)    *Canada Stockwatch*, September 2014:  "[I]n the Democratic Republic of the Congo … a … '***security incident***[]' … is one of several ***euphemisms for an 'act of terror,*** 'war,' or even a spontaneous hacking."[236]

611.    *Tenth*, each Defendant's **consciousness of guilt** confirmed Defendants knew that their "Security Cooperation" Agreement with the "Iranian Shareholders" aided terrorist attacks sponsored by the IRGC.  The conduct of MTN Group, Phuthuma Nhleko, and Irene Charnley, among other MTN-related persons, manifested obvious guilt concerning their relationship with the Iranian Shareholders.  All three, for example, concealed the secret Security Cooperation Agreement from MTN Group's shareholders to whom they owed a legal duty of disclosure.

612.    Defendants' consciousness of guilt can *only* be explained by each Defendants' knowledge that the IRGC's "security" assistance needs comprised knowing provision of material support for the terrorist agenda of the IRGC for the specific purpose of facilitating the anti-American terror "security" operations of the IRGC:  (a) **inside of Iran**, e.g., joint training camps funded by the IRGC and staffed by Hezbollah, through which the IRGC's Shiite Terrorist Proxies and Sunni Terrorist Proxies received essential training, safe haven, and logistical support designed to facilitate their terrorist attacks against Americans in Iraq, Afghanistan, Syria, Yemen, Israel, and Europe; and (b) **outside of Iran**, including, but not limited to, though IRGC proxies in Iraq, Afghanistan, Syria, Yemen, Israel, and Europe e.g., a Joint Cell in Basra that specializes in kidnapping and was comprised of Hezbollah, the Qods Force, and Jaysh al-Mahdi, as well as a Joint Cell in Syria that provides communications and smuggling support for the IRGC's Shiite Terrorist Proxies.

---

[236] Canada Stockwatch, *\*MKTDIAM Diamonds & Specialty Minerals Summary for Sept. 22, 2014* (Sept. 22, 2014) (emphasis added).

613.    This conclusion is ineluctable.  With respect to the phrase "defensive, security, and political cooperation," the first and third of those items were unquestionably legal in Defendants' home country of South Africa.  At all relevant times, South African companies could legally sell weapons to Iran, and therefore it is implausible that Defendants were worried about the criminal risk of facilitating weapons sales from South Africa because however disgusting such conduct was, it was not illegal under South African law (and MTN Group did not have any U.S. affiliates).

614.    Moreover, the South African government was a longstanding close ally of Iran based upon their unique historical bond, and in such context, it is implausible that Defendants were concerned about breaking South African law by promoting "political cooperation" between their respective countries and Iran, since "political cooperation" with Iran was a perfectly acceptable thing in South Africa at all relevant times.

615.    *Only* Defendants' knowledge that "security" meant "Hezbollah, Qods Force, and anti-American terror" explains the totality of each Defendant's conduct, as well as the parallel nature of their crimes, e.g., rampant document destruction.  For Defendants to facilitate a helicopter sale to the regular Iranian Army (not the IRGC), or help broker political cooperation, was not only legal, but in furtherance of South Africa's economic and political agendas.  For MTN Group, Phuthuma Nhleko, and Irene Charnley to agree to guarantee MTN's "Security" "Cooperation" to the Hezbollah and the Qods Force, however, was a totally different matter.

616.    For MTN Group, Phuthuma Nhleko, and Irene Charnley, directly assisting the "security" operations of Hezbollah and the Qods Force plainly ran the risk of committing a litany of crimes under U.S. and South African law (e.g., terrorism crimes, espionage), and created obvious – and dire – potential risk to any MTN Group executive, employee, or agent who agreed

to support the secret Security Cooperation Agreement between MTN Group and the IRGC without making a noisy withdrawal from the scheme.  Indeed, to this date, MTN Group, Phuthuma Nhleko, Irene Charnley, and their implicated agents, have yet to disavow the terrorist finance, and associated fraud on MTN Group's shareholders, which occurred on their watch (in the case of Mr. Nhleko and Ms. Charnley) and continues today (in the case of MTN Group).

**B.     Defendants Knew That Their Secret Security Cooperation Agreement With The IRGC Was An Act Of International Terrorism Because Defendants Knew That The American Smartphones And Other U.S.-Origin Communications Technologies That Defendants Illicitly Acquired For, And Transferred To, The IRGC Substantially Assisted Terrorist Attacks Against Americans**

617.     Defendants knew that their illicit provision of American smartphones, computing technologies, and other key items requested by the IRGC, including its Hezbollah Division and Qods Force, was an act of international terrorism because Defendants knew that such phones, supplied in such volumes to such terrorists, would fund, and logistically support, thousands of terrorists every year.

618.     Defendants knew that Hezbollah, the Qods Force, and IRGC proxies like al-Qaeda, depended upon reliable supplies of cell phones as a key growth engine for expanding the shared global terrorist enterprise they needed to effectively counter the U.S. and NATO and kill Americans in Iraq and Afghanistan.  For example, as the *Montreal Gazette* reported at the time:

> Under [] Ahmadinejad [], U.S. officials said, the [IRGC] has moved increasingly into commercial operations, ***earning profits*** and extending its influence in Iran in areas involving big government contracts, including … ***providing cell phones***. Washington has claimed the Revolutionary Guard's Quds Force wing is responsible for the growing flow of explosives, roadside bombs, rockets and other arms to Shiite militias in Iraq and the Taliban in Afghanistan.  Quds Force has also been blamed for supporting Shiite allies such as Lebanon's Hezbollah and to such Sunni movements as Hamas and the Palestinian Islamic Jihad.[237]

---

[237] Montreal Gazette (Canada), *What is the Revolutionary Guard?* (Aug. 16, 2007), 2007 WLNR 28659733.

619.    Defendants knew that, since 9/11, *every* major transnational Islamist terrorist organization that has targeted Americans has prioritized providing its operatives with a robust, reliable, and covert supply of two material items above all else:  stockpiling vast quantities of secure, untraceable American mobile phones, and obtaining as much U.S. currency as possible. This maxim holds true for Shiite and Sunni groups alike, including, but not limited to, the IRGC (including its Hezbollah Division and Qods Force) Jaysh al-Mahdi, al-Qaeda, the Taliban (including its Haqqani Network), ISIS, al-Nusra Front, and every other major group.

620.    Decades of media coverage alerted Defendants to Hezbollah's specific reputation for using cell phones to help commit terrorist violence, including, but not limited to:

(i)    <u>L.A. Times</u>, November 1997:  "Hezbollah us[ed] ***mobile phones to coordinate attacks*** and roadside bombs camouflaged as rocks."[238]

(ii)    <u>Montreal Gazette</u>, March 2001:  "Two men … were accused of aiding the Islamic extremist group Hezbollah in an indictment … They are said to have conspired to provide Hezbollah with cash, night-vision goggles, global-positioning devices, mine-detection equipment, ***cell phones*** and blasting equipment."[239]

(iii)    <u>Globe & Mail</u>, July 2006:  "Air strikes took out relay towers belonging to Lebanon's three main cellular phone companies, Hezbollah's al-Manar television network … Such communications channels are traditional targets ahead of military action."[240]

(iv)    <u>Detroit Free Press</u>, July 2006:  "Capt. Jacob Dallal, an Israeli army spokesman, said the targets of the strikes were Al-Manar and Al-Nour, Hizballah's TV and radio stations, respectively. He said five of the radio station's antennas were hit.  'It's important to understand why the attack was carried out,' Dallal said. 'This will disrupt their ability to

---

[238] Marjorie Miller, *Hezbollah Battles to Shed Extremist Image in Lebanon*, Los Angeles Times (Nov. 28, 1997) (emphasis added), 1997 WLNR 5640765.

[239] Montreal Gazette (Canada), *B.C. Men Accused of Aiding Hezbollah* (Mar. 29, 2001) (emphasis added), 2001 WLNR 6561271.

[240] Carolynne Wheeler, *Israeli Troops Enter Village in Lebanon*, globeandmail.com (Toronto), (July 22, 2006), 2006 WLNR 27225853.

communicate,' he said, adding that **cell phones were a 'key communication link' for Hizballah**."[241]

(v)    _Daily Mail_, November 2007:  "Back at base, [Chris] Hunter [a "veteran 'ammunition technical officer' or counterterrorist bomb-disposal expert"] looks for patterns in the way that bombs are made and laid. At first his main opponent is a Sunni bomb-making gang, who are happy to slaughter scores of Shia civilians along with Coalition soldiers. Then, in the spring of 2004 comes the Shia militia uprising. **They increasingly receive high-tech help from Iran and even Hezbollah in using devices such as mobile phones ....... to detonate bombs by remote control**."[242]

(vi)   _Washington Times_, March 2009:  "Almost everyone I met warned me about using my cell phone. It was **common knowledge that Hezbollah officers in the security forces were regularly intercepting phone calls** and **tracking their human targets** by triangulating the signals the phones send out to cell phone towers around the city."[243]

(vii)  _Derby Evening Telegraph_, November 2009:  "Mr Godsmark told the jury that a video clip found on an external hard-drive at Lusha's home gave instructions on how to turn a mobile phone into a bomb trigger. The prosecutor also said video clips produced by organisations undertaking "fundamentalist violent jihad in Iraq, Afghanistan and Chechnya … Mr Godsmark said 14 mobile phones were also found at Lusha's home. Documents found on computers or drives include the Hezbollah Military Instruction Manuals; Middle Eastern Terrorist Bomb Design; Improvised Radio Detonation Techniques; Radnar's Detonators; The Mujahideen Explosives Handbook and The Bomb Book. A video film entitled "mobile detonators" was also discovered."[244]

621.    Indeed, Defendants should have been alerted by Hezbollah's own public statements taunting the United States concerning a purported "US 'request' for information on mobile phones."[245]

---

[241] Detroit Free Press, _Israeli Push Deepens Conflict_ (July 23, 2006) (emphasis added), 2006 WLNR 25249492.

[242] Jonathan Foreman, _Defusing the Iraqi Conflict_, Daily Mail (UK) (Nov. 2, 2007) (emphasis added), 2007 WLNR 21680052.

[243] Kenneth Timmerman, _Fear Grips Democracy in Lebanon_, Washington Times (Mar. 2, 2009) (emphasis added), 2009 WLNR 4034008.

[244] _Id_.

[245] Al-Sharq al-Awsat, BBC International Reports (Middle East), _Lebanese Hezbollah Reacts to US "Request" For Information on Mobile Phones_ (Mar. 3, 2010) ("Lebanese Hezbollah reacts to US "request" for information on mobile phones.  Accusations against the US Embassy in Beirut

209

C.   **Defendants Knew That Their Secret Security Cooperation Agreement With The IRGC Was An Act Of International Terrorism Because Defendants Knew That The Illicit Commercial Transactions That Defendants Facilitated With, On Behalf Of, Or For The Benefit Of, IRGC Fronts, Operatives, Agents, And Cut-Outs Substantially Assisted Terrorist Attacks Against Americans**

622.   Defendants knew or recklessly disregarded that their transactions with fronts, operatives, and agents for the IRGC financed, armed, and operationally supported Iranian proxy terrorist attacks against Americans in Iraq.

623.   Defendants knew that "'[c]ompanies doing business in Iran face substantial risks…,' said Sigal Mandelker, Treasury Department undersecretary for terrorism.  She added:

> …. "deceptive" Iranian transactions that ultimately channel money to terrorists. The Iranian government "uses shell and front companies to conceal its tracks" as part of an elaborate scheme designed to procure cash for the Quds Force of Iran's militant Islamic Revolutionary Guard Corps, which the U.S. designates as a terrorist organization.

624.   By early 2005, it was widely understood in diplomatic, business, and military circles that the IRGC had seized control of Iran's telecom, communications, and information technology sectors.  Before they transacted with IRGC, including Qods Force, fronts, operatives, and agents, Defendants were aware that the IRGC had seized control of these sectors.

625.   Defendants were aware of the IRGC's capture of Iran's telecom, communications, and information technology companies in part through their local agents and affiliates, whom Defendants relied upon to keep abreast of Iranian market conditions; these agents (who were subject to Defendants' control and whose knowledge is imputed to Defendants) knew that the IRGC controlled Iran's telecom, communications, and information technology sectors and used that control to raise money, obtain weapons, and source operational support for terrorism.  As a

_____

that it seeks to obtain sensitive information on the mobile phone networks raised doubts within Hezbollah. Hezbollah has doubts that this information might be used by the US intelligence in infiltrating the communications network and tracking Lebanese figures.").

general matter, those agents spoke fluent Farsi, had relationships with people throughout Iranian government and industry, and were well-informed about Iranian politics and economics. They could not have remained ignorant of the common understanding that the Iranian telecom, communications, and information technology sectors were controlled by the IRGC.

626.    Defendants knew, or recklessly disregarded, that the IRGC routinely used commercial transactions to raise money and acquire key weapons and weapons components in support of the IRGC's lead terrorist agent, Hezbollah, as well as Hezbollah's Iraqi proxy, Jaysh al-Mahdi. As a regional studies professor explained, "Dubai … maintains crucial avenues for the IRGC … to generate money" and serves as "the gate to the world for" Iranian terrorist front company efforts.[246]

627.    Defendants knew, or recklessly disregarded, that as American sanctions increasingly sought to choke off IRGC, including Qods Force, access to the global financial system, the IRGC responded by using IRGC, including Qods Force, front companies and agents in the United Arab Emirates, Iraq, and elsewhere to raise money through criminal enterprise, facilitate terrorist finance through the banking system, and maintain the steady supply of key telecom, communications, and information technologies necessary to continue to prosecute a terrorist campaign against Americans in Iraq and elsewhere. Per *Reuters*, the IRGC has:

> long proved successful in defending [its] economic interests, including in recent years when the sanctions … effectively exclude[ed] Iran from the global financial and trading system. "Even under very difficult economic circumstances, the funds for the IRGC's activities, whether domestic or overseas, remained intact," said a former official close to the [Iranian] government… As the U.S. and EU sanctions on Iran's oil and finance sectors in 2012 started to bite, the [IRGC] responded by setting up complex operations involving the likes of Dubai ….
> "***The IRGC started to buy hundreds of … companies around the [U.A.E.] to use as front companies,***" said a trader involved in … the oil industry. "***These***

---

[246] TRT World (Turkey), *Amid Soleimani Crisis, Iran Threatens to Level Dubai and Israel. But Why?* (Jan. 8, 2020), 2020 WLNR 663153.

*companies partnered with some foreign companies to bypass sanctions. Most of the time cash was delivered to a foreign account in a neighbouring country.*"[247]

628.   At all relevant times, Defendants understood that the U.S. government believed that IRGC, including Qods Force, activities in the U.A.E. supported anti-American terrorism in Iraq and Afghanistan.  For example, in 2008, President George W. Bush gave a widely-reported speech to U.A.E. government and business leaders in which he called Iran "the world's leading sponsor of terrorism" and stressed that illicit transactions in the U.A.E. were important to the IRGC's ability to provide "support for Islamist groups and militants in Afghanistan, Iraq, Lebanon and the Palestinian territories."[248]  Press reports concerning President Bush's speech emphasized the U.S. government's efforts "to enforce US sanctions against … the Quds Force of the IRGC" because "Dubai in particular ha[d] become a financial centre handling substantial Iranian investments which the administration want[ed] to restrict."[249]

629.   From 2005 through 2016, accounts from prominent Western media sources also reported on the direct link between the Iranian telecom, communications, and information technology sectors and the IRGC.

630.   On information and belief, Defendants were aware of these reports documenting the link between their Iran-related counterparties and the IRGC.  Each Defendant generally maintained a corporate security group responsible for supervising their global supply chains, doing counterparty diligence, and preventing the theft or diversion of the devices or services they sold, including in the Middle East.  As part of such efforts, Defendants' standard practice would

---

[247] Parisa Hafezi, *RPT-INSIGHT-Iran's Elite Guards to Gain Regional, Economic Power in Post-Sanctions Era*, Reuters News (Jan. 20, 2016) (emphasis added).

[248] APS Diplomat Redrawing the Islamic Map, *Bush Says Iran Poses Threat To Global Security* (Jan. 14, 2008), 2008 WLNR 25283869.

[249] *Id.*

have been to conduct basic open-source research on the Iranian telecom market and the

mechanics of making telecom deals in Iran – even a modicum of which would have uncovered

the reports discussing the Iranian front entities' terrorist ties set forth above.[250]

631.    After 2005, Defendants could not have conducted credible due diligence that

would have "cleared" their transactions with their counterparties controlled by the IRGC.

Defendants also knew or recklessly disregarded the IRGC's control of their business partners

based upon the statements set forth in prominent due diligence materials concerning Iran.

632.    MTN's collusion against Turkcell with the conservatives who controlled the

IRGC fronts responsible for the Irancell contract itself became a notable "red flag" about the

highly risky Iranian business environment that Defendants knew of, and ignored.  For example,

as the *Economist*'s flagship due diligence report, the *Economist Intelligence Unit*, explained in

June 2005:

> There is considerable doubt that [] Turkish investment projects … will proceed
> after facing opposition from the new conservative-dominated [Iranian parliament,
> the] Majlis. The Majlis in late 2004 passed a law giving it a veto over foreign
> investment and in early 2005 ruled that Turkcell … should reduce its stake in []
> Irancell … to 49% from 70% [and] … that a majority of Iranian shareholders
> would have to support any management decisions and that security issues be
> referred to the intelligence ministry and the Supreme National Security Council.
> … The Majlis's opposition to the projects … is sure to cause nervousness among
> foreign investors who will see it as calling into question the value of contracts in
> the Islamic Republic and as a sign of arbitrariness in governance.[251]

---

[250] This allegation applies to all Defendants except MTN Irancell.  Plaintiffs allege that MTN
Irancell relied upon the IRGC, including the Qods Force, to conduct diligence on the
counterparties with whom MTN Irancell conducted business, and that the IRGC, including Qods
Force, fronts, operatives, and agents that owned and managed MTN Irancell would not have
approved any significant investment or hire by MTN Irancell if the IRGC, including the Qods
Force, believed that such proposed deal did not benefit the "security" agenda of the IRGC,
including the Qods Force.

[251] Economist Intelligence Unit, *Iran Risk: Legal & Regulatory Risk*, Risk Briefing (June 29,
2005), 2005 WLNR 26571496.

633.    After MTN had finished off Turkcell and secured the Irancell license from the IRGC, including Qods Force, fronts who controlled Irancell, the *Economist* updated its standard diligence briefing concerning Iran to warn potential investors, including Defendants, against the "High Risk" of doing business with Iranian entities:

> ***Foreign investors are deterred by the nationalist stance of the Majlis towards foreign investment (High Risk)***. The Majlis in late 2004 passed a law giving it a veto over foreign investment which it has used to ... severely tighten up on the terms of a project by Turkcell … ***The conditions imposed on Turkcell have seen its bid superseded by a South African company, MTN.*** The episodes caused nervousness among foreign investors who fear that they called into question the value of contracts in [Iran] and indicated arbitrariness in government decision-making. President Mahmoud Ahmadinejad's presidency (until at least 2009, when fresh elections will take place) will ***continue to heighten such concerns***. …[252]

634.    Public statements made by prominent Members of Congress also alerted Defendants to the IRGC's control of the Iranian telecom sector. For example, on February 10, 2011, a bipartisan group of United States Senators and Representatives confirmed the widespread understanding that the IRGC's (and by extension, the Qods Force's) control of the "Iran telecom sector, of which the Iranian Revolutionary Guard Corps owns a significant stake."[253] These Members' letter received widespread coverage in the global media.

635.    Defendants also knew that most of their multinational peers had already chosen to exit ventures in which they participated alongside Iranian entities that could potentially be fronts for the IRGC. By 2012, the roster of companies that announced an intention to depart Iran included such prominent multinationals as Siemens, Ingersoll Rand, Hitachi, ABB, Porsche,

---

[252] Economist Intelligence Unit, *Iran Risk: Legal & Regulatory Risk*, Risk Briefing (Nov. 9, 2006) (emphasis added), 2006 WLNR 26677912.

[253] Letter from U.S. Senators Jim Webb, Jon Kyl, and Richard Burr, and U.S. Representatives Ileana Ros Lehtinen and Sue Myrick, *Sens. Webb, Kyl: Sale of U.S. Computer Technology to Chinese Firm Poses Serious Risk Chinese Firm Has History of Illegal Behavior and Ties with the People's Liberation Army, Taliban and Iranian Revolutionary Guard*, States News Service (Feb. 10, 2011).

Komatsu, and others.  Regardless of whether Defendants' other multinational peers, in fact, exited these Iranian relationships, their public announcement of their intention to do so further alerted Defendants to the extreme risk posed by their continued economic relationships with their Iranian counterparties.

636.     On April 24, 2016, the *Washington Post* published an opinion written by Senator Joseph I. Lieberman, and Amb. Mark D. Wallace in which the authors warned multinational corporations of the severe financial and reputational risk attendant upon doing business with a notorious IRGC front, like MTN Irancell, presciently warning Defendants that, "[s]evere risks exist for companies thinking about investing with the [A]yatollah, including doing business with the wide array of front companies tied to the IRGC, a terrorist organization sanctioned by the United States and the international community."[254]

> **D.      Defendants Knew That Their Secret Security Cooperation Agreement With The IRGC Was An Act Of International Terrorism Because Defendants Knew That Their Service As A Key Global Facilitator, Management Consultant, Financial Planner, Weapons Procurer, Logistician, Cell Phone and Computing Technology Provider, Recruiter, Fundraiser, Strategic Communications Provider, And Disinformation Agent For The IRGC, Including Its Hezbollah Division And Qods Force, Which Defendants Knew Substantially Assisted Attacks Against Americans**

637.     MTN Group and MTN Irancell, from at least 2005 through the present, and Phuthuma Nhleko and Irene Charnley, from at least 2005 through 2015, knowingly structured their transactions to facilitate the IRGC's fundraising, weapons procurement, and operational support from their IRGC-controlled counterparties – which the IRGC used to support Hezbollah's, al-Qaeda's, al-Qaeda-in-Iraq's, Ansar al-Islam's, and the Taliban's, including its Haqqani Network's, acts of international terrorism against Americans in Iraq.  Senior Iranian

---

[254] Sen. Joseph I. Lieberman (I-NY) and Amb. Mark D. Wallace, *Why Iran Is Arming Up*, Washington Post (Apr. 24, 2016).

entity officials involved in the Defendants' transactions were avowed, well-known fronts, operatives, and agents for the Regular IRGC, Hezbollah, and Qods Force.

638.    Defendants knew or recklessly disregarded that their corrupt transactions, overseen by a counterparty that the IRGC had totally commandeered, delivered resources directly to the IRGC which they provided to Hezbollah in the form of funds, weapons, logistical support, and other aid to jointly commit terrorist attacks against Americans in Iraq through their Joint Cells.

639.    The IRGC's control over the Iranian telecom, communications, and computer sector was so complete that by 2004, there was no longer any meaningful distinction between any of the large Iranian telecom, communications, or computer companies and the IRGC. Because the IRGC had effectively captured the Iranian telecom, communications, and computer sectors and was using such control to fund and arm Hezbollah as Hezbollah led the Joint Cell attacks against Americans in Iraq, transactions with Iranian telecom, communications, and information technology companies directly benefited the Hezbollah campaign targeting Americans in Iraq.

640.    Defendants' transactions with their IRGC-controlled, including Qods Force-controlled, Iranian counterparties supplied Hezbollah, and through Hezbollah, Jaysh al-Mahdi, with resources critical to the Joint Cells' terrorist operations.  The IRGC's control over these critical Iranian economic sectors – and the enormous cash flow that came with it, both from normal revenue as well as corrupt payments from foreign companies – was a key source of the IRGC's power.

641.    Indeed, the telecom, communications, and information technology sectors were (and remain) controlled by the IRGC precisely because such control allows the IRGC to make

groups like Hezbollah more effective at attacking the enemies of Iran, both foreign and domestic, through the substantial funding for the IRGC which flows through to Hezbollah in its capacity as a constituent member of the IRGC.  The IRGC's complete conversion of the telecom, communications, and computer sectors of the Iranian economy as direct tools of terrorism further strengthened the potency of Defendants' illicit transactions as a means of financing, arming, and operationally supporting attacks.

642.    Defendants provided fungible funds to the IRGC that inevitably flowed through the Hezbollah Division to Jaysh al-Mahdi for attacks against Americans in Iraq. As Ambassador Mark D. Wallace explained in 2012, "[a]bsent *economic support from international businesses*, the Iranian regime would *not have the financial wherewithal to … support terrorism*."[255]

643.    Writing in the *Eurasia Review*, a foreign affairs analyst specializing in Iran explained the tight nexus between economic transactions with the Bonyad Mostazafan and Hezbollah-led terrorist attacks against Americans in Iraq and elsewhere:

> The question is, where does the revenue go? …  Since US sanctions caused a sharp decline in Iran's official revenues, the regime is facing financial difficulties and cannot fund its proxies to meddle in the region or as the mullahs' call it "expand its strategic scope". *Iran cannot fund its proxies including Hezbollah, and its multitude of militia forces in Iraq* and Yemen, or its Afghan Fatemiyoun Division and Pakistani Zainebiyoun militias in Syria using its official annual budget. *The millions of dollars used to fund these group must be provided from other financial sources*. …[B]onyads such as Bonyad-e-Mostazafan, are among the organizations that have *directly assisted the Quds Force in this regard*. Iranian opposition sources have previously stated that the Quds Force receives *most of its funds* from [Bonyads]. … The US's decision to sanction [Bonyads] will definitely be welcomed by Iranians who are tired of having their *stolen wealth used for terrorism*.[256]

---

[255] Wallace May 17, 2012, Testimony (emphasis added).

[256] Cyrus Yaqubi, *Recently Sanctioned Iran Foundation Is Regime's Slush Fund For Terrorism*, Eurasia Review (Jan. 24, 2021) (emphasis added). While Mr. Yaqubi primarily focused on a separate bonyad, his claims apply equally to Bonyad Mostazafan.  *See id.* ("[B]onyads such as Bonyad-e-Mostazafan, … have directly assisted the Quds Force in this regard.").

644.    Indeed, the Qods Force has a direct share of the Bonyads Mostazafan, and therefore the Qods Force shares a portion of every dollar of profit realized by the Bonyads Mostazafan, including the Bonyads Mostazafan profits from MTN Irancell, TCI, and MCI.

645.    Moreover, when the Treasury Department designated one of the Bonyad Mostazafan's American shell companies, Assa, in 2008, and Treasury noted the direct link to the flow of funds and logistical support to the Qods Force and Hezbollah, as well as their terrorist proxies, including the Taliban.[257]

646.    Juan C. Zarate, former Deputy National Security Advisor for Combatting Terrorism from 2005 through 2009, previously testified about the key role played by IRGC, including Qods Force, front companies in funding and arming anti-American terrorist attacks committed by Iranian terrorist proxy groups:

> We have limited tools to address … terrorism … And the use of financial power and the power to exclude from the global system is one of our principal if not most effective tools …. [W]e have to have a comprehensive strategy with the use of all tools of national power. No doubt. But the reality is at the end of the day, these tools are the ones that prove to be most effective.… So we are going to have to, *if we are honest about what's happening in the international financial commercial order, we are going to have to crack down on Qods Force front companies*.…. That's the nature of the Iranian economy in the way that they do business, and the way they have reached precisely what we have cut off that hardened them so much.[258]

647.    On April 23, 2012, the Treasury Department announced new sanctions against Iran that recognized that the IRGC's control of the telecommunications sector was inextricably linked with violence, and stated, in part, as follows:

> The Order targets …information and communications technology that facilitates computer or network disruption, monitoring or tracking that could assist in or

---

[257] U.S. Treasury Dep't, *Treasury Designates Bank Melli Front Company in New York City* (Dec. 17, 2008).

[258] Testimony of Juan Zarate, *Sen. Bob Corker Holds a Hearing on Sanctions and the Joint Comprehensive Plan of Action*, SEC Wire (July 31, 2015) (emphasis added).

enable human rights abuses by or on behalf of the … Government of Iran.
Pursuant to this order sanctions were imposed on … Iran's Islamic Revolutionary
Guard Corps (IRGC) … The IRGC's Guard Cyber Defense Command (GCDC)
includes a special department called the Center for Inspecting Organized Crimes
(CIOC). … The IRGC's CIOC has openly admitted that it would forcefully
suppress anyone seeking to carry out "cultural operations" against the Islamic
Republic via the Internet … Individuals arrested by the IRGC have been subjected
to severe mental and physical abuse …."[259]

648.     The nexus between Defendants' illicit transactions in the Iranian telecom sector

and terrorist violence by Iranian proxies was especially tight.  As Ali Alfoneh of the American

Enterprise Institute explained, the IRGC pushed their way into the telecom sector mafia-style,

and relied upon the funds and technology they acquired through their telecom front companies to

fund IRGC, including Qods Force, operations:

**Telecommunications**
The ***IRGC has also muscled its way into the Iranian telecommunications sector***.
In February 2002, Turkish cell phone company Turkcell … won a bid to
inaugurate a second mobile phone network for Iran … ***The Iranian government
welcomed Turkcell.  That is, Turkcell was welcome until the IRGC complained.***
Turkcell would have been in direct competition with IRGC communications
technology and electronics firms.  The Council of Guardians–an executive body
close to the IRGC and the supreme leader–protested that Iranians would have only
30 percent ownership of the new company.  Even after the National Bank of Iran
bought out foreign investors to achieve a 51 percent Iranian stake, ***the IRGC was
not satisfied***.  The IRGC-operated [IEI] and the [Bonyad Mostazafan]–an
independent financial body ***traditionally run by a retired IRGC commander and
used by the state as a proxy to fund off-the-books IRGC operations***–erected a
cascade of legal and practical obstacles leading Turkish investors to retreat from
the Iranian market.

The IRGC rooted its rhetoric on Turkcell in national security.  …  ***the IRGC
expects to maintain its dominant position not only on the battlefield, but in
civilian sectors as well.*** …  Because some of the Iranian economy's most
advanced technological undertakings occur under the aegis of the IRGC and
within the framework of the Iranian arms industry, the IRGC can monopolize the
transfer and adaptation of high technology to civilian applications … The
homepage of [IEI] … display[s] many consumer goods produced by the arms
industry for sale in the Iranian market. The list includes personal computers,

---

[259] U.S. Treasury Dep't, *Fact Sheet: New Executive Order Targeting Human Rights Abuses Via
Information Technology* (Apr. 23, 2012).

scanners, telephone sets and intercoms, mobile phones, and telephone sim cards. These ***purchases support … IRGC operations*** ….[260]

649.     As national security analysts Elliot Hen-Tov and Nathan Gonzalez wrote in the

*Washington Quarterly* in 2011, the IRGC "'cashed in' since 2005."[261]  Describing the "dramatic

increase" in the IRGC's "economic importance" since 2005, they explained that:

> [T]he Guards [i.e., the IRGC] controlled less than five percent of GDP shortly after the end of the Iran-Iraq War in 1989.  Now, they directly or indirectly oversee … about 35 percent and growing. … Prior to 2005, the Guards … occasionally ***used raw power to reverse high-profile tenders in their favor***.  One of the ***most notable examples*** is when it nullified Turkcell's winning bid to operate a second mobile-phone network as part of a consortium [in favor of Defendant MTN]. Upon ***pressure by the Guards*** and their patrons, the Majles was ***forced to change the terms of the deal and revoke Turkcell's majority share in the consortium***. After Turkcell's departure, an Iranian-led consortium ***under the ownership of a Guards' subsidiary*** [i.e., Defendant MTN Irancell] received the license for the network.[262]

650.     Defendants also helped the IRGC arm their terrorist proxies in Iraq by providing

embargoed dual-use technology from the United States.  Defendants' contribution to the terrorist

enterprise was essential, as the embargoed American technology that Defendants provided to

Hezbollah Division and the Qods Force, through IRGC front transactions, directly improved the

efficacy of the bombs deployed against Americans in Iraq from 2005 through 2010

651.     As a result of the foregoing, each time Defendants publicly touted how each had

helped improve the technical capabilities of the phones and other network devices supplied to

MTN Irancell, TCI, or MCI, MTN were also admitting that they were bolstering the

---

[260] Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*, American Enterprise Institute (Oct. 22, 2007) (emphasis added).

[261] Elliot Hen-Tov and Nathan Gonzalez, *The Militarization of Post-Khomeini Iran: Praetorianism 2.0*, The Washington Quarterly (Winter 2011).

[262] *Id.* (emphasis added).

communications networks, technologies, and operative phones relied upon by the IRGC to sponsor Hezbollah's terrorist attacks against Americans in Iraq.

652.    The technology Defendants provided also helped the IRGC communicate with Hezbollah and Jaysh al-Mahdi (through Hezbollah) in Iraq by sourcing embargoed dual-use technology from the United States.  Indeed, the IRGC's desire to ensure that it could securely communicate with Hezbollah and Jaysh al-Mahdi in Iraq was what initially motivated it to instruct MTN to obtain the embargoed U.S. technology.  And for good reason:  for a terrorist alliance seeking to evade the surveillance of the world's greatest military so that it could plan its attacks unmolested, sensitive communications technology from the United States offered an almost impossible-to-overstate communications advantage to the terrorists by arming them with state-of-the-art communications and encryption technology.  As the RAND Corporation explained:

> For security forces monitoring terrorist communication, such mode nimbleness can *increase the challenges of successfully using terrorist communication traffic*. … *Terrorist access to easy-to-use devices with multiple modes of communication present challenges for security forces* attempting to intercept or track communications … Such communication networks can bypass security forces' centralized monitoring at switches or through the intermediate organization that manages the network infrastructure, *and thereby provide fairly secure communication* …[263]

### 1.    Defendants Knew That Their Secret Security Cooperation Agreement Revolutionized The IRGC's Command, Control, Communications, And Intelligence Capabilities

653.    Command, Control, Communications, and Intelligence (or C3i) are a fundamental cornerstone to all military operations.[264]  Without C3i, military operations cannot be

---

[263] *Id*. at 35-36 (emphasis added).

[264] Lieutenant Colonel Dale E. Fincke, *Principles of Military Communications for C3i*, Army War College School of Advanced Miliary Studies (May 20, 1986), https://apps.dtic.mil/sti/pdfs/ADA174214.pdf.

synchronized to effect combat operations at a specific time and place.  These principles apply not only to legitimate military operations, but are necessary to effect terrorist operations as well.

654.    As General George W. Casey explained in 2009:  "Technology is [a] double-edged sword. Inexpensive access to information enables entrepreneurs and innovators to **collaborate in developing new technologies** and improving existing ones. Yet our adversaries can **exploit these same technologies to export terror around the globe**."[265]  He continued:

> The Israeli-Hezbollah conflict also illustrates the potential impact of hybrid threats. Hezbollah employed modern civil technology (secure cell phones, computers and video telecommunications systems) combined with military means (antitank, surface-to-air and antiship missiles, rockets, mortars and unmanned aerial vehicles) and improvised explosive devices in an innovative array of unanticipated patterns.[266]

655.    Defendants' sourcing of illicit technologies for the IRGC enabled the IRGC to accomplish its Revolution in Terrorist Affairs, to devastating effect.

656.    "In future operational environments," General Casey warned, "where the tactical environment and strategic environment will often be seamless, it is the network that will provide the ability to gain and maintain the operational advantage."[267]  When General Casey wrote this, the IRGC was already well on its way to becoming the world's first fully networked terrorist organization, resourced by Defendants' multi-national corporate muscle.

657.    Indeed, in 2010, General Casey called attention to Hezbollah's use of cell phones and secure computers for command and control, which allowed Hezbollah to inflict far higher casualties on their Israeli enemies: "[Hezbollah] had **secure cell phones, used secure computers**

---

[265] General George W. Casey, Jr., *The Army of the 21st Century*, Army (Oct. 1, 2009), 2009 WLNR 30869494.

[266] *Id*.

[267] *Id*.

***for command and control and got their message out*** on local television, and about 3,000

Hezbollah operatives basically held off 30,000 well-armed, well-equipped Israeli soldiers."[268]

658.    **Interoperability.**  Defendants also ensured that the IRGC realized enormous

gains in terrorist effectiveness and lethality based upon the unique interoperability advantages

that MTN Group, Phuthuma Nhleko, and Irene Charnley, afforded to the IRGC and its terrorist

allies.

659.    **Intelligence.**  Defendants also ensured that the IRGC achieved a generational

improvement in their intelligence collection.  As one analyst told the *Christian Science Monitor*,

"[m]obile phone networks and how they connect is one of the IRGC's key priorities because it's

one of the key tools for opponents," and concluded the IRGC was "improving its connectivity

and information-sharing."[269]

660.    MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley served as

corporate "covers" for the IRGC and intentionally structured transactions, supplier relationships,

and pricing decisions, among other things, for the specific purpose of illicitly obtaining state-of-

the-art American technology, like enterprise level servers.  The end goal: transfer the illicitly

obtained goods to the IRGC for their use in the terrorist campaign against Americans around the

world.  By serving as corporate "covers" for the IRGC each Defendant significantly increased

the potency of the scheme, as demonstrated by how long it has endured.

---

[268] J.D. Leipold, *CSA Addresses Worldwide Challenges at Brookings Institution*, Defense
Department Documents (Feb. 2, 2010), 2010 WLNR 2196129.

[269] Iason Athanasiadis, *How Iranian Dissidents Slip Through Tehran's Airport Dragnet*,
Christian Science Monitor (Feb. 8, 2010), 2010 WLNR 2676528.

### 2. Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Finance Terrorist Attacks Against Americans

### i. Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Finance Terrorist Attacks Against Americans Through The Illicit Cash Flow That Defendants Caused To Course Through MTN Irancell To The IRGC For Its Terrorist Operations Budgets

661.    The IRGC derived substantial terrorist funding from the billions of dollars in MTN Irancell and TCI-related cash flows, and at least hundreds of millions of dollars annually.

662.    From 2005 through the present, MTN Group's, Phuthuma Nhleko's, and Irene Charnley's illicit transactions with MTN Irancell, the Bonyad Mostazafan, IEI, TCI (including MCI), Exit40, and/or the Akbari Fronts, provided millions, annually, in illicit funds, weapons, and operational support to Hezbollah, Jaysh al-Mahdi, and the IRGC which the Joint Cells used to attack Americans in Iraq, including Plaintiffs and their loved ones.

663.    MTN Group, Phuthuma Nhleko, and Irene Charnley significantly increased the cash flowing through MTN Irancell and TCI, and ultimately deployed by the IRGC.  They did so by illicitly supplying the state-of-the-art American technologies, like servers, to MTN Irancell and TCI, and by extension the IRGC (including its Hezbollah Division and Qods Force) needed to attack Americans abroad.

664.    By illicitly helping MTN Irancell expand the footprint of its network, MTN Group, Phuthuma Nhleko, and Irene Charnley generated new cash flow by connecting more customers to MTN and therefore more money to flow through MTN Irancell to the IRGC.

665.    As a matter of economic first principles, MTN Group's, Phuthuma Nhleko's, and Irene Charnley's participation in MTN Irancell caused the latter to become more profitable, because MTN Group was able to bring its networking expertise to the table.

666.     MTN's logic compels this conclusion.  According to Gordon Kyomukama, Chief Technical Officer of MTN, "[a]t MTN, extending the footprint of our network and services to ***ensure that we connect more people*** has been and remains a high priority for our company."[270]

667.     On information and belief, on or about 2012, MTN Group began discussions with one or more components of the U.S. government concerning MTN Group's desire to repatriate hundreds of millions of dollars from MTN Irancell.

668.     The financial, technical, communications, intelligence, and operational support that that MTN Group, Phuthuma Nhleko, and Irene Charnley, and their respective U.S. manufacturers provided to their IRGC-controlled, including Qods Force-controlled, counterparties flowed through to the Joint Cells that committed each attack that injured each Plaintiff through some channels that were "official" and some that were "off-the-books."

669.     From 2003 through the present, the IRGC supplied the Joint Cells – at a Cell level and directly to each constituent member (i.e., Hezbollah, the Qods Force, and Jaysh al-Mahdi) – with substantial and regular arms deliveries, financial aid, training, logistical support, communications technology (including secure American mobile phones), safe haven assistance, and aid with narcotics trafficking (conspiring with, among others, al-Qaeda and the Taliban, including its Haqqani Network), each form of aid facilitated their shared terrorist enterprise against America (i.e., their agreement to attack Americans in Iraq and Afghanistan to drive the U.S. out of the Middle East), which al-Qaeda, al-Qaeda-in-Iraq, Ansar al-Islam used to execute the nationwide attack campaign in Iraq that killed and injured Plaintiffs.

---

[270] Intelsat, *Press Release: Uganda Joins Forces with Intelsat, ITSO and MTN to Accelerate 3G Network Infrastructure Deployment in Rural Areas* (May 4, 2018), https://investors.intelsat.com/news-releases/news-release-details/uganda-joins-forces-intelsat-itso-and-mtn-accelerate-3g-network.

670.     MTN Group, Phuthuma Nhleko, and Irene Charnley transferred (or facilitated the transfer of) embargoed dual-use American technology, included the annual funneling of thousands of secure American smartphones, supplied hundreds of millions of U.S. Dollars' worth of cash flow, and facilitated a vast network of logistical and operational support for the Irancell and TCI fronts that were controlled by the IRGC. This technology, money, and services flowed through to Hezbollah, the Qods Force, and Jaysh al-Mahdi, who committed each attack that injured each Iraq Plaintiff, through transfers made by the IRGC to the IRGC Sunni Terrorist Proxies, and flowed through to facilitate attacks against Americans in Afghanistan by the al-Qaeda/Taliban Syndicate.

671.     With respect to MTN Group's, Phuthuma Nhleko's, and Irene Charnley's "official" transactions with Hezbollah, Qods Force, and Regular IRGC front counterparties – which, though open and notorious, were still illegal – flowed through the IRGC into the specific terrorist organizations upon which the IRGC relied to conduct Iranian "security" operations outside of Iran including, but not limited to:

**(A)     Hezbollah's External Security Organization Budget:** In order to fund, arm, train, equip, and logistically support designated terrorist groups, or forward-deployed Hezbollah terrorists, who sought to attack Americans including, but not limited to:

  (i)   Hezbollah's forward-deployed operatives worldwide, including but not limited to, Hezbollah attack planners, bomb makers, logisticians, trainers, attack cells, fundraisers, financiers, propagandists, and videographers, all of whom were regularly forward deployed, under IRGC doctrine, to help commit and plan terrorist attacks alongside local proxy groups (e.g., Jaysh al-Mahdi in Iraq or the Taliban in Afghanistan) wherever Americans were found, including, but not limited to, Iraq, Iran, Lebanon, Syria, Yemen, Bahrain, the U.A.E.,  Afghanistan; and

  (ii)  The other members of the Joint Cells (through forward-deployed in-country Hezbollah cell leaders) that committed each attack that injured each Plaintiff in Iraq, and to support Iranian terrorist proxies worldwide, including, but not limited to, al-Qaeda, the Taliban (including its Haqqani Network), and the Houthis.

226

**(B)**     **The Qods Force's "Security" Budget:**  In order to fund, arm, train, equip, and logistically support designated terrorist groups that specifically targeted Americans including, but not limited to:

      **(i)**     **IRGC Shiite Terrorist Proxies:**  Hezbollah and, through Hezbollah, Jaysh al-Mahdi, including Jaysh al-Mahdi Special Group Asaib Ahl al-Haq, and Jaysh al-Mahdi Special Group Ka'taib Hezbollah, in order to facilitate terrorist attacks against Americans in Iraq or Afghanistan on their own or through cooperation with al-Qaeda and the Taliban, including its Haqqani Network; and

      **(ii)**     **IRGC Sunni Terrorist Proxies:**  al-Qaeda, al-Qaeda-in-Iraq (which later became ISIS), Ansar al-Islam, and the Taliban (including its Haqqani Network), among other al-Qaeda affiliates, to facilitate terrorist attacks against Americans in Iraq, Syria, Yemen, Afghanistan, and Europe, through cooperation with one another.

      672.     From 2005 until the present, MTN Group, Phuthuma Nhleko, and Irene Charnley, each showered (or caused to be showered) millions in value upon the IRGC each year.  Their official transactions flowed through Hezbollah to the terrorist(s) that committed each attack against each Plaintiff.

      673.     MTN Group's, Phuthuma Nhleko's, and Irene Charnley's covert "off-the-books" assistance to the terrorists was no less important.  The IRGC has provided tens of millions of dollars "off-the-books" to Hezbollah and (through Hezbollah) to local terrorist proxies since Hezbollah's inception.  Defendants' "off-the-books" financial-, technology-, and services-related transactions with their IRGC, including Hezbollah Division and Qods Force, front counterparties also flowed into the Joint Cells and IRGC proxies like Jaysh al-Mahdi, in order to fund the attacks committed by the Joint Cells and Jaysh al-Mahdi that injured each Plaintiff.  MTN Group's, Phuthuma Nhleko's, and Irene Charnley's illicit transactions with the Bonyad Mostazafan, IEI, MTN Irancell, TCI (including MCI), and/or the Akbari Fronts provided millions in illicit "off-the-books" income, often in U.S. dollars, to the IRGC each year, which the

IRGC then provided to Hezbollah so that the Joint Cells could commit each attack that injured each Plaintiff, which they did.

674.    On information and belief, from 2005 through on or about 2010, the IRGC diverted approximately twenty percent (20%) of its net income cash flow from MTN Group and MTN Irancell to the IRGC, Qods Force, and Hezbollah, with each receiving a similar amount each year.  At those rates, MTN Group, Phuthuma Nhleko, and Irene Charnley caused, at least: (i) more than $30 million dollars to flow through Irancell to the Qods Force each year; (ii) more than $30 million dollars to flow through the IRGC to Hezbollah each year; and (iii) more than $30 million dollars to flow to the Regular IRGC each year.  Such cash flows were delivered in regular, predictable amounts, and supported Joint Cells and Jaysh al-Mahdi in Iraq, and Qods Force and Hezbollah operations, weapons purchases, and personnel costs, among other expenses, in support of anti-American terrorist operations by Qods Force and Hezbollah throughout the Middle East including, but not limited to, Iran, Iraq, Lebanon, Afghanistan, Syria, and Yemen.

675.    On information and belief, MTN Group's and MTN Irancell's cash flows to the IRGC began in earnest by no later than the summer of 2005.  Based on MTN Group and MTN Irancell cash flows (from MTN Group loans) in 2005, MTN Group caused approximately $75 million to flow through to Hezbollah, the Qods Force, and Regular IRGC during the final six months of 2005 alone, split roughly evenly between these three IRGC components.[271]

676.    On information and belief, after economic sanctions began to hammer the IRGC in or about 2010, the IRGC responded by cutting spending across the board in half, and therefore cut the cash flow through from MTN Irancell to the IRGC, Qods Force, and Hezbollah from

---

[271] In 2005, MTN Group caused the initial 300 million Euro payment made to the Iranian Shareholders, which was valued at approximately $375 million in 2005 dollars; 20% of that was approximately $75 million.

twenty percent (20%) to ten percent (10%), with each receiving a similar amount each year.  At those rates, MTN Group, Phuthuma Nhleko, and Irene Charnley caused, at least:  (i) more than $15 million dollars to flow through the IRGC to the Qods Force each year; (ii) more than $15 million dollars to flow to Hezbollah each year; and (iii) more than $15 million dollars to flow through to Regular IRGC each year.  Moreover, MTN Group also caused additional enormous cash flows to course through Irancell and flow through to the IRGC's terrorist enterprise when MTN Group regularly made large additional loans worth tens of millions of dollars to Irancell after the sanctions intensified.  The above-described cash flows were delivered in regular, predictable amounts, and supported Qods Force and Hezbollah operations, weapons purchases, and personnel costs, among other expenses, in support of anti-American terrorist operations by Hezbollah, the Qods Force, Jaysh al-Mahdi, and the Joint Cells in Iraq.

> **ii.    Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Finance Terrorist Attacks Against Americans Through Illicit Off-Books Cash Flow From Fundraising Campaigns, Procurement Bribes, Khums, Financial Management, And Fronts Like Exit40**

677.    Defendants knew that their **technical assistance** facilitated terrorist fundraising campaigns by the IRGC that directly supported attacks by Hezbollah, the Qods Force, Jaysh al-Mahdi, and the Joint Cells in Iraq by supplying resources to such terrorists through the IRGC.

678.    Defendants knew that their **procurement bribes** facilitated terrorist fundraising campaigns by the IRGC that directly supported attacks by Hezbollah, the Qods Force, Jaysh al-Mahdi, and the Joint Cells in Iraq by channeling resources to such terrorists through the IRGC.

679.    Defendants knew that their **indirect donations (*khums*)**, meaning the cash flow that Defendants triggered when they paid the IRGC (e.g., when they bribed an IRGC cutout in Dubai), facilitated terrorist fundraising campaigns by the IRGC that directly supported attacks in Iraq and Afghanistan by channeling resources to the IRGC and its terrorist allies.

229

680.    Defendants knew that their **management consulting assistance** aided the IRGC by revolutionizing their financial management capabilities, which meant that the terrorists had more resources upon which to draw for killing Americans.

**3.      Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Source Weapons To Commit Terrorist Attacks Against Americans**

**i.      Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Source Improvised Explosive Devises (IEDs)**

681.    Defendants also supported the terrorist campaign through their financial support of fronts acting for the IRGC which provided Hezbollah and the Qods Force the funds, bomb parts, and other necessary material vital to the IRGC Sunni Terrorist Proxies' ability to conduct a nationwide IED campaign targeting Americans in Iraq.  The IRGC manufactured and/or sourced key components for the IRGC Sunni Terrorist Proxies' IED attacks, including, but not limited to:

(i)      military- and factory-grade explosives;

(ii)     calcium ammonium nitrate ("CAN") fertilizer (smuggled from Pakistan, through Iran, into Iraq), for use by al-Qaeda and al-Qaeda-in-Iraq in their signature fertilizer bombs;

(iii)    secure cell phones and other embargoed communications technologies, which Hezbollah, the Qods Force, and Jaysh al-Mahdi used to safely and securely communicate with one another, as well as with their IRGC sponsors, including Hezbollah and the Qods Force;

(iv)     embargoed bomb components necessary to produce the large volumes of reliable IEDs needed by the IRGC Sunni Terrorist Proxies to sustain their nationwide campaign against Americans in Iraq; and

(v)      fully-built IEDs, including, but not limited to, roadside bombs, vehicle-borne IEDs, and suicide vests.

682.    MTN also supported the terrorist campaign through their financial support of fronts acting for the IRGC which funded the IRGC Sunni Terrorist Proxy attacks as well as the weapons, resources, communications technologies (including the American smartphones

Defendants helped source), which also flowed through to the same IRGC proxies so they could

attack Americans around the world, including Iraq.

> ### i.   Defendants Knew That Their Secret Security Cooperation Agreement Helped The IRGC Source Rockets

683.    Defendants' assistance directly improved the lethality and accuracy of the rockets

deployed by the IRGC.

> ### 4.   Defendants Knew That Their Secret Security Cooperation Agreement Amplified The IRGC's Recruiting, Fundraising, Strategic Communications, And Disinformation Campaigns, Which Defendants Knew Facilitated IRGC Terrorist Operations Against Americans

684.    IRGC doctrine emphasizes the centrality of orchestrated propaganda campaigns to

drive recruiting and fundraising, strategic communications to deliver custom messages to custom

audiences, and broad disinformation campaigns to conceal the terrorists' schemes and facilitate

the continued flow of material support from the IRGC's corporate sponsors, like each Defendant,

which flowed through to the IRGC's terrorist proxies targeting Americans in the Middle East.

The terrorists devoted so much time to these efforts for an obvious reason:  they played a vital

role in fueling the terrorists' campaigns and maximizing the number of Americans the terrorists

could kill in Iraq, Afghanistan, and throughout the Middle East.  "Based on their extensive reach

in the communications economy," according to Ms. Gill, "the IRGC orchestrated a

'comprehensive messaging strategy' using radio and television broadcasts, newspapers, websites,

and social media accounts to amplify the message that the Islamic Republic was under attack

from the West.  Using media infrastructure … and telecommunications infrastructure …, the

IRGC actively engaged the communications economy in defending the Islamic Republic against

the soft war tactics of the West.[272]

---

[272] Gill, *Capitalism, Communications, and the Corps*, at 110.

685.    In so doing, Hezbollah, the Qods Force, and their proxies, leveraged the explosion of information technologies and computing power since 2000.  As the United Nations Office on Drugs and Crime ("UNODC") documented in 2012:

> Technology is one of the strategic factors driving the increasing use of the Internet by terrorist organizations and their supporters for a wide range of purposes, including recruitment, financing, propaganda, training, incitement to commit acts of terrorism, and the gathering and dissemination of information for terrorist purposes. While the many benefits of the Internet are self-evident, it may also be used to facilitate communication within terrorist organizations and to transmit information on, as well as material support for, planned acts of terrorism, all of which require specific technical knowledge for the effective investigation of these offences.[273]

### i.    Defendants Knew That Their Secret Security Cooperation Agreement Aided The IRGC's Recruiting and Fundraising Campaigns

686.    Islamist terrorists have widely relied upon antisemitic appeals to raise money, recruit followers, and gain other advantages.  The Anti-Defamation League observed in 2015:

> Fourteen years after 9/11, terrorist groups motivated by Islamic extremist ideology, from Al Qaeda to the Islamic State of Iraq and Syria (ISIS), continue to rely on depictions of a Jewish enemy – often combined with violent opposition to the State of Israel – to recruit followers, motivate adherents and draw attention to their cause. Anti-Israel sentiment is not the same as anti-Semitism. However, terrorist groups often link the two, exploiting hatred of Israel to further encourage attacks against Jews worldwide and as an additional means of diverting attention to their cause.[274]

687.    Few terrorists are more committed to this strategy than the IRGC who have long used baldly antisemitic propaganda as a core part of their terrorist recruitment strategy, by

---

[273] United Nations Office on Drugs and Crime, *The Use of the Internet for Terrorist Purposes* at 1 (Sept. 2012), https://www.unodc.org/documents/frontpage/Use_of_Internet_for_Terrorist_Purposes.pdf.

[274] Anti-Defamation League, *Anti-Semitism: A Pillar of Islamic Extremist Ideology* at 1 (2015), https://www.adl.org/sites/default/files/documents/assets/pdf/combating-hate/Anti-Semitism-A-Pillar-of-Islamic-Extremist-Ideology.pdf.

spreading the hateful slur that the United States and Israel are part of a Jewish-led cabal seeking to take over Muslim lands.

688.    The IRGC's campaign to spread hateful antisemitic propaganda about Israel, the United States, and people of the Jewish faith were not the idle musings of disorganized radical Islamists blogging out of their parents' basements.  These were industrial scale, IRGC- and Hezbollah-administered propaganda campaigns that sought to strengthen the terrorist conspirators' ability to attack Americans worldwide by, among other things:  (1) **bolster terrorist fundraising** by increasing the potency of the terrorists' online fundraising appeals, and thereby drive more dollars to the terrorist campaign; (2) **recruit more terrorists** by creating the initial touchpoints for new recruits, e.g., a 16-year old watches a splashy Hezbollah video and decides to join the group; and (3) **enhance the terrorists' concealment** by flooding the zone with propaganda designed to persuade the population to support the terrorists (ideal) or, at least, not rat them out to the Americans nearby (almost as good), by portraying a common enemy.

689.    Regular media discussions also specifically alerted Defendants that the IRGC, including its Hezbollah Division and the Qods Force, deployed antisemitic propaganda to raise money and recruit terrorists.

690.    In furtherance of the IRGC's recruiting efforts, MTN Group, Phuthuma Nhleko, and Irene Charnley were one in spirit with the antisemitic terrorist recruiting messaging of the IRGC, including Hezbollah, and the Qods Force, as well as their co-conspirators in Syria (like the Assad regime) and Afghanistan (like al-Qaeda and the Taliban, including its Haqqani Network).

691.    *First*, MTN Group, while led by Phuthuma Nhleko and Irene Charnley, regularly enabled the creation, uploading, distribution, downloading, and propagation of a near-constant

233

24/7 river of terrorist recruitment appeals by, among others, Hezbollah, the Qods Force, Regular IRGC, the Assad regime, and the Taliban, including its Haqqani Network, through Defendants' provision of technical, financial, operational, and personnel support to MTN Irancell and MTN Syria, both of which reinforced the recruiting campaigns.

692.     *Second*, MTN Group never publicly condemned the antisemitic terrorist propaganda MTN Group enabled in Iran (through MTN Irancell), Syria (through MTN Syria), Yemen (through MTN Yemen), and Afghanistan (through MTN Afghanistan).  In every country where the IRGC sponsored terrorist proxy attacks against Americans, MTN Group, Phuthuma Nhleko, and Irene Charnley facilitated the local MTN subsidiary's direct and indirect assistance to the recruiting campaigns, all of which followed the Hezbollah playbook of using over-the-top bile to raise awareness for recruiting drives, fundraising solicitations, and more.

693.     MTN Group was (and remains) one in spirit with the IRGC's, including Hezbollah's and the Qods Force's, antisemitic terrorist recruiting message.  Most obviously, MTN Group is the but-for cause of the terrorists' ability to spread their recruitment pitches so effectively through the litany of terrorist-enabling services that MTN Group committed every MTN subsidiary and affiliate to provide to all "Iranian Shareholders," i.e., the IRGC, including its Hezbollah Division and the Qods Force, which substantially bolstered the terrorists' antisemitic recruiting and fundraising pitches.

694.     Since 2005, MTN Group, Phuthuma Nhleko, and Irene Charnley facilitated Irancell's broadcasts of the terrorists' antisemitic recruiting propaganda throughout the Middle East while never once publicly stating that: (a) Israel has a right to exist; (b) bomb attacks against Americans in Iraq by Iranian proxies are wrongful; or (c) the Holocaust should be

remembered.  The reason is obvious:  MTN Group, Phuthuma Nhleko, and Irene Charnley agree with their terrorist business partner:  they are one in spirit.[275]

ii.    **Defendants Knew That Their Secret Security Cooperation Agreement Aided The IRGC's Strategic Communications and Disinformation**

695.    After 9/11, the IRGC was keenly aware how an effective strategic communications (or "stratcoms") campaign could directly aid their transnational terrorist campaign.  Indeed, no major global terrorist organization has a longer, more prolific, or more impactful record of turning effective strategic communications campaigns into new sources of funds, personnel, safehouses, and the litany of other functions that required an ever-growing group of allies and enablers.

696.    The U.S. military concluded long ago that there was a direct relationship between effective strategic communications and overall probability of success on a given venture.  This reflects a recognition, that, as General George W. Casey, Jr., explained, "Conflicts will continue to take place under the unblinking scrutiny of the 24-hour media cycle and the World Wide Web…. Adversaries will have many forums in which to disseminate their messages worldwide."[276]

---

[275] A Westlaw News search designed to obtain any media report containing the phrases "MTN Group" or "MTN Dubai" within 100 words of the roots for Israel and antisemitism (Westlaw News "MTN Group" or "MTN Dubai" /100 Israel! Antisem! Holocaust!) reveals approximately 300 documents as responsive hits.  Nothing.  A comprehensive Google search similarly reveals no statement.  MTN Group could, of course, cease broadcasting terrorist propaganda, publicly issue a sweeping defense of Israel's right to exist, and unequivocally condemn roadside bomb attacks supported by Iran.  MTN Group's obvious refusal to do so in nearly two decades flies so contrary to international corporate norms, only one conclusion results:  MTN Group and the IRGC are one in spirit.

[276] General George W. Casey, Jr., *The Army of the 21st Century*, Army (Oct. 1, 2009), 2009 WLNR 30869494.

697.    The IRGC also understood that effective strategic communications were necessary to facilitate terrorist operations by, among other things, promoting a disinformation campaign designed to conceal the illicit scheme by causing the spread of falsehoods relating to it, and preventing controversies that could expose co-conspirators, incentivize people to halt their support for terrorist schemes, or foreseeably cause a co-conspirator to be financially or logistically unable to continue supporting the criminal agreement, such as a threat that could cause a corporate co-conspirator to lose billions of dollars or cause an individual co-conspirator to lose their life or freedom.

698.    Writing in an official NATO journal in 2020, Ms. Gill explained, "The Invisible Hand of the IRGC" touched every transaction relating to MTN Irancell, TCI, and their associated IRGC front company shareholders and, as a result, "the reliance of the IRGC's strategic narrative on the communications economy concerns more than explicitly ideological motivations; a distinctly coercive element can also be identified.  Beyond their devotion to the Construction Jihad, the Guard relied on the communications economy as a tool of power projection."[277]

699.    MTN Group, Phuthuma Nhleko, and Irene Charnley coordinated the strategic communications and crisis prevention efforts that concealed MTN Group's explicit embrace of the terrorist campaign through the Security Cooperation Agreement, and managed MTN Irancell-related strategic communications and public branding outside of Iran.

700.    Ever since MTN Group, Phuthuma Nhleko, and Irene Charnley committed themselves, and every MTN subsidiary and affiliate, to MTN's secret Security Cooperation

---

[277] Gill, *Capitalism, Communications, and the Corps*, at 108.  Ms. Gill concluded that "[w]hilst strategic narratives construct the truth, communications economies enable control over communicative processes; both reinforce one another to create a hegemonic understanding of reality that supports a political actor's values, interests, or objectives."  *Id.* at 113.

Agreement with Hezbollah, the Qods Force, and the Regular IRGC on September 18, 2005, MTN Group, Phuthuma Nhleko, Irene Charnley, and agents acting on their behalf, pursued an aggressive strategic communications campaign to conceal Defendants' material support to Hezbollah, the Qods Force, Regular IRGC, and their terrorist proxies in Iraq and Afghanistan.

701.    MTN Group, Phuthuma Nhleko, and Irene Charnley successfully suppressed any leaks, materially negative press reporting, or public sector investigations in the United States, Europe, Africa, or Southeast Asia concerning MTN Group's secret Security Cooperation Agreement with Hezbollah, the Qods Force, and Regular IRGC, until on or about March 28, 2012, when Turkcell sued MTN in federal district court in Washington, D.C., at which time a whistleblower revealed the secret Agreement to the world through Turkcell's lawsuit.  On information and belief, MTN Group relied upon effective strategic communications and crisis prevention services to prevent negative information from "leaking" for nearly seven years after the Agreement was signed.

702.    MTN Group's successful communications strategy prevented any major media scandals concerning MTN Group from between 2005 and 2010.  Ordinarily, of course, a parent company's brand equity is of no moment in an Anti-Terrorism Act case.  But when that parent company is, effectively, the joint venture partner of terrorists, as is the case here, and when the point of the joint venture is to generate cash flow and serve as cover for sourcing illicit weapons parts, then the parent company's brand and reputation are essential.

703.    Simply put, MTN Group began serving as the IRGC's telecommunications- and computing-related financial and logistics agent worldwide in 2005, never stopped doing so, and continues to play the same role today even after the IRGC was designated an FTO.  To accomplish that task, MTN Group, Phuthuma Nhleko, and Irene Charnley, coordinated MTN

Group's strategy with MTN Dubai and others to engage in a series of illegal and fraudulent transactions designed to raise money and source key terrorist components from the United States.

704.    When MTN Group, Phuthuma Nhleko, and Irene Charnley, operated a worldwide campaign to, among other things, illicitly source more than ten thousand (10,000) high-tech American-manufactured smartphones from sellers within the United States to MTN Group's complicit agents, employees, and cut-outs worldwide, ***MTN Group, Phuthuma Nhleko, and Irene Charnley, were acting as a front for Hezbollah and the Qods Force***.  Through their conduct, MTN Group, Phuthuma Nhleko, and Irene Charnley, turned MTN Group itself into an "Orbit" for Hezbollah, the Qods Force, and the Regular IRGC, similar to how – as described in an analysis published by NATO – the IRGC deployed "Orbit" terrorist tradecraft to acquire money and technologies necessary to grow the IRGC and further its terrorist mission.

705.    MTN Group's, Phuthuma Nhleko's, and Irene Charnley's, continued open and notorious service as a terrorist front even after these issues surfaced repeatedly in litigation beginning on March 28, 2012 and continuing ever since.   Even now, MTN Group continues to act as a front for the IRGC (an FTO), the Qods Force (an FTO), Hezbollah (an FTO), all of whom, as constituent members of the IRGC were, and remain, parties to MTN's Security Cooperation Agreement with the IRGC.  Plainly, MTN Group, Phuthuma Nhleko, and Irene Charnley meant to serve as a terrorist front.

706.    In their capacity as long-standing joint venture allies, fundraising partners, and illicit sourcing fronts since 2005, MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley knew, or were generally aware, that there was a direct, linear, and measurable relationship between MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's public reputation and brand health, on the one hand, and the volume of money and illicitly

sourced technology that ultimately flowed through to the Regular IRGC, Hezbollah, Qods Force, and their terrorist proxies worldwide, on the other hand.  Such knowledge, or general awareness, extended to, among others: (1) MTN Group's President and CEO; (2) MTN Group's Commercial Director; (3) MTN Group's Board of Directors; (4) MTN Group's in-house counsel and "compliance"[278] staff; and (5) MTN Group's external advisors.

707.    The better MTN Group's  public reputation and brand health, the more cash to flow through MTN Irancell to the terrorists because, among other reasons:  (1) the better MTN Group's  brand, the better the sales for MTN Group's joint venture partner, the IRGC, through Irancell; and (2) the easier it was for MTN Group  to illicitly source the technology demanded by Hezbollah and the Qods Force – especially for the higher-cost items like servers, or unusually large bulk orders of less expensive (but still costly) items, like smartphones.  Often, such transactions required that MTN Group, Phuthuma Nhleko, and Irene Charnley, and the agents and cut-outs acting on their behalf, transact with suppliers who were more concerned about reputational risk in comparison to the more traditional high-tech black-market resellers for things like smartphones.

708.    From 2005 through at least 2011, MTN Group  pursued a successful strategic communications campaign that prevented any catastrophic public relations scandals in the United States, Europe, Africa, or Southeast Asia concerning MTN Irancell, MTN Group, or any

---

[278] MTN Group and its agents and affiliates are actively – and defiantly – aiding multiple Foreign Terrorist Organizations through the ongoing river of cash, free goods, services, management consulting, strategic communications, and disinformation support that MTN Group and its agents and affiliates are effectively causing to flow to the IRGC, including its Lebanese Hezbollah Division and Qods Force, through MTN Irancell, which MTN Group refuses to immediately compel to wind down.  As such, one may reasonably assume that "compliance" as currently practiced at MTN Group is the opposite of what it supposed to be – a program designed to conceal criminality rather than flush it out of MTN.

other MTN subsidiary or affiliate that could have undermined MTN Group's ability to serve as "cover" most effectively for the terrorist campaign's continuing efforts to illicitly source weapons and funds to enable terrorist attacks against Americans in Iraq and Afghanistan.

709.     In or about December 2010 or January 2011, MTN Group caused MTN Nigeria to hire Individual 1, a former high-level official in the Obama Administration, ostensibly to give two speeches, for which Individual 1 accepted a $100,000 speaking fee.  On information and belief, MTN Group either wired the $100,000 to Individual 1's bank account in the United States itself, or MTN Nigeria wired the $100,000 to Individual 1's bank account at the direction of MTN Group, which thereafter reimbursed MTN Nigeria.

710.     When MTN Group caused MTN Nigeria to pay Individual 1's $100,000 speaker fee, it was not because MTN Group or MTN Nigeria were interested in Individual 1's speech. Instead, on information and belief, MTN Group caused MTN Nigeria to pay Individual 1, because MTN Group knew that Individual 1 would return to the Obama Administration, and MTN Group intended to induce Individual 1's service as a backdoor communications channel with the White House.

711.     MTN Group paid Individual 1 because MTN Group knew Individual 1 would be immensely influential within the Obama Administration while it was analyzing, among other things, the geopolitical and public messaging concerns attendant to the question of whether to soften the then-existing sanctions, which were crushing the IRGC, and therefore undermining MTN Group's joint venture partner – and, by extension, MTN Group.

712.     MTN Group's retention of Individual 1 in December 2010 and indirect payment (through its captive subsidiary, MTN Nigeria) of $100,000 to Individual 1 was an act in furtherance of the scheme.  On information and belief, MTN Group wired $100,000 to Individual

1, causing it to be received by Individual 1 inside the United States, hoping that Individual 1 would, in effect, be on MTN Group's "side" (or at least, willing to take a meeting) when the Irancell-related sanctions came before the Obama Administration.

## VIII.   THE FUNDS, ARMS, TECHNOLOGIES, AND SERVICES THAT DEFENDANTS ILLICITLY TRANSFERRED TO HEZBOLLAH AND THE QODS FORCE THROUGH MTN IRANCELL FLOWED ON TO THE JOINT CELLS AND JAYSH AL-MAHDI AND CAUSED THE ATTACKS IN IRAQ THAT KILLED AND INJURED PLAINTIFFS

### A.   Hezbollah Created Jaysh Al-Mahdi And Jaysh Al-Mahdi Special Groups Asaib Ahl Al-Haq And Ka'taib Hezbollah

713.   Through Iran's proxy Hezbollah, the IRGC, including its Hezbollah Division and Qods Force, provided material support to the Joint Cells attacking Americans in Iraq.

714.   The IRGC's – and therefore Hezbollah's – objective was always to kill Americans in order to drive the U.S. out of Iraq.

715.   The IRGC, including its Hezbollah Division and Qods Force, provided material support to its longstanding lead terrorist agent and proxy, Hezbollah, to facilitate Hezbollah-led attacks against Americans in Iraq, and Hezbollah's commission, planning, and/or authorization of attacks carried out by the Joint Cells between 2011 and 2016.

716.   Hezbollah's role regarding Jaysh al-Mahdi and the attacks by the Joint Cells in Iraq was similar to its role in other terror campaigns it sponsored:  Hezbollah recruited, trained, armed, and directed Jaysh al-Mahdi terrorists, who carried out terrorist attacks against Americans on Hezbollah's behalf.  Hezbollah Secretary-General Hassan Nasrallah was deeply involved in this campaign, reportedly spending "several hours daily dealing with 'the situation in Iraq.'"[279]

---

[279] Hamza Hendawi & Qassim Abdul-Zahra, *Shiite Sources:  Hezbollah Helping Iraqi Militia*, NBC News (July 1, 2008).

717.    Federal judges have recognized the key role that the IRGC, including its Hezbollah Division and Qods Force, played in ensuring that Hezbollah had the funds, arms, and logistical aid it needed to manage the Joint Cells' attack campaign against Americans in Iraq. For example, in *Fritz*, the Honorable Randolph D. Moss found that "Iranian support—in the form of funding, weapons, and training—was critical to the success of the Special Groups, which otherwise 'would [have been] unable to conduct their terrorist attacks in Iraq.'"[280]

718.    Hezbollah at all times acted at the instruction of the IRGC, including its Hezbollah Division and Qods Force, to benefit its terrorist enterprise targeting Americans in Iraq, by helping establish Jaysh al-Mahdi, including the Jaysh al-Mahdi Special Groups, and later supporting the Jaysh al-Mahdi terrorist campaign against Americans in Iraq.[281]

719.    In April 2003, Hezbollah dispatched to Iraq its chief terrorist mastermind, Imad Mugniyeh, to help Muqtada al-Sadr found Jaysh al-Mahdi.  Hezbollah's goal, according to an October 2003 Israeli intelligence report, was to set up a terrorist network in Iraq to inflict "mass casualties" on Americans.  A U.S. Special Operations task force report quoted by the *U.S. News & World Report* in 2004 explained that "the Lebanese Hizballah leadership believes that the struggle in Iraq is the new battleground in the fight against the U.S."[282]  As one embedded war correspondent put it, Jaysh al-Mahdi was created to be "the Iraqi branch of Hezbollah."[283]

---

[280] *Fritz*, 320 F. Supp. 3d at 62.

[281] The Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Kataib Hezbollah were both the fruits of Iran's and Hezbollah's strategy of standing up and supporting Jaysh al-Mahdi in Iraq. For that reason, all of allegations concerning Jaysh al-Mahdi also apply to Asaib Ahl al-Haq and Kataib Hezbollah.

[282] *Id.*

[283] Michael J. Totten, *Balance of Terror*, Michael J. Totten's Middle East J. (Aug. 14, 2007).

720.    Sadr was a natural fit to lead Hezbollah's campaign of terror in Iraq.  In addition to being the descendant of two revered Shi'a martyrs (Sadiq al-Sadr and Baqir al-Sadr) and sharing Hezbollah's affinity for violence, Sadr himself had a close relationship with Hezbollah and Iran.  Hassan Nasrallah, Hezbollah's Secretary-General, had studied under Muqtada al-Sadr's uncle, Baqir al-Sadr.  Muqtada's cousin, Musa al-Sadr, founded Hezbollah's predecessor in Lebanon.  A 2004 U.S. military-intelligence report concluded that Sadr had a direct relationship with Hassan Nasrallah, the head of Hezbollah, and that a top adviser to Nasrallah had personally delivered funds to Sadr in Najaf.  Sadr himself visited Tehran and Beirut on numerous occasions.  And, in 2016, Nasrallah personally brokered talks between Sadr and the Iraqi government.

721.    Immediately after Jaysh al-Mahdi's founding in April 2003, Mugniyeh began to recruit and train soldiers for Jaysh al-Mahdi.  Mugniyeh soon recruited 300 terrorists for Jaysh al-Mahdi from Shi'a communities in Kuwait and Saudi Arabia, then sent those terrorists to Lebanon for training in the use of assault rifles, booby traps, and kidnapping.  These 300 fighters were some of Jaysh al-Mahdi's first members.  That same month, according to the *Asia Times*, Hezbollah "opened two offices in the Iraqi cities of Basra and Safwan" in order to "build[] up [its] organizational and military apparatuses in Iraq."[284]  By August 2003, Hezbollah had established permanent teams of 30 to 40 operatives in Najaf to recruit and train Jaysh al-Mahdi terrorists.  At the same time, these Hezbollah operatives were acquiring rocket-propelled grenades, anti-tank missiles, and other weapons for Jaysh al-Mahdi.

722.    Hezbollah's involvement in Jaysh al-Mahdi's campaign of terror only grew during the subsequent months and years.  By January 2004, nearly 800 Hezbollah agents had

---

[284] Olivier Guitta, *Nasrallah's Other Fight*, Asia Times (July 29, 2006).

been sent to Iraq where they were deployed to direct Jaysh al-Mahdi's terrorist campaign from key Jaysh al-Mahdi strongholds in Iraq, including, but not limited to, Sadr City, Najaf, Safwan, and Basra.  Eighteen of these Hezbollah operatives were detained on charges of terrorism in February 2005.  An October 2006 U.S. intelligence summary (as published online) noted that "300 Hezbollah terrorists from Lebanon have joined with [the] Mahdi Militia in Najaf" after traveling to Iraq on tourist visas.[285]  Mugniyeh continued to personally supervise Jaysh al-Mahdi's campaign of terror until his death in February 2008, at which point he was replaced by other Hezbollah operatives.  At the time Mugniyeh was killed in 2008, the U.S. government continued to view him as an ongoing threat to Americans in Iraq.

723.    In addition to its terrorist mastermind Imad Mugniyeh, Hezbollah deployed a litany of its senior terrorist planners to direct Jaysh al-Mahdi's campaign of terror against Americans in Iraq, including, but not limited to, the following Hezbollah terrorists:

- **Ali Mussa Daqduq (Senior Hezbollah Field Commander).**  Hezbollah directed its senior field commander, Ali Mussa Daqduq, to work with the Qods Force to instruct Jaysh al-Mahdi on the use of EFPs, mortars, rockets, and other terrorist tactics, including kidnapping operations.

- **Muhammad Kawtharani (Nasrallah's Personal Liaison to Sadr).**  Hezbollah also deployed a senior cleric, Muhammad Kawtharani, to serve as a liaison to Jaysh al-Mahdi. In 2013, the U.S. Treasury Department identified Kawtharani as a member of "Hizballah's leadership" who "act[ed] for, or on behalf of Hizballah," and was "responsible for terrorist operations" in Iraq "[a]s the individual in charge of Hizballah's Iraq activities."[286] Kawtharani, as personal adviser to Nasrallah, was directly involved in coordinating attacks against Americans in Baghdad.

- **Yusuf Hashem (Iraq Operations – Country-wide).**  Hezbollah also tasked another senior Hezbollah terrorist commander, Yusuf Hashem, to coordinate Hezbollah's Jaysh al-Mahdi operations in Iraq.

---

[285] U.S. Dep't of Defense, *US Iraq Intelligence Summary – Iran – Mahdi Militia – Hezbollah – Harbala* (Oct. 10, 2006).

[286] U.S. Dep't of Treasury, *Treasury Sanctions Hizballah Leadership* (Aug. 22, 2013).

- **Ali Falih Hadi (Iraq Operations – Basra and Amarah).** According to a Coalition threat report (as published online), Ali Falih Hadi was a member of Hezbollah who was based in Amarah in Basra Province and was "responsible for supplying" weapons to members of a joint Jaysh al-Mahdi/Hezbollah cell operating in Basra.

- **Hezbollah Bombmakers.** On information and belief, Hezbollah deployed one or more experienced bombmakers into Iraq to provide in-country direction to Jaysh al-Mahdi terrorists relating to the design, manufacture, storage, and maintenance of EFPs and IEDs for use against Americans in Iraq.

724. At Hezbollah's direction, Jaysh al-Mahdi escalated its attacks on Americans in Iraq beginning in the winter of 2005. This escalation was the result of Hezbollah's own "strategic decision" to ratchet up pressure on the United States by boosting Hezbollah's "support [for] Sadr" and fostering "managed instability" in Iraq.[287] According to the *New York Times*, a senior American intelligence official assessed that, as part of this "strategic decision" to escalate the terrorist campaign against Americans in Iraq, IRGC, including its Hezbollah Division and Qods Force, served as "a link to Lebanese Hezbollah" and "helped facilitate Hezbollah training inside of Iraq, but more importantly Jaish al-Mahdi members going to Lebanon" for training.[288]

725. Jaysh al-Mahdi and Sadr publicly embraced their links to Hezbollah. During his Friday sermon on March 26, 2004 – in which he praised the attacks of September 11th and called for violence against Americans in Iraq – Sadr swore fealty to Hezbollah in Shi'a Islamist terms, pledging support to "our victorious party, Hezbollah." Weeks later, in a sermon in April 2004, Sadr declared that he was Hezbollah's "striking arm in Iraq," proclaiming: "I will support the real Islamic unity that has been created by Hassan Nasrallah, the secretary-general of the victorious Hezbollah."[289] In an August 2007 interview, Sadr again reportedly acknowledged that

---

[287] Michel R. Gordon & Dexter Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, N.Y. Times (Nov. 28, 2006).

[288] *Id.*

[289] The Buffalo News, *Iraqi Cleric Calls for Alliance with Hezbollah, Hamas* (Apr. 2, 2004).

Jaysh al-Mahdi "ha[s] formal links with Hizbollah" and "cop[ies] Hizbollah in the way they fight and their tactics."[290]  Another Jaysh al-Mahdi member told an interviewer that "[w]e learned [from Hezbollah] how to take advantage of an armored vehicle's weakness" – referring to the use of EFPs – "and how to wait and kill the soldiers who try to escape."[291]

726.    In the years after 2003, Jaysh al-Mahdi fighters regularly participated in anti-American marches in which they marched under Hezbollah flags and banners.  Tens of thousands of members of Jaysh al-Mahdi publicly swore fealty to Hezbollah in various marches in Sadr City in 2006, including on July 21, 2006, and August 4, 2006.

727.    On August 4, 2006, more than 10,000 members of Jaysh al-Mahdi attended a joint Jaysh al-Mahdi/Hezbollah march in Sadr City, which further demonstrated Hezbollah's control over Jaysh al-Mahdi operations.  As recounted in a field report in *Al Jazeera*, demonstrators wore "white shrouds symboli[z]ing [their] willingness to die for Hezbollah, waved the Lebanese guerrillas' yellow banner and chanted slogans in support of their leader, Sheik Hassan Nasrallah."[292]  The crowd of Jaysh al-Mahdi fighters further declared "Mahdi Army and Hezbollah are one," and chanted "Allah, Allah, give victory to Hassan Nasrallah."[293]  The close, symbiotic connection between Jaysh al-Mahdi and Hezbollah was summed up by Jaysh al-Mahdi members' repeated declaration at the rally:  "we are Hezbollah."

728.    In 2009, the U.S. Treasury Department formally recognized the links between Hezbollah and Jaysh al-Mahdi when it designated Jaysh al-Mahdi Special Groups Commander,

---

[290] Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, Independent (Aug. 20, 2007).

[291] *Id.*

[292] Al-Jazeera, *Iraq's Shia March for Hezbollah* (Aug. 4, 2006).

[293] *Id.*

Abu Mahdi al-Muhandis as a SDGT.  The press release noted that, "[a]s of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces."[294] According to the press release, these Jaysh al-Mahdi cells "received training in guerilla warfare, handling bombs and explosives, and employing weapons [such as] missiles, mortars, and sniper rifles" from Hezbollah instructors.[295]

729.    The U.S. Treasury Department again recognized the links between Hezbollah and Jaysh al-Mahdi in 2012, finding that "Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks."[296]  According to the Treasury's findings, in 2005, "Iran asked Hizballah to form a group to train Iraqis to fight Coalition Forces in Iraq.  In response, Hassan Nasrallah established a covert Hizballah unit to train and advise Iraqi militants in Jaysh al-Mahdi (JAM) and JAM Special Groups."[297]  As of 2006, that unit was working with the Iranian Qods Force "to provide training and equipment to JAM Special Groups to augment their ability to inflict damage against U.S. troops."[298]

730.    The IRGC, including its Hezbollah Division and Qods Force, used Hezbollah to provide material support to Asaib Ahl al-Haq, which was one of the most dangerous of Jaysh al-Mahdi's so-called "Special Groups."  As such, AAH was a terrorist proxy of the IRGC's lead terrorist agent, Hezbollah.  Given Asaib Ahl al-Haq's status as a Jaysh al-Mahdi Special Group,

---

[294] U.S. Dep't of Treasury, *Treasury Designates Individual, Entity Posing Threat to Stability in Iraq* (July 2, 2009).

[295] *Id*.

[296] U.S. Dep't of Treasury, *Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq* (Nov. 19, 2012).

[297] *Id*.

[298] *Id*.

the IRGC, including its Hezbollah Division and Qods Force, through its agent, Hezbollah, caused the provision of the same types of support to Asaib Ahl al-Haq as Hezbollah provided to Jaysh al-Mahdi and Ka'taib Hezbollah.

731.    Federal courts have previously concluded that the IRGC, including its Hezbollah Division and Qods Force, provided material support to Jaysh al-Mahdi Special Group, Asaib Ahl al-Haq through Hezbollah that proximately caused terrorist attacks against Americans in Iraq. For example, in *Fritz*, the Honorable Randolph D. Moss ruled that, "Based on the testimony of these witnesses, and almost one hundred trial exhibits, the Court finds as follows: … Iran provided AAH with significant support—in the form of training, supplies, intelligence, and funding—as part of its larger strategy to destabilize Iraq and drive the United States from the Middle East using Iraqi Shia militias as proxies. … [and] AAH could not have committed any of these acts without Iran's support."[299]  Indeed, Judge Moss found that "Iran played a central role in Qais Khazali's ascent and AAH's formation."[300]

732.    The IRGC, including its Hezbollah Division and Qods Force, also used Hezbollah to provide material support to Jaysh al-Mahdi Special Group Ka'taib Hezbollah.  As such Ka'taib Hezbollah was Hezbollah's terrorist proxy in Iraq.

   **B.    Acting Through Hezbollah, The Islamic Revolutionary Guard Corps, Including The Qods Force, Provided Jaysh Al-Mahdi With The Weapons Used To Attack Americans In Iraq**

733.    The IRGC, including its Hezbollah Division and Qods Force, relied upon Hezbollah to provide Jaysh al-Mahdi the weapons it used to attack Americans in Iraq, including, but not limited to, IEDs, EFPs, advanced rockets (including IRAMs), and rocket-propelled

---

[299] *Fritz*, 320 F. Supp. 3d at 58.

[300] *Id.* at 62.

grenades, and explosives, which were uniquely suited for terrorist attacks on U.S. peacekeeping and allied forces and civilian convoys in Iraq.

734.    As Judge Moss found in *Fritz*, the "[t]he Special Groups were … armed[] and directed by Iran's Q[u]ds Force, with help from Lebanese Hezbollah" and "[t]he U.S. Department of Defense estimated that, in addition to training, the Quds Force supplied the Special Groups with arms and funding valued at between $750,000 and $3 million a month."[301]

735.    The IRGC, including its Hezbollah Division and Qods Force, through their lead terrorist agent, Hezbollah, provided the Joint Cells with weapons to use against Americans in Iraq.

736.    Hezbollah supplied many of the weapons that Jaysh al-Mahdi used to commit acts of terror against Americans in Iraq – though Jaysh al-Mahdi still required money and resources to acquire those weapons and transport them to the appropriate cells in Iraq.  A Jaysh al-Mahdi commander told journalists in June 2007 that "[a]ll of the Mahdi Army's weapons except for the AK-47 rifles come from Iran."[302]

737.    Hezbollah facilitated the flow of these weapons from Iran into Iraq by working with Jaysh al-Mahdi to set up cross-border smuggling networks.  The *Long War Journal* reported in June 2007 that rockets that Jaysh al-Mahdi fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[303]  Later that year, on August 12, 2008, Coalition forces arrested nine Hezbollah members who had been funneling weapons into Iraq.  Hezbollah's involvement in

---

[301] *Fritz*, 320 F. Supp. 3d at 63.

[302] Leila Fadel, *Chilling Stories from the Mahdi Army*, McClatchy DC (June 22, 2007).

[303] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

these smuggling operations accorded with its longstanding role as Iran's weapons smuggler (including its attempt in 2003 to smuggle 50 tons of weapons from Iran to the Palestinian Authority, the largest Iranian-linked smuggling operation ever uncovered).

738.     Hezbollah also used funds provided by the IRGC, including its Hezbollah Division and Qods Force, to purchase weapons for Jaysh al-Mahdi outright.  For example, according to a U.S. military-intelligence document, "Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other weapons for Sadr's militia."

739.     Weapons supplied to Jaysh al-Mahdi by Hezbollah include the same types of weapons on which Hezbollah trained Jaysh al-Mahdi:  small arms, IEDs, EFPs, rockets, mortars, and RPGs.  These weapons were first smuggled into the Jaysh al-Mahdi command-and-control safe haven of Sadr City and then distributed to Jaysh al-Mahdi cells in outlying provinces.  For attacks carried out with those weapons, Hezbollah not only trained Jaysh al-Mahdi how to use them; it supplied the weapons themselves.

740.     These trends accelerated "[a]fter Lebanese Hizb Allah's successful 'summer war' against Israel in July 2006," when Hezbollah and the IRGC, including its Hezbollah Division and Qods Force, "sought to replicate this victory in Iraq, opening the floodgates to provide advanced [EFP] munitions and other weapons to" Jaysh al-Mahdi terrorists in Iraq.[304]  As one analyst explained in 2010:

> Iran's support to Special Groups appears to be largely focused on anti-U.S. resistance operations … The most visible symbol of Iran's support is the 20-30 rocket attacks launched against U.S. bases each month in Iraq, almost all of which involve entire rocket/mortar systems or components (such as fuel packs) identified as Iranian-produced by U.S. weapons intelligence specialists. The IRGC has been supporting such attacks since the early 1980s … Iran []

---

[304] Knights, *The Evolution of Iran's Special Groups in Iraq*.

smuggle[d] large numbers of 107mm Hesab and 122mm Grad rockets into Iraq, as well as some larger 240mm Fajr rockets.[305]

741.     U.S. and allied forces have seized large caches of Iran-made weapons and explosives in Iraq, many of which bore markings of Iranian origin, and all of which, on information and belief, were smuggled into Iraq by Hezbollah.  Coalition forces regularly recovered weapons caches from Iranian proxies that were replete with newly manufactured weapons often stamped "Made in Iran."  Examples include a massive seizure of a Joint Cell terrorist weapons cache near Basra in 2010, which seized "76 rockets, 15 tons of TNT and significant amounts of bomb-making material," and "41 magnets for making under-vehicle IEDs and silenced weapons."[306]  Indeed, "[t]he Iranian government does not appear to be unduly concerned about plausible deniability, deploying new Iranian-produced 'signature' weapons across Iraq. The U.S. government has released many photographic slideshows of newly-produced weapons systems in Iraq that are known to be manufactured by Iran."[307]

### C.     Acting Through Hezbollah, The Islamic Revolutionary Guard Corps, Including The Qods Force, Provided Jaysh Al-Mahdi With Key Training And Logistical Support To Attack Americans In Iraq

742.     The IRGC's, including the Qods Force's, funding for Hezbollah and support for the Hezbollah-led training and logistical effort relating to Jaysh al-Mahdi had cross-cutting effects.  As the State Department explained in 2009, "[t]he Qods Force, in concert with Lebanese Hizballah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry."[308]

---

[305] *Id.*

[306] *Id.*

[307] *Id.*

[308] U.S. State Dep't, *Country Reports on Terrorism 2008* at 182-83 (Apr. 2009).

743.    Hezbollah trained Jaysh al-Mahdi, including its Special Groups Asaib Ahl al-Haq and Ka'taib Hezbollah, in the use of weapons and tactics that were specifically designed to target Americans in Iraq.

744.    Jaysh al-Mahdi successfully used Hezbollah training to perpetrate terrorist attacks against Americans in Iraq.

745.    This training began at Jaysh al-Mahdi's inception in April 2003, when Imad Mugniyeh recruited and trained some of Jaysh al-Mahdi's first 300 fighters in Lebanon.  It continued through at least 2008, when Hezbollah held training camps for Jaysh al-Mahdi fighters in Iran (in conjunction with Iran's Qods Force), Lebanon, and Iraq.  According to a captured Jaysh al-Mahdi operative, paraphrased in an unclassified (as redacted) U.S. military-intelligence report, "[w]ithout a doubt, all training received in Iran" – at Hezbollah-run camps – "is intended for use against [Coalition forces]."[309]

746.    From 2003 through the present, Jaysh al-Mahdi recruits have traveled to Hezbollah training camps in Lebanon and Iran through meticulously planned routes.  Because of the logistical challenges associated with bringing Jaysh al-Mahdi militants into Iran and Lebanon, Hezbollah occasionally trained members of Jaysh al-Mahdi to become "master trainers," who learned terrorist tactics from Hezbollah in Iran or Lebanon and then passed that knowledge on to other Jaysh al-Mahdi members in Iraq.[310]  U.S. officials have referred to this

---

[309] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 002, at 2 (Spring 2007-Early 2008).

[310] Michael R. Gordon, *Hezbollah Trains Iraqis in Iran, Officials Say*, N.Y. Times (May 5, 2008).

practice as "training the trainer."[311]  Hezbollah also trained members of Jaysh al-Mahdi inside of Iraq, including, but not limited to, in Sadr City, Najaf, Basra, and Safwan.

747.    Hezbollah's training was rigorous.  According to unclassified (as redacted) U.S. military-intelligence reports, Hezbollah's training camps lasted anywhere from three weeks to several months.[312]  Trainees were awakened at 5:30 a.m. every day to pray and exercise.  Classes started at 8:00 a.m. and continued until dusk.  Each class lasted roughly 50 minutes, with 10-minute breaks in between classes.  Some classes were held in actual classrooms with whiteboards and projectors; others were held at firing ranges and other outdoor locations.  The training included programs in a myriad of skills, including "[w]eapons, bomb-making, intelligence, assassinations, the [gamut] of skill sets," according to a U.S. intelligence official quoted in the *New York Times* in November 2006.[313]  The topics covered in these training programs included the following:

748.    **EFPs.**  In 2004, Hezbollah "introduced [to Iraq] a new breed of roadside bomb more lethal than any seen before" – the EFP.[314]  Hezbollah trained members of Jaysh al-Mahdi in the deployment of EFPs, which were expressly designed to penetrate the American armor. Hezbollah was essential to those EFP training efforts because Hezbollah fighters had direct experience using EFPs against Israeli armor in Lebanon.  Indeed, at that point, Hezbollah was the world's foremost expert on EFPs.  Hezbollah also imparted to Jaysh al-Mahdi the complex expertise required to manufacture and use EFPs, and drawing on its experience in Lebanon,

---

[311] *Id.*

[312] *See* Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 005, at 2-3 (Spring 2007-Early 2008).

[313] Michel R. Gordon & Dexter Filkins, *Some Mahdi Army Fighters Trained with Hezbollah*, N.Y. Times (Nov. 28, 2006).

[314] Michael Ware, *Inside Iran's Secret War for Iraq*, Time (Aug. 22, 2005).

Hezbollah instructed Jaysh al-Mahdi to use EFPs against American soldiers.  The *New York Times* reported in 2013 that "Iran passed E.F.P. technology to the Lebanese militia Hezbollah, which in turn passed E.F.P. kits to proxy groups fighting in Iraq."[315]  On information and belief, the EFP factory that Iraqi forces discovered in Jaysh al-Mahdi's Sadr City stronghold in October 2008, was built using the EFP technology that Hezbollah had provided to Jaysh al-Mahdi with funding provided by the IRGC, including its Hezbollah Division and Qods Force.  As a declassified British intelligence report concluded, EFPs used in Iraq were "exclusively associated with Hizballah."[316]

749.    Hezbollah planned the Joint Cells' EFP attacks (as with the other attacks outlined in this Complaint) in Iraq through the extensive training and coordination set forth above. Hezbollah's planning of the Joint Cells' EFP attacks against Americans included:  (1) targeting specific geographies in Iraq, such as Baghdad and Basra, where Jaysh al-Mahdi and the Joint Cells were permitted to launch EFP attacks; (2) instructing Jaysh al-Mahdi and the Joint Cells to use EFPs against American armored vehicles in the first instance; (3) providing technical assistance to Jaysh al-Mahdi and the Joint Cells with respect to EFP design schematics and concepts; (4) helping manufacture EFPs for use against Americans in Iraq; (5) training senior Jaysh al-Mahdi terrorist commanders in Lebanon, Baghdad, and Iran with respect to all aspects of the EFP network, from design, to manufacture, to transportation, to attack strategy; (6) training lower-level Jaysh al-Mahdi members in camps in Lebanon, Iraq, and Iran with respect to EFP tactics; (7) preparing and distributing sophisticated, high production value, Arabic-language CD-ROMs and instructional videos concerning EFPs; and (8) forward deploying senior

---

[315] John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013).

[316] Minute, Deputy Chief of Assessments Staff to Sir Nigel Sheinwald, Iraq: Lebanese Training including manuscript comment Blair (May 3, 2007).

Hezbollah terrorists, including but not limited to Daqduq, to coordinate EFP attacks against Americans with Jaysh al-Mahdi and the other members of the Joint Cells.

750.    **Rockets.**  Hezbollah trained members of Jaysh al-Mahdi in the use of rocket launchers and anti-aircraft missiles.  In particular, Hezbollah directed Jaysh al-Mahdi members to launch indirect-fire rocket attacks on the Green Zone from Sadr City, and it instructed them on how to do so.  Hezbollah's direction to fire rockets on the Green Zone specifically included the indirect-fire attacks in early 2008 that precipitated the Battle of Sadr City.  During these attacks in 2008, Jaysh al-Mahdi rocket teams showed an ability to hit specific targets several miles away, demonstrating the effectiveness of Hezbollah's instruction.  By that point, Hezbollah had become renowned for its use of rockets during the 2006 Israel-Hezbollah war, when it fired rockets at civilian targets in northern Israel.  Indeed, the *Long War Journal* reported that the rockets Jaysh al-Mahdi fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[317]

751.    **Kidnappings**.  Hezbollah is well-known for its kidnapping operations.  In 2006, for example, Hezbollah agents conducted cross-border raids into Israel and abducted a number of Israeli soldiers.  Hezbollah also trained Jaysh al-Mahdi operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the *New York Times*).[318]  Jaysh al-Mahdi put this training to use during the 2007 raid on the Provincial Joint Coordination Center in Karbala, where Jaysh al-Mahdi terrorists kidnapped four U.S. soldiers and killed another.  And a 2011 letter from five U.S. Senators documented that

---

[317] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

[318] *Id*.

Hezbollah operative Daqduq instructed "Iraqi extremists" who were part of Jaysh al-Mahdi on "how to conduct intelligence and kidnapping operations."

752.    As Judge Moss found in *Fritz*, IRGC, including its Hezbollah Division and Qods Force, through Hezbollah, "played a significant role in the success of AAH and other Special Groups. Without that Iranian-backed training, the Special Groups would have been 'nowhere' near as effective as they were."[319]

753.    The extent of Hezbollah's involvement in Jaysh al-Mahdi's attacks was demonstrated by evidence gathered in connection with Daqduq's capture in 2007, which included a document described by five U.S. Senators as a 22-page "planning guide" memorializing Hezbollah's wide-ranging involvement in the terrorist attacks detailed above. This "planning guide" included specific instructions describing how to plant IEDs and carry out abductions of Americans.  Hezbollah's instruction as reflected in this "planning guide" enabled Jaysh al-Mahdi to execute an array of sophisticated attacks against Americans that it otherwise would have been unable to carry out.

### D.    Acting Through Hezbollah, The Islamic Revolutionary Guard Corps, Including The Qods Force, Routed Funds To Jaysh Al-Mahdi To Finance Attacks Against Americans In Iraq

754.    Acting through Hezbollah, the IRGC, including its Hezbollah Division and Qods Force, also provided substantial financial support to Jaysh al-Mahdi, including its Special Groups Asaib Ahl al-Haq and Ka'taib Hezbollah.

755.    Acting through Hezbollah, the IRGC, including its Hezbollah Division and Qods Force, regularly provided large cash payments to Jaysh al-Mahdi, channeled via Hezbollah, in the latter's role as the connector between Jaysh al-Mahdi and the IRGC, including its Hezbollah

---

[319] *Fritz*, 320 F. Supp. 3d at 64.

Division and Qods Force.  Jaysh al-Mahdi Special Groups were supported by the Qods Force, through Hezbollah, with arms and funding valued at between $750,000 and $3 million a month.[320]  "In the words of Dr. Levitt, although far less than the funding Iran provided to Hezbollah, the funds provided to AAH were devoted 'to carry[ing] out operations,' and 'three-quarter[s] of a million dollars to $3,000,000 a month ... can buy a lot of damage.'"[321]

756.    Acting through Hezbollah, the IRGC, including its Hezbollah Division and Qods Force, also paid the Joint Cells to kill U.S. forces.  As one scholar examining Iranian support for Hezbollah and Jaysh al-Mahdi found in 2010, "[m]oney continues to be provided in significant volumes, allowing cells to be paid between $4,000 and $13,000 per rocket or roadside bomb attack, depending on the circumstances."[322]

757.    Acting through Hezbollah, the IRGC, including its Hezbollah Division and Qods Force, also provided funding to individual Jaysh al-Mahdi commanders, including for Asaib Ahl al-Haq and Ka'taib Hezbollah.  For example, through Hezbollah, the IRGC, including its Hezbollah Division and Qods Force, paid millions each to Muqtada al-Sadr, Qais and Laith Khazali, and Abu Mahdi al-Muhandis.

758.

759.

760.    Although there are religious differences between the Shiite Iranian regime and the Sunni Taliban organization, those differences have not deterred the IRGC from supporting the Taliban's terrorist activities.  Iran and the Taliban share a core geopolitical aim:  to inflict mass

---

[320] *Id*. at 63.

[321] *Id*.

[322] Knights, *The Evolution of Iran's Special Groups in Iraq*.

casualties on Americans in the region.  As two military-intelligence scholars observed, "the Iranian regime is ideologically and religiously opposed to the Taliban, [but] it nevertheless views the group as a useful counterweight to the United States."[323]  Similarly, as a Taliban commander stated in 2010 of Iran, "Our religions and our histories are different, but our target is the same – we both want to kill Americans."[324]  Sectarian distinctions aside, the IRGC has supported and funded attacks by the Taliban on U.S. and allied forces in Afghanistan to harm the United States.

761.    The Fourth Corps of the Qods Force, one of its four regional commands, implements Iran's foreign policy in Afghanistan.[325]  During the relevant timeframe, the Qods Force did so largely by providing the Taliban (including the Haqqani Network) with material support for terrorist attacks in Afghanistan.  The Fourth Corps' al-Ansar Command Center is based in Iran's second-largest city, Mashhad, near the border with Afghanistan.[326]  Mashhad naturally serves as a stopping point between Afghanistan and Tehran, Iran's capital.[327]

762.    Following the 9/11 attacks on the United States, the IRGC met with senior Taliban officials to offer military aid to support the Taliban's fight against U.S.-led Coalition forces.  The IRGC planned that meeting and hosted it on the Iranian side of the Afghanistan border.  As part of this initial offer of support, the IRGC pledged to sell advanced military equipment to the Taliban for use against U.S. and allied forces, boasted of the IRGC's ability to track U.S. troop movements, and promised to allow terrorists entering Afghanistan to travel

---

[323] *Iran's Balancing Act* at 5.

[324] Bill Roggio, *Taliban Commander Linked To Al Qaeda, Iran, Killed In US Strike In Western Afghanistan*, Long War J. (July 16, 2010).

[325] *JIEDDO Report* at 5.

[326] Joseph Felter & Brian Fishman, *Iranian Strategy in Iraq, Politics and "Other Means"* at 18, Combating Terrorism Center (Oct. 13, 2008).

[327] *JIEDDO Report* at 5.

through Iranian territory.  The IRGC also provided safe harbor to Taliban leaders who escaped U.S. forces.

763.    Immediately following the U.S. invasion of Afghanistan, the IRGC made a pretense of professing support for the U.S. and NATO mission, but in reality was already seeking to undermine it.  In February 2002, then-CIA Director George J. Tenet testified before Congress that "initial signs of Tehran's cooperation and common cause with us in Afghanistan are being eclipsed by Iranian efforts to undermine US influence there.  While Iran's officials express a shared interest in a stable government in Afghanistan, its security forces appear bent on countering the US presence."[328]  As one scholar explained, Iran "feared the US might use Afghanistan as a base from which to launch a kinetic attack on Iran.  The Taliban insurgency thus became viewed by Tehran as a tool with which to keep American forces preoccupied."[329]

764.    The U.S. government documented the IRGC's escalating support for the Taliban terrorists over the course of the United States' involvement in Afghanistan.  In April 2007, General Peter Pace, Chairman of the U.S. Joint Chiefs of Staff, stated that Iranian explosives had been captured in Kandahar Province en route to the Taliban but acknowledged that it was not yet entirely clear who within Iran was responsible.[330]  The next day, U.S. Assistant Secretary of State Richard Boucher described "a series of indicators that Iran is maybe getting more involved in an unhealthy way in Afghanistan."[331]

---

[328] *DCI Testimony:  Converging Dangers in a Post 9/11 World*, Central Intelligence Agency (Feb. 6, 2002).

[329] Farhad Rezaei, *Iran and the Taliban:  A Tactical Alliance?*, The Begin-Sadat Center for Strategic Studies (Jan. 15, 2019) ("*Iran and the Taliban:  A Tactical Alliance?*").

[330] Breffni O'Rourke, *Afghanistan:  U.S. Says Iranian-Made Weapons Found*, RadioFreeEurope (Apr. 18, 2007).

[331] *Id.*

765.    Those indicators rapidly grew in intensity, and soon there was little doubt that the IRGC was actively sponsoring the Taliban terrorists as a core part of its foreign policy.  A purported May 2007 U.S. State Department cable (as published online), for example, reported that Afghan President Hamid Karzai had expressed concerns "over Iranian agents engaging Taliban and supplying them with weapons."  A purported July 2007 U.S. State Department cable (as published online) similarly reported that Taliban terrorists had received "light weapons and grenade launchers [that] bore the stamps of the Iranian factories where they were manufactured, primarily in 2006 and 2007."  The same cable explained that the fighters claimed they had received training in Iran and had been promised access to antiaircraft rockets by Iranian officials.  A purported military-intelligence summary the next month (as published online), reported on an "'alarmingly rapid increase' in Iranian presence in Afghanistan."

766.    When the U.S. Treasury Department designated the Qods Force as a SDGT later in 2007, it confirmed that the "Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan."[332]  As the designation explained:

> The Qods Force is the Iranian regime's primary instrument for providing lethal support to the Taliban.  The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan.  Since at least 2006, Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable defense systems to the Taliban. . . .  Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.[333]

767.    Similar observations continued in 2008.  According to the U.S. State Department's 2008 Country Reports on Terrorism:  "The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating

---

[332] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

[333] *Id.*

and supporting terrorists abroad.  The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hizballah, Iraq-based militants, and Taliban fighters in Afghanistan."[334]

768.     The U.S. government's JIEDDO recognized in a 2009 report that "Iran's intentions are the same in both Iraq and Afghanistan:  to develop, fund and arm proxy networks to leverage against the perceived U.S. aim of pursuing an active regime change doctrine in Iran."[335]  Similarly, a purported January 2010 cable (as published online) explained that senior officials from the United Arab Emirates' State Security Department had accused the IRGC of supporting the Taliban by providing money and weapons, smuggling drugs, and facilitating the movement of Taliban leaders and fighters.

769.     According to another purported February 2010 cable (as published by online), President Karzai's Chief of Staff and former Ambassador to Iran, Omar Daudzai, reported that Iranian officials were no longer denying the IRGC's support for the Taliban in Afghanistan, instead remaining silent in the face of the assertion by the Government of Afghanistan.

770.     By April 2010, the U.S. Department of Defense reported that The IRGC was "covertly" supporting the Taliban.  "Arms caches have been recently uncovered with large amounts of Iranian manufactured weapons, to include l07mm rockets, which we assess IRGC-QF delivered to Afghan militants." [336]  It further explained that "Tehran's support to the Taliban

---

[334] U.S. State Dep't, *Country Reports on Terrorism 2008* at 182-83 (Apr. 2009).

[335] *JIEDDO Report* at 5.

[336] Unclassified Report on Military Power of Iran (Apr. 2010), https://fas.org/man/eprint/dod_iran_2010.pdf.

is inconsistent with their historic enmity, but fits with the IRGC's strategy of backing many groups to ensure that it will have a positive relationship with the eventual leaders."[337]

771.    On August 3, 2010, the U.S. Treasury Department – pursuant to Executive Order 13224 – designated General Hossein Musavi and Colonel Hasan Mortezavi, senior officials in the Qods Force, as SDGTs for their roles in supporting the Taliban.[338]  General Musavi was the leader of the Ansar Corps, also known as the Fourth Corps, the branch of the Qods Force responsible for carrying out activities within Afghanistan.[339]  The U.S. Treasury Department found that both General Musavi and Colonel Mortezavi, acting in their capacity as senior Qods Force officers, had provided "financial and material support to the Taliban."[340]  The U.S. Treasury Department further concluded that "the IRGC-QF provides select members of the Taliban with weapons, funding, logistics and training."[341]

772.    General David Petraeus, then the Commander of the ISAF, testified before the Senate Armed Services Committee in March 2011 that the IRGC "without question" supplied weapons, training, and funding to the Taliban in order to "make life difficult" for U.S. and NATO forces in Afghanistan.[342]

---

[337] *Id.*

[338] Press Release, U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010).

[339] *Id.*

[340] *Id.*

[341] *Id.*

[342] *The Situation in Afghanistan: Hr'g Before the S. Comm. On Armed Services,* 112 Cong. 40 (Mar. 15, 2011) (statement of General David Petraeus), https://www.govinfo.gov/content/pkg/CHRG-112shrg72295/pdf/CHRG-112shrg72295.pdf.

773.    When the U.S. Department of Defense provided Congress with its Annual Report on Military Power of Iran in April 2012, it explained that, even though Iranian "support to the Taliban is inconsistent with their historic enmity, it complements Iran's strategy of backing many groups to maximize its influence while also undermining U.S. and [NATO] objectives by fomenting violence."[343]  By means of "the IRGC-QF, Iran provides material support to terrorist or militant groups such as . . . the Taliban."[344]  The U.S. Department of Defense characterized the support as part of a "grand strategy" to "challeng[e] U.S. influence."[345]

774.    In its 2012 Report on Progress Toward Security and Stability in Afghanistan, the U.S. Department of Defense reported to Congress that the IRGC was engaging in "covert activities" in Afghanistan, including the provision of weapons and training to the Taliban.[346]  As the report explained, "Since 2007, Coalition and Afghan forces have interdicted several shipments of Iranian weapons.  Tehran's relationship with the insurgency, although not ideologically based, is consistent with Iran's short- to mid-term goal of undermining Coalition efforts and opposing the international military presence in Afghanistan."[347]

775.    Less than two years later, the U.S. Treasury Department concluded that the Qods Force "utilized now-detained Afghan associate, Sayyed Kamal Musavi, who was designated today, to plan and execute attacks in Afghanistan."  It further confirmed that "[t]wo IRGC-QF officers also designated today, Alireza Hemmati and Akbar Seyed Alhosseini, provided logistical

---

[343] *Annual Report on Military Power of Iran* 2 (Apr. 2012).

[344] *Id*. at 3.

[345] *Id.* at 1.

[346] U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* at 148 (Dec. 2012).

[347] *Id.*

support to this associate."[348]  Similarly, according to a Taliban commander in central

Afghanistan in 2015:  "Iran supplies us with whatever we need."[349]

776.    In 2016, Taliban leader Mullah Mansour was killed by an American drone strike

while returning to Afghanistan from Tehran, where he had been meeting with Iranian security

officials, and possibly directly with Ayatollah Ali Khameni, to discuss tactical coordination of

Taliban terrorist activities in Afghanistan.  He had made at least two visits to Iran since 2013.

777.    The IRGC's support for terrorist groups in Afghanistan has continued.  The U.S.

State Department stated in 2017 that "Iran is responsible for intensifying multiple conflicts and

undermining the legitimate governments of, and U.S. interests in, Afghanistan . . . ."[350]  The U.S.

Department of Defense similarly confirmed that the IRGC "provides some support to the Taliban

and Haqqani Network."[351]  In May 2018, U.S. Secretary of State Michael Pompeo publicly

accused the IRGC of supporting the Taliban and other terrorist groups in Afghanistan.[352]

778.    In October 2018, the U.S. Treasury Department, pursuant to Executive Order

13224, designated additional Qods Force officials "for acting for or on behalf of IRGC-QF and

for assisting in, sponsoring, or providing financial, material, or technological support for, or

financial or other services to or in support of, the Taliban."[353]  The U.S. Treasury Department

---

[348] Press Release, U.S. Treasury Dep't, *Treasury Targets Networks Linked To Iran* (Feb. 6, 2014).

[349] Margherita Stancati, *Iran Backs Taliban With Cash And Arms*, Wall St. J. (June 11, 2015).

[350] *Country Reports on Terrorism 2017* at Foreword.

[351] U.S. Dep't of Def., *Enhancing Security and Stability in Afghanistan at 21* (June 2017).

[352] *Mike Pompeo speech:  What are the 12 demands given to Iran?*, Al Jazeera News (May 21, 2018).

[353] Press Release, U.S. Treasury Dep't, *Treasury and the Terrorist Financing Targeting Center Partners Sanction Taliban Facilitators and their Iranian Supporters* (Oct. 23, 2018).

acted along with the six other member nations of the Terrorist Financing Targeting Center – a multinational, cooperative effort to combat terrorism in the Middle East.[354]

779.    The Secretary of Iran's Supreme National Security Council, Ali Shamkhani, publicly acknowledged the IRGC's support for the Taliban in January 2019, claiming that it was designed to "curb the security problems in Afghanistan."[355]

780.    Most recently, the United States has recognized the IRGC's support of the Taliban in the aftermath of Qassem Soleimani's death.  In a press conference in the days after the killing of General Soleimani, Secretary of State Michael Pompeo publicly accused the IRGC of backing the Taliban and associated groups, including the Haqqani Network.

781.    The IRGC, in turn, signaled its continued focus on destabilizing U.S. forces in Afghanistan by appointing General Esmail Ghaani ("Ghaani" or "Qaani"), the former head of Iran's Qods Force branch in Afghanistan, to be the top commander of the Qods Force.  General Ghaani traveled to Afghanistan in 2018 as the deputy ambassador of Iran to Kabul and remains focused on cultivating the IRGC's relationship with the Taliban in Afghanistan.

782.    The Taliban's reaction to Soleimani's death similarly recognized the IRGC's support for its terrorist activities.  A Taliban statement condemned American forces for the attack on Soleimani and expressed regret for his "martyrdom."  Additional details were reported in Taliban-aligned publications about Soleimani's support for the Taliban, including his meeting with Taliban delegations in Iran, personally traveling to Afghanistan, and planning attacks.

---

[354] *Mike Pompeo speech:  What are the 12 demands given to Iran?*, Al Jazeera News (May 21, 2018); Press Release, U.S. Treasury Dep't, *U.S. and Saudi Arabia to Co-Chair New Terrorist Financing Targeting Center* (May 1, 2017).

[355] *Iran and the Taliban:  A Tactical Alliance?*

783.     Consistent with the policy described above, the IRGC provided material support or resources for the acts of international terrorism that killed or injured Plaintiffs or their family members.  As explained below, that support took the form of "currency . . .  lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, . . . and transportation."[356]

## IX.   HEZBOLLAH, THE QODS FORCE, AND JAYSH AL-MAHDI KILLED AND INJURED THE PLAINTIFFS WHO WERE ATTACKED IN IRAQ THROUGH TERRORIST ATTACKS THAT DEFENDANTS FUNDED, ARMED, AND LOGISTICALLY SUSTAINED

784.     Plaintiffs are American civilians, servicemembers, and contractors serving in Iraq, and their family members, who were killed or injured in terrorist attacks committed by joint cells comprised of Hezbollah (an FTO), Jaysh al-Mahdi (including Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Ka'taib Hezbollah), and the Qods Force (an SDGT at the time), as well as Jaysh al-Mahdi terrorists who committed attacks that were planned and authorized by Hezbollah.

785.     Hezbollah has a history of significantly escalating the violence during its ongoing terroristic campaigns to drive its own (and that of the IRGC's, including the Qods Force's) terroristic Anti-American and Anti-Israeli messaging in the Middle East.  For example, in 2006, during its terrorist attacks against Israel, Hezbollah executed a coordinated rocket offensive that Hezbollah, and the IRGC, including its Hezbollah Division and Qods Force, touted to show that Hezbollah and its Iranian paymasters could militarily challenge the Great Satan (the United States) and the Little Satan (Israel), both of whom the terrorists sought to attack.

---

[356] 18 U.S.C. § 2339A(b)(1).

786.    Following this practice, Hezbollah escalated its ongoing terrorist campaign in Iraq to support a messaging strategy on behalf of Hezbollah and its Iranian patrons, the IRGC, including its Hezbollah Division and Qods Force.  Hezbollah's decision in 2005 to aggressively expand the EFP and rocket campaigns throughout Iraq, as well as Hezbollah's repeated tactic of targeting the Green Zone in Baghdad, such as in 2008, are two examples of Hezbollah following this longstanding Hezbollah strategy in Iraq.

787.    Hezbollah provided each bomb, EFP, and rocket (including IRAM) that the Joint Cells used to commit each attack that injured each Plaintiff.  Hezbollah also coordinated every aspect of the terrorist campaign that injured each Plaintiff.  In both respects, Hezbollah continued the same strategy and practice it had pursued in Iraq since 2003.

788.    The IRGC provided key aid to the intensified terrorist campaign through the Joint Cells in Iraq.  The IRGC provided Hezbollah money, logistical support, telecommunications technology, and advanced weapons, which Hezbollah supplied to the Joint Cells to facilitate their ability to conduct the attacks that injured Plaintiffs.  Each Plaintiff who suffered injury because of a Joint Cell attack between 2005 and 2009 was injured because of Hezbollah's above-described strategic decision to further escalate Hezbollah's anti-American terror campaigns during that period to intimidate the U.S. and Iraqi governments.

789.    Defendants also aided the Joint Cell terrorist(s) who committed each attack by transacting with notorious terrorist front counterparties, including, but not limited to, the Bonyad Mostazafan, IEI, MTN Irancell, TCI (including MCI), Exit40, and/or the Akbari Fronts, which had a widespread and specific reputation for raising money, providing logistical support, and obtaining weapons for terrorists, including Hezbollah, to use to attack Americans.  Defendants' financial support and provision of embargoed American technologies and services for such

IRGC-controlled, including the Qods Force-controlled, counterparties flowed through Hezbollah to the terrorist(s) that committed each attack that injured each Plaintiff.

### A.   The August 17, 2007 Attack In Basra (The Chand Family and Estate)

790.   Michael Chand, Sr. worked in southeast Iraq as a civilian contractor who provided security relating to road construction projects.

791.   On August 17, 2007, Hezbollah (an FTO at all times), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell, executed a kidnapping attack that targeted American civilian contractors in Basra and Amara – the geographic headquarters of the Joint Cells in southern Iraq, which resulted in the hostage-taking, detention, torture, and murder of Michael Chand, Sr. by Hezbollah, Jaysh al-Mahd, and Qods Force terrorists.  Plaintiffs refer to the ambush itself, and the subsequent kidnapping, detention, torture, and murder, as the "August 17, 2007 Attack."

792.   On August 17, 2007, Mr. Chand's convoy was ambushed by a joint cell comprised of Hezbollah, Qods Force, and Jaysh al-Mahdi, which totaled roughly 300 Jaysh al-Mahdi fighters near the Jaysh al-Mahdi stronghold of Amarah, northwest of Basra.

793.   Mr. Chand suffered a gunshot wound in the ambush and was kidnapped by Jaysh al-Mahdi.  He was held in captivity by Jaysh al-Mahdi for several years afterwards, and he was tortured in captivity.  He was 52 years old at the time of his kidnapping.  On or about March 13, 2010, his body was returned to the U.S. government.  The autopsy report revealed that Mr. Chand was killed by multiple gunshot wounds to the head and body, and it was consistent with the conclusion that he had been tortured.

794.   Initial reports of the August 17, 2007 attack suggested that Mr. Chand had been killed in the attack.  On August 24, 2007, the U.S. State Department officially informed Mr. Chand's wife that he was dead.  On October 31, 2007, the State Department reversed course and

informed his wife, Mrs. Sally Chand, that, according to eyewitnesses, Mr. Chand was actually alive and being held in captivity.  However, efforts to secure his release over the next several years failed, and, on or about March 13, 2010, the Chand family learned that Jaysh al-Mahdi had tortured and executed Mr. Chand while he was being held in captivity.

795.    The Joint Cell that committed the August 17, 2007 Attack. was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

796.    Senior Hezbollah operative Ali Mussa Daqduq planned and authorized the August 17, 2007 Attack.

797.    The Department of Defense assessed that the Crescent Security Attack was a "Hezbollah Event."

798.    One or more other components of the U.S. government also represented to the hostage's families that Hezbollah (and Daqduq) were responsible for the Attack.

799.    Five U.S. Senators also concurred in a 2011 letter, in which the senators noted that Daqduq had "coordinated the kidnapping and execution of U.S. citizens and British nationals in Iraq" in conjunction with Jaysh al-Mahdi.

800.    The tactics, techniques, and procedures upon which the Joint Cell kidnappers relied during the August 17, 2007 Attack. were derived from Hezbollah, who both trained the Jaysh al-Mahdi kidnappers with whom they jointly committed the raid, but also participated in the kidnapping itself.

801.    Mr. Chand was a U.S. citizen when he was kidnapped and killed in Iraq.

802.    Mr. Chand's kidnapping and murder would have violated the law of war if Jaysh al-Mahdi, Hezbollah, and the Qods Force were subject to it because, among other reasons, Mr. Chand was a civilian not taking part in hostilities, was tortured during his captivity, was executed without trial, and was attacked by groups who neither wore uniforms nor otherwise identified themselves as enemy combatants.

803.    Plaintiff Sally Chand is a U.S. citizen and California resident.  She is the widow of Michael Chand, Sr.

804.    Sally Chand is also the Personal Representative of Michael Chand's estate.  A copy of the California Superior Court order appointing her as special administrator, as well as an authenticated copy of Michael Chand's will, has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for his estate is now open in the District of Columbia.  Mrs. Chand brings claims both in her personal capacity and in her representative capacity as the Personal Representative, on behalf of Michael Chand's estate.

805.    Plaintiff Michael Chand, Jr. is a U.S. citizen and California resident.  He is the son of Michael Chand, Sr.

806.    Plaintiff Christina Mahon is a U.S. citizen and California resident.  She is the daughter of Michael Chand, Sr.

807.    Plaintiff Ryan Chand is a U.S. citizen and California resident.  He is the son of Michael Chand, Sr.

808.    Plaintiff Brenda Chand is a U.S. citizen and California resident.  She is the daughter of Michael Chand, Sr.

809.    As a result of the August 17, 2007 Attack, and the subsequent kidnapping and execution of Michael Chand, Sr., the Chand Family has experienced severe mental anguish,

emotional pain and suffering, and the loss of Michael Chand, Sr.'s society, companionship, and counsel.

810.    Michael Chand, Sr.'s estate is entitled to recover economic and non-economic damages from Defendants, due to his kidnapping, detainment, torture, and murder by Hezbollah, Jaysh al-Mahdi, and the Qods Force.

**B.    The August 2, 2005 Kidnapping Attack In Basra (The Vincent Family and Estate)**

811.    Steven Vincent worked in Iraq as a journalist.

812.    On August 2, 2005, Steven Vincent was reporting in Basra, Iraq, when he was kidnapped, taken hostage for several hours, and then shot by his kidnappers.  Mr. Vincent's kidnapping and murder was committed by a Hezbollah (an FTO), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell ("August 2, 2005 Kidnapping Attack").

813.    Steven Vincent was injured in the August 2, 2005 Kidnapping Attack.  Samuel Parlin died on August 2, 2005 as a result of injuries sustained during the attack.

814.    The Joint Cell that committed the August 2, 2005 Kidnapping Attack was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

815.    Mr. Vincent's kidnapping and murder would have violated the law of war if Hezbollah, Jaysh al-Mahdi and the Qods Force were subject to it because, among other reasons, he was a civilian not taking part in hostilities, he was executed without trial, and the Jaysh al-Mahdi and Hezbollah member(s) who conducted the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

816.    Steven Vincent was a U.S. national at the time of the attack and his death.

817.     Plaintiff Lisa Ramaci is the widow of Steven Vincent and a U.S. national.  She brings claims in both her personal capacity and her representative capacity on behalf of Steven Vincent's estate.

818.     Plaintiff Isabell Vincent is the mother of Steven Vincent and a U.S. national.

819.     As a result of the August 2, 2005 Kidnapping Attack, and Steven Vincent's death, the Vincent Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Steven Vincent's society, companionship, and counsel.

820.     As a result of the August 2, 2005 Kidnapping Attack, Steven Vincent was injured in his person and/or property. The Plaintiff members of the Vincent Family are the survivors and/or heirs of Steven Vincent and are entitled to recover for the damages Steven Vincent sustained.

## C.     The September 26, 2005 EFP Attack In Baghdad (The Tulsa T. Tuliau Family)

821.     Master Sergeant Tulsa T. Tuliau served in Iraq in the U.S. Army as part of the 3rd Battalion, 314th Field Artillery Regiment, 2nd Brigade, 78th Division.

822.     On September 26, 2005, Hezbollah (an FTO at all times), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell, executed an EFP attack that targeted Americans in Baghdad, with a Jaysh al-Mahdi terrorist serving as the triggerman planting and detonating the EFP near FOB Rustamiyah in the New Baghdad District while being locally supervised by one or more Hezbollah operatives deployed to the Joint Cell ("September 26, 2005 EFP Attack").

823.     MSG Tuliau was injured in the September 26, 2005 EFP Attack.  MSG Tuliau died on September 26, 2005 as a result of injuries sustained during the attack.

824.     The Joint Cell that committed the September 26, 2005 EFP Attack was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the

Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

825.    The EFP used by the Joint Cell to injure MSG Tuliau and other victims in the September 26, 2005 EFP Attack was a Hezbollah-designed, Iranian-manufactured EFP emplaced by Jaysh al-Mahdi terrorists at the direction of Hezbollah, using specialized training and components funded by the IRGC, including its Hezbollah Division and Qods Force, and supplied to the Joint Cell that executed the attack by Hezbollah.

826.    The September 26, 2005 EFP Attack would have violated the law of war if Hezbollah, the Qods Force, and Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi Joint Cell member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

827.    MSG Tuliau was a U.S. national at the time of the attack and his death.

828.    Plaintiff Masina Tuliau is the mother of MSG Tuliau and a U.S. national.

829.    As a result of the September 26, 2005 EFP Attack, and MSG Tuliau's death, the Tuliau Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSG Tuliau's society, companionship, and counsel.

830.    As a result of the September 26, 2005 EFP Attack, MSG Tuliau was injured in his person and/or property. The Plaintiff members of the Tuliau Family are the survivors and/or heirs of MSG Tuliau and are entitled to recover for the damages MSG Tuliau sustained.

**D.    The January 16, 2006 EFP Attack In Baghdad (The Samuel E. Parlin, Jr. Family)**

831.    Samuel E. Parlin, Jr. served in Iraq as a civilian contractor employed by DynCorp International, working for the Civilian Police Advisory Training Team ("CPATT"), which was responsible for the Coalition efforts to train and equip the Iraqi Police.

273

832.     On January 16, 2006, Hezbollah (an FTO at all times), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell, executed an EFP attack that targeted Americans in Baghdad, with a Jaysh al-Mahdi terrorist serving as the triggerman planting and detonating the EFP in the Al-Rashid District of western Baghdad on the road connecting Baghdad International Airport to the center of Baghdad (Airport Road) while being locally supervised by one or more Hezbollah operatives deployed to the Joint Cell ("January 16, 2006 EFP Attack").

833.     Samuel Parlin was injured in the January 16, 2006 EFP Attack.  Samuel Parlin died on January 16, 2006 as a result of injuries sustained during the attack.

834.     The Joint Cell that committed the January 16, 2006 EFP Attack was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

835.     The EFP used by the Joint Cell to injure Samuel Parlin and other victims in the January 16, 2006 EFP Attack was a Hezbollah-designed, Iranian-manufactured EFP emplaced by Jaysh al-Mahdi terrorists at the direction of Hezbollah, using specialized training and components funded by the IRGC, including its Hezbollah Division and Qods Force, and supplied to the Joint Cell that executed the attack by Hezbollah.

836.     The January 16, 2006 EFP Attack would have violated the law of war if Hezbollah, the Qods Force, and Jaysh al-Mahdi were subject to it because, among other reasons, Samuel Parlin was a civilian not taking part in hostilities, and because the Jaysh al-Mahdi Joint Cell member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

837.     Samuel Parlin was a U.S. national at the time of the attack and his death.

838.     Plaintiff Cynthia Parlin is the widow of Samuel Parlin and a U.S. national.

839.     Plaintiff Sharonda Parlin is the daughter of Samuel Parlin and a U.S. national.

840.     As a result of the January 16, 2006 EFP Attack, and Samuel Parlin's death, the Parlin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Samuel Parlin's society, companionship, and counsel.

841.     As a result of the January 16, 2006 EFP Attack, Samuel Parlin was injured in his person and/or property. The Plaintiff members of the Parlin Family are the survivors and/or heirs of Samuel Parlin and are entitled to recover for the damages Samuel Parlin sustained.

**E.     The January 18, 2006 EFP Attack In Basra (The Richard Hickman Family)**

842.     Richard Thomas "Rick" Hickman served in Iraq as a civilian contractor, employed by DynCorp International, working to train Iraqi Police units in Basra.

843.     On January 18, 2006, Hezbollah (an FTO at all times), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell, executed an EFP attack that targeted Americans in Basra, with a Jaysh al-Mahdi terrorist serving as the triggerman planting and detonating the EFP while being locally supervised by one or more Hezbollah operatives deployed to the Joint Cell ("January 18, 2006 EFP Attack").

844.     Richard Hickman was injured in the January 18, 2006 EFP Attack.  Richard Hickman died on January 18, 2006 as a result of injuries sustained during the attack.

845.     The Joint Cell that committed the January 18, 2006 EFP Attack was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

846.     The EFP used by the Joint Cell to injure victims in the January 18, 2006 EFP Attack was a Hezbollah-designed, Iranian-manufactured EFP emplaced by Jaysh al-Mahdi

275

terrorists at the direction of Hezbollah, using specialized training and components funded by the IRGC, including its Hezbollah Division and Qods Force, and supplied to the Joint Cell that executed the attack by Hezbollah.

847.     The January 18, 2006 EFP Attack would have violated the law of war if Hezbollah, the Qods Force, and Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Parlin was a civilian not taking part in hostilities, and because the Jaysh al-Mahdi Joint Cell member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

848.     Richard Hickman was a U.S. national at the time of the attack and his death.

849.     Plaintiff Jennifer Link is the daughter of Richard Hickman and a U.S. national.

850.     Plaintiff Jessica Rew is the daughter of Richard Hickman and a U.S. national.

851.     Plaintiff Sara Lilly is the daughter of Richard Hickman and a U.S. national.

852.     Plaintiff Ryan Hickman is the son of Richard Hickman and a U.S. national.

853.     Plaintiff E.H., by and through his next friend April Hudgens, is the son of Richard Hickman and a U.S. national.

854.     Plaintiff Sharon Johnston is the sister of Richard Hickman and a U.S. national.

855.     As a result of the January 18, 2006 EFP Attack, and Richard Hickman's death, the Hickman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Richard Hickman's society, companionship, and counsel.

856.     As a result of the January 18, 2006 EFP Attack, Richard Hickman was injured in his person and/or property. The Plaintiff members of the Hickman Family are the survivors and/or heirs of Richard Hickman and are entitled to recover for the damages Richard Hickman sustained.

F.      **The February 20, 2006 EFP Attack In Baghdad (The Daniel J. Kuhlmeier Family and Estate)**

857.    Special Agent Daniel J. Kuhlmeier worked in Iraq for the U.S. Air Force, and was assigned to the Air Force Office of Special Investigations Detachment 204 (Offutt AFB, Nebraska), supporting the 55th Wing and Headquarters, U.S. Strategic Command. He was a civilian employee of the U.S. Air Force who was posthumously awarded the Outstanding Civilian Career Service Award.

858.    On February 20, 2006, Hezbollah (an FTO at all times), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell, executed an EFP attack that targeted Americans in Basra, with a Jaysh al-Mahdi terrorist serving as the triggerman planting and detonating the EFP while being locally supervised by one or more Hezbollah operatives deployed to the Joint Cell ("February 20, 2006 EFP Attack in Baghdad").

859.    Special Agent Kuhlmeier was injured in the February 20, 2006 EFP Attack.  He died on February 20, 2006 as a result of injuries sustained during the attack.

860.    The Joint Cell that committed the February 20, 2006 EFP Attack in Baghdad was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

861.    The EFP used by the Joint Cell to injure victims in the February 20, 2006 EFP Attack was a Hezbollah-designed, Iranian-manufactured EFP emplaced by Jaysh al-Mahdi terrorists at the direction of Hezbollah, using specialized training and components funded by the IRGC and supplied to the Joint Cell that executed the attack by Hezbollah.

862.    The February 20, 2006 EFP Attack would have violated the law of war if Hezbollah, the Qods Force, and Jaysh al-Mahdi were subject to it because, among other reasons,

277

Special Agent Kuhlmeier was a civilian not taking part in hostilities, and because the Jaysh al-Mahdi Joint Cell member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

863.    Special Agent Kuhlmeier was a U.S. national at the time of the attack and his death.

864.    Plaintiff Tanja Kuhlmeier is the widow of Special Agent Kuhlmeier and a U.S. national.

865.    Tanja Kuhlmeier is also the Personal Representative of Special Agent Kuhlmeier's estate. A copy of the Nebraska County Court order appointing her as Personal Representative, as well as an authenticated copy of Special Agent Kuhlmeier's will, has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for his estate is now open in the District of Columbia. She brings claims in both her personal capacity and her representative capacity on behalf of Special Agent Kuhlmeier's estate.

866.    Plaintiff K.K., by and through her next friend Tanja Kuhlmeier, is the son of Special Agent Kuhlmeier and a U.S. national.

867.    Plaintiff Robert J. Kuhlmeier is the father of Special Agent Kuhlmeier and a U.S. national.

868.    Plaintiff Theresa A. Kuhlmeier is the mother of Special Agent Kuhlmeier and a U.S. national.

869.    Plaintiff Theresa A. Kuhlmeier is the sister of Special Agent Kuhlmeier and a U.S. national.

870.    Plaintiff Edward Kuhlmeier is the brother of Special Agent Kuhlmeier and a U.S. national.

871.    Plaintiff Thomas Kuhlmeier is the brother of Special Agent Kuhlmeier and a U.S. national.

872.    Plaintiff John Kuhlmeier is the brother of Special Agent Kuhlmeier and a U.S. national.

873.    Plaintiff David Kuhlmeier is the brother of Special Agent Kuhlmeier and a U.S. national.

874.    Plaintiff Robert W. Kuhlmeier is the brother of Special Agent Kuhlmeier and a U.S. national.

875.    As a result of the February 20, 2006 EFP Attack, and Special Agent Kuhlmeier's death, the Kuhlmeier Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Special Agent Kuhlmeier's society, companionship, and counsel.

876.    As a result of the February 20, 2006 EFP Attack, Special Agent Kuhlmeier was injured in his person and/or property. The Plaintiff members of the Kuhlmeier Family are the survivors and/or heirs of Special Agent Kuhlmeier and are entitled to recover for the damages Special Agent Kuhlmeier sustained.

G.    **The February 20, 2006 EFP Attack In Karbala (The Jay T. Collado Family And Estate And The Justin Waldeck Family)**

877.    On February 20, 2006 Hezbollah (an FTO at all times), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell, executed an EFP attack that targeted Americans in Karbala, with a Jaysh al-Mahdi terrorist serving as the triggerman planting and detonating the EFP in Karbala while being locally supervised by one or more Hezbollah operatives deployed to the Joint Cell ("February 20, 2006 EFP Attack").

878.    The Joint Cell that committed the February 20, 2006 EFP Attack was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the

Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

879.    The EFP used by the Joint Cell to injure victims in the February 20, 2006 EFP was a Hezbollah-designed, Iranian-manufactured EFP emplaced by Jaysh al-Mahdi terrorists at the direction of Hezbollah, using specialized training and components funded by the IRGC and supplied to the Joint Cell that executed the attack by Hezbollah.

880.    The February 20, 2006 EFP Attack in Karbala would have violated the law of war if Hezbollah, the Qods Force, and Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Parlin was a civilian not taking part in hostilities, and because the Jaysh al-Mahdi Joint Cell member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.    The Jay T. Collado Family and Estate

881.    Staff Sergeant Jay T. Collado served in Iraq in the U.S. Marine Corps and was assigned to Marine Light Attack Helicopter Squadron-267, Marine Aircraft Group-39, 3rd Marine Aircraft Wing, I Marine Expeditionary Force, Camp Pendleton, California, attached to the Army's 4th Infantry Division.

882.    S. Sgt. Collado was injured in the February 20, 2006 EFP Attack in Karbala.  S. Sgt. Collado died on February 20, 2006, as a result of injuries sustained during the attack.

883.    S. Sgt. Collado was a U.S. national at the time of the attack and his death.

884.    Plaintiff Judy Collado is the widow of S. Sgt. Collado and a U.S. national.  She brings claims in both her personal capacity and her representative capacity on behalf of S. Sgt. Collado's estate.

885.    Plaintiff Kaiya Collado is the daughter of S. Sgt. Collado and a U.S. national.

886.     As a result of the February 20, 2006 EFP Attack, and S. Sgt. Collado's death, the Collado Family has experienced severe mental anguish, emotional pain and suffering, and the loss of S. Sgt. Collado's society, companionship, and counsel.

887.     As a result of the February 20, 2006 EFP Attack and S. Sgt. Collado's injuries and death, each member of the Collado family has experienced severe mental anguish, emotional pain and suffering.

888.     As a result of the February 20, 2006 EFP Attack, S. Sgt. Collado was injured in his person and/or property. The Plaintiff members of the Collado Family are the survivors and/or heirs of S. Sgt. Collado and are entitled to recover for the damages S. Sgt. Collado sustained.

889.     S. Sgt. Collado's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Hezbollah, Jaysh al-Mahdi, and the Qods Force.

### 2.     The Justin Waldeck Family

890.     Plaintiff Major Justin A. Waldeck served with the U.S. Marine Corps in Iraq as part of the 3rd Light Armored Reconnaissance Battalion, 1st Marine Division, I Marine Expeditionary Force, attached to the Army's 4th Infantry Division. He was a U.S. national at the time of the attack and remains one to this day.

891.     Maj. Waldeck was injured in the February 20, 2006 EFP Attack, which caused him to suffer from fused metacarpal, nerve damage, and shrapnel injuries. Due to his injuries, Maj. Waldeck received a 20% disability rating from the VA. As a result of the February 20, 2006 Attack, Maj. Waldeck has experienced extreme physical and emotional pain and suffering.

### H.     The May 6, 2006 EFP Attack In Diwaniyah (The David M. Veverka Family)

892.     Staff Sergeant David M. Veverka served in Iraq with B Company, 3rd Battalion, 172nd Mountain Infantry Regiment, Army National Guard.

893.    On May 6, 2006, Hezbollah (an FTO at all times), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell, executed an EFP attack that targeted Americans in Diwaniyah, in Qadisiyah Province in central Iraq, with a Jaysh al-Mahdi terrorist serving as the triggerman planting and detonating the EFP while being locally supervised by one or more Hezbollah operatives deployed to the Joint Cell ("May 6, 2006 EFP Attack").

894.    SSG Veverka was injured in the May 6, 2006 EFP Attack.  SSG Veverka died on May 6, 2006 as a result of injuries sustained during the attack.

895.    The Joint Cell that committed the May 6, 2006 EFP Attack was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

896.    The EFP used by the Joint Cell to injure victims in the May 6, 2006 EFP Attack was a Hezbollah-designed, Iranian-manufactured EFP emplaced by Jaysh al-Mahdi terrorists at the direction of Hezbollah, using specialized training and components funded by the IRGC and supplied to the Joint Cell that executed the attack by Hezbollah.

897.    The May 6, 2006 EFP Attack would have violated the law of war if Hezbollah, the Qods Force, and Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi Joint Cell member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

898.    SSG Veverka was a U.S. national at the time of the attack and his death.

899.    Plaintiff Carol Polley is the mother of SSG Veverka and a U.S. national.

900.    Plaintiff Ronald Veverka is the father of SSG Veverka and a U.S. national.

901.    Plaintiff Keith Veverka is the brother of SSG Veverka and a U.S. national.

902.     Plaintiff Douglas Veverka is the brother of SSG Veverka and a U.S. national.

903.     Plaintiff Sandra Soliday is the sister of SSG Veverka and a U.S. national.

904.     As a result of the May 6, 2006 EFP Attack, and SSG Veverka's death, the Veverka Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Veverka's society, companionship, and counsel.

905.     As a result of the May 6, 2006 EFP Attack, SSG Veverka was injured in his person and/or property. The Plaintiff members of the Veverka Family are the survivors and/or heirs of SSG Veverka and are entitled to recover for the damages SSG Veverka sustained.

**I.      The July 15, 2006 EFP Attack In Baghdad (The Andres J. Contreras Family)**

906.     Sergeant Andres J. Contreras served in Iraq in the U.S. Army as part of the 519th Military Police Battalion, 1st Combat Support Brigade.

907.     On July 15, 2006, Hezbollah (an FTO at all times), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell, executed an EFP attack that targeted Americans in eastern Baghdad, with a Jaysh al-Mahdi terrorist serving as the triggerman planting and detonating the EFP while being locally supervised by one or more Hezbollah operatives deployed to the Joint Cell ("July 15, 2006 EFP Attack").

908.     SGT Contreras was injured in the July 15, 2006 EFP Attack.  SSG Veverka died on July 15, 2006 as a result of injuries sustained during the attack.

909.     The Joint Cell that committed the July 15, 2006 EFP Attack was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

910.     The EFP used by the Joint Cell to injure victims in the July 15, 2006 EFP Attack was a Hezbollah-designed, Iranian-manufactured EFP emplaced by Jaysh al-Mahdi terrorists at

the direction of Hezbollah, using specialized training and components funded by the IRGC and supplied to the Joint Cell that executed the attack by Hezbollah.

911.    The July 15, 2006 EFP Attack would have violated the law of war if Hezbollah, the Qods Force, and Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi Joint Cell member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

912.    SGT Contreras was a U.S. national at the time of the attack and his death.

913.    Plaintiff Jonathan Contreras, Sr. is the father of SGT Contreras and a U.S. national.

914.    Plaintiff Norma Contreras is the mother of SGT Contreras and a U.S. national.

915.    Plaintiff Carlos Contreras is the brother of SGT Contreras and a U.S. national.

916.    Plaintiff Cesar Contreras is the brother of SGT Contreras and a U.S. national.

917.    Plaintiff Hernan Contreras is the brother of SGT Contreras and a U.S. national.

918.    Plaintiff Noel Contreras is the brother of SGT Contreras and a U.S. national.

919.    Plaintiff Dannyel Contreras is the brother of SGT Contreras and a U.S. national.

920.    As a result of the July 15, 2006 EFP Attack, and SGT Contreras's death, the Contreras Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Contreras's society, companionship, and counsel.

921.    As a result of the July 15, 2006 EFP Attack, SGT Contreras was injured in his person and/or property. The Plaintiff members of the Contreras Family are the survivors and/or heirs of SGT Contreras and are entitled to recover for the damages SGT Contreras sustained.

**J.      The July 15, 2006 EFP Attack In Baghdad (The Andres J. Contreras Family)**

922.    Sergeant Andres J. Contreras served in Iraq in the U.S. Army as part of the 519th Military Police Battalion, 1st Combat Support Brigade.

923.     On July 15, 2006, Hezbollah (an FTO at all times), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell, executed an EFP attack that targeted Americans in eastern Baghdad, with a Jaysh al-Mahdi terrorist serving as the triggerman planting and detonating the EFP while being locally supervised by one or more Hezbollah operatives deployed to the Joint Cell ("July 15, 2006 EFP Attack").

924.     SGT Contreras was injured in the July 15, 2006 EFP Attack.  SSG Veverka died on July 15, 2006 as a result of injuries sustained during the attack.

925.     The Joint Cell that committed the July 15, 2006 EFP Attack was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

926.     The EFP used by the Joint Cell to injure victims in the July 15, 2006 EFP Attack was a Hezbollah-designed, Iranian-manufactured EFP emplaced by Jaysh al-Mahdi terrorists at the direction of Hezbollah, using specialized training and components funded by the IRGC and supplied to the Joint Cell that executed the attack by Hezbollah.

927.     The July 15, 2006 EFP Attack would have violated the law of war if Hezbollah, the Qods Force, and Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi Joint Cell member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

928.     SGT Contreras was a U.S. national at the time of the attack and his death.

929.     Plaintiff Jonathan Contreras, Sr. is the father of SGT Contreras and a U.S. national.

930.     Plaintiff Norma Contreras is the mother of SGT Contreras and a U.S. national.

931.    Plaintiff Carlos Contreras is the brother of SGT Contreras and a U.S. national.

932.    Plaintiff Cesar Contreras is the brother of SGT Contreras and a U.S. national.

933.    Plaintiff Hernan Contreras is the brother of SGT Contreras and a U.S. national.

934.    Plaintiff Noel Contreras is the brother of SGT Contreras and a U.S. national.

935.    Plaintiff Dannyel Contreras is the brother of SGT Contreras and a U.S. national.

936.    As a result of the July 15, 2006 EFP Attack, and SGT Contreras's death, the Contreras Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Contreras's society, companionship, and counsel.

937.    As a result of the July 15, 2006 EFP Attack, SGT Contreras was injured in his person and/or property. The Plaintiff members of the Contreras Family are the survivors and/or heirs of SGT Contreras and are entitled to recover for the damages SGT Contreras sustained.

**K.    The October 22, 2006 EFP Attack In Baghdad (The Families of David G. Taylor, Jr., Brian G. Taylor, Karar Adel Alabsawi, James Gmachowski, Judas E. Recendez )**

938.    On October 22, 2006, Hezbollah (an FTO at all times), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell, executed an EFP attack that targeted Americans in Baghdad, with a Jaysh al-Mahdi terrorist serving as the triggerman planting and detonating the EFP in Karbala while being locally supervised by one or more Hezbollah operatives deployed to the Joint Cell ("October 22, 2006 EFP Attack").

939.    The Joint Cell that committed the October 22, 2006 EFP Attack was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

940.    The EFP used by the Joint Cell to injure victims in the October 22, 2006 EFP Attack was a Hezbollah-designed, Iranian-manufactured EFP emplaced by Jaysh al-Mahdi

terrorists at the direction of Hezbollah, using specialized training and components funded by the IRGC and supplied to the Joint Cell that executed the attack by Hezbollah.

941.    The October 22, 2006 EFP Attack would have violated the law of war if Hezbollah, the Qods Force, and Jaysh al-Mahdi were subject to it because, among other reasons, the terrorists targeted civilians not taking part in hostilities, and because the Jaysh al-Mahdi Joint Cell member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.    The David G. Taylor, Jr. Family and Estate

942.    Major David G. Taylor, Jr. served in Iraq in the U.S. Army as part of the Battalion, 6th Infantry Regiment, 2nd Brigade Combat Team, 1st Armored Division.

943.    MAJ Taylor was injured in the October 22, 2006 EFP Attack.  MAJ Taylor died on October 22, 2006 EFP Attack, as a result of injuries sustained during the attack.

944.    MAJ Taylor was a U.S. national at the time of the attack and his death.

945.    Plaintiff Michelle Taylor is the widow of MAJ Taylor and a U.S. national.  She brings claims in both her personal capacity and her representative capacity on behalf of MAJ Taylor estate.

946.    Plaintiff J.D.J.T., by and through his next friend Michelle Taylor, is the minor son of 892. MAJ Taylor.  He is a national of the United States.

947.    Plaintiff Phyllis K. Taylor is the mother of MAJ Taylor and a U.S. national.

948.    Plaintiff John K. Taylor is the brother of MAJ Taylor and a U.S. national.

949.    As a result of the October 22, 2006 EFP Attack, and MAJ Taylor's death, the Taylor Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MAJ Taylor's society, companionship, and counsel.

950.    As a result of the October 22, 2006 EFP Attack, MAJ Taylor was injured in his person and/or property. The Plaintiff members of the Taylor Family are the survivors and/or heirs of MAJ Taylor and are entitled to recover for the damages MAJ Taylor sustained.

951.    MAJ Taylor's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Hezbollah, Jaysh al-Mahdi, and the Qods Force.

### 2.    The Karar Adel Alabsawi Family

952.    Plaintiff Specialist Karar A. Alabsawi served in the U.S. Army in Iraq as part of the 2nd Battalion, 6th Infantry Regiment, 2nd Brigade Combat Team, 1st Armored Division. He is a U.S. national.

953.    SPC Alabsawi was injured in the October 22, 2006 EFP Attack, when Jaysh al-Mahdi planted and detonated an EFP near his vehicle in the New Baghdad District in eastern Baghdad, Iraq.  After activation, the EFP was set to detonate using a passive infrared trigger system. The explosion resulted in the amputation of his left leg, severe injury to his left hand and arm, and shrapnel and burns throughout his body. As a result of the October 22, 2006 attack, SPC Alabsawi has experienced extreme physical and emotional pain and suffering.

### 3.    The Judas E. Recendez Family

954.    Plaintiff Sergeant Judas E. Recendez served in Iraq in the U.S. Army as part of the 2nd Battalion, 6th Infantry Regiment, 2nd Brigade Combat Team, 1st Armored Division. He is a U.S. national.

955.    SGT Recendez was injured in the October 22, 2006 EFP Attack, which severely wounded SGT Recendez and, among other things, required the amputation of both of his legs below the knee. SGT Recendez also suffered shrapnel injuries to the lower part of his body from the waist down, hearing and vision damage, and nerve damage in his left hand. Due to his injuries, SGT Recendez received a 100% disability rating from the VA. As a result of the

288

October 22, 2006 attack, SGT Recendez has experienced extreme physical and emotional pain and suffering.

### 4.   The Brian G. Taylor Family

956.   Plaintiff Specialist Brian G. Taylor served in Iraq in the U.S. Army as part of the 2nd Battalion, 6th Infantry Regiment, 2nd Brigade Combat Team, 1st Armored Division. He is a U.S. national.

957.   SPC Taylor was injured in the October 22, 2006 EFP Attack, which resulted in injuries to his right thigh, loss of muscle, skin, and part of his femur, a dislocated knee, a damaged femoral artery, compartment syndrome, and ultimately the amputation of his right leg. As a result of the October 22, 2006 attack, SPC Taylor has experienced extreme physical and emotional pain and suffering.

### 5.   The Tyler Norager Family

958.   Plaintiff Private First Class Tyler Norager served in Iraq as part of the Blue Spaders. He is a U.S. national.

959.   PFC Noragerwas injured in the October 22, 2006 EFP Attack, which severely wounded PFC Norager and caused him to suffer shrapnel wounds to the face, the right side of his body, and the top of his spine. His injuries have caused him long-term, permanent back pain. Due to his injuries, PFC Norager received a 100% disability rating from the VA. As a result of the October 22, 2006 attack, and the injuries he sustained therein, PFC Norager has experienced extreme physical and emotional pain and suffering.

### 6.   The James Gmachowski Family

960.   Plaintiff Staff Sergeant James Gmachowski served in Iraq as part of the Blue Spaders. He is a U.S. national.

961.    SSG Gmachowski was injured in the October 22, 2006 EFP Attack, which severely wounded SSG Gmachowski and lodged a golf-ball-sized piece of copper in his back, which required invasive surgery to remove. The wound took roughly five months to heal and was accompanied by traumatic brain injury and a PTSD diagnosis. Due to his injuries, SSG Gmachowski received a 100% disability rating from the VA. As a result of the October 22, 2006 attack, and the injuries he sustained therein, SSG Gmachowski has experienced extreme physical and emotional pain and suffering, resulted in injuries to his right thigh, loss of muscle, skin, and part of his femur, a dislocated knee, a damaged femoral artery, compartment syndrome, and ultimately the amputation of his right leg. As a result of the October 22, 2006 attack, SPC Taylor has experienced extreme physical and emotional pain and suffering.

**L.     The November 13, 2006 In Baghdad (The Kurtiss Lamb Family)**

962.    Plaintiff Sergeant Kurtiss Lamb served in Iraq as part of the Blue Spaders. He is a U.S. national.

963.    On November 13, 2006, Hezbollah (an FTO at all times), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell, executed an EFP attack that targeted Americans in eastern Baghdad, with a Jaysh al-Mahdi terrorist serving as the triggerman planting and detonating the EFP while being locally supervised by one or more Hezbollah operatives deployed to the Joint Cell ("November 13, 2006 EFP Attack").

964.    SGT Lamb was injured in the November 13, 2006 EFP Attack.  The EFP severely wounded SGT Lamb and caused partial paralysis to his arm, bulging disks in his lumbar spine, and Traumatic Brain Injury. Due to his injuries, SGT Lamb received a 100% disability rating from the VA. As a result of the November 13, 2006 attack, and the injuries he sustained therein, SGT Lamb has experienced extreme physical and emotional pain and suffering.

965.    The Joint Cell that committed the November 13, 2006 was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

966.    The EFP used by the Joint Cell to injure victims in the November 13, 2006 was a Hezbollah-designed, Iranian-manufactured EFP emplaced by Jaysh al-Mahdi terrorists at the direction of Hezbollah, using specialized training and components funded by the IRGC and supplied to the Joint Cell that executed the attack by Hezbollah.

967.    The November 13, 2006 would have violated the law of war if Hezbollah, the Qods Force, and Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi Joint Cell member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

968.    Plaintiff Lisa M. Lamb is the wife of SGT Lamb and a U.S. national. As a result of the November 13, 2006 attack, and SGT Lamb's injuries, Lisa M. Lamb has experienced extreme emotional pain and suffering.

### M.    The November 16, 2006 Crescent Security Attack In Basra (The Families of Jonathon Coté, Joshua Munns, Paul Johnson-Reuben, and John Roy Young)

969.    On November 16, 2006, Hezbollah (an FTO at all times), the Qods Force, and Jaysh al-Mahdi, acting together in a Joint Cell, executed a kidnapping attack that targeted Americans working for Crescent Security in Basra, which resulted in the hostage-taking, detention, torture, and murder of Jonathon Coté, Joshua Munns, Paul Johnson-Reuben and John Roy Young by the Joint Cell near Basra. Plaintiffs refer to the ambush itself, and the subsequent kidnapping, detention, torture, and murder, as the "Crescent Security Attack."

970.    In or about January 2007, the terrorists holding hostage Mr. Munns, Paul Johnson-Reuben, Jonathon Coté and the other Crescent Security contractors released a video that showed each man in a state of obvious distress. The video made plain the terroristic nature of the Crescent Security Attack. Among other things, the terrorists holding Mr. Coté hostage compelled him to state on camera: "I can't be released until the prisoners in the American jails and British jails are released." The video was broadcast on an Iranian state-run Arabic-language cable news outlet called al-Alam.

971.    On information and belief, Mr. Munns was held hostage by terrorists affiliated with Jaysh al-Mahdi from on or about November 16, 2006, when he was kidnapped, to on or about 2008. Jaysh al-Mahdi members committed the Crescent Security Attack on November 16, 2006 and the subsequent hostage holding and execution of Mr. Munns. Throughout this time period, Mr. Munns, and the Munns Family members, suffered as a result of the kidnapping, notwithstanding the weekly briefings they received from the State Department.

972.    In or about 2008, the Jaysh al-Mahdi terrorists holding hostage Mr. Munns and the other Crescent Security contractors cut off one finger from each hostage – including Mr. Munns – and transported the fingers to an intermediary, who ultimately provided them to the FBI, which determined that one of the fingers belonged to Mr. Munns.

973.    On information and belief, on or after when the terrorists severed Mr. Munns' finger, the terrorists proceeded to beat Mr. Munns to death. They subsequently mutilated his remains.

974.    On or about March 2008, four bodies were discovered near Basra. On March 27, 2008, the FBI publicly announced that it had confirmed that Mr. Munns' remains were among the recovered, and in April 2008 his body was returned to his family for cremation.

975.     The Joint Cell that committed the Crescent Security Attack was led by forward-deployed Hezbollah operatives, funded and logistically sustained by Hezbollah, the Qods Force, and Jaysh al-Mahdi, armed and trained by Hezbollah at camps in Iran, Iraq, Lebanon, and/or Syria that were run by Hezbollah and funded by the IRGC.

976.     Senior Hezbollah operative Ali Mussa Daqduq planned and authorized the Crescent Security Attack.

977.     The Department of Defense assessed that the Crescent Security Attack was a "Hezbollah Event."  One or more other components of the U.S. government also represented to the hostage's families that Hezbollah (and Daqduq) were responsible for the Attack.  Five U.S. Senators also concurred in a 2011 letter, in which the senators noted that Daqduq had "coordinated the kidnapping and execution of U.S. citizens and British nationals in Iraq" in conjunction with Jaysh al-Mahdi.

978.     The tactics, techniques, and procedures upon which the Joint Cell kidnappers relied during the Crescent Security Attack were derived from Hezbollah, who both trained the Jaysh al-Mahdi kidnappers with whom they jointly committed the raid, but also participated in the kidnapping itself.

979.     The Crescent Security Attack would have violated the law of war if Hezbollah, the Qods Force, and Jaysh al-Mahdi were subject to it because, among other reasons, the Crescent Security contractors were civilians not taking part in hostilities, were tortured during their captivity, and were executed without trial, and because the Jaysh al-Mahdi member(s) who carried out the Crescent Security Attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1. The Coté Family and Estate

980.    Jonathon M. Coté worked in Iraq as a civilian security contractor employed by Crescent Security and was a U.S. national.

981.    Mr. Coté was kidnapped, held hostage, tortured, and murdered in Iraq or Iran during the Crescent Security Attack.  Jaysh al-Mahdi mutilated Mr. Coté's remains after executing him. On April 23, 2008, the FBI announced that it had identified the remains of Mr. Coté – which were recovered four days prior – and made arrangements to return Mr. Coté's remains to his family.

982.    Plaintiff Christopher Coté is the brother of Mr. Coté and a U.S. national.  He brings claims in both his personal capacity and his representative capacity on behalf of Jonathon Coté's estate.

983.    Plaintiff Francis L. Coté is the father of Mr. Coté and a U.S. national.

984.    Plaintiff Nancy Coté is the stepmother of Mr. Coté and a U.S. national.

985.    Plaintiff Samantha Dunford is the stepsister of Mr. Coté and a U.S. national.

986.    Plaintiff Maximillian Shroyer is the stepbrother of Mr. Coté and a U.S. national.

987.    As a result of the ambush and kidnapping of the Crescent Security contractors on November 16, 2006, and the subsequent captivity, torture, mutilation, and murder of Jonathon Coté, and the post-murder mutilation of Jonathon Coté's remains on or about 2008, the Coté Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Jonathon Coté's society, companionship, and counsel.

988.    Mr. Coté's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Hezbollah, Jaysh al-Mahdi, and the Qods Force.

989.     As a result of the Crescent Security Attack, Jonathon Coté was injured in his person and/or property. The Plaintiff members of the Coté Family are the survivors and/or heirs of Jonathon Coté and are entitled to recover for the damages Jonathon Coté sustained.

**2.     The Joshua Munns Family**

990.     Joshua Munns served in southern Iraq as a civilian security contractor for Crescent Security and was a U.S. national.

991.     Mr. Munns was kidnapped, held hostage, tortured, and murdered in Iraq or Iran during the Crescent Security Attack.

992.     Plaintiff Mark Munns is the father of Mr. Munns and a U.S. national.

993.     Plaintiff Martha Elaine Jackie Stewart is the mother of Mr. Munns and a U.S. national.

994.     Plaintiff Crista Munns is the stepmother of Mr. Munns and a U.S. national.

995.     As a result of the ambush and kidnapping of the Crescent Security contractors on November 16, 2006, and the subsequent captivity, torture, mutilation, and murder of Joshua Munns during the Crescent Security Attack, and the post-murder mutilation of Joshua Munns' remains in or about 2008, the Munns Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Joshua Munn's society, companionship, and counsel.

996.     As a result of the Crescent Security Attack, Joshua Munns was injured in his person and/or property. The Plaintiff members of the Munns Family are the survivors and/or heirs of Joshua Munns and are entitled to recover for the damages Joshua Munns sustained.

**3.     The Paul Johnson-Reuben Family**

997.     Paul Johnson-Reuben worked in Iraq as a civilian security contractor employed by Crescent Security and was a U.S. national.

998.    Mr. Johnson-Reuben was kidnapped, held hostage, tortured, and murdered in Iraq or Iran during the Crescent Security Attack.  Jaysh al-Mahdi member(s) mutilated Mr. Johnson-Reuben's remains after executing him. Mr. Johnson-Reuben's body was ultimately returned to his family in April 2008.

999.    Plaintiff Bree Reuben is the daughter of Mr. Johnson-Reuben and a U.S. national.

1000.   Plaintiff Casey Nicole Reuben is the daughter of Mr. Johnson-Reuben and a U.S. national.

1001.   Plaintiff Ben Reuben is the father of Mr. Johnson-Reuben and a U.S. national.

1002.   Plaintiff Patrick Reuben is the twin brother of Mr. Johnson-Reuben and a U.S. national.

1003.   Plaintiff Quinten Reuben is the brother of Mr. Johnson-Reuben and a U.S. national.

1004.   Plaintiff Linda Reuben is the stepmother of Mr. Johnson-Reuben and a U.S. national.

1005.   As a result of the ambush and kidnapping of the Crescent Security contractors on November 16, 2006, and the subsequent captivity, torture, mutilation, and murder of Paul Johnson-Reuben during the Crescent Security Attack, and the post-murder mutilation of Paul Johnson-Reuben' remains in or about 2008, the Johnson-Reuben Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Paul Johnson-Reuben's society, companionship, and counsel.

1006.   As a result of the Crescent Security Attack, Paul Johnson-Reuben was injured in his person and/or property. The Plaintiff members of the Johnson-Reuben Family are the

survivors and/or heirs of Paul Johnson-Reuben and are entitled to recover for the damages Paul Johnson-Reuben sustained.

### 4.      The John Roy Young Family

1007.   John Roy Young worked in Iraq as a civilian security contractor employed by Crescent Security and was a U.S. national.

1008.   Mr. Young was kidnapped, held hostage, tortured, and murdered in Iraq or Iran during the Crescent Security Attack.  Jaysh al-Mahdi mutilated Mr. Young's remains after executing him. On March 24, 2008, the FBI announced that it had identified the remains of Mr. Young. He was 44 years old.

1009.   Plaintiff John Robert Young is the son of Mr. Young and a U.S. national.

1010.   Plaintiff Sharon DeBrabander is the mother of Mr. Young and a U.S. national.

1011.   Plaintiff Dennis DeBrabander is the stepfather of Mr. Young and a U.S. national.

1012.    As a result of the ambush and kidnapping of the Crescent Security contractors on November 16, 2006, and the subsequent captivity, torture, mutilation, and murder of Paul Johnson-Reuben during the Crescent Security Attack, and the post-murder mutilation of Paul Johnson-Reuben' remains in or about 2008, the Johnson-Reuben Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Paul Johnson-Reuben's society, companionship, and counsel.

1013.    As a result of the Crescent Security Attack, Paul Johnson-Reuben was injured in his person and/or property. The Plaintiff members of the Johnson-Reuben Family are the survivors and/or heirs of Paul Johnson-Reuben and are entitled to recover for the damages Paul Johnson-Reuben sustained.

### N. The January 5, 2007 Kidnapping Attack In Basra Attack In Basra (The Alexander Family and Withrow Estate)

1014.   Ronald J. ("Ronnie") Withrow served as a civilian information technology contractor and computer specialist, who was hired by JPI Worldwide to help rebuild Iraq and provide IT-related services in support of such efforts.

1015.   On information and belief, Mr. Withrow was kidnapped, held hostage, tortured, and ultimately murdered by the same Hezbollah-led Jaysh al-Mahdi cell responsible for the Crescent Security Attack.  Specifically, on January 5, 2007, Mr. Withrow was kidnapped in Basra as part of an elaborate operation that, on information and belief, was planned, coordinated and carried out by a joint Hezbollah/Jaysh al-Mahdi team.

1016.   On information and belief, a senior Jaysh al-Mahdi operative named Abu Zainab, and his two sons, helped supervise the kidnapping of Mr. Withrow, and did so in order to take American hostages for purposes of furthering Jaysh al-Mahdi's terrorist agenda.  On information and belief, as a senior Jaysh al-Mahdi operative tasked with kidnapping operations, Abu Zainab received personal instruction, and direct operational support, from Hezbollah with respect to kidnapping tactics and strategy.

1017.   On information and belief, senior Hezbollah operative Daqduq planned, committed, and/or authorized some or all the kidnapping, detention, and summary execution of Mr. Withrow.  This belief is based upon, among other things, representations made by the U.S. government to the family members of the Crescent Security hostages.

1018.   On or about 2008, the terrorists holding Mr. Withrow, as well as the Crescent Security hostages, cut off one finger from each hostage, including Mr. Withrow, and transported the fingers to an intermediary, who ultimately provided them to the FBI, which determined that

one of the fingers belonged to Mr. Withrow.  On or after when the terrorists severed Mr. Withrow's finger, the terrorists proceeded to beat him to death.

1019.   On or about March 24, 2008, the FBI announced that it had confirmed the recovery of Mr. Withrow's remains and made arrangements to return his remains to his family.

1020.   Mr. Withrow's kidnapping and execution would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Withrow was a civilian not taking part in hostilities, was tortured during captivity, and was executed without trial, and because the Jaysh al-Mahdi and Hezbollah member(s) who carried out the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1021.   Mr. Withrow was a U.S. citizen when he was kidnapped and killed in Iraq and/or Iran.

1022.   Plaintiff Johnny Wayman Alexander is a U.S. citizen and Texas resident.  He is the stepfather of Ronald Withrow.

1023.   As a result of the ambush and kidnapping of Ronald Withrow on January 5, 2007, and the subsequent captivity, torture, mutilation, and murder of Ronald Withrow, and the post-murder mutilation of Ronald Withrow's remains on or about 2008, the Alexander Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ronald Withrow's society, companionship, and counsel.

### O.   The Ryan Family

1024.   Plaintiff Staff Sergeant Shawn Ryan served in Iraq in the U.S. Air Force as part of the 82nd Security Forces Squadron.  He is a U.S. citizen and Texas resident.

1025.   On February 1, 2007, SSgt Ryan was seriously injured from shrapnel by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District, a Jaysh al-Mahdi stronghold in western Baghdad.  The EFP attack came inches away from killing SSgt Ryan, and the shrapnel

injuries that SSgt Ryan sustained from the EFP left him permanently disabled.  Due to his

injuries, SSgt received a 100% disability rating from the VA.  As a result of the attack, SSgt

Ryan has experienced extreme physical and emotional pain and suffering.

1026.   The attack that injured SSgt Ryan would have violated the law of war if Jaysh al-

Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as

enemy combatants.

1027.   Plaintiff Sandra Ryan is a U.S. citizen and Texas resident.  She is the wife of SSgt

Ryan.

1028.   Plaintiff A.R., by and through her next friend SSgt Ryan, is a U.S. citizen and

Texas resident.  He is the minor son of SSgt Ryan.

1029.   Plaintiff Barb Thiede is a U.S. citizen and Illinois resident.  She is the mother of

SSgt Ryan.

1030.   Plaintiff Jason Ryan is a U.S. citizen and Illinois resident.  He is the brother of

SSgt Ryan.

1031.   Plaintiff Billy Ryan is a U.S. citizen and Illinois resident.  He is the brother of

SSgt Ryan.

1032.   Plaintiff Angie Ryan is a U.S. citizen and Illinois resident.  She is the sister of

SSgt Ryan.

1033.   Plaintiff Teresa Beckley is a U.S. citizen and Illinois resident.  She is the sister of

SSgt Ryan.

1034.   As a result of the February 1, 2007 attack, and SSgt Ryan's injuries, the Ryan

Family has experienced extreme emotional pain and suffering.

### P.     The Landeck Family

1035.   Captain Kevin C. Landeck served in Iraq in the U.S. Army as part of the 2nd Battalion, 15th Field Artillery Regiment, 2nd Brigade Combat Team, 10th Mountain Division.

1036.   On February 2, 2007, CPT Landeck was killed by an EFP planted and detonated by Jaysh al-Mahdi in its stronghold in the city center of Mahmudiyah.

1037.   CPT Landeck was a U.S. citizen when he was killed in Iraq.

1038.   CPT Landeck's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1039.   Plaintiff Richard Landeck is a U.S. citizen and Illinois resident.  He is the father of CPT Landeck.

1040.   Plaintiff Victoria Landeck is a U.S. citizen and Illinois resident.  She is the mother of CPT Landeck.

1041.   As a result of the February 2, 2007 attack, and CPT Landeck's death, the Landeck Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPT Landeck's society, companionship, and counsel.

### Q.     The Thomas Family and Estate

1042.   Master Sergeant Sean M. Thomas served in the Green Zone in Baghdad in the 28th Division Support Command of the Pennsylvania Army National Guard.

1043.   On March 27, 2007, MSG Thomas was killed by a 107mm rocket that was transported, stored, and launched by Jaysh al-Mahdi against the U.S. Embassy Diplomatic Compound in the Green Zone.  The attack took place during a period when Jaysh al-Mahdi was specifically targeting the Green Zone with 107mm rockets.

1044.   MSG Thomas was a U.S. citizen when he was killed in Iraq.

1045.   MSG Thomas' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the attack placed civilians at risk, and because the Jaysh al-Mahdi member(s) who launched the rockets neither wore uniforms nor otherwise identified themselves as enemy combatants.

1046.   Indirect fire ("IDF") attacks against the Green Zone, including the U.S. Embassy, were a signature attack of Jaysh al-Mahdi, and were a particular lever that Muqtada al-Sadr deployed with Hezbollah's assistance.  On information and belief, Hezbollah specifically directed Jaysh al-Mahdi agents to launch indirect fire attacks against U.S. facilities in Baghdad – including the U.S. Embassy in the Green Zone – to terrorize American civilian leadership and intimidate America into changing its policy in Iraq.

1047.   Hezbollah operatives participated in Jaysh al-Mahdi's 107mm rocket attacks against Americans in Baghdad, including, on information and belief, with respect to the attack that killed MSG Thomas.  A State Department cable (as published by *WikiLeaks*) memorialized the consensus amongst U.S. and Iraqi personnel in Baghdad that Iran – and therefore on information and belief its proxy Hezbollah – played a specific operational role with respect to "IDF Attacks on the Green Zone."[357]  And a U.S. Army assessment (as published by *WikiLeaks*) concluded that indirect fire attacks against Americans in Baghdad were "most likely" the result of "Hezbollah operatives … directing [Jaysh al-Mahdi] to conduct [indirect fire] attacks against CF/ISF in [the] Baghdad area, utilizing historic TAI [i.e., Target Areas of Interest]."[358]

---

[357] U.S. State Dep't Cable, *July 15 Ministerial Committee on National Security* (Jul. 23, 2007) https://wikileaks.org/plusd/cables/07BAGHDAD2437_a.html.

[358] *WikiLeaks* (Mar. 16, 2008), https://wikileaks.org/irq/report/2008/03/IRQ20080316n10618.html.

1048.   Plaintiff Carrie Thompson is a U.S. citizen and Pennsylvania resident.  She is the widow of MSG Thomas.

1049.   Carrie Thompson is also the Personal Representative of MSG Thomas' estate.  A copy of the Grant of Letters Testamentary to Carrie Thompson from the Pennsylvania Register of Wills, as well as an authenticated copy of MSG Thomas' will, has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for his estate is now open in the District of Columbia.  Carrie Thompson brings claims in both her personal capacity and her representative capacity as the Personal Representative, on behalf of MSG Thomas' estate.

1050.   Plaintiff A.T., by and through her next friend Carrie Thompson, is a U.S. citizen and Pennsylvania resident.  She is the minor daughter of MSG Thomas.

1051.   Plaintiff Daniel Thomas, Sr.  is a U.S. citizen and Pennsylvania resident.  He is the father of MSG Thomas.

1052.   Plaintiff Diana Thomas is a U.S. citizen and Pennsylvania resident.  She is the mother of MSG Thomas.

1053.   Plaintiff Daniel Thomas, Jr.  is a U.S. citizen and Pennsylvania resident.  He is the brother of MSG Thomas.

1054.   Plaintiff David Thomas is a U.S. citizen and Pennsylvania resident.  He is the brother of MSG Thomas.

1055.   Plaintiff Kelly Gillis is a U.S. citizen and Pennsylvania resident.  She is the sister of MSG Thomas.

1056.   Plaintiff Melinda Flick is a U.S. citizen and Pennsylvania resident.  She is the sister of MSG Thomas.

1057.   As a result of the March 27, 2007 attack, and MSG Thomas' death, the Thomas Family has experienced severe mental anguish, emotional pain and suffering, and the loss of MSG Thomas' society, companionship, and counsel.

1058.   MSG Thomas' estate is entitled to recover economic and non-economic damages from Defendants, due to his death in the March 27, 2007 Jaysh al-Mahdi attack.

R.      **The Fuentes Family and Estate**

1059.   Private First Class Daniel A. Fuentes served in the U.S. Army in Iraq as part of the 1st Battalion, 28th Infantry Regiment, 4th Infantry Brigade Combat Team, 1st Infantry Division.

1060.   On April 6, 2007, PFC Fuentes was killed by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi in the Al Rashid District in Baghdad, Iraq. He was 19 years old.

1061.   PFC Fuentes was a U.S. citizen when he was killed in Iraq.

1062.   PFC Fuentes' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1063.   Plaintiff Nancy Fuentes is a U.S. citizen and New York resident. She is the mother of PFC Fuentes. She brings claims in both her personal capacity and her representative capacity on behalf of PFC Fuentes' estate.

1064.   Plaintiff Armando Fuentes is a U.S. citizen and New York resident. He is the father of PFC Fuentes.

1065.   Plaintiff Tatyana Fuentes is a U.S. citizen and New York resident. She is the sister of PFC Fuentes.

1066.   Plaintiff Julio Fuentes is a U.S. citizen and New York resident. He is the brother of PFC Fuentes.

1067.   Plaintiff Emma McGarry is a U.S. citizen and New York resident. She was the fiancée of PFC Fuentes at the time of his death, and is the mother of Plaintiff D.F.

1068.   Plaintiff D.F., by and through his next friend Emma McGarry, is a U.S. citizen and New York resident. He is the minor son of PFC Fuentes.

1069.   As a result of the April 6, 2007 attack, and PFC Fuentes' death, the Fuentes Family has experienced severe mental anguish, emotional pain and suffering, and the loss PFC Fuentes' society, companionship, and counsel.

1070.   PFC Fuentes' estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**S.     The Kirby Family**

1071.   Plaintiff Staff Sergeant John Kirby served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

1072.   On April 6, 2007, SSG Kirby was injured in a complex attack carried out by Jaysh al-Mahdi in the Mua'lmeen neighborhood.  The complex attack involved both a roadside EFP and an ambulance that Jaysh al-Mahdi had rigged with explosives.  On May 29, 2007, near Route Predator at the edge of the Fedilayah neighborhood, a Jaysh al-Mahdi sniper shot SSG Kirby in the arm, which broke his humerus in three places and later required an implant.  Both attacks occurred east of Sadr City.  Due to his injuries, SSG Kirby received a 60% disability rating from the VA.  As a result of the April 6, 2007 and May 29, 2007 attacks, SSG Kirby has experienced extreme physical and emotional pain and suffering.

1073.   The April 6, 2007 and May 29, 2007 attacks that injured SSG Kirby would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Jaysh

al-Mahdi used an ambulance as a weapon, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP and shot SSG Kirby neither wore uniforms nor otherwise identified themselves as enemy combatants.

1074.   Plaintiff Rebekah Kirby is a U.S. citizen and Texas resident.  She is the wife of SSG Kirby.

1075.   As a result of the April 6, 2007 and May 29, 2007 attacks and SSG Kirby's injuries, Rebekah Kirby has experienced extreme emotional pain and suffering.

**T.     The Murphy-Sweet Family**

1076.   Commander Philip A. Murphy-Sweet served in Iraq in the U.S. Navy, and was assigned to the Joint Contracting Command, Multi-National Force–Iraq.

1077.   On April 7, 2007, Cmdr. Murphy-Sweet was killed by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern Baghdad, near Sadr City.

1078.   Cmdr. Murphy-Sweet was a U.S. citizen when he was killed in Iraq.

1079.   Cmdr. Murphy-Sweet's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the convoy that Jaysh al-Mahdi attacked was a civilian convoy, and because the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1080.   Plaintiff Michael Murphy-Sweet is a U.S. citizen and Idaho resident.  He is the brother of Cmdr. Murphy-Sweet.

1081.   Plaintiff Elizabeth Murphy-Sweet is a U.S. citizen and Idaho resident.  She is the sister of Cmdr. Murphy-Sweet.

1082.   Plaintiff Anona Gonelli is a U.S. citizen and Idaho resident.  She is the sister of Cmdr. Murphy-Sweet.

1083.   As a result of the April 7, 2007 attack, and Cmdr. Murphy-Sweet's death, the Murphy-Sweet Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Cmdr. Murphy-Sweet's society, companionship, and counsel.

**U.      The Holden Family**

1084.   Private First Class Brian L. Holden served in Iraq in the U.S. Army as part of the 2nd Battalion, 17th Field Artillery Regiment, 2nd Brigade Combat Team, 2nd Infantry Division.

1085.   On April 9, 2007, PFC Holden was killed by an EFP planted and detonated by Jaysh al-Mahdi in eastern Baghdad.  He was 20 years old.

1086.   PFC Holden was a U.S. citizen when he was killed in Iraq.

1087.   PFC Holden's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1088.   Plaintiff Leasa Dollar is a U.S. citizen and North Carolina resident.  She is the mother of PFC Holden.

1089.   Plaintiff Eugene DeLozier is a U.S. citizen and North Carolina resident.  He is the stepfather of PFC Holden.

1090.   As a result of the April 9, 2007 attack and PFC Holden's death, the Holden Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Holden's society, companionship, and counsel.

**V.      Jared Stevens**

1091.   Plaintiff Sergeant First Class Jared S. Stevens served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Maryland resident.

307

1092.   On April 28, 2007, SFC Stevens was injured by a Jaysh al-Mahdi sniper in the Kamaliyah neighborhood of eastern Baghdad.  The sniper shot SFC Stevens in the lip, lacerating it and requiring immediate evacuation to FOB Rustamiyah.  As a result of the April 28, 2007 attack, SFC Stevens has experienced extreme physical and emotional pain and suffering.

1093.   The attack that injured SFC Stevens would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member who shot him neither wore a uniform nor otherwise identified himself as an enemy combatant. xxxx

**W.**   **Jeremy Smith**

1094.   Plaintiff Staff Sergeant Jeremy D. Smith served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and North Carolina resident.

1095.   On May 5, 2007, SSG Smith was injured by a mortar round fired by Jaysh al-Mahdi.  He was resting and refitting at COP Bushmaster in Kamaliyah when three mortar rounds were fired at the U.S. installation.  One of the mortars impacted near SSG Smith, peppering him with shrapnel in his right arm and right leg.  Though at first no major injury was visible, a piece of shrapnel had damaged a ligament in SSG Smith's right ankle.  The injury impacted SSG Smith's ability to perform his job functions, and required surgeries in 2011 and 2018.  As a result of the May 5, 2007 attack and his injuries, Smith has experienced extreme physical and emotional pain and suffering.

1096.   The attack that injured SSG Smith would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who executed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

X.   **The Stephens Family**

1097.   Sergeant Blake Stephens served in Iraq in the U.S. Army as part of the 3rd Brigade Combat Team of the 3rd Infantry Division.

1098.   On May 8, 2007, SGT Stephens was killed by an EFP planted and detonated by Jaysh al-Mahdi in Salman Pak, a town 18 miles south of Baghdad.  He was 25 years old.

1099.   SGT Stephens was a U.S. citizen when he was killed in Iraq.

1100.   SGT Stephens' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1101.   Plaintiff Erin Dructor is a U.S. national.  She is the widow of SGT Stephens.

1102.   Plaintiff Kathleen Stephens is a U.S. citizen and Idaho resident.  She is the mother of SGT Stephens.

1103.   Plaintiff Trent Stephens is a U.S. citizen and Idaho resident.  He is the father of SGT Stephens.

1104.   Plaintiff Derek Stephens is a U.S. citizen and Idaho resident.  He is the brother of SGT Stephens.

1105.   Plaintiff Rhett Stephens is a U.S. citizen and California resident.  He is the brother of SGT Stephens.

1106.   Plaintiff Summer Stephens is a U.S. citizen and California resident.  She is the sister of SGT Stephens.

1107.   Plaintiff Brittani Hobson is a U.S. citizen and Idaho resident.  She is the sister of SGT Stephens.

1108.   As a result of the May 8, 2007 attack, and SGT Stephens' death, the Stephens Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Stephens' society, companionship, and counsel.

**Y.     The Packer Family**

1109.   Sergeant Steven M. Packer served in Iraq in the U.S. Army as part of A Company, 2nd Battalion, 14th Infantry Regiment, 2nd Brigade Combat Team, 10th Mountain Division.

1110.   On May 17, 2007, SGT Packer was killed by an EFP planted and detonated by Jaysh al-Mahdi in an area near Yusufiyah in central Iraq in which Jaysh al-Mahdi was known to operate.

1111.   SGT Packer was a U.S. citizen when he was killed in Iraq.

1112.   SGT Packer's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1113.   Plaintiff Robin Davidson is a U.S. citizen and California resident.  She is the mother of SGT Packer.

1114.   Plaintiff Christopher Packer is a U.S. citizen and California resident.  He is the brother of SGT Packer.

1115.   Plaintiff Danielle Packer is a U.S. citizen and California resident.  She is the sister of SGT Packer.

1116.   Plaintiff J.D., by and through his next friend Robin Davidson, is a U.S. citizen and California resident.  He is the minor brother of SGT Packer.

1117.   Plaintiff Z.D., by and through his next friend Robin Davidson, is a U.S. citizen and California resident.  He is the minor brother of SGT Packer.

1118.   As a result of the May 17, 2007 attack, and SGT Packer's death, the Packer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Packer's society, companionship, and counsel.

### Z.    Tammy DenBoer

1119.   Private First Class Shawn Gajdos served in Iraq as part of the 2-16 Rangers.

1120.   On June 6, 2007, PFC Gajdos was riding in a Humvee on Route Pluto, just south of the Amin neighborhood in eastern Baghdad, when his platoon was ambushed in a complex attack by Jaysh al-Mahdi.  The attack involved an EFP and small-caliber rifle fire.  During the attack, PFC Gajdos was killed by the EFP planted and detonated by Jaysh al-Mahdi.  He was 25 years old.

1121.   PFC Gajdos was a U.S. citizen when he was killed in Iraq.

1122.   PFC Gajdos' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1123.   Plaintiff Tammy DenBoer is a U.S. citizen and Michigan resident.  She is the sister of PFC Gajdos.

1124.   As a result of the June 6, 2007 attack, and PFC Gajdos' death, Tammy DenBoer has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Gajdos' society, companionship, and counsel.

### AA.   **Brandeaux Campbell**

1125.   Plaintiff Specialist Brandeaux Campbell served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Texas resident.

1126.   On June 8, 2007, SPC Campbell was injured in a complex attack carried out by Jaysh al-Mahdi in the western Mua'lmeen neighborhood.  The attack began with an EFP attack on SPC Campbell's vehicle, followed by Jaysh al-Mahdi small-caliber rifle fire.  The EFP, which was planted and detonated by Jaysh al-Mahdi, severely wounded SPC Campbell, giving him a concussion, slicing open his forehead, mouth, and tongue, and lodging shrapnel in both his shoulder and leg.  Due to his injuries, SPC Campbell received a 70% disability rating from the VA.  As a result of the attack, SPC Campbell has experienced extreme physical and emotional pain and suffering.

1127.   The attack that injured SPC Campbell would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### BB.   **The Wilson Family**

1128.   Plaintiff Private First Class Ryan Wilson served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Florida resident.

1129.   On June 8, 2007, PFC Wilson was injured in a complex attack carried out by Jaysh al-Mahdi in the western Mua'lmeen neighborhood.  The attack began with an EFP attack on PFC Wilson's Humvee, followed by small-caliber rifle fire.  PFC Wilson was injured by the EFP, including shrapnel wounds to his right arm.  Due to his injuries, PFC Wilson received a 90% disability rating from the VA.  As a result of the June 8, 2007 attack, and the injuries he

sustained therein, PFC Wilson has experienced extreme physical and emotional pain and suffering.

1130.   The attack that injured PFC Wilson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1131.   Plaintiff Jami Lin Wilson is a U.S. citizen and Florida resident.  She is the wife of PFC Wilson.  As a result of the June 8, 2007 attack, and PFC Wilson's injuries, Jami Lin Wilson has experienced extreme emotional pain and suffering.

**CC.**   **Denise Jackson**

1132.   Specialist Cameron K. Payne served in Iraq as part of the 2-16 Rangers.

1133.   On June 11, 2007, SPC Payne was killed by an EFP planted and detonated by Jaysh al-Mahdi in the southern portion of the Fedilayah neighborhood.

1134.   SPC Payne was a U.S. citizen when he was killed in Iraq.

1135.   SPC Payne's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1136.   Plaintiff Denise Jackson is a U.S. citizen and California resident.  She is the mother of SPC Payne.

1137.   As a result of the June 11, 2007 attack, and SPC Payne's death, Denise. Jackson has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Payne's society, companionship, and counsel.

### DD.  **Johnny Castillo**

1138.   Plaintiff Sergeant Johnny Castillo served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and New York resident.

1139.   On June 25, 2007, SGT Castillo was injured by an EFP planted and detonated in the southern portion of the Fedilayah neighborhood. The EFP injured his neck and caused nerve damage. As a result of the June 25, 2007 attack and his injuries, SGT Castillo has experienced extreme physical and emotional pain and suffering.

1140.   The attack that injured SGT Castillo would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### EE.  **The Craig Family**

1141.   Specialist Andre Craig, Jr. served in Iraq as part of the 2-16 Rangers.

1142.   On June 25, 2007, SPC Craig was killed by an EFP planted and detonated by Jaysh al-Mahdi southern portion of the Fedilayah neighborhood.

1143.   SPC Craig was a U.S. citizen when he was killed in Iraq.

1144.   SPC Craig's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1145.   Plaintiff Aundra Craig is a U.S. citizen and Connecticut resident.  He is the father of SPC Craig.

1146.   Plaintiff Joyce Craig is a U.S. citizen and Connecticut resident.  She is the mother of SPC Craig.

314

1147.   Plaintiff Jonathan Craig is a U.S. citizen and Connecticut resident.  He is the brother of SPC Craig.

1148.   Plaintiff Michael Cook is a U.S. citizen and Connecticut resident.  He is the brother of SPC Craig.

1149.   Plaintiff Andre Brown is a U.S. citizen and Connecticut resident.  He is the brother of SPC Craig.

1150.   Plaintiff Valencia Cook is a U.S. citizen and Connecticut resident.  She is the sister of SPC Craig.

1151.   Plaintiff Debra L. Cook-Russell is a U.S. citizen and Connecticut resident.  She is the sister of SPC Craig.

1152.   As a result of the June 25, 2007 attack, and SPC Craig's death, the Craig Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Craig's society, companionship, and counsel.

**FF.   The Tutwiler Family**

1153.   Plaintiff Private First Class Patrick Tutwiler served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Tennessee resident.

1154.   On June 30, 2007, PFC Tutwiler was injured in an attack by Jaysh al-Mahdi in eastern Baghdad near Route Pluto.  During the attack, a Jaysh al-Mahdi sniper shot PFC Tutwiler through the face and neck.  Due to his injuries, PFC Tutwiler received a 100% disability rating from the VA.  As a result of the June 30, 2007 attack and his injuries, Tutwiler has experienced extreme physical and emotional pain and suffering.

1155.   The attack that injured PFC Tutwiler would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi sniper who shot him neither wore a uniform nor otherwise identified himself as an enemy combatant.

315

1156.   Plaintiff Crystal Tutwiler is a U.S. citizen and Tennessee resident.  She is the wife of PFC Tutwiler.  As a result of the June 30, 2007 attack and PFC Tutwiler's injuries, Crystal Tutwiler has experienced extreme emotional pain and suffering.

**GG.**   **Matthew Mergele**

1157.   Plaintiff Specialist Matthew L. Mergele served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Kentucky resident.

1158.   On or about July 6, 2007, SPC Mergele was injured while returning to FOB Rustamiyah two blocks west of the New Baghdad District Advisory Council.  He was injured by an IED planted and detonated by Jaysh al-Mahdi.  As a result of the attack and his injuries, SPC Mergele has experienced extreme physical and emotional pain and suffering.

1159.   The attack that injured SPC Mergele would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi members who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

**HH.**   **Tausolo Aieti**

1160.   Plaintiff Specialist Tausolo Aieti served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and a Nevada resident.

1161.   On July 17, 2007, SPC Aieti was injured by an IED – consisting of 130mm artillery rounds rigged together – planted and detonated by Jaysh al-Mahdi.  The attack took place on Outer Berm Road in a palm tree grove close to Sadr City.  The attack severely wounded Aieti, who injured his leg and suffered traumatic brain injury. Due to his injuries, SPC Aieti received a 90% disability rating from the VA.  As a result of the July 17, 2007 attack and his injuries, Aieti has experienced extreme physical and emotional pain and suffering.

1162.   The attack that injured SPC Aieti would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

**II.**     **The Bouten Family**

1163.   Plaintiff Sergeant Christopher Bouten served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Kentucky resident.

1164.   On July 17, 2007, SGT Bouten was injured by a mortar round fired by Jaysh al-Mahdi on the COP that served as the base for the Bravo Company of the 2-16 Rangers in the Kamaliyah neighborhood in eastern Baghdad.  He was hit by shrapnel on his neck, back, and leg, and was subsequently medically retired.  Due to his injuries, SGT Bouten received a 90% disability rating from the VA.  As a result of the July 17, 2007 attack, Bouten has experienced physical and emotional pain and suffering.

1165.   The attack that injured SGT Bouten would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the mortar attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1166.   Plaintiff Erin Bouten is a U.S. citizen and Kentucky resident.  She is the wife of SGT Bouten.

1167.   As a result of the July 17, 2007 attack and SGT Bouten's injuries, Erin Bouten has experienced extreme emotional pain and suffering.

**JJ.**     **Tammy Kinney**

1168.   Private First Class James J. Harrelson served in Iraq as part of the 2-16 Rangers.

1169.   On July 17, 2007, PFC Harrelson was killed by an IED – consisting of 130mm artillery rounds rigged together – planted and detonated by Jaysh al-Mahdi.  The attack took place on Outer Berm Road in a palm tree grove close to Sadr City.

1170.   PFC Harrelson was a U.S. citizen when he was killed in Iraq.

1171.   PFC Harrelson's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

1172.   Plaintiff Tammy Kinney is a U.S. citizen and Alabama resident.  She is the mother of PFC Harrelson.

1173.   As a result of the July 17, 2007 attack, and PFC Harrelson's death, Tammy Kinney has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Harrelson's society, companionship, and counsel.

**KK.**   **The Price Family**

1174.   Plaintiff Specialist Daniel Price served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Illinois resident.

1175.   On July 17, 2007, SPC Price was injured by an IED – consisting of three artillery rounds rigged together – planted and detonated by Jaysh al-Mahdi on Outer Berm Road in a palm tree grove close to Sadr City.  Due to his injuries, SPC Price received a 90% unemployability rating from the VA.  As a result of the attack, SPC Price has experienced extreme physical and emotional pain and suffering.

1176.   The attack that injured SPC Price would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who

318

planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

1177.   Plaintiff Terri Overton is a U.S. citizen and Illinois resident.  She is the mother of SPC Price.

1178.   As a result of the July 17, 2007 attack, and SPC Price's injuries, Terri Overton has experienced extreme emotional pain and suffering.

**LL.   COL Daniel Dudek**

1179.   Plaintiff Colonel Daniel Dudek served in Iraq in the U.S. Army.  He is a U.S. citizen and Washington resident.

1180.   In April 2007, COL Dudek was deployed to Iraq while serving in his third year as a Brigade Fire Officer for the 4th Brigade, 2nd Infantry Division, a then-active Stryker Brigade Combat Team, specifically to Taji in support of the U.S. government's efforts under the Baghdad Security Plan to interdict Jaysh al-Mahdi terrorist operations that threatened the Green Zone and risked destabilizing Iraq.

1181.   On July 19, 2007, COL Dudek was seriously injured by an EFP planted and detonated by Jaysh al-Mahdi on the north side of Husseinyah, a Jaysh al-Mahdi stronghold north of Baghdad.  The EFP attack resulted in the death of one Soldier and left COL Dudek with limited paralysis in his hips and legs, and complete paralysis in both of his ankles and feet.  He also has a Lumbar 3/4 cauda equina with no glute muscles and no ability to move the muscles in his calf/ankles/feet and has reduced feeling in his legs down to his ankles.  He also has a deep shrapnel hole in his back and pieces of fragmentation all throughout his left arm, hips, and buttocks area.

1182.   The attack on COL Dudek would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and

detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**MM.**   **The Neiberger Family**

1183.   Specialist Christopher Neiberger served in Iraq in the U.S. Army as part of the 1st Battalion, 18th Infantry Regiment.   He served as a tank gunner.

1184.   On August 6, 2007, SPC Neiberger was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in western Baghdad.   He was 22 years old.

1185.   SPC Neiberger was a U.S. citizen when he was killed in Iraq.

1186.   SPC Neiberger's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1187.   Plaintiff Richard Neiberger is a U.S. citizen and Florida resident.   He is the father of SPC Neiberger.

1188.   Plaintiff Mary Neiberger is a U.S. citizen and Florida resident.   She is the mother of SPC Neiberger.

1189.   Plaintiff Eric Neiberger is a U.S. citizen and Florida resident.   He is the brother of SPC Neiberger.

1190.   Plaintiff Ami Neiberger is a U.S. citizen and Virginia resident.   She is the sister of SPC Neiberger.

1191.   Plaintiff Robert Neiberger is a U.S. citizen and Washington, D.C. resident.   He is the brother of SPC Neiberger.

1192.   As a result of the August 6, 2007 attack, and SPC Neiberger's death, the Neiberger Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Neiberger's society, companionship, and counsel.

   NN.   **The Casey Family**

1193.   Plaintiff Second Lieutenant Brian J. Casey served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Montana resident.

1194.   On August 14, 2007, 2LT Casey was leading a platoon securing a gas station near Route Predator, providing security to prevent Jaysh al-Mahdi from extorting the local population, when he was shot by a Jaysh al-Mahdi sniper.  The sniper round collapsed 2LT Casey's lung and fractured his ribs.  Due to his injuries, 2LT Casey received a 20% disability rating from the VA. As a result of the August 14, 2007 attack, and the injuries he sustained therein, 2LT Casey has experienced extreme physical and emotional pain and suffering.

1195.   The attack that injured 2LT Casey would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member who shot him neither wore a uniform nor otherwise identified himself as an enemy combatant.

1196.   Plaintiff Brittany Hogan is a U.S. citizen and Montana resident.  She was the wife of 2LT Casey at the time of his injury.

1197.   Plaintiff Shelley Ann Casey is a U.S. citizen and North Carolina resident.  She is the mother of 2LT Casey.

1198.   Plaintiff Richard Casey is a U.S. citizen and North Carolina resident.  He is the father of 2LT Casey.

1199.   As a result of the August 14, 2007 attack and 2LT Casey's injuries, the Casey Family has experienced extreme emotional pain and suffering.

### OO.   The Looney Family

1200.   Private First Class Andrew R. Looney served in Iraq as part of the 2-16 Rangers. He was a U.S. citizen when he served in Iraq.

1201.   On August 17, 2007, PFC Looney was injured by an EFP planted and detonated by Jaysh al-Mahdi near COP Cajimat.  As a result of the EFP attack, Looney suffered a partial right foot amputation, shrapnel in his leg, and burns and laceration to his hand.  PFC Looney is now deceased.

1202.   The attack that injured PFC Looney would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1203.   Plaintiff Martha Looney is a U.S. citizen and Oklahoma resident.  She is the mother of PFC Looney.

1204.   As a result of the August 17, 2007 attack and PFC Looney's injuries, the Looney Family has experienced extreme emotional pain and suffering.

### PP.   Mario Bowen

1205.   Plaintiff Sergeant First Class Mario Bowen served in the U.S. Army in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Georgia resident.

1206.   On August 23, 2007, SFC Bowen was injured by an EFP planted and detonated by Jaysh al-Mahdi south of FOB Rustamiyah, near Route Pluto in the New Baghdad District in eastern Baghdad, Iraq. The attack severely wounded SFC Bowen, rendering him unconscious and causing a Traumatic Brain Injury, memory loss, speech issues, and headaches. As a result of the August 23, 2007 attack, SFC Bowen has experienced extreme physical and emotional pain and suffering.

322

1207.   The attack that injured SFC Bowen would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**QQ.   Michele White**

1208.   Staff Sergeant Delmar White served in Iraq as part of the 2nd Battalion of the 138th Field Artillery in the Kentucky National Guard.

1209.   On September 2, 2007, SSG White was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Rusafa District in eastern Baghdad.  He was 37 years old.

1210.   SSG White was a U.S. citizen when he was killed in Iraq.

1211.   SSG White's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1212.   Plaintiff Michele White is a U.S. citizen and Kentucky resident.  She is the widow of SSG White.

1213.   As a result of the September 2, 2007 attack, and SSG White's death, the White Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG White's society, companionship, and counsel.

**RR.   Joshua Wold**

1214.   Plaintiff Sergeant Joshua P.G. Wold served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Oregon resident.

1215.   On September 2, 2007, SGT Wold was injured in a complex attack carried out by Jaysh al-Mahdi on Route Pluto west of FOB Rustamiyah.  Jaysh al-Mahdi's complex attack

involved the use of an array of multiple EFPs to attack SGT Wold's convoy, followed by small-arms fire. SGT Wold was severely wounded in the attack, and his injuries required partial amputation of his right foot. SGT Wold received a 40% disability rating from the VA due to his amputation. As a result of the September 2, 2007 attack, and the injuries he sustained therein, SGT Wold has experienced extreme physical and emotional pain and suffering.

1216. The attack that injured SGT Wold would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFPs neither wore uniforms nor otherwise identified themselves as enemy combatants.

### SS.   The Mixson Family

1217. Plaintiff Corporal Joseph Mixson served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Florida resident.

1218. On September 4, 2007, CPL Mixson was severely injured by an EFP planted and detonated by Jaysh al-Mahdi on Route Predator near Sadr City. The EFP attack on CPL Mixson's vehicle severely wounded CPL Mixson, while three of the other 2-16 Rangers were killed outright and the fourth died of wounds four months later. CPL Mixson sustained a skull fracture, suffered traumatic brain injury, lost one of his elbows, and lost both of his legs above the knee. Due to his injuries, CPL Mixson received a 100% disability rating from the VA. As a result of the attack, CPL Mixson has experienced extreme physical and emotional pain and suffering.

1219. The attack that injured CPL Mixson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1220.   Plaintiff John Mixson is a U.S. citizen and Florida resident.  He is the father of CPL Mixson.  Mr. Mixson lived with and helped care for CPL Mixson in the aftermath of the attack.

1221.   Plaintiff Karon Mixson is a U.S. citizen and Florida resident.  She is the mother of CPL Mixson.  Mrs. Mixson lived with and helped care for CPL Mixson in the aftermath of the attack.

1222.   Plaintiff Alicia Mixson is a U.S. citizen and Florida resident.  She is the sister of CPL Mixson.  Ms. Mixson lived with and helped care for CPL Mixson in the aftermath of the attack.

1223.   As a result of the September 4, 2007 attack, and CPL Mixson's injuries, the Mixson Family has experienced extreme emotional pain and suffering.

**TT.   <u>The Murray Family</u>**

1224.   Sergeant Joel L. Murray served in Iraq as part of the 2-16 Rangers.

1225.   On September 4, 2007, SGT Murray was killed by an EFP planted and detonated by Jaysh al-Mahdi on Route Predator on the northwestern side of the Mashtal neighborhood. After activation, the EFP was set to detonate using a passive infrared trigger system.  The attack also killed two other 2-16 Rangers outright, caused another to die of wounds four months later, and seriously wounded another.

1226.   SGT Murray was a U.S. citizen when he was killed in Iraq.

1227.   SGT Murray's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger system placed civilians at risk.

1228.   Plaintiff Maricel Murray is a U.S. citizen and Kansas resident.  She is the widow of SGT Murray.

1229.   Plaintiff W. Ann Meuli is a U.S. citizen and Kansas resident.  She is the mother of SGT Murray.

1230.   Plaintiff J.M., by and through his next friend Maricel Murray, is a U.S. citizen and Kansas resident.  He is the minor son of SGT Murray.

1231.   As a result of the September 4, 2007 attack, and SGT Murray's death, the Murray Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Murray's society, companionship, and counsel.

### UU.   The Reeves Family

1232.   Corporal Joshua H. Reeves served in Iraq as part of the 2-16 Rangers.

1233.   On September 22, 2007, CPL Reeves was killed by an EFP planted and detonated by Jaysh al-Mahdi outside of FOB Rustamiyah.  After activation, the EFP was set to detonate using a passive infrared trigger system.  When his vehicle was hit by the EFP that killed him, CPL Reeves was returning to FOB Rustamiyah from a gas station across the street, where he had been providing security to prevent Jaysh al-Mahdi from extorting the local population.

1234.   CPL Reeves initially survived the EFP detonation, losing consciousness from the pain and shock of the injuries he suffered.  Although CPL Reeves initially survived the attack, he died from his injuries later that day.  CPL Reeves died one day after his first child was born.

1235.   CPL Reeves was a U.S. citizen when he was killed in Iraq.

1236.   CPL Reeves' murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the passive infrared trigger system placed civilians at risk.

1237.   Plaintiff Leslie Key Hardcastle is a U.S. citizen and Tennessee resident.  She is the widow of CPL Reeves.

1238.   Plaintiff J.R., by and through his next friend Leslie Reeves-Hardcastle, is a U.S. citizen and Tennessee resident.  He is the minor son of CPL Reeves.

1239.   Plaintiff James Reeves is a U.S. citizen and Georgia resident.  He is the father of CPL Reeves.

1240.   Plaintiff W. Jean Reeves is a U.S. citizen and Georgia resident.  She is the mother of CPL Reeves.

1241.   Plaintiff Jared Reeves is a U.S. citizen and Georgia resident.  He is the brother of CPL Reeves.

1242.   Plaintiff Sherri C. Hoilman is a U.S. citizen and Florida resident.  She is the sister of CPL Reeves.

1243.   Plaintiff Joni Reeves is a U.S. citizen and Georgia resident.  She is the sister of CPL Reeves.

1244.   As a result of the September 22, 2007 attack, and CPL Reeves' death, the Reeves Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Reeves' society, companionship, and counsel.

**VV.   Charles Gregston**

1245.   Plaintiff Specialist Charles B. Gregston served in the U.S. Army in Iraq as part of the 1-2 Stryker Calvary Regiment. He is a U.S. citizen and California resident.

1246.   During 2007 and 2008, SPC Gregston was deployed in and/or near Sadr City for 15 months. For the entire Battle of Sadr City, SPC Gregston was either directly in Sadr City or doing patrols on the outskirts of the area. SPC Gregston's second and final deployment was from November 2009 to December 2010, where he was stationed on the outskirts of Baghdad, Iraq.

1247.   During both deployments in Iraq, SPC Gregston dealt predominantly with Jaysh al-Mahdi. SPC Gregston was an immediate responder during the Jaysh al-Mahdi sniper attack that killed SGT Randell Olguin on September 30, 2007, and the Jaysh al-Mahdi EFP attack that killed CPL Joshua Molina on March 27, 2008. SPC Gregston was engaged in fighting during the Battle of Sadr City, including supporting the construction of a wall in Sadr City to interdict the movement of supplies to Jaysh al-Mahdi members in Sadr City. SPC Gregston was subjected to multiple roadside bomb attacks in Jaysh al-Mahdi strongholds.

1248.   As a result of the Jaysh al-Mahdi attacks and fighting, SPC Gregston suffered a number of injuries, including PTSD, Traumatic Brain Injury, and tinnitus, resulting in, among other things, permanent hearing loss. Due to his injuries, he received a 100% disability rating from the VA. As a result of Jaysh al-Mahdi's attacks, SPC Gregston has experienced extreme physical and emotional pain and suffering.

1249.   The attacks that injured SPC Gregston would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed them neither wore uniforms nor otherwise identified themselves as enemy combatants.

**WW.   The Olguin Family and Estate**

1250.   Sergeant Randell Olguin served in the U.S. Army in Iraq as part of the 1-2 Stryker Cavalry Regiment.

1251.   On September 30, 2007, SGT Olguin was shot and killed by sniper fire from a Jaysh al-Mahdi member in the village of Ur, near Sadr City. He was 24 years old.

1252.   SGT Olguin was a U.S. citizen when he was killed.

1253.   SGT Olguin's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member who murdered SGT Olguin neither wore a uniform nor otherwise identified himself as an enemy combatant.

1254.   Plaintiff Jose Olguin is a U.S. citizen and Texas resident. He is the brother of SGT Olguin. He brings claims in both his personal capacity and his representative capacity on behalf of SGT Olguin's estate.

1255.   Plaintiff Jennie Morin is a U.S. citizen and Texas resident. She is the sister of SGT Olguin.

1256.   Plaintiff Anita Baker is a U.S. citizen and Texas resident. She is the sister of SGT Olguin.

1257.   Plaintiff Janet L. Rios is a U.S. citizen and Texas resident. She is the sister of SGT Olguin.

1258.   As a result of the September 30, 2007 attack, and SGT Olguin's death, the Olguin Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Olguin's society, companionship, and counsel.

1259.   SGT Olguin's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Jaysh al-Mahdi.

**XX.   The Juneau Family and Estate**

1260.   William ("Bill") Juneau worked in Iraq as a civilian security contractor working to train members of Iraq's police service.

1261.   On November 26, 2007, Mr. Juneau was killed near Basra by an IED planted and detonated by a cell that included members of both Jaysh al-Mahdi and Hezbollah.  He was 36 years old.

1262.   Mr. Juneau was a U.S. citizen when he was killed in Iraq.

329

1263.   Mr. Juneau's murder would have violated the law of war if Jaysh al-Mahdi and Hezbollah were subject to it because, among other reasons, Mr. Juneau was a civilian not taking part in hostilities, and the Jaysh al-Mahdi and Hezbollah member(s) who planted and detonated the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

1264.   Plaintiff Bridget Juneau is a U.S. citizen and Minnesota resident.  She is the twin sister of Bill Juneau.

1265.   Bridget Juneau is also the Personal Representative of Bill. Juneau's estate.  A copy of the Minnesota District Court order appointing her as Personal Representative, as well as an authenticated copy of Bill Juneau's will, has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for his estate is now open in the District of Columbia.  Bridget Juneau brings claims in both her personal capacity and her representative capacity as the Personal Representative, on behalf of Bill Juneau's estate.

1266.   Plaintiff Stephanie Juneau is a U.S. citizen and Montana resident.  She is the sister of Bill Juneau.

1267.   As the result of the November 26, 2007 attack, and Bill Juneau's death, the Juneau Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Bill Juneau's society, companionship, and counsel.

1268.   Bill Juneau's estate is entitled to recover economic and non-economic damages from Defendants, due to his death in the November 26, 2007 Jaysh al-Mahdi attack.

### YY.   **The Shaw Family**

1269.   Micah Shaw worked as a civilian security specialist in Iraq.  He was employed by a military contractor that provided security for civilian contractors who searched for and disposed of captured munitions.

1270.   On December 9, 2007, Mr. Shaw was killed by an EFP planted and detonated by Jaysh al-Mahdi in Az Zubaydiyah – the Jaysh al-Mahdi stronghold in Wasit Province.  The EFP attack destroyed Mr. Shaw's vehicle, which was also occupied by Michael Doheny, Steven Evrard, and Plaintiff Billy Johnson.  Mr. Shaw was 32 years old.

1271.   Mr. Shaw was a U.S. citizen when he was killed in Iraq.

1272.   Mr. Shaw's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Shaw was a civilian not taking part in hostilities, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1273.   Plaintiff Elena Shaw is a U.S. citizen and New Hampshire resident.  She is the widow of Micah Shaw.

1274.   Plaintiff Emily Shaw is a U.S. citizen and New Hampshire resident.  She is the daughter of Micah Shaw.

1275.   Plaintiff C.S., by and through his next friend Elena Shaw, is a U.S. citizen and New Hampshire resident.  He is the minor son of Micah Shaw.

1276.   Plaintiff L.S., by and through her next friend Elena Shaw, is a U.S. citizen and New Hampshire resident.  She is the minor daughter of Micah Shaw.

1277.   As a result of the December 9, 2007 attack, and Micah Shaw's death, the Shaw Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Micah Shaw's society, companionship, and counsel.

### ZZ.   The Doheny Family

1278.   Michael Doheny worked as a civilian security specialist in Iraq.  He was employed by a military contractor that provided security for civilian contractors who disposed of captured munitions.

1279.   On December 9, 2007, Mr. Doheny was killed by an EFP planted and detonated by Jaysh al-Mahdi in Az Zubaydiyah, the Jaysh al-Mahdi stronghold in Wasit Province.  The EFP attack destroyed Mr. Doheny's vehicle, which was also occupied by Micah Shaw, Steven Evrard, and Plaintiff Billy Johnson.  Mr. Doheny was 30 years old.

1280.   Mr. Doheny was a U.S. citizen when he was killed in Iraq.

1281.   Mr. Doheny's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Doheny was a civilian not taking part in hostilities, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1282.   Plaintiff Melissa Doheny is a U.S. citizen and Nebraska resident.  She is the widow of Michael Doheny.

1283.   Plaintiff Kathy Kugler is a U.S. citizen and Nebraska resident.  She is the mother of Michael Doheny.

1284.   Plaintiff Robert Kugler is a U.S. citizen and Oregon resident.  He is the brother of Michael Doheny.

1285.   Plaintiff Amy Ritchie is a U.S. citizen and Nebraska resident.  She is the sister of Michael Doheny.

1286.   As a result of the December 9, 2007 attack, and Michael Doheny's death, the Doheny Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Michael Doheny's society, companionship, and counsel.

**AAA.  Tanya Evrard**

1287.   Steven Evrard worked as a civilian security specialist in Iraq.  He was employed by a military contractor that provided security for civilian contractors who disposed of captured munitions.

1288.   On December 9, 2007, Mr. Evrard was killed by an EFP planted and detonated by Jaysh al-Mahdi in Az Zubaydiyah – the Jaysh al-Mahdi stronghold in Wasit Province.  The EFP attack destroyed Mr. Evrard's vehicle, which was also occupied by Michael Doheny, Micah Shaw, and Plaintiff Billy Johnson.  Mr. Evrard was 36 years old.

1289.   Mr. Evrard was a U.S. citizen when he was killed in Iraq.

1290.   Mr. Evrard's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Evrard was a civilian not taking part in hostilities, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1291.   Plaintiff Tanya Evrard is a U.S. citizen and Texas resident.  She is the widow of Steven Evrard.

1292.   As a result of the December 9, 2007 attack, and Steven Evrard's death, Tanya Evrard has experienced severe mental anguish, emotional pain and suffering, and the loss of Steven. Evrard's society, companionship, and counsel.

**BBB.   Billy Johnson**

1293.   Plaintiff Billy Johnson worked as a civilian security specialist in Iraq.  He was employed by a military contractor that provided security for civilian contractors who disposed of captured munitions.  Mr. Johnson is a U.S. citizen and Tennessee resident.

1294.   On December 9, 2007, Mr. Johnson was injured by an EFP planted and detonated by Jaysh al-Mahdi in Az Zubaydiyah – the Jaysh al-Mahdi stronghold in Wasit Province.  The EFP attack destroyed Mr. Johnson's vehicle, which was also occupied by Michael Doheny, Micah Shaw, and Steven Evrard.  The attack severely wounded Mr. Johnson.  As a result of the attack, Mr. Johnson has experienced extreme physical and emotional pain and suffering.

1295.   The attack that injured Mr. Johnson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, Mr. Johnson was a civilian not taking part in hostilities, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**CCC.   The Lukow Family**

1296.   Plaintiff Staff Sergeant Michael Lukow served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Utah resident.

1297.   On January 30, 2008, SSG Lukow was injured by an EFP planted and detonated by Jaysh al-Mahdi in eastern Baghdad, along the outskirts of the Baghdad al Jadeeda neighborhood as his vehicle was nearing Route Predator.  The attack severely wounded SSG Lukow and, among other things, required an amputation of his foot.  Due to his injuries, SSG Lukow received a 70% disability rating from the U.S. Army.  As a result of the attack, SSG Lukow has experienced extreme physical and emotional pain and suffering.

1298.   The attack that injured SSG Lukow would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1299.   Plaintiff Bruce Lukow is a U.S. citizen and Colorado resident.  He is the father of SSG Lukow.

1300.   Plaintiff Rikki Lukow is a U.S. citizen and Colorado resident.  She is the mother of SSG Lukow.

1301.   Plaintiff Kristen Kelley is a U.S. citizen and Colorado resident.  She is the sister of SSG Lukow.

1302.   Plaintiff Andrew Lukow is a U.S. citizen and Wisconsin resident.  He is the brother of SSG Lukow.

1303.   Plaintiff Joseph Paul Lukow is a U.S. citizen and Colorado resident.  He is the brother of SSG Lukow.

1304.   As a result of the January 30, 2008 attack, and SSG Lukow's injuries, the Lukow Family has experienced extreme emotional pain and suffering.

**DDD.  The West Family**

1305.   Staff Sergeant Laurent J. West served in Iraq in the U.S. Army as part of the 3rd Squadron, 73rd Cavalry Regiment, 1st Brigade Combat Team, 82nd Airborne Division.

1306.   On March 11, 2008, SSG West was killed by a roadside bomb planted and detonated by Jaysh al-Mahdi in Babil Province, the Jaysh al-Mahdi stronghold in south central Iraq.

1307.   SSG West was a U.S. citizen when he was killed in Iraq.

1308.   SSG West's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the roadside bomb neither wore uniforms nor otherwise identified themselves as enemy combatants.

1309.   Plaintiff Michelle West is a U.S. citizen and Colorado resident.  She is the widow of SSG West.

1310.   As a result of the March 11, 2008 attack, and SSG West's death, the West Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG West's society, companionship, and counsel.

**EEE.  Anthony M. Gerber**

1311.   Plaintiff Sergeant Anthony M. Gerber served in the U.S. Army in Iraq as part of

335

the 1-2 Stryker Cavalry Regiment. He is a U.S. citizen and Washington resident.

1312.   SGT Gerber was the target of numerous Jaysh al-Mahdi attacks during the Battle of Sadr City, and was involved in several counter-offensives against Jaysh al-Mahdi terrorists.

1313.   He was the target of regular ambushes by Jaysh al-Mahdi that relied on the use of women and children as human shields, as well as RPG and sniper attacks. SGT Gerber was also part of the fight surrounding the construction of the wall on Route Gold; the fighting involving Chris Kyle depicted in the film *American Sniper*; and the fighting to interdict Jaysh al-Mahdi attempts to resupply Sadr City and counter Jaysh al-Mahdi attacks on the flanks of Sadr City.

1314.   On March 27, 2008, during the Battle of Sadr City, SGT Gerber survived an EFP attack by Jaysh al-Mahdi. During this attack, he witnessed an EFP destroy the vehicle immediately in front of him, killing Corporal Joshua Molina. SGT Gerber was hit by the concussion from the blast, damaging his hearing.

1315.   In the course of fighting against Jaysh al-Mahdi terrorists in late 2007 and early 2008, including during the Battle of Sadr City, SGT Gerber suffered multiple concussions, developed PTSD, chronic back pain, and tinnitus. Due to his injuries, SGT Gerber received a 50% disability rating from the VA. As a result of multiple Jaysh al-Mahdi attacks, SGT Gerber has experienced extreme physical and emotional pain and suffering.

1316.   The attacks that injured SGT Gerber would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who attacked him neither wore uniforms nor otherwise identified themselves as enemy combatants, and because they used children as human shields.

### FFF.   The Hanley Family

1317.   Plaintiff Specialist Patrick Keith Hanley served in Iraq as part of the 2-16 Rangers.  He is a U.S. citizen and Virginia resident.

336

1318.   On March 29, 2008, during the Battle of Sadr City, SPC Hanley was injured by an EFP planted and detonated by Jaysh al-Mahdi between the New Baghdad District Advisory Council and COP Cajimat.  The EFP detonated during a complex attack by Jaysh al-Mahdi that included small-arms fire.  The EFP caused him to lose his left arm and one third of his skull. Due to his injuries, SPC Hanley received a 100% disability rating from the VA.  As a result of the March 29, 2008 attack, and the injuries he suffered therein, SPC Hanley has experienced extreme physical and emotional pain and suffering.

1319.   The attack that injured Hanley would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1320.   Plaintiff Edward Hanley is a U.S. citizen and Virginia resident.  He is the father of SPC Hanley.

1321.   As a result of the March 29, 2008 attack, and SPC Hanley's injuries, Edward Hanley has experienced extreme emotional pain and suffering.

**GGG.  The Patrick Miller Family**

1322.   Private First Class Patrick Miller served in Iraq in the U.S. Army as part of the 2-16 Rangers.

1323.   On March 29, 2008, during the Battle of Sadr City, PFC Miller was killed by an EFP planted and detonated by Jaysh al-Mahdi between the New Baghdad District Advisory Council and COP Cajimat. He was 23 years old.

1324.   PFC Miller was a U.S. citizen when he was killed in Iraq.

1325.   PFC Miller's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and

detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1326.   Plaintiff Kimberly Miller is a U.S. citizen and Florida resident. She is the mother of PFC Miller.

1327.   Plaintiff Dana Svenson is a U.S. citizen and New Jersey resident. She is the sister of PFC Miller.

1328.   As a result of the March 29, 2008 attack, and PFC Miller's death, PFC Miller's family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Miller's society, companionship, and counsel.

### HHH.  Jimmy Connolly

1329.   Plaintiff Specialist Jimmy Connolly served in Iraq in the U.S. Army as the lead Combat Medic for the 3rd Platoon, 58th Combat Engineer Company, 11th Armored Cavalry Regiment.  SPC Connolly is a U.S. citizen and Washington, D.C. resident.

1330.   SPC Connolly was deployed in Iraq from 2007 through 2009.  While deployed near Bayji, his unit was subject to regular improvised rocket attacks from the east.  On information and belief, these rocket attacks were perpetrated by Jaysh al-Mahdi.  This belief is based upon, among other things, SPC Connolly's personal observations of local indicators consistent with Jaysh al-Mahdi death squads being active in the area, and statements made to SPC Connolly by local Iraqi allies identifying the remains of burned out vehicles (including human remains) as having resulted from Jaysh al-Mahdi death squads active in the area.

1331.   In or about the spring of 2008, SPC Connolly's company was transferred to FOB Hammer, which was east of Baghdad.  His company was moved to FOB Hammer because Jaysh al-Mahdi had inflicted severe casualties on the prior company that had been stationed there.  His company's mission at FOB Hammer was to fight Jaysh al-Mahdi to prevent Jaysh al-Mahdi from

undermining the military's civil-capacity-building objectives and de-railing the U.S. government's broader efforts to strengthen Iraqi democracy.

1332.  While at FOB Hammer, SPC Connolly was subjected to repeated attacks by Jaysh al-Mahdi.  This included SPC Connolly being part of multiple convoys subjected to IEDs planted and detonated by Jaysh al-Mahdi.  SPC Connolly was also subjected to attacks while he and his unit were resting and refitting at FOB Hammer.

1333.  Due to the intense, relentless terrorist attacks perpetrated by Jaysh al-Mahdi on SPC Connolly and his company both while near Bayji and while in FOB Hammer, SPC Connolly experienced extreme emotional trauma and distress.  He was diagnosed with Post-Traumatic Stress Disorder ("PTSD").  Due to his injuries, SPC Connolly received a 70% disability rating from the VA.  As a result of the attacks, SPC Connolly has experienced extreme physical and emotional pain and suffering.

1334.  The attacks that injured SPC Connolly would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

### III.  Carl Reiher

1335.  Plaintiff Private First Class Carl Reiher served in Iraq as part of the 2-16 Rangers. He is a U.S. citizen and Arkansas resident.

1336.  On March 29, 2008, during the Battle of Sadr City, PFC Reiher was injured in a complex attack carried out by Jaysh al-Mahdi, between the New Baghdad District Advisory Council and COP Cajimat.  The complex attack involved both an EFP planted and detonated by Jaysh al-Mahdi and small-arms fire.  The attack severely wounded PFC Reiher and caused him to lose a hand.  Due to his injuries, PFC Reiher received a 100% disability rating from the VA.

As a result of the attack, PFC Reiher has experienced extreme physical and emotional pain and suffering.

1337.   The attack that injured PFC Reiher would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP and opened fire neither wore uniforms nor otherwise identified themselves as enemy combatants.

**JJJ.**   **The Robinson Family**

1338.   Plaintiff Staff Sergeant Jason Robinson served in Iraq in the U.S. Army as part of the 2nd Battalion, 30th Infantry Regiment, 4th Brigade, 10th Mountain Division (the "2-30 Wild Boars").  He is a U.S. citizen and Virginia resident.

1339.   On April 3, 2008, SSG Robinson was injured by an EFP planted and detonated by Jaysh al-Mahdi, in eastern Baghdad, near Sadr City.  SSG Robinson sustained shrapnel wounds to his face, neck, and shoulder; the blast also dislocated two lumbar disks and ruptured both of his eardrums.  Due to his injuries, SSG Robinson received a 90% disability rating from the VA. As a result of the April 3, 2008 attack, and the injuries he sustained therein, SSG Robinson has experienced extreme physical and emotional pain and suffering.

1340.   The attack that injured SSG Robinson would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1341.   Plaintiff Frances Robinson is a U.S. citizen and Virginia resident.  She is the wife of SSG Robinson.

1342.   Plaintiff E.R., by and through her next friend Frances Robinson, is a U.S. citizen and Virginia resident.  She is the minor daughter of SSG Robinson.

1343.   Plaintiff William Justin Weatherly is a U.S. citizen and Virginia resident.  He is the stepson of SSG Robinson.  He was raised in substantial part by SSG Robinson; lives with SSG Robinson; and has a relationship with SSG Robinson that resembles one of a biological father and son.

1344.   Plaintiff Michael Weatherly is a U.S. citizen and Virginia resident.  He is the stepson of SSG Robinson.  He was raised in substantial part by SSG Robinson; lives with SSG Robinson; and has a relationship with SSG Robinson that resembles one of a biological father and son.

1345.   As a result of the April 3, 2008 attack, and SSG Robinson's injuries, the Robinson Family has experienced extreme emotional pain and suffering.

**KKK.  The Von Letkemann Family**

1346.   Plaintiff Sergeant First Class Grant Von Letkemann II served in Iraq as a reservist who was deployed with the 396th Military Police Detachment of the U.S. Army.  He is a U.S. citizen and Colorado resident.

1347.   On April 4, 2008, while he was on base, SFC Von Letkemann was seriously injured from the blast and explosion from a Jaysh al-Mahdi 107mm rocket attack on Victory Base Complex.  Due to his injuries, SFC Von Letkemann received a 70% disability rating from the VA.  As a result of the April 4, 2008 attack, SFC Von Letkemann has experienced extreme physical and emotional pain and suffering.

1348.   The attack that injured SFC Von Letkemann would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the rockets neither wore uniforms nor otherwise identified themselves as enemy combatants, and because the attack placed civilians at risk.

1349.   Plaintiff Kelly Von Letkemann is a U.S. citizen and Colorado resident.  She is the wife of SFC Von Letkemann.

1350.   As a result of the April 4, 2008 attack, and SFC Von Letkemann's injuries, Kelly Von Letkemann has experienced extreme emotional pain and suffering.

**LLL.   The Vaughn Family**

1351.   Sergeant Richard A. Vaughn served in Iraq in the U.S. Army as part of the 1st Battalion, 66th Armor Regiment, 1st Brigade Combat Team, 4th Infantry Division.

1352.   On April 7, 2008, during the Battle of Sadr City, SGT Vaughn was killed in a complex attack carried out by Jaysh al-Mahdi in Fedaliyah, which is in the New Baghdad District in eastern Baghdad.  The complex attack involved the use of both RPGs and EFPs planted and detonated by Jaysh al-Mahdi.

1353.   SGT Vaughn was a U.S. citizen when he was killed in Iraq.

1354.   SGT Vaughn's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFPs and fired the RPGs neither wore uniforms nor otherwise identified themselves as enemy combatants.

1355.   Plaintiff Rachelle Idol is a U.S. citizen and North Carolina resident.  She is the widow of SGT Vaughn.

1356.   Plaintiff James Vaughn is a U.S. citizen and Arizona resident.  He is the father of SGT Vaughn.

1357.   Plaintiff Jeannine Vaughn is a U.S. citizen and Arizona resident.  She is the mother of SGT Vaughn.

1358.   Plaintiff Clifford Vaughn is a U.S. citizen and Arizona resident.  He is the brother of SGT Vaughn.

1359.    As a result of the April 7, 2008 attack, and SGT Vaughn's death, the Vaughn Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Vaughn's society, companionship, and counsel.

**MMM.        The Billiter Family**

1360.    Staff Sergeant Jesse A. Ault served in Iraq in the as part of the 429th Brigade Support Battalion, Virginia Army National Guard.

1361.    On April 9, 2008, during the Battle of Sadr City, SSG Ault was killed by an EFP planted and detonated by Jaysh al-Mahdi on the outskirts of Sadr City.  SSG Ault's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1362.    SSG Ault was a U.S. citizen when he was killed in Iraq.

1363.    Plaintiff Virginia Billiter is a U.S. citizen and West Virginia resident.  She is the mother of SSG Ault.

1364.    Plaintiff Eric Billiter is a U.S. citizen and West Virginia resident.  He is the stepfather of SSG Ault.

1365.    As a result of the April 9, 2008 attack, and SSG Ault's death, the Billiter Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Ault's society, companionship, and counsel.

**NNN.  The Bogart Family**

1366.    Plaintiff Specialist Evan D. Bogart served in Iraq in the U.S. Army as part of Headquarters Company, 4th Brigade, 10th Mountain Division. He is a U.S. citizen and Arizona resident.

1367.   On April 21, 2008, during the Battle of Sadr City, SPC Bogart was injured when an EFP was planted and detonated near his vehicle by Jaysh al-Mahdi on Route Predators, close to FOB Loyalty, in the New Baghdad District in eastern Baghdad, Iraq. SPC Bogart sustained burns and blast injuries to his face, as well as a shrapnel injury to his left shoulder, PTSD, and tinnitus. Due to his injuries, he received an 80% disability rating from the VA. As a result of the April 21, 2008 attack, SPC Bogart has experienced extreme physical and emotional pain and suffering.

1368.   The attack that injured SPC Bogart would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1369.   Plaintiff Lani D. Bogart is a U.S. citizen and Arizona resident. She is the mother of SPC Bogart.

**OOO.  The Rosa Family**

1370.   Plaintiff Sergeant Luis Rosa-Valentin served in Iraq in the U.S. Army as part of the 66th Armored Regiment, 3rd Brigade Combat Team, 4th Infantry Division.  He is a U.S. citizen and Maryland resident.

1371.   On April 21, 2008, SGT Rosa-Valentin was injured by an EFP planted and detonated by Jaysh al-Mahdi in Sadr City.  SGT Rosa-Valentin's injuries caused him to lose both his legs and his left arm, and doctors gave him 5% survival odds in the wake of the attack.  He also suffered blindness in one eye, lost his hearing, broke every bone in his face, suffered traumatic brain injury, and was diagnosed with PTSD.  Due to his injuries, SGT Rosa-Valentin received a 100% disability rating from the VA.  As a result of the attack, SGT Rosa-Valentin has experienced extreme physical and emotional pain and suffering.

344

1372. The attack that injured SGT Rosa-Valentin would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1373. Plaintiff Luis Rosa-Alberty is a U.S. citizen and Maryland resident. He is the father of SGT Rosa-Valentin.

1374. Plaintiff M.R., by and through her next friend Luis Rosa-Valentin, is a U.S. citizen and Maryland resident. She is the minor daughter of SGT Rosa-Valentin.

1375. Plaintiff Alex Rosa-Valentin is a U.S. citizen and Florida resident. He is the brother of SGT Rosa-Valentin.

1376. Plaintiff Iliana Rosa-Valentin is a U.S. citizen and Maryland resident. She is the sister of SGT Rosa-Valentin.

1377. As a result of the April 21, 2008 attack, and SGT Rosa-Valentin's injuries, the Rosa Family has experienced extreme emotional pain and suffering.

**PPP. The Thomsen Family**

1378. Plaintiff Sergeant Mark E. Thomsen served in Iraq in the 1-2 Stryker Cavalry Regiment. He is a U.S. citizen and Arkansas resident.

1379. From approximately March 2008 through April 2008, SGT Thomsen survived multiple attacks by Jaysh al-Mahdi, including EFP, IED, RPG, sniper, and indirect-fire attacks in or near Sadr City, during the Battle of Sadr City. SGT Thomsen sustained several injuries during these attacks, including at least one Traumatic Brain Injury.

1380. On April 21, 2008, during the Battle of Sadr City, SGT Thomsen was injured by a Jaysh al-Mahdi-modified 107mm rocket attack, which used an IRAM, on JSS Sadr City. The attack wounded SGT Thomsen with a concussion, Traumatic Brain Injury, and PTSD. Due to his

injuries, he received a VA rating of 100%. As a result of the April 21, 2008 and other Jaysh al-Mahdi attacks, SGT Thomsen has experienced extreme physical and emotional pain and suffering.

1381.   The attacks that injured SSG Thomsen would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed them neither wore uniforms nor otherwise identified themselves as enemy combatants.

1382.   Plaintiff Ardell Thomsen is a U.S. citizen and Arkansas resident. She is the mother of SGT Thomsen.

1383.   Plaintiff Ralph Thomsen is a U.S. citizen and Arkansas resident. He is the father of SGT Thomsen.

1384.   As a result of the Jaysh al-Mahdi attacks, and SGT Thomsen's injuries, the Thomsen Family has experienced extreme emotional pain and suffering.

**QQQ.  The Farina Family**

1385.   Plaintiff Staff Sergeant Anthony Farina served in the U.S. Army in Iraq as part of C Company, 3rd Brigade, 4th Infantry Division. He is a U.S. citizen and Indiana resident.

1386.   On April 27, 2008, during the Battle of Sadr City, SSG Farina was injured by an RPG fired by Jaysh al-Mahdi while he was providing security for personnel constructing a wall in Sadr City. SSG Farina suffered shrapnel wounds to his neck and was knocked unconscious.

1387.   Due to his injuries, SSG Farina received a 100% disability rating from the VA. As a result of the April 27, 2008 attack, SSG Farina has experienced extreme physical and emotional pain and suffering.

1388.   The attack that injured SSG Farina would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed it neither wore uniforms nor otherwise identified themselves as enemy combatants.

1389.   Plaintiff Kathleen Pirtle is a U.S. citizen and Indiana resident. She is the mother of SSG Farina. As a result of the April 27, 2008 attack, and SSG Farina's injuries, Kathleen Pirtle has experienced extreme emotional pain and suffering.

**RRR.  Adam Magers**

1390.   Plaintiff Sergeant Adam Magers served in Iraq as a medic for the 1138th Sapper Company with the Missouri National Guard, 35th Engineer Brigade. His company was temporarily under the operational control of both the 10th Mountain Division, and 2nd Stryker Cavalry Regiment, while running missions in northern Baghdad and Sadr City. He is a U.S. citizen and Missouri resident.

1391.   On April 28, 2008, during the Battle of Sadr City, SGT Magers was injured when eight Jaysh al-Mahdi-modified 107mm rockets known as Improvised Rocket Assisted Munitions (IRAMs), also known as "lob bombs," hit JSS Sadr City. The rockets were launched by a joint Jaysh al-Mahdi and Hezbollah cell operating near Sadr City. The eight blasts resulted in a Traumatic Brain Injury, and lacerations to his arms, hands, neck, and head, among other injuries.

1392.   On May 9, 2008, SGT Magers was injured by an EFP planted and detonated by Jaysh al-Mahdi on Route Gold in Sadr City. Three additional EFPs hit the convoy in the same ambush. The EFP blasts resulted in a Traumatic Brain Injury, among other injuries.

1393.   Due to his injuries in these attacks, SGT Magers received a 90% disability rating from the VA. As a result of the April 28, 2008 and May 9, 2008 attacks, SGT Magers has experienced extreme physical and emotional pain and suffering.

347

1394.   The attacks that injured SGT Magers would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who committed the attacks neither wore uniforms nor otherwise identified themselves as enemy combatants.

**SSS.   Luis Garza**

1395.   Plaintiff Specialist Luis Garza served in the U.S. Army in Iraq as part of the 2-30 Wild Boars. He is a U.S. citizen and Florida resident.

1396.   On or about April 29, 2008, during the Battle of Sadr City, SPC Garza was injured by an EFP planted and detonated near his vehicle by Jaysh al-Mahdi near Sadr City. The explosion severely damaged the vehicle and caused facial injuries to SPC Garza from shrapnel.

1397.   On or about May 9, 2008, during the Battle of Sadr City, SPC Garza was injured by another EFP planted and detonated by Jaysh al-Mahdi in Sadr City. This attack dazed him, and he was peppered with shrapnel in his face. As a result of both attacks, SPC Garza suffers from PTSD, and had to have part of his kidney removed.

1398.   Due to his injuries, SPC Garza received a 90% disability rating from the VA. As a result of the Jaysh al-Mahdi attacks, SPC Garza has experienced extreme physical and emotional pain and suffering.

**TTT.   The Woodard Family**

1399.   Plaintiff Captain David Woodard served in Iraq as part of the 2-30 Wild Boars. He is a U.S. citizen and Georgia resident.

1400.   On April 28, 2008, during the Battle of Sadr City, CPT Woodard was injured by an EFP planted and detonated by Jaysh al-Mahdi in the New Baghdad District in eastern

1401.   Baghdad, Iraq while he was on a patrol at a checkpoint on Route Gold and Route Arrow, approximately 200 meters outside of Sadr City. CPT Woodard's patrol was attacked by

an ambush, with a dual-array EFP on both sides of the route. He was hit by the first one. The EFP went through the door of his vehicle and into the transmission. A large fragment struck his right leg and blew out four inches of his leg bone. Two large shrapnel fragments entered his left calf, removing approximately 25% of the calf muscle. Another fragment entered near his Achilles tendon, and the shrapnel was later surgically removed. The second EFP was set off during the medical-evacuation operation to evacuate CPT Woodard, but it failed to detonate. Due to his injuries, he received a 90% disability rating from the VA. As a result of the April 28, 2008 attack, CPT Woodard has experienced significant physical and emotional pain and suffering.

1402.   The attack that injured CPT Woodard would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who launched the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and because they attacked a medical-evacuation helicopter during a medical evacuation of a wounded soldier.

1403.   Plaintiff D.W., by and through his next friend CPT Woodard, is a U.S. citizen and Georgia resident. He is the minor son of CPT Woodard.

1404.   As a result of the attack, and CPT Woodard's injuries, the Woodard Family has experienced severe mental anguish, emotional pain, and suffering.

**UUU.  The Tucker Family and Estate**

1405.   Specialist Ronald J. Tucker served in Iraq in the U.S. Army as part of the 1st Battalion, 22nd Infantry Regiment, 1st Brigade Combat Team, 4th Infantry Division.

1406.   On April 30, 2008, during the Battle of Sadr City, SPC Tucker was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in western Baghdad.  The EFP attack killed SPC Tucker while he was in a vehicle traveling back from helping to build a soccer field for Iraqi children.  He was 21 years old.

1407. SPC Tucker was a U.S. citizen when he was killed in Iraq.

1408. SPC Tucker's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, he was traveling with a civilian convoy at the time of the EFP attack, and the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1409. Plaintiff Susan Arnold is a U.S. citizen and Colorado resident. She is the mother of SPC Tucker.

1410. Susan Arnold is also the Personal Representative of SPC Tucker's estate. A copy of the Colorado District Court order appointing her as Personal Representative has been filed with the D.C. Register pursuant to D.C. Code § 20-341(b), and a Foreign Estate Proceeding for SPC Tucker's estate is now open in the District of Columbia. Susan Arnold brings claims in both her personal capacity and her representative capacity as the Personal Representative, on behalf of SPC Tucker's estate.

1411. Plaintiff David Arnold is a U.S. citizen and Colorado resident. He is the stepfather of SPC Tucker.

1412. Plaintiff Samantha Tucker is a U.S. citizen and Ohio resident. She is the sister of SPC Tucker.

1413. Plaintiff Daisy Tucker is a U.S. citizen and Colorado resident. She is the sister of SPC Tucker.

1414. Plaintiff Brandon Arnold is a U.S. citizen and Colorado resident. He is the brother of SPC Tucker.

1415.   As a result of the April 30, 2008 attack, and SPC Tucker's death, the Tucker Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Tucker's society, companionship, and counsel.

1416.   SPC Tucker's estate is entitled to recover economic and non-economic damages from Defendants, due to his death in the April 30, 2008 Jaysh al-Mahdi attack.

### VVV.  The Daggett Family

1417.   Sergeant John K. Daggett served with the U.A. Army in Iraq as part of the 1st Battalion, 14th Infantry Regiment, 2nd Brigade Combat Team, 25th Infantry Division.

1418.   On May 1, 2008, during the Battle of Sadr City, SGT Daggett was injured by an RPG fired at his vehicle by Jaysh al-Mahdi. The attack occurred while SGT Daggett was providing security for personnel constructing a wall in Sadr City. SGT Daggett underwent surgery at Camp Taji in Baghdad, Iraq. He was transported to Landstuhl, Germany, where he spent several days. SGT Daggett was then to be flown from Germany to a military hospital in the Washington, D.C. area but, due to a mid-flight medical emergency caused by his injuries, SGT Daggett was rerouted to Halifax, Nova Scotia to tend to his injuries. SGT Daggett's family, including his father and mother, traveled to Halifax, where they spent several days beside his hospital bed. SGT Daggett died on May 15, 2008 in Halifax. SGT Daggett was 21 years old.

1419.   SGT Daggett was a U.S. citizen when he was killed.

1420.   SGT Daggett's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who fired the RPG neither wore uniforms nor otherwise identified themselves as enemy combatants.

1421.   Plaintiff John Daggett is a U.S. citizen and Arizona resident. He is the father of SGT Daggett.

1422.   Plaintiff Colleen Czaplicki is a U.S. citizen and Arizona resident. She is the mother of SGT Daggett.

1423.   Plaintiff Kendall Rasmusson is a U.S. citizen and Arizona resident. She is the sister of SGT Daggett.

1424.   As a result of the May 1, 2008 attack, and SGT Daggett's death 14 days later, the Daggett Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Daggett's society, companionship, and counsel.

WWW.       **The Farley Family**

1425.   Steven L. Farley worked in Iraq under the auspices of the U.S. Department of State as a member of a Provincial Reconstruction Team ("PRT") in eastern Baghdad in 2008.

1426.   On June 24, 2008, a Jaysh al-Mahdi cell – whose members had, on information and belief, received training from Hezbollah in Iran – executed a sophisticated assassination bombing in a local government office in Sadr City that targeted Americans and local government officials who were not following Sadr.  The bomb killed eleven people, including Mr. Farley and three other Americans.

1427.  Mr. Farley was a U.S. citizen when he was killed in Iraq.

1428.  Mr. Farley's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, he and others killed in the attack were civilians not taking part in hostilities, and because the Jaysh al-Mahdi member(s) who planted and detonated the bomb neither wore uniforms nor otherwise identified themselves as enemy combatants.

1429.   Plaintiff Donna Farley is a U.S. citizen and Oklahoma resident.  She is the widow of Steven Farley.

1430.   Plaintiff Noel Farley, Sr. is a U.S. citizen and Oklahoma resident.  He is the father of Steven Farley.

352

1431.   Plaintiff Barbara Farley is a U.S. citizen and Oklahoma resident.  She is the mother of Steven Farley.

1432.   Plaintiff Brett Farley is a U.S. citizen and Oklahoma resident.  He is the son of Steven Farley.

1433.   Plaintiff Jessica Farley is a U.S. citizen and Oklahoma resident.  She is the daughter-in-law of Steven Farley; had an especially close relationship with her father-in-law; and thought of him as the equivalent of a biological father.

1434.   Plaintiff Cameron Farley is a U.S. citizen and Oklahoma resident.  He is the son of Steven Farley.

1435.   Plaintiff Chris Farley is a U.S. citizen and Oklahoma resident.  He is the son of Steven Farley.

1436.   Plaintiff Vickie McHone is a U.S. citizen and Oklahoma resident.  She is the sister of Steven Farley.

1437.   Plaintiff Noel S. Farley is a U.S. citizen and Oklahoma resident.  He is the brother of Steven Farley.

1438.   Plaintiff David Farley is a U.S. citizen and Oklahoma resident.  He is the brother of Steven Farley.

1439.   As a result of the June 24, 2008 attack, and Steven Farley's death, the Farley Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Steven Farley's society, companionship, and counsel.

## XXX.  The Suveges Family and Estate

1440.   Nicole Suveges was a political scientist who worked for BAE Systems in the Human Terrain System (HTS) program in eastern Baghdad, Iraq in 2008. The HTS program was designed to promote cultural understanding between U.S. military and Iraqis.

353

1441.   On June 24, 2008, a Jaysh al-Mahdi cell – whose members had, on information and belief, received training from Hezbollah in Iran – executed a sophisticated assassination bombing in a local government office in Sadr City that targeted Americans and local government officials who were not following Sadr. The bomb killed 11 people, including Nicole Suveges and three other Americans.

1442.   Ms. Suveges was a U.S. citizen when she was killed in Iraq.

1443.   Ms. Suveges's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, she and others killed in the attack were civilians not taking part in hostilities, and because the Jaysh al-Mahdi member(s) who planted and detonated the bomb neither wore uniforms nor otherwise identified themselves as enemy combatants.

1444.   Plaintiff David C. Iverson is a U.S. citizen and Maryland resident. He is the widower of Nicole Suveges. He brings claims in both his personal capacity and his representative capacity on behalf of Ms. Suveges's estate.

1445.   As a result of the June 24, 2008 attack, and Nicole Suveges's death, David C. Iverson has experienced severe mental anguish, emotional pain and suffering, and the loss of Nicole Suveges's society, companionship, and counsel.

1446.   Ms. Suveges's estate is entitled to recover economic and non-economic damages from Defendants, due to her murder by Jaysh al-Mahdi.

### YYY.  The Connelly Family

1447.   Corporal Brian Connelly served in Iraq in the U.S. Army as part of the 40th Engineer Battalion, 2nd Brigade Combat Team, 1st Armored Division.

1448.   On February 26, 2009, CPL Connelly was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Adhamiyah District in eastern Baghdad, an area north of Sadr City.  He was 26 years old.

1449.  CPL Connelly was a U.S. citizen when he was killed in Iraq.

1450.  CPL Connelly's murder would have violated the law of war if Jaysh al-Mahdi were subject to it because, among other reasons, the Jaysh al-Mahdi member(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

1451.  Plaintiff Kara Connelly is a U.S. citizen and New Jersey resident.  She is the widow of CPL Connelly.

1452.  Plaintiff Jean Dammann is a U.S. citizen and Ohio resident.  She is the mother of CPL Connelly.

1453.  Plaintiff Mark Dammann is a U.S. citizen and Ohio resident.  He is the father of CPL Connelly.

1454.  Plaintiff Kevin Connelly is a U.S. citizen and New Jersey resident.  He is the brother of CPL Connelly.

1455.  As a result of the February 26, 2009 attack, and CPL Connelly's death, the Connelly Family has experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Connelly's society, companionship, and counsel.

## CLAIMS FOR RELIEF

### COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
[All Defendants:  Primary Liability, 18 U.S.C. § 2339A Predicate]

1456.   Plaintiffs incorporate their factual allegations above.

1457.   MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley[359] provided

material support to the IRGC, including its Hezbollah Division and Qods Force,[360] Jaysh al-

Mahdi, including Jaysh al-Mahdi Special Group Asaib Ahl al-Haq and Jaysh al-Mahdi Special

Group Ka'taib Hezbollah,[361] al-Qaeda, and the Taliban, including its Haqqani Network,[362] in

violation of 18 U.S.C. § 2339A.  They did so negotiating, executing, performing under, and

fraudulently concealing MTN's secret Security Cooperation Agreement with the IRGC, and by

making payments, or causing payments to be made, to the IRGC, including its Hezbollah

Division and Qods Force, Jaysh al-Mahdi, al-Qaeda, and the Taliban, including its Haqqani

Network, that financed such FTOs' and SDGT's terrorist attacks, and by providing management,

---

[359] Phuthuma Nhleko and Irene Charnley at all times served MTN Group and MTN's affiliates and therefore their acts, omissions, and knowledge is imputed to MTN Group.  All references to "Phuthuma Nhleko" and "Irene Charnley" in Counts One through Six below are inclusive of MTN Group, unless otherwise specified.

[360] All references to the "IRGC" in Counts One through Six below are inclusive of Hezbollah and the Qods Force, unless otherwise specified.  *See supra* Part I.A.2 (explaining that the Hezbollah Division and Qods Force are both parts of the IRGC).  When Plaintiffs refer to the IRGC operatives inside of Iraq, Plaintiffs refer exclusively to terrorists from the IRGC's Hezbollah Division and Qods Force, which are the two IRGC components that conduct terrorist operations outside of Iran's borders.  *See id.*

[361] All references to the "Jaysh al-Mahdi" in Counts One through Six below are inclusive of Jaysh al-Mahdi Special Group Asaib Ahl al-Haq and Jaysh al-Mahdi Special Group Ka'taib Hezbollah, unless otherwise specified.

[362] All references to the "Taliban" in Counts One through Six below are inclusive of the Haqqani Network, unless otherwise specified.  *See supra* Part V.A.2 (explaining that the Haqqani Network is part of the Taliban).  Attacks committed by the Taliban also include attacks committed by the Kabul Attack Network and joint Taliban-al-Qaeda cells, which definitionally reflect Taliban involvement.  *See supra* Parts V.A.3; V.B.3.

financial, operational, and strategic communications services to the Hezbollah and the Qods Force, and, in the case of MTN Group, by deactivating MTN's transmission masts to assist the Taliban's, including its Haqqani Network's, counterintelligence activities and undermine U.S. counterinsurgency efforts in Afghanistan.  Defendants' payments took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1).  MTN Group's manipulation of MTN's cellular signals, and Phuthuma Nhleko's and Irene Charnley's management, financial, operational, and strategic communications services for the IRGC's benefit also provided a service; assistance derived from scientific, technical, or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out the Haqqani Network's cell tower deactivation requests, or the persons who transferred management, financial, and operational services and knowledge to the above FTOs and SDGTs, and who executed the strategic communications and disinformation campaigns that helped fraudulently conceal the secret Security Cooperation Agreement from MTN Group's shareholders until March 28, 2012), which likewise qualified as material support.

1458.   Defendants knew or recklessly disregarded that their material support would be used by the IRGC, including its Hezbollah Division and Qods Force, Jaysh al-Mahdi, al-Qaeda, and the Taliban, including its Haqqani Network, in the preparation for, or in carrying out, the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, and receiving training from FTOs.  Those acts by the IRGC, including its Hezbollah Division and Qods Force, Jaysh al-Mahdi, al-Qaeda, and the

357

Taliban, including its Haqqani Network, in turn, violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively. Defendants also disguised the nature of their support, in further violation of 18 U.S.C. § 2339A.

1459. Defendants' conduct, by providing material support to groups that were committing terrorist acts against Americans, involved violent acts and acts dangerous to human life. Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).[363] Defendants' support for the IRGC, including its Hezbollah Division and Qods Force, Jaysh al-Mahdi, al-Qaeda, and the Taliban, including its Haqqani Network appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Iran,[364] Iraq, Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Iraq, Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraq, Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

1460. Defendants' provision of material support to the IRGC, including its Hezbollah Division and Qods Force, Jaysh al-Mahdi, al-Qaeda, and the Taliban, including its Haqqani Network occurred primarily outside the territorial jurisdiction of the United States.

---

[363] *See, e.g.*, *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 48-49 (D.D.C. 2010) (violation of material-support statutes, even without any "subjective intent" to further terrorist objectives, meets statutory definition of "international terrorism" based on such support's "objective 'external appearance'"); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 106-07 (D.D.C. 2003) (similar).

[364] Defendants enabled the IRGC's terrorism against Iran's population.

1461.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1462.   As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339A, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

### COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [All Defendants:  Primary Liability, 18 U.S.C. § 2339B Predicate]

1463.   Plaintiffs incorporate their factual allegations above.

1464.   MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley provided material support to Hezbollah and al-Qaeda (through al-Qaeda member Sirajuddin Haqqani), in violation of 18 U.S.C. § 2339B.  MTN Group and MTN Irancell did so by making cash and in-kind payments to Hezbollah and al-Qaeda.  MTN Group's and MTN Irancell's payments took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1).  MTN Group, Phuthuma Nhleko, and Irene Charnley also did by providing global management consulting, logistics, financial, and communications agent services to Hezbollah to provide Hezbollah secure cell phones, embargoed American communications and network computing technologies, illicit financial, consulting, and technical services (e.g., remote IT from the United States to keep everything working in a Hezbollah data center outside of Beirut), strategic communications and disinformation services, all to undermine U.S. counterterrorism efforts in Iraq, Iran, Lebanon, and Afghanistan pursuant to Defendants' contractual obligation, and/or performance to satisfy MTN's obligation, to the IRGC under the secret Security Cooperation Agreement that Defendants fraudulently concealed until March 28,

2012, all of which also provided Hezbollah with a service; assistance derived from scientific, technical or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out Hezbollah's cell phone acquisition requests, or the persons who transferred management, financial, and operational services and knowledge to Hezbollah, and who executed the strategic communications and disinformation campaigns that provided cover and concealment to Hezbollah and fraudulently concealed Hezbollah's secret Security Cooperation Agreement with MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley[365] until March 28, 2012), all of which likewise qualified as material support. MTN further disguised the nature of its support, in further violation of 18 U.S.C. § 2339B.

1465.   The United States has designated Hezbollah and al-Qaeda an FTOs under 8 U.S.C. § 1189 since 1997 and 1999, respectively. At all times since that designation, MTN Group, MTN Irancell, Phuthuma Nhleko, and Irene Charnley, knew or recklessly disregarded that Hezbollah and al-Qaeda were designated FTOs and/or that Hezbollah and al-Qaeda had engaged in acts of terrorism against the United States.

1466.   MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's conduct, by providing material support to designated FTOs, involved violent acts and acts dangerous to human life. MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's support for Hezbollah and al-Qaeda appears, as an objective matter, to have been intended (a) to intimidate or coerce the

---

[365] Irene Charnley knew of the secret Security Cooperation Agreement, helped secure the Agreement, concealed the Agreement, and performed under the Agreement. Through Irene Charnley's performance, Irene Charnley made herself a party to the Agreement all the same as if she had originally signed it alongside Phuthuma Nhleko.

civilian populations of Iraq, Lebanon, Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Iraq, Lebanon, Afghanistan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraq, Lebanon, Afghanistan, and other Coalition governments by mass destruction, assassination, and kidnapping.

1467.   MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's provision of material support to Hezbollah and al-Qaeda occurred primarily outside the territorial jurisdiction of the United States.

1468.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1469.   As a result of MTN Group's, MTN Irancell's, Phuthuma Nhleko's, and Irene Charnley's violation of 18 U.S.C. §§ 2333(a) and 2339B, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [All Defendants:  Primary Liability, 18 U.S.C. § 2339C Predicate]

1470.   Plaintiffs incorporate their factual allegations above.

1471.   Defendants, by making payments to the IRGC, including its Hezbollah Division and Qods Force, Jaysh al-Mahdi, al-Qaeda, and Taliban, including its Haqqani Network, that financed such FTOs' and/or SDGTs' terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(A).  Defendants knew or recklessly disregarded that the IRGC, including its Hezbollah Division and Qods Force, Jaysh al-Mahdi, al-

Qaeda, and Taliban, including its Haqqani Network, would use those funds in full or in part to carry out acts constituting an offense within the scope of the International Convention for the Suppression of Terrorist Bombings, as implemented by the United States at 18 U.S.C. § 2332f, including by delivering, placing, discharging, or detonating explosives or other lethal devices in, into, or against places of public use and government facilities, with the intent to cause death or serious bodily injury.

1472.   Defendants, by making payments to the IRGC, including its Hezbollah Division and Qods Force, Jaysh al-Mahdi, al-Qaeda, and Taliban, including its Haqqani Network, that financed the Hezbollah's, Jaysh al-Mahdi's, al-Qaeda's, and the Taliban's, including its Haqqani Network's, terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(B).  Defendants knew or recklessly disregarded that the IRGC, including its Hezbollah Division and Qods Force, Jaysh al-Mahdi, al-Qaeda, and Taliban, including its Haqqani Network, would use those funds in full or in part to carry out acts intended to cause death or serious bodily injury to civilians and/or others not taking an active part in the hostilities in a situation of armed conflict, and that the IRGC's, Jaysh al-Mahdi's, al-Qaeda's, and Taliban's, including its Haqqani Network's, purpose was to intimidate the U.S., Iraqi, and Afghan populations and to compel the U.S., Iraqi, and Afghan governments to effect a withdrawal of U.S. forces from Iraq and Afghanistan.

1473.   Defendants' provision of funds to the IRGC, including its Hezbollah Division and Qods Force, Jaysh al-Mahdi, al-Qaeda, and Taliban, including its Haqqani Network, involved violent acts and acts dangerous to human life.  Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).  Defendants' support for the IRGC, including its Hezbollah Division and Qods Force, Jaysh al-Mahdi, al-Qaeda, and Taliban, including its

Haqqani Network, appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

1474.   Defendants' provision of funds to the IRGC, including its Hezbollah Division and Qods Force, Jaysh al-Mahdi, al-Qaeda, and Taliban, including its Haqqani Network, occurred primarily outside the territorial jurisdiction of the United States.

1475.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1476.   As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339C, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

1477.   In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

1478.   Plaintiffs request that the Court:

(a)   Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)   Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c)   Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

(d)   Award Plaintiffs prejudgment interest; and

(e)   Award Plaintiffs any such further relief the Court deems just and proper.

364

Dated:  March 27, 2022

Respectfully submitted,

*/s/ Ryan R. Sparacino*

Ryan R. Sparacino (D.C. Bar. No. 493700)
Eli J. Kay-Oliphant (D.C. Bar. No. 503235)
Shuman Sohrn (*pro hac vice*)
Sparacino PLLC
1920 L Street, NW, Suite 8358
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com
shuman.sohrn@sparacinopllc.com

*Counsel for Plaintiffs*